# EXHIBIT

# 2

MANSON CONSTRUCTION CO.

**KIEWIT/MANSON, A JOINT VENTURE**
P.O. Box 1689, 100 Lanes Way, Nome, Alaska 99762
(907) 443-7651 - Fax (907) 443-7663

August 5, 2005

C/SAO-088

Contracting Officer
Southern Alaska Area Office
c/o US Army Engineer District, Alaska
P.O. Box 6898
Elmendorf, Alaska 99506-0898

Reference Nome Navigation Improvements
Contract No. DACW 85-03-C-0014
Company Job No. 376-2263

Subject: REA certification

Dear Ms. Davidson,

Please find the attached REA regarding the quantity disputes on the Nome Project. In addition please consider the following statement our certification per the specifications.

As the duly appointed representative of Kiewit Manson I certify that the claim is made in good faith; that the supporting data is accurate and complete to the best of my knowledge and belief. The amount requested accurately reflects the contract adjustment for which Kiewit Manson believes the Government is liable.

If you have any questions please feel free to call me at 907-222-9350

Sincerely,

Shawn D. Lannen
Alaska Area Manager

cc: Job

PLAINTIFF'S EXHIBIT
Z

# *Nome Navigation Improvements*

*Contract No. DACW 85-03-R-0001*

# Request for Equitable Adjustment/Claim

# Nome Navigational Project

Prepared for:

United States Army

Corp of Engineers

Kiewit-Manson, A Joint Venture

July, 2005

# TABLE OF CONTENTS

**Executive Summary** .......... **1**

**I. Introduction** .......... **7**

1.1 Project Information. .......... 7
1.2 Scope of Work. .......... 7
1.3 Time for Performance. .......... 7
1.4 KM's Plan of Construction. .......... 8
1.5 Contract Documents. .......... 8
1.6 Request for Equitable Adjustment/Certified Claim Amount. .......... 8
1.7 Layout of Document. .......... 9

**II. Contract Assertions and Representations** .......... **11**

2.0 Introduction. .......... 11
2.1 Contract Documents are to be Complete and Constructible. .......... 11
2.2 Scope of Work is Correctly defined from reliable Owner data. .......... 12
2.3 Changes Clause Anticipates Fair and Timely Payment for Changes. .......... 12
2.4 Contract Changes will be Promptly Reviewed and Acted Upon. .......... 13
2.5 Defective Design Costs to Contractor will be Fairly Compensated (FAR 52.243-4). .......... 13
2.6 Owner Lines of Authority are Clearly Defined. .......... 14
2.7 Executing Work to Lines and Grades will Result in Accepted/Paid Work. .......... 14
2.8 Variation in Estimated Quantities ("VEQ") under FAR 52.211-18. .......... 14
2.9 Words are Given "Normal" Meaning Absent Specific Contract Definition. .......... 15
2.10 Spur Breakwater "A22" Peel Back includes Some Seawall Quantities. .......... 15
2.11 The detail for Spur "tie in" to existing causeway is constructible. .......... 16
2.12 Main Breakwater Transition would be Constructed as Materials Allowed. .......... 17

**III. KM's Plan of Operations** .......... **18**

3.0 Introduction. .......... 18
3.1 KM Based Its Plan and Schedule on presumed Complete Documents and the defined Scope of Work. .......... 18
3.1.1 KM Based Its Demobilization Plan Upon Accurate Quantities And Estimated Production rates. .......... 19
3.2 KM Unit Bid prices tie to bid quantities and establish estimated labor and equipment hours and production rates. .......... 19
3.3 KM Budgeted Project Resources and Equipment Assuming Payment per the terms of the Contract. .......... 20
3.4 Manpower Resources Assume Prompt Owner Action and Response. .......... 20
3.5 All project resources and scheduling assumed accurate Owner design representations. .......... 20

3.6 KM Would Work With Administrative Contracting Officer Regarding Contract Issues .. 21
3.7 KM intended to build to the Owner's plans and established grade, and to be paid for surveyed quantities. .......... 21
3.8 KM would perform added quantities assuming fair and accurate interpretation of the Changes clause and the VEQ clause, if necessary.......... 22
3.9 KM assumed that any rock peel back and salvage was KM's property by Contract.......... 22
3.10 KM Had Identified That The Existing Causeway Seawall Was Part Of "Peel Back". ...... 23
3.11 KM planned to construct the spur and related work in a single operation. .......... 23
3.12 Transition at main breakwater would be as KM represented, and as Owner approved...... 24

**IV. Actual Events and Conditions Experienced ..........25**

4.0 Introduction.......... 25
4.1 Contract Docs Proved Incomplete and Inaccurate.......... 26
4.2 No Owner Back-up existed for Represented Quantities and for Cross Section representations. .......... 27
4.3 Despite timely Notices and demonstrated quantity increases, the Owner Refuses to Recognize quantities beyond amounts it included in Modifications to date. .......... 28
4.4 KM Requests for Written and Constructive Changes Consistently Met with Inaction. ..... 28
4.5 Payment for Extra Work Performed and Work resulting from design deficiencies has not been made.......... 30
4.6 Owner Inconsistent in who has Authority. .......... 30
4.7 B22 quantity increases essentially the same as A22 quantity increases. .......... 31
4.8 Owner has interpreted VEQ clause as requiring payments for added quantities at unit prices.......... 32
4.9 Owner Interpretation of Peel Back is unreasonable and outside of industry standards...... 32
4.9.1 Despite Material Being Credited And Salvaged By KM, Owner Refuses To Pay For Quantities Installed. .......... 33
4.10 Owner Gave Direction for Seawall Replacement.......... 34
4.11 Owner Gave Direction to Perform Tie-in Quantities to eliminate "cupping" design defect, but refuses to make payment. .......... 34
4.12 Main Breakwater Transition rock quantities remain unpaid.......... 35

**V. Effects of Changes and Impacts..........36**

5.0 Introduction.......... 36
5.1 Since the Contract Documents were not accurate, KM's plan significantly altered. ......... 36
5.1.1 Equipment Hours have increased significantly due to A22 Quantity Overruns............ 37
5.1.2 KM could not demobilize its Truck Fleet, Mining Equipment, and related equipment, which remained on winter standby. .......... 37
5.2 Without reliable quantities and cross-section data from the Owner, KM became obligated to exclusively demonstrate and confirm all unit quantities.......... 38
5.3 As a result of added uncompensated rock quantities, KM has unpaid units of various rock grades aggregating a minimum amount of $4,067,223.00.......... 39
5.4 KM has been forced to finance unpaid portions of the work.......... 39
5.5 KM and Terra-Surveys Expend Additional Time Due to Lack of Details and Design Flaws.......... 39

5.6 KM was continually operating in an environment where no person with apparent Owner authority was on-site. .... 40
5.7 Work Installed Consistent with Plans and Specifications Remains Unpaid. .... 40
5.8 VEQ clause impact, if any, remains uncertain. .... 40
5.9 Due to unreasonable interpretation of undefined words, KM remains unpaid for large quantities of A22 and B22 rock .... 41

**VI. Quantification** .... 42

6.0 Introduction. .... 42
6.1 Uncompensated A22 quantities for Bid Item 006 aggregate $3,639,328. .... 42
6.2 Additional costs associated with equipment standby and demobilization are $1,075,854.47. .... 43
6.3 Unpaid Bid Item 004 Trenched-in Toe Quantities Aggregate $64,230. .... 46
6.4 Uncompensated B22 Quantities for Bid Item 0013 aggregate $427,895.00. .... 46
6.5 Uncompensated Bond costs total $56,146.75. .... 47

**VII. Contractual Entitlement** .... 48

7.0 Introduction. .... 48
7.1 KM made an interpretation that conforms to the limited details provided in the plans .... 48
7.2 In a bid/build contract, Owner is responsible for and warrants the accuracy of its Contract Documents, per the Spearin Doctrine. .... 49
7.3 The Owner is to accurately reflect the Scope and Quantities, and to pay for work performed within its original and amended designs. .... 50
7.4 The Changes clause is to be used to compensate the Contractor for Owner revisions to defective design and for added quantities. .... 51
7.5 Constructive Owner changes are to be compensated under the terms of the Contract .... 52
7.6 Owner's Actions or Failures to Act and Apparent Authority. .... 53
7.7 The rules of contract interpretation require that undefined terms be given their "normal" or industry standard meanings. .... 54
7.8 The maxim of contra proferentem provides that contract ambiguities will be interpreted against the Owner as drafter. .... 55
7.9 Variation in Estimated Quantities clause is to be interpreted consistent with the Foley case .... 55
7.10 Contractor Performance Evaluation. .... 57
7.11 Conclusion .... 57

# EXECUTIVE SUMMARY

**INTRODUCTION.** On September 9, 2003, a joint venture of Kiewit Pacific Co. and Manson Construction Co. ("KM") was the low proposer on the Nome Navigation project to construct a new Breakwater and a Spur Breakwater (plus dredging work) in a Contract Amount of $36,800,877.00.

KM intended to perform the various elements of work sequentially, constructing the Spur Breakwater, the causeway bridge and the main breakwater during the 2004 construction season, thereafter demobilizing the mining equipment prior to winter freeze up. The dredging portion of the work would be performed in the summer of 2005.

As a result of the unpaid additional quantities of work plus costs associated with delays and impacts, defective and incomplete design, and other un-reimbursed changes, KM is requesting an equitable adjustment in the minimum amount of $5,263,454.22 to the Contract Price.

**CONTRACT ASSERTIONS AND REPRESENTATIONS.** KM was entitled to rely on the Owner-provided Contract Documents, which served as the foundation for determining the necessary means and methods, time, and costs to perform the anticipated quantities of work.

A bidding contractor can reasonably assume that an Owner such as USACE would have prepared the contract representations based upon reliable, empirical design and quantity data. As part of its bid preparation, KM submitted a question to the Owner on July 25, 2003 stating that KM's review of quantities for several rock classifications (A22, B22, and A10) were greater than the Owner's represented quantities "by more than 10%". The Owner never provided a response. Consequently, KM had no option but to proceed under the assumption that the represented quantities were accurate.

The contract incorporated various FAR provisions, including FAR 52.243-4, Changes. Subpart (d) provides that: "If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment. That paragraph concludes: "In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred in attempting to comply with the defective specifications."

The duty of good faith and fair dealing is imposed on both parties to the contract to identify and negotiate changes and the timely payment obligation lies exclusively with the Owner.

During performance, significant quantity changes occurred in various bid items, most notably those identified in KM's pre-bid email. The bid schedule included a Lump Sum item 8 "Peel back Causeway Rock for Spur Breakwater Construction, complete". The lump sum amount bid for "peel back" was $595,500, which included A22 and other stone. The unit price for A22 to be installed in both the main breakwater and the spur breakwater was $308 per unit.

KM assumed that the contract documents presented a constructible design. To the extent that any element or elements of the design were not constructible, KM reasonably anticipated that changes would be paid for consistent with the Changes clause and the contract payment provisions for the various bid items.

The Owner plan sheets confirmed that the Spur Breakwater "A22" layer removal would include various quantities of the in place A22 Seawall. In order to construct the new core and ultimately the B and A layers of the Spur Breakwater, it was necessary for KM to remove seawall quantities since the materials underlying and supporting the seawall had to be removed. §02220, ¶3.2 dictated how KM was to treat the materials removed under Bid Item 8 "Peel back": the Contractor was obligated to take title to the material and dispose of it or otherwise use it as long as he did not sell it to third parties on the Project Site.

**KM'S PLAN OF OPERATIONS.** KM prepared its plan of construction to minimize disruption and assure continuity, thereby maximizing productivity, minimizing cost, and facilitating early completion of the Project. Fundamental to this plan was the mobilization of a fleet of large mining equipment and specialized support equipment, and timely demobilization before winter freeze up. It was imperative that the mining fleet work continuously in the manner anticipated.

Estimated production rates in the rock quarry were based upon correctly represented quantities of the respective bid items.

KM's construction plan for all portions of the Work and the dredging relied on accurate Owner design representations. KM was able to proceed with the Work knowing that the provisions of ¶d of the Changes clause (FAR 52.243-4), if necessary, would allow all reasonable costs associated with a defective design to be paid.

Finally, timely Owner response to changes was critical to KM's planning assumptions. One or more Contracting Officer designees on-site at this remote location would be essential to KM being able to properly react to any changes/re-designs that could impact the project schedule.

**ACTUAL EVENTS AND CONDITIONS EXPERIENCED.** As KM progressed with the work on the Breakwaters, inaccurate Owner-estimated quantities, unreasonable Owner contract interpretation, and Owner inaction in responding to various requests for approval of additional rock quantities significantly changed KM's construction plan and bid assumptions.

Throughout performance of the work, KM repeatedly provided notice to USACE of current overrun quantities being installed on the project. Not only was this done by the monthly pay applications, but overruns were noticed orally at various Owner meetings and in correspondence, including a September 9, 2004 letter to the Owner providing notice that A22 and B22 would be "in excess of 115%" of bid quantities. The Owner disagreed with KM's quantities but never provided a basis for rejection of them. Only after repeated inquiry by KM, USACE representatives advised KM that the designer's computer had "crashed" and all cross-sections and quantity data had been lost and could not be reproduced.

There are four (4) areas in which A22 quantities (and certain B22 quantities) are fully or partially contested: 1) the main breakwater transition, 2) the quantities removed as part of the peel back and later installed as part of the spur breakwater, 3) the quantities in the design change to avoid the "cupping" on the seaward side of the causeway tie-in, and 4) the seawall quantities first removed (and later installed) during construction of the spur transition. There is no question that KM has constructed all of the work at least to the lines and grades represented in the original Owner design or design change in each of those areas. KM's survey data confirms all of those quantities and the Owner has offered no empirical data to contest any of those quantities.

KM's bid notes, confirm that USACE got the benefit of KM's anticipated salvage of various peel back quantities, including Bid Items 6 (A22) and 14 (B22), respectively. Since KM would not have to mine, process, haul and pay royalty on quantities it could otherwise salvage, it chose to credit those savings to the Owner in its estimate.

Despite having been "credited" for salvage materials, USACE refuses to pay for those quantities which were able to be installed on the project.

The overrun in B22 quantities is virtually the same percentage as the overrun in A22 quantities for the "peel back" item, the main breakwater transition, and the re-design for the tie in item to eliminate the "cupping" mis-design.

Finally, toe excavation was performed consistent with the plans. USACE does not contest the location of the toe excavation, but it continues to refuse to pay for those added quantities.

**EFFECTS OF CHANGES AND IMPACTS.** KM planned to have all rock-related portions of the project completed during the 2004 construction season prior to winter freeze up, when it could safely demobilize from the project. However, due to quantity increases and other design defects, KM could not complete its work in 2004 as planned and it could not demobilize its equipment as planned.

The only quantity computations that the Owner has offered are those that it "derived based on estimated calculations using the contract drawings." The impact of the Owner having no quantity data has basically put KM into a position of trying to disprove a negative; i.e., the Owner

refuses to accept KM's quantity computations but, since the Owner has no opposing information, KM has to prove that there is no explanation other than that its quantities are accurate.

The minimum cost impact to KM for the additional uncompensated quantities of A22 and B22 alone was noticed to the Owner in a December 10, 2004 letter, C/SAO-040. "Quantities not shown on the pay estimates as a result of this directive currently results in $4,193,085.16 of under billing." That letter added: "KM is currently proceeding under the presumption that we will be paid for this work."

After numerous meetings and months of unfulfilled promises to timely review and negotiate, USACE's position was only forthcoming in 3 "position letters" issued between mid-March 2005 and the end of April 2005, refusing to pay for the majority of the additional contested quantities. Each response is based on untenable arguments.

**QUANTIFICATION.** The total A22 approved by the USACE is 47,429 CY. Of that total, only 35,613 CY (or an increase of 5,013 CY) has been paid as of mid-July, 2005. Therefore, unpaid quantities of **A22** alone are 11,816 CY at the bid price of $308/CY. **The remaining unpaid amount is $3,639,328.00.**

As of mid-July, the unpaid quantities of **B22** are 6,583 CY at the bid price of $65/CY. **The remaining unpaid amount is $427,895.00.**

As of mid-July 2005, the unpaid quantities of **Trenched-in Toe** are 2,141 CY at the bid price of $30/CY. **The remaining unpaid amount is $64,230.00.**

Due to the overruns, **rock handling and mining equipment** could not be demobilized and was stranded in Nome due to frozen seas. The amount of direct cost un-reimbursed to KM is $930,753.47 before overhead, profit and bond is affixed. **The total cost of $1,075,854.47, which includes these added costs are shown in the Appendix.**

**CONTRACTUAL ENTITLEMENT.** Any bidding contractor has to be able to rely on the Owner accurately representing the actual conditions the contractor should expect to encounter. Absent a contractor being able to rely on the Owner's documents, it would otherwise be necessary for each contractor to insert a large contingency cost factor into its bid. Without that contingency factor included, the Owner receives the lowest competitive price.

It is well-settled case law that when an Owner issues drawings and specifications for use on a contract it impliedly warrants the drawings and specifications are accurate and are suitable for their intended purpose. US v. Spearin, 218 U.S. 132 (S.Ct. 1918); Consolidated Diesel Electric Corp. ASBCA No. 10486, 67-2 BCA 6,669 (1967); Samuel v. Poorvu, 190 Ct.Cl. 640, 420 F.2d 993 (1970).

As the Board summarized in Consolidated Diesel, after affirmatively citing Spearin:

"The (Owner's) implied warranty of the adequacy of its specifications is based on its responsibility for the specifications rather than any presumed 'superior knowledge' in the sense of greater expertise. **When one of the parties to a contract undertakes to prepare the specifications, that party is responsible for the correctness, adequacy and feasibility of the specifications, and the other party is under no obligation to check and verify the work product** of the other party who assumed responsibility for the preparation of the (documents)…" (emphasis added).

In the instance of defective design, ¶(d) of the Changes clause, provides: "In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased costs reasonably incurred by the contractor in attempting to comply with defective specifications."

The concept of "defective" specifications should include not only instances where there is a demonstrated design defect, but also where represented contract quantities are so patently inaccurate that they constitute a design defect for that reason alone.

An Owner's defective specifications constituting a constructive change to the contract has long been recognized by the federal courts. Most cases follow the theory that a specification which contains incorrect information or from which vital information is missing is defective.

Disagreement on how to interpret the contract has also been addressed by the federal courts. The courts found in the case of Len Co. & Assocs. v. U.S., 385 F.2d 438 (Ct. Cl. 1967), at 443: "The court has considered it to 'be idle for the contractor to demand a written order from the contracting officer for an extra when the contracting officer was insisting that the work required was not additional…' and, therefore, has often dispensed, on these occasions, with the formality of issuing a written change order under the standard clause. *Fleisher Eng'r & Constr. Co. v. United States*, 98 Ct. Cl. 139, 158 (1942); *Valley Eng'r, Inc. v. United States*, 151 Ct. Cl. 228, 238 (1960).

A universally-accepted rule of contract interpretation is that terms which are not otherwise defined by the contract are to be given an interpretation of "common usage". A word search of the entire library of USACE Engineer Manuals does not show a single instance of the words "Peel back" in any of those manuals. It is clearly a term that was used for purposes of this project to define the simple act of removing causeway rock for the purpose of exposing an area in which the spur breakwater construction could be safely completed.

KM is entitled to its interpretation of how those materials were to be handled and payment for those items under the respective bid items for rock after they have been removed, handled multiple times, and re-hauled and replaced at various locations on the causeway spur or the main breakwater as applicable. (See § O2220, ¶ 3.2 et seq.). KM had the right to rely on all of the Contract Documents and did so, but it has not been compensated significant amounts of money to which it is contractually entitled.

The VEQ clause here provided for unit price payment for increases up to 15%, and higher, once added quantities have been approved. Various cases that have interpreted the intent of the VEQ clause under FAR 52.211-18, including Foley and Bean Dredging resulted in different holdings. However, the apparent conflict between those cases was resolved in the case entitled Foley Co. v. United States, 11 F.3d 1032 (1993).

The Foley court stated, at 1040: "The holding in Victory unequivocally rejects the notion that the VEQ clause permits replacement of a negotiated unit price with a complete re-pricing based on actual costs plus a reasonable profit."

As applied to the circumstances here, unless there is a demonstration by the government that KM had costs which increased or decreased "due solely to the variation above 115%...of the estimated quantity", KM is entitled to its unit prices of $308 per unit and $65 per unit for A22 and B22, respectively. Those unit prices could be altered only by a demonstration that KM actually had "costs plus a reasonable profit" that exceeded each or either of those amounts solely due to the variation above 115%, and the contract unit prices are a minimum pay amount. In fact, KM can demonstrate that its price per unit is in excess of both the $308 per unit and the $65 per unit for the respective bid items.

**CONCLUSION** As a result of the defective design and incorrectly estimated quantities for A22 and B22, among other items from the USACE, delayed performance and additional equipment costs, and as a result of inappropriate and unsupportable interpretations of contract provisions by USACE, KM is entitled to an equitable adjustment to the contract amount aggregating $5,263,454.22.

# I. INTRODUCTION

## 1.1 Project Information.

KM, a joint venture, was low proposer for $36,800,877.

On September 9, 2003, a joint venture of Kiewit Pacific Co. and Manson Construction Co. ("KM") was the low proposer on the Nome Navigation contract to construct a new Breakwater and a Spur Breakwater, along with related work including design and installation of a new bridge on the existing causeway as well as significant dredging.

Notice to proceed was given effective November 4, 2003 in a Contract Amount, including Owner-selected options, of $36,800,877.00.

## 1.2 Scope of Work.

The Scope of Work included 29 separate bid items relating to:
- Dredging
- Peel back of causeway rock.
- Construction of the Main Breakwater and the Spur Breakwater

The Scope of Work included 29 separate bid items relating to the following items and areas of work:

- Mobilization
- Dredging and excavating the entrance channel and causeway dock area
- Excavation for Spur and main breakwater toe
- Peel back of causeway rock for Breakwater construction
- Construction of the main breakwater, causeway abutment and the Spur Breakwater in various rock qualities and grades, including A22 and B22 rock, among others
- Design and construct causeway bridge
- Miscellaneous additional items

## 1.3 Time for Performance.

Per the terms of the Solicitation, work was to begin within 10 days of Notice to Proceed. Work was to be completed within 1,270 calendar days of that date.

## 1.4 KM's Plan of Construction.

KM intended to construct the Spur and Main Breakwater during 2004 and to demobilize all mining equipment prior to freeze up.

KM, as joint venturers, intended to perform the various elements of work sequentially, constructing the Spur Breakwater, the causeway bridge and the main breakwater during the 2004 construction season, thereafter demobilizing the mining equipment and the related rock placement equipment prior to winter freeze up anticipated in October, 2004. The dredging portion of the work was planned to be performed in the summer of 2005, as soon as the in-water restrictions would be lifted in mid-June, 2005.

## 1.5 Contract Documents.

In addition to the solicitation offer and award documents, the Contract Documents consisted of the Owner-provided plan sheets, FAR contract clauses incorporated by reference (§00700), Special Contract Requirements (§00800), and the following "construction" sections: §01016 (Civil Works); §02220 (Demolition); §02222 (Dredging, Excavation and Disposal); and, §02270 (Breakwaters, Rock).

The documents issued for bid had comparatively few cross sections to assist the Contractor in construction of both the Spur Breakwater and the Main Breakwater. Moreover, the referenced "construction" sections provided the limited remainder of the detail that the Owner gave the Contractor for bid preparation and construction.

## 1.6 Request for Equitable Adjustment/Certified Claim Amount.

KM is requesting an equitable adjustment in the minimum amount of $5,263,454.22.

KM is requesting an equitable adjustment in the minimum amount of $5,263,454.22 to the contract price as a result of the unpaid additional quantities of work plus costs associated with delays and impacts, defective and incomplete design, and other un-reimbursed changes experienced on the Project.

To date, KM has borne the financial burden of the increased costs that resulted from the increased quantities on the Project.

### 1.7 Layout of Document.

This document details the effects of the actual conditions on KM's plan of operations and details the costs and time associated with performing un-reimbursed additional elements of work.

This document outlines the representations made by the Owner in the Contract Documents which KM relied upon in bid preparation in order to formulate its plan of operations. In addition, this document details the effects of the actual conditions that have been encountered on KM's plan of operations and it details the costs and time associated with performing the un-reimbursed additional elements of work and related delays and impacts.

The document is constructed as follows:

**Executive Summary**: A summary and overview of this Impacted Cost Proposal, the issues involved, grounds for entitlement, and the time and money involved.

I. **Introduction**: Some general background information pertaining to this project and a brief explanation of the way this document has been structured.

II. **Contract Assertions and Representations**: The Contract provisions, representations and assertions KM relied upon in preparing their estimate, schedule, and plan for performing the Work.

III. **KM's Plan of Operations**: The plan formulated by KM to construct The Nome Navigation Project in reliance on the Contract Assertions and Representations.

IV. **Actual Events and Conditions Experienced**: The conditions and events that were discovered during the performance of work to-date.

This document discusses why KM is entitled to the unpaid costs it has incurred in performing the changed work.

V. **Effects of Changes and Impacts**: A detailed evaluation of the effects of the actual condition encountered versus the representations relied upon during bid preparation. This section will provide the foundation for the variations between KM's plan and the actual conditions discovered.

VI. **Quantification**: The summary of costs incurred by KM relating to uncompensated work, delays, and impacts.

VII. **Contractual Entitlement**: An analysis of the contractual justifications supporting KM's claim.

> The Appendix ("Appx.") contains documentation, supporting cost data, or factual data summarized in the preceding Sections.

**VIII. Appendix**: The Appendix contains documentation, supporting cost data, or factual data summarized in the preceding Sections.

KM has attempted to structure this document in a manner that presents the facts as clearly as possible. In the event that the USACE, as Owner, has further questions, KM would be pleased to provide any additional information and supporting documentation as requested.

# II. CONTRACT ASSERTIONS AND REPRESENTATIONS

## SUMMARY

This section identifies the contract assertions and representations that KM relied upon in preparing its plan of operations, its schedule, and its proposal to construct the Nome Navigational Improvements project.

As described below, the Contract Documents prepared by USACE represented that:

- The cross sections were complete and constructible.
- The scope of work was based upon reliable Owner data.
- Changes would be fairly and timely compensated.
- Undefined words would be given an industry standard or "dictionary" meaning.
- A22 quantities included some seawall quantities.
- Owner designs and approvals would be constructible.

### 2.0 Introduction.

> KM relied on the Owner-provided bid documents to be accurate, complete, sufficient, and constructible.

In submitting its responsive and best value proposal, KM relied on the Owner-provided Contract Documents. This section identifies various clauses KM relied on. Based on the representations in those documents, KM determined its most efficient and effective means and methods to prosecute the work and further determined the time and cost to perform the Work.

### 2.1 Contract Documents are to be Complete and Constructible.

KM relied on the Owner-provided bid documents to be accurate, complete, sufficient, and constructible and that the actual conditions encountered, including the quantities required to build the work, would not materially deviate from the contract representations. If KM could not rely on the quantity representations, it could not have prepared a realistic bid. Also, in this sub-Arctic setting, without accurate information KM could not reasonably plan its resources and timing to limit the effects and limitations of working in Nome, Alaska.

KM was entitled to and did rely on the information provided when bidding the Project. As such, the Contract

> KM submitted a question to the Owner on July 25, 2003 stating that KM's review of quantities were greater than the Owner's represented quantities. The Owner never provided a response.

Documents served as the foundation for determining the necessary means and methods, time, and costs to perform the anticipated quantities of work.

As part of its pre-bid preparation, KM submitted a question to the Owner on July 25, 2003 stating that KM's review of quantities for several rock classifications (A22, B22, and A10) were greater than the Owner's represented quantities "by more than 10%". **(Appx. 1)**. That question went on to add, referring to A22: "our team is concerned that any overrun in the large stone will dramatically affect the mining operations…". The Owner never provided a response to that inquiry. Consequently, KM had no option but to proceed under the assumption that the represented quantities were accurate.

> The Owner has the obligation to establish the respective material quantities based upon reliable, empirical design and quantity data.

## 2.2 Scope of Work is Correctly defined from reliable Owner data.

The Owner, as preparer of the Contract Documents, has the obligation to establish the respective material quantities which define the Scope of Work. KM, as with any other similarly situated contractor, has the ability to rely on the quantities and the scope as defined by the Owner. Moreover, any bidding contractor can reasonably assume that an Owner such as USACE would have prepared the contract representations based upon reliable, empirical design and quantity data.

When dealing with a bid-build contract, as opposed to a design-build contract, design and quantity data responsibilities lie exclusively with the Owner. In this case, other than the limited design responsibilities that KM had relating to the Causeway Bridge, all design and quantity representations lay exclusively with the Owner.

> The Changes clause provides that if "…any change under this clause causes an increase or decrease in the Contractor's cost of performance of any part of the work" the Contracting Officer shall make an equitable adjustment.

## 2.3 Changes Clause Anticipates Fair and Timely Payment for Changes.

Among the FAR provisions incorporated by reference in any federal contract is FAR 52.243-4, Changes. That provision states, among other things, that the Contracting Officer may, at any time, make "changes in the work within the general scope of the contract…". Under subparagraph (b) of the Changes clause, any "other written or oral order…from the Contracting Officer that causes a change shall be treated as a change order under this clause" provided various specifics are included. Finally, subpart

(d) provides that: "If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing." That paragraph concludes: "In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications."

## 2.4 Contract Changes will be Promptly Reviewed and Acted Upon.

> The duty of good faith and fair dealing is imposed on both parties to the contract, and the timely payment obligation lies exclusively with the Owner.

Explicitly by contract, and implicitly under the Owner's continuing duty of good faith and fair dealing, KM reasonably assumed that any requested contract changes would be promptly reviewed and acted upon. The reality is that changes often occur in construction contracts of this magnitude. The duty of good faith and fair dealing is imposed on both parties to the contract, and the timely payment obligation lies exclusively with the Owner. For an Owner to fail to promptly respond to requests for changes and to reasonably compensate a contractor for those changes constitutes a constructive change to the contract. Again, KM could not anticipate any such "constructive changes" to the contract, but it was able to bid under the assumption that the Contracting Officer or his/her designated Contracting Officer or Field Representative would respond to and pay for changes, ordered or constructive.

## 2.5 Defective Design Costs to Contractor will be Fairly Compensated (FAR 52.243-4).

> If the Owner's represented quantities or design proved to be defective, KM would be reimbursed for its reasonable costs of performing.

As referenced above, FAR 52.243-4 (d) provides that in the instance of defective specifications by the Owner, the Contractor's entitlement to an equitable adjustment shall include any costs it reasonably incurs in attempting to comply with those defective specifications.

As a bidding contractor, KM relied upon the entirety of the Changes clause and proceeded to submit a competitive bid for the contract based upon the assumption that if the Owner's represented quantities or design proved to be defective, KM

would be reimbursed for its reasonable costs of performing (or attempting to perform) consistent with a defective design.

## 2.6 Owner Lines of Authority are Clearly Defined.

Based on KM's experience, and due to the remote location of this Project, KM reasonably assumed that it would deal primarily at the Project level with government personnel who would be delegated authority to perform specific functions even if a general grant of contractual authority under FAR 1.601 is technically made only to Contracting Officers. The practicalities of performing this Project would require that KM be able to deal with persons other than the Contracting Officer in the daily performance of the contract.

## 2.7 Executing Work to Lines and Grades will Result in Accepted/Paid Work.

The payment provisions confirm that work constructed to the Contract-defined lines and grades would be paid.

The payment provisions of the Contract confirm that, on a monthly basis, work constructed to the Contract-defined lines and grades in approved quantities would be paid for consistent with the unit bid prices or a lump sum amount by bid item. KM's Proposal Schedule established the agreed-upon contract amounts for the Lump Sum item for peel back (Bid Item 8) as well as respective unit prices for the various Owner-designated contract items, including construction of the A22 layer under Bid Item 6. The lump sum amount for peel back was $595,500, while the unit price for the A22 layer, in both the main breakwater and the spur breakwater was $308 per unit.

## 2.8 Variation in Estimated Quantities ("VEQ") under FAR 52.211-18.

The VEQ clause under FAR 52.211-18.

The VEQ clause under FAR 52.211-18 for this Project provided in pertinent part: "If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies by more than 15% above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115% or below 85% of the estimated quantity."

KM relied upon a reasonable interpretation of the VEQ clause in constructing its bid. Notwithstanding the fact that its July 25, 2003 query to the Owner concerning an anticipated overrun went unanswered, KM knew that if the quantities for any items varied by more than 15% any approved quantities would be paid for at the unit price "equitably adjusted" up or down if timely demanded by either party.

That assumption is essential to any federal government contract, based upon KM's experience.

The Contract Documents did not further define "peel" or "peel back". KM reasonably assumed that it meant simply to remove the rock in preparation for breakwater construction.

## 2.9 Words are Given "Normal" Meaning Absent Specific Contract Definition.

The bid schedule included a Lump Sum item entitled Bid Item 8 "Peel back Causeway Rock for Spur Breakwater Construction, complete". The "construction" or "technical" Sections did not further define the Scope of Work contained in Bid Item 8 other than to give general direction for breakwater construction. A note on sheet H-5 in the plans provided limited, general information related to tying in new construction with the existing causeway. Consequently, in the absence of specific definition of any term of art such as "peel back", KM reasonably relied on the fact that those words would be given a normal meaning consistent with industry standards (if any) and the dictionary definition of those words. The Contract Documents did not further define "peel" or "peel back". Therefore, KM reasonably assumed that it meant simply to remove the rock in preparation for breakwater construction. The final word, "complete", was included in virtually all construction bid items here and therefore provided no additional guidance as to what it meant within the context of Bid Item 8.

Owner plan sheets confirmed that the Spur Breakwater "A22" layer removal would include quantities of A22 on the Seawall.

## 2.10 Spur Breakwater "A22" Peel Back includes Some Seawall Quantities.

A review of the Exhibit drawings in the Owner plan sheets confirmed that the Spur Breakwater "A22" layer removal would include various quantities of the A22 Seawall already in place on the existing causeway. **(Appx. 2, 3).** The neatline boundary for removal and construction is determined from the intersect point of the existing A and B rock layers (after the peel back) and the coinciding point where it ties into the new A and B rock layers. (See Note 1, Sheet H-5). Although not known at

> Not removing the "supporting material" as well as the seawall quantities would create an unstable and unsafe work environment.

bid time, the Owner's later response to RFI #1 defined those neatline boundaries.

Applying that definition plus the terms of RFI #1 and the Owner's answer, the seawall quantities of A22 had to be removed as part of the peel back.

That concept is further confirmed by plan sheet H-05, Note 1: "Remove causeway armor and B rock layers along Spur Breakwater alignment as required to tie in new B-8 layer with existing causeway core…". In other words, in order to construct the new core and ultimately the B and A layers of the Spur Breakwater, it was necessary for KM to remove seawall quantities since the materials underlying and supporting the seawall had to be removed. KM reasonably assumed that not removing the "supporting material" as well as the seawall quantities would create an unstable and unsafe work environment. Finally, §02220, ¶3.2 dictated how KM was to treat the materials removed under Bid Item 8, including the existing armor layers plus seawall quantities, as follows:

"3.2 DISPOSITION OF MATERIAL

Title to material and equipment to be demolished is vested in the Contractor upon receipt of Notice to Proceed. The Government will not be responsible for the condition, loss or damage to such property after Notice to Proceed."

Thereafter, the following paragraph provides:

"¶3.2.1 SALVAGEABLE ITEMS AND MATERIAL

Contractor shall salvage Items and Materials to the maximum extent possible."

Finally, the ensuing paragraph confirmed that title to the material lay with KM as follows:

"3.2.1.1 MATERIALS SALVAGED FOR THE CONTRACTOR

Materials salvaged for the Contractor shall be stored as approved by the Contracting Officer and shall be removed from Government property before completion of the contract. Materials salvaged for Contractor shall not be sold on the site."

Therefore, the Contractor was obligated to take title to the material and dispose of it or otherwise use it as long as he did not sell it to third parties on the Project Site.

> The Contractor was obligated to take title to the material and dispose of it or otherwise use it as long as he did not sell it to third parties on the Project Site.

## 2.11 The detail for Spur "tie in" to existing causeway is constructible.

> The Owner approved KM's proposed solution to the "cupping" of the causeway tie-in on June 21, 2004.

KM assumed that the contract documents presented a constructible design. To the extent that any element or elements of the design were not constructible, KM reasonably anticipated that changes would be ordered and any related additional

quantities and extra work would be paid for consistent with the Changes clause and the contract payment provisions.

Although not known at the time of contract award, during pre-construction when the "cupping" issue arose on the seaward side of the "tie-in" section between the existing causeway and the new spur breakwater, KM proposed a fix for that defective design which was accepted and approved by the Owner. **(Appx. 4).** In its June 21, 2004 letter to Kiewit concerning the tie-in, in response to how KM would create a "smooth" transition, the Administrative Contracting Officer said that KM's sketch generally conforms to the contract intent. That letter added that as long as the "crest width of 20 feet" remained, the "side slopes can vary to provide a smooth transition to catch existing causeway stone at the peel back point." **(Appx. 5, 6).**

## 2.12 Main Breakwater Transition would be Constructed as Materials Allowed.

To construct the transition KM reasonably assumed that it could use the available materials as limited by any size restrictions of the materials.

As designed, beginning at approximate station 38+25 on the main breakwater, KM was required to construct that "transition" section over 100 feet from a 10-foot wide top to a 20-foot wide top which therefore also widened that entire breakwater prism. In order to construct that transition KM reasonably assumed that it could use the available materials as limited by any size restrictions of the materials in performing the transition. In that regard, and with knowledge of the fact that the A22 armor rock material averaged a cube of 6' to 7' in all dimensions, the construction of the transition would be dictated by the size of that material as the outer most layer of the finished breakwater. Any resulting increases or decreases in the contract quantities for A22 were reasonably assumed to result in increases or decreases in the contract quantities for that item and payment would be made accordingly.

# III. KM'S PLAN OF OPERATIONS


## SUMMARY

This section explains how KM planned and scheduled manpower and equipment resources to accomplish the designated Scope of Work. Based upon the Owner's Contract Document representations, KM's plan included the following:

- To determine manpower and equipment resources based upon represented quantities.
- Demobilization of all mining equipment before winter freeze up based upon presumed accurate Owner quantities.
- Budgeting assumptions were based upon timely payment for surveyed quantities.
- The spur and related work were to be completed in a single operation.
- All Spur and Main Breakwater work would be completed by mid-October 2004.


> It was imperative that the mining fleet work continuously in the manner anticipated to construct the quantities planned for and represented.

## 3.0 Introduction.

In order to provide USACE with a competitive bid, KM prepared its plan of construction to minimize disruption and assure continuity of the work, therefore maximizing productivity, minimizing cost, and facilitating early completion of the Project. Fundamental to this plan was the mobilization of a fleet of large mining equipment and specialized support equipment, including a specially-equipped Hitachi 1200 Excavator, a CAT 5130 Front Shovel, and a Manitowoc 4600 duty cycle crane. The sea-mobilized fleet was capable of operating at high efficiency, minimizing the time to perform the work and the unit cost of that work. To provide the Owner and KM maximum advantage from this equipment committed, it was imperative that the mining fleet work continuously in the manner anticipated and to construct the quantities planned for and represented at bid time. Disruptions, delays, significant quantity variations, or extended contract times which differed from the plan would prove to be extremely costly.

## 3.1 KM Based Its Plan and Schedule on presumed Complete Documents and the defined Scope of Work.

The remote nature of this project mandated that KM have a well-conceived plan to maximize use of its equipment fleet on the spur and main breakwater portions of the project such that the dredging work, as the follow-on work, would not be delayed and

When the Owner did not respond to the July 25, 2003 inquiry, KM established its plan and schedule commensurate with the represented quantities.

would be able to be completed consistent with weather and in-water work limitations. Prior to bid, based upon the quantity takeoffs performed by KM's estimators, KM notified USACE that it had reason to believe that quantities of the largest rock appeared to exceed the represented quantities. When the Owner did not respond to the July 25, 2003 inquiry in that regard, KM established its plan and schedule as well as its equipment requirements commensurate with the represented quantities. Although it could reasonably assume that those quantities would vary to some extent, KM could neither plan nor assume that the bid quantities of large rock would vary by a large percentage from those represented.

### 3.1.1 KM Based Its Demobilization Plan Upon Accurate Quantities And Estimated Production rates.

KM planned to demobilize its fleet of mining equipment and related equipment when the last departing barge could be expected on or before mid-October of 2004.

As discussed in some detail above, KM planned to demobilize its fleet of mining equipment and related equipment as soon as possible. Its plan was to complete all of the rock-related spur, bridge, and main breakwater work during the 2004 construction season and to demobilize all of that specialized equipment when the last departing barge could be expected on or before mid-October of 2004. The production capabilities of the fleet and the other special equipment would be a valuable asset to other projects that would not be able to be realized - - if the equipment could not be timely demobilized and was required to remain on standby until the spring thaw would allow demobilization sometime in early summer of 2005. Moreover, given the in-water work limitations which did not expire until mid-June of any succeeding construction year, the mobilization and utilization plan for the dredging equipment would also be significantly impacted.

### 3.2 KM Unit Bid prices tie to bid quantities and establish estimated labor and equipment hours and production rates.

Manpower resources, the mining fleet, and the support equipment each presumed production rates based upon correctly represented quantities.

KM's establishment of its unit prices for the various bid items was based upon historical data which formed the basis for its estimated labor and equipment hours and the resulting production rates. Manpower resources, the size of the mining fleet, and the support equipment fleet to be mobilized each presumed production rates in the rock quarry, and the actual construction, based upon correctly represented quantities of the respective bid items.

Although KM's planned production rates and estimated equipment and man hours were likely to vary, it had the right to base its plan and committed resources on the assumption that bid quantities were reasonably accurate.

Since KM knew that it would be extremely expensive to keep the mining fleet stranded in a remote location unnecessarily, and knowing that significant delay to the dredging operations could have a similar impact on the dredging equipment and resources, KM had to allow for certain variances in its plan assumptions within tolerable limits.

## 3.3 KM Budgeted Project Resources and Equipment Assuming Payment per the terms of the Contract.

KM's planned performance schedule relied upon cash flow and contract representations that timely payment would be made.

Timely payment for work performed was integral to KM's budgeting of project resources and equipment. KM's planned performance schedule relied upon certain cash flow assumptions and the contract representations by the Owner that timely payment for work performed within the lines and grades represented would be made.

Although KM could not assume any quantity changes and resulting Modifications would occur, it could plan on the fact that ordered or constructive changes would be timely reimbursed under the Changes clause, FAR 52.243-4.

## 3.4 Manpower Resources Assume Prompt Owner Action and Response.

Timely Owner response to changes, if any, was critical of KM's planning assumptions. One or more Contracting Officer designees on-site would be critical to KM being able to properly react to any changes or re-designs that could significantly impact the project schedule. Owner inaction or indecision on time-critical items would have a significantly negative effect on KM's carefully structured and timed construction plans.

## 3.5 All project resources and scheduling assumed accurate Owner design representations.

KM's construction plan for the rock portions and the dredging also relied on accurate Owner design representations and, if a re-design was necessary due to scope changes or defective design, KM knew that the provisions of ¶d of the

KM knew that the provisions of ¶d of the Changes clause (FAR 52.243-4) would allow all reasonable costs associated with a defective design to be paid.

Changes clause (FAR 52.243-4) would allow all reasonable costs associated with a defective design to be paid. From a planning standpoint, KM could rely on the interpretation and predictability of that as a contract remedy based upon its experience and the fact that the same Changes clause applies to all federal contracts. From a planning and pricing standpoint, the existence of those remedies give a federal owner a better and more competitive contract price and therefore allow the contractor to reduce its bid price commensurately.

Consequently, if elements of the design proved defective and were re-designed, KM could respond accordingly.

### 3.6 KM Would Work With Administrative Contracting Officer Regarding Contract Issues

Lines of authority were defined at the May 2004 Pre-Construction meeting. The full-time onsite Quality Assurance Representative would not have authority to direct work or change the contract. However, the QAR and the Project Engineer, Karl Harvey, were to be consulted for contract interpretations or clarifications. Only the Contracting Officer, Sandra Davidson, or the Administrative Contracting Officer, Lee Seeba, has the authority to modify the contract. Ron Flodin and Pete Perez were also identified as having ACO authority. Contract correspondence from KM was to be addressed to Lee Seeba.

### 3.7 KM intended to build to the Owner's plans and established grade, and to be paid for surveyed quantities.

KM anticipated that it would be timely paid for the quantities installed consistent with the Owner's design representations.

Based on all of the assumptions detailed above, and consistent with its contract obligation to perform the quantity survey as part of its Quality Control functions on the project, KM anticipated that it would be timely paid for the quantities installed consistent with the Owner's design representations. KM included in its Technical Proposal of September 9, 2003 cross sections and profiles for the main breakwater as well as the spur breakwater. Using the limited number of cross sections provided by the Owner, KM represented how it planned to "peel back" the existing causeway and construct the main and spur breakwaters.

Likewise, it was necessary for KM to understand the particulars of how the spur breakwater tied into the causeway in order to appropriately plan for and quantify the respective rock

layers installed in that portion of the finished construction. All related assumptions and timing were based upon realistic representations of the respective quantities and materials by the Owner.

Although it was not able to plan for it until it became known on the project, all of KM's quantity and planning assumptions for construction of the "smooth" transition on the seaward side of the causeway were also based upon Owner representations and approval.

> KM could not plan for the Owner taking an unreasonable interpretation of the Changes and VEQ clauses, if necessary.

### 3.8 KM would perform added quantities assuming fair and accurate interpretation of the Changes clause and the VEQ clause, if necessary.

KM maintained its completion plan and retained equipment on the project assuming that a fair interpretation of the Changes and VEQ clauses would be administered. KM could not plan for the Owner taking an unreasonable interpretation of those provisions and it could not plan for outright rejection by the Owner of KM's surveyed quantity calculations.

> The exact amount of material to be removed under Lump Sum Item 8 ("Peel back") was immaterial to the Owner.

### 3.9 KM assumed that any rock peel back and salvage was KM's property by Contract.

In order to construct the spur breakwater, KM knew it would be necessary to remove the existing armor rock, including all of the A22 rock, from the "tie-in" or "transition" section of the existing causeway that corresponded to the new spur prism. Additionally, since the new spur was not at a 90-degree angle to the existing causeway, it would be necessary to peel back the existing armor rock to expose the core and causeway on straight lines to allow for gravity and safety considerations. Simply stated, although the new spur would have angled side slopes where it contacted the existing causeway, KM would have to remove all rock on a straight line (i.e. 90-degree angle) above the toe of the new spur construction in order to properly construct the new spur. A graphic in the Appendix illustrates what the existing causeway would look like were the peel back performed in strict conformance with Section F on plan sheet H-5, without a "smooth" transition. (Appx. 7). This illustration clearly shows rock on the slopes and the seawall directly above the new spur perched unsupported above the work area. The white lines indicate the limits of removal needed to avoid this safety hazard.

The lump sum removal item, and a note on sheet H-5 stating "Remove causeway armor and B rock layers along spur breakwater alignment as required to tie in new B8 layer with existing causeway core" leaves the contractor to determine what quantities to assume for removal and salvage.

KM had to plan for the removal of amounts of the necessary A22 and B22 material and had to price the Lump Sum item accordingly. (Bid Item 8). The exact amount of material to be removed was conceptually immaterial to the Owner since the peel back was a lump sum. How much of the removal quantities that KM could reuse under separate bid items, from a planning standpoint, was a function of how carefully it removed and re-handled the pre-existing stone materials.

Prior to construction, as a part of RFI #1, KM provided a sketch with its proposed transition and tie-in. Clearly identified on this sketch was KM's intended limits of "peel back". The Owner accepted this proposal, expressing no reservations regarding the limits of removal identified.

## 3.10 KM Had Identified That The Existing Causeway Seawall Was Part Of "Peel Back".

The existing seawall along portions of the top of the causeway would need to be removed as part of the "Peel back".

During pre-bid planning, KM recognized that the existing seawall along the top of the existing seawall would need to be removed as part of the "Peel Back" for spur breakwater construction. KM also anticipated that this seawall would be reconstructed after construction of the spur breakwater. These concepts were shown in KM's Technical Proposal. **(Appx. 8, 9).** KM reasonably assumed that any material removed as part of "Peel Back" would be paid as part of the lump sum peel back bid item, and that any A22 stone placed within the limits of construction would be paid for under the unit priced A22 bid item.

## 3.11 KM planned to construct the spur and related work in a single operation.

The materials below OG supported the seawall A22, so the impacted portions of the seawall also had to be removed.

As part of removing the lump sum "peel back" materials, KM also had to treat the A22 material on the seawall within those same demolition lines as being part of the peel back item. Removal of those materials above and below the "original grade" ("OG") line of the causeway all had to be planned for. The materials below OG supported the seawall A22, so the impacted portions of the seawall also had to be removed. The skill with which KM could

peel back those and other salvageable materials would dictate how much of that existing material to be "demolished" (i.e. demo'ed) could be hauled away, stockpiled, sorted, re-handled, and installed as A22 material under Bid Item 6. If it could not install the salvaged material as A22, additional materials would have to be quarried and hauled to the site at significant additional time and cost.

During pre-construction planning, it became evident the "transition" could not be constructed exactly as shown in the Technical Proposal due to the size of stones and geometric constraints.

## 3.12 Transition at main breakwater would be as KM represented, and as Owner approved.

KM intended to construct the 10-foot to 20-foot transition at the main breakwater consistent with reasonable assumptions it made in preparing its Technical Proposal. During pre-construction planning, it became evident the transition could not be constructed exactly as shown in the Technical Proposal due to the size of stones to be placed, and geometric constraints between the typical sections for the main breakwater and bull-nose section. KM modified its plan for construction of the transition and submitted it to the Owner on August 6, 2004 as part of the Pre-Construction Survey submittal **(Appx. 10-10i)**. The revised plan, including quantities and cross sections, was constructible and conformed to the limited details and cross sections provided in the plans.

# IV. ACTUAL EVENTS AND CONDITIONS EXPERIENCED

## SUMMARY

This section details the actual conditions during performance of the work which differed from those anticipated based upon the Contract Document representations.

During construction, KM encountered the following conditions which remain partially or wholly uncompensated:

- Actual quantities of A22 and B22 differed by as much as 155%.
- The Owner could not provide any reasonable back up for its represented quantities or its quantification of actual quantities installed.
- Payment for extra work due to design defects and inaccuracies have not been made.
- Actual and constructive Owner changes noticed by KM have been met with Owner inaction.
- USACE's interpretation of contract provisions and definitions have been unreasonable.
- Owner has refused to pay for additional work it has ordered.
- Owner refuses to pay for salvaged materials installed by KM.

Constructability of the Owner's design and reasonable accuracy in rock items were central to KM's plan and scheduling assumptions.

## 4.0 Introduction.

In Section III KM demonstrated, based upon the representations in the Contract Documents, how it determined the necessary means and methods to perform the work, how it developed its performance schedules for the Spur and Main Breakwaters along with the dredging, and how it compiled its original bid price. KM's plan was practical and workable, maximizing performance while minimizing cost and time expended.

Constructability of the Owner's design and reasonable accuracy in the respective major rock items were central to the development of KM's plan and scheduling assumptions.

As KM progressed with the work on the Breakwaters, it became apparent that inaccurate Owner-estimated quantities, unreasonable contract interpretation by the Owner, and inaction by the Owner in responding to various requests for approval for additional rock quantities would significantly change KM's bid assumptions.

### 4.1 Contract Docs Proved Incomplete and Inaccurate.

Notwithstanding the fact that KM pointed out that any significant overrun in the large stone would dramatically affect its mining operations, there was no answer from USACE.

KM's estimators attempted to verify rock quantities in the various categories prior to bid submission in an effort to prepare an accurate and competitive bid. Their determination that the A22, B22, and A10 quantities could vary from those represented by more than 10% prompted the July 25, 2003 pre-bid inquiry to the Owner. However, notwithstanding the fact that KM pointed out that any significant overrun in the large stone would dramatically affect its mining operations due to the low yield for the large stone, there was no answer from USACE. As with any set of Owner-prepared bid/build contract documents, the Owner assumes the duty to accurately reflect its expectations and to establish a definable scope of work. Without an Owner response to that KM inquiry, KM was obligated to proceed under the assumption that the Owner's quantities were accurate.

Thereafter, on July 28, 2003 KM posed additional questions, including whether there were "cross sections available for **any** portion of the work?" **(Appx. 11, 12).** In an August 5, 2003 response from Gail West to KM, Ms. West confirmed "no cross-sections are available other than those provided in the plans and specifications." Consequently, KM was obligated to bid the project based upon the plans and specifications as they had been prepared and presented to bidders by USACE. That same email response from Ms. West included an internal USACE email of July 30, 2003 stating that this inquiry included "some more questions from Kiewit Pacific". **(Appx. 11, 12).** For reasons not articulated to KM, USACE had apparently simply chosen to ignore the July 25, 2003 request concerning quantities and the effect that overruns could have on project timing and resource commitment.

After repeated inquiry by KM, USACE confirmed that no additional cross-sections or quantity data were provided since the designer no longer had the data available.

Only after repeated inquiry by KM during the course of construction, USACE confirmed that no additional cross-sections or quantity data were provided as the designer for the project no longer worked for USACE. USACE representatives advised KM that the designer's computer had "crashed" and all cross-sections and quantity data had been lost and could not be reproduced. That information was never communicated to KM or the other bidders prior to bid letting.

To date, USACE has not been able to produce any additional evidence to support its quantities of A22, B22, A10, and other rock quantities.

## 4.2 No Owner Back-up existed for Represented Quantities and for Cross Section representations.

Other than USACE confirming on August 5, 2003 that no cross-sections other than those already provided existed, no additional information was provided pre-bid which indicated why limited cross-section and quantity data was available. To date, even after repeated requests, USACE has not been able to produce any additional evidence to support how it arrived at the respective quantities of A22, B22, A10, and other quantities that are reflected in the documents. Notwithstanding that fact, KM was contractually obligated to perform the work.

Throughout performance of the work, KM has repeatedly provided notice to USACE as to the current quantities of the respective rock classifications being installed on the project. Not only was this done by the monthly pay applications, but the respective rock quantities and related overruns for A22 and B22 were noticed formally in a September 9, 2004 letter, orally at various Owner meetings, in the pre-construction survey submittal, and during on-site meetings. At an October 6, 2004 on-site meeting with the USACE project engineer, KM provided a full set of its rock quantities, along with cross-sections and three-dimensional pictures of the spur breakwater construction. Additionally, on October 8, 2004 by email and on October 28, 2004 in transmittal 2270-15.1, KM provided the interim survey data for the spur breakwater. Quantities requested for payment have been confirmed by Terra-Surveys survey data. KM has provided survey data to the Owner confirming as-built A22 quantities alone in excess of 47,000 cubic yards, an amount more than 155% of the represented plan quantities. (B22 quantities have overrun in almost the same percentage.)

KM has provided survey data confirming A22 quantities alone are more than 155% of the represented plan quantities.

Even when denying payment to KM, the owner has failed to support the quantities in question. Quantities referenced in correspondence from the owner are rough, rounded numbers provided by KM in a meeting held December 15-16, 2004. KM calculated these numbers during the meeting for discussion purposes, so that both parties would know the order of magnitude of quantity discrepancies. Despite repeated requests made by KM, the owner has failed to quantify quantities in contention, and continues to base its arguments on inaccurate numbers.

The Owner has identified four (4) areas in which A22 quantities are fully or partially contested: the transition, peel back, re-design to avoid the "cupping", and seawall quantities.

### 4.3 Despite timely Notices and demonstrated quantity increases, the Owner Refuses to Recognize quantities beyond amounts it included in Modifications to date.

The Owner has identified four (4) areas in which A22 quantities are fully or partially contested: 1) the main breakwater transition, 2) the quantities removed as part of the peel back and later installed as part of the breakwaters, 3) the quantities in the re-design to avoid the "cupping" on the seaward side of the causeway tie-in, and 4) the seawall quantities first removed (and later installed) during construction of the spur transition. There is no question that KM has constructed all of the work at least to the lines and grades represented in the original Owner design or re-designs in each of those areas. KM's survey data confirms all of those quantities and the Owner has offered no empirical data to contest any of those quantities.

Without citing a reviewable basis for its quantity calculations, the Owner has issued contract Modifications which have increased the quantities of A22 and B22 to 35,613 CY and 26,117 CY, respectively. In spite of the survey-confirmed neatline quantities of 47,429 CY of A22 and 32,700 CY of B22, the Owner simply refuses to pay for additional quantities.

Except for two contract modifications adding some 16% to A22 and 27% to B22, USACE has done virtually nothing more in terms of payment for the additional overruns.

### 4.4 KM Requests for Written and Constructive Changes Consistently Met with Inaction.

Except for finally issuing two (2) contract modifications adding some 16% to A22 and 27% to B22 quantities, USACE has done virtually nothing additional in terms of payment for the additional overruns other than to promise to continue to look at the quantities issue.

In a November 5, 2004 email **(Appx. 13, 14)** from USACE, the Owner stated that a Modification to cover quantity overruns would be forthcoming following survey verification. "Once we get the surveys, and we review them to validate that the quantity of in place material is over the contract amount, we'll be able to crank a mod out and bill for it." In KM's response to the Administrative Contracting Officer, among others, KM asked why the September 9, 2004 notice of overruns on A22 and B22 had not been responded to. That email confirmed that on October 6, 2004 in an on-site meeting, KM had provided a "detailed summary of the expected quantities overruns" and there had been an itemized review of the quantities with USACE representatives.

On December 6, 2004, some 3 months after notice of increased quantities of A22 and B22, USACE had not even confirmed the existence of any additional quantities.

One month and another pay estimate later, no progress had been made in processing a contract modification. The Owner stated in a December 6, 2004 email: "We are discussing the quantity now. In reality, the mod is going to take a few days to run through the system due to the $$ size." **(Appx. 15).** Therefore, now some 3 months after the September 9, 2004 notice of increased quantities of A22 and B22, USACE had neither confirmed its quantity representations nor made any progress in processing a contract modification for demonstrated overruns. Finally, in a conference call among USACE representatives and KM representatives on December 7, 2004 the Owner confirmed that they were still working on the letter regarding quantity overruns, but that it now agreed that at least 115% of the A22 and B22 quantities were owing and a modification would be prepared for those amounts.

USACE agreed to hold a meeting in its Elmendorf offices on December 15 and 16, 2004 to discuss the various quantity issues face to face.

Throughout the interim KM continued to perform all of the project work. After the December 15-16 meeting with USACE wherein nothing additional was resolved on the quantities, KM sent a follow- on email on December 30, 2004 to Ronald Flodin, the USACE Administrative Contracting Officer. That email said: "Since our meeting in Anchorage 2 weeks ago I have not heard an update on the status of a contract modification." It continued: "In addition we informed the USACE that this is a time sensitive issue since we are experiencing additional cost to pursue work in Nome during the winter. Please contact me with any information you may have as to when K/M could expect a contract mod to be issued to cover this work." This email was now 3 weeks after a December 9, 2004 USACE letter that stated: "It is the government's intention to issue a modification to the contract to increase the A22 and B22 in the amount needed to construct the spur breakwater and transition area…"

Finally, on January 6, 2005, four months after KM had formally noticed A22 and B22 would "overrun the bid quantity in excess of 115%", USACE issued a partial Modification.

Finally, on January 6, 2005, USACE submitted an email to KM stating: "The mod was signed today and should be faxed out to you in Nome this afternoon." Now, four months after KM had formally noticed USACE that the A22 and B22 would "overrun the bid quantity in excess of 115%", USACE finally issued a Modification increasing the A22 by 15% and B22 by little over 8%.

On May 6, 2005, the Owner indicated that a second modification would be issued, adding additional A22 and B22 quantity. The modified quantities still fell short of the in-place quantities and did not address work that remained to be done on the main breakwater.

Serial letter SAO/C-0086 from the Owner, sent on June 27, 2005, indicated KM was entitled to additional quantities. An RFP