was to be sent no later than July 8, 2005. As of this writing, KM has not received the promised RFP.

The Owner's actions have consistently indicated the existence of constructive changes to the project, whether formalized or not as changes or modifications, yet administration of these changes has been both untimely and done with little or no quantitative backup.

## 4.5 Payment for Extra Work Performed and Work resulting from design deficiencies has not been made.

At a September 3, 2004 meeting KM had advised the Owner that its truck fleet, mining equipment and support equipment would miss the last barge out.

At a September 3, 2004 weekly Owner's meeting, KM informed USACE that increased quantities of the various rock items would significantly impact the scheduled completion of the rock mining and thus the breakwaters and would push the work into the winter. KM further advised the Owner that its truck fleet, mining equipment and related support equipment would miss the last barge out for the season. Prior to that date, KM had submitted (and been paid) Pay Estimate Number 6 through August 31, 2004 which confirmed that 78.2% of the total A22 bid quantity had already been installed, while only a portion of the spur breakwater had been constructed, leaving all A22 quantities for the main breakwater yet to be installed. As indicated in a KM serial letter on October 4, 2004 **(Appx. 16, 17)**, because of the scant Owner cross-section data, KM could not prepare the survey data as quickly as it wanted and as it was required to do by contract. Both KM and Terra-Surveys expended considerable amounts of time not anticipated at bid time developing design templates.

At an October 6, 2004 on-site meeting with the USACE project engineer, KM provided a full set of its rock quantities, along with cross-sections and three-dimensional pictures of the spur breakwater construction. Additionally, on October 8, 2004 by email and on October 28, 2004 in transmittal 2270-15.1, KM provided the interim survey data for the spur breakwater.

## 4.6 Owner Inconsistent in who has Authority.

Depending upon the subject matter, KM dealt with USACE representatives under the supposition that each of them was acting with some authority of the Contracting Officer.

Prior to and during the construction season of 2004, KM dealt on a regular basis with on-site USACE personnel along with the Project Engineer and the Administrative Contracting Officer as well as the Contracting Officer. Depending upon the subject matter being discussed, and as a result of the remote project location, KM dealt with USACE representatives under the supposition that each of them was acting on behalf of and with

some authority of the Contracting Officer. The practicalities of the performance of any construction contract, especially given the particulars of this contract, reasonably led KM to believe that it was dealing with the person or persons who could make enforceable representations on behalf of USACE.

On December 10, 2004, months after KM had informed USACE of significant quantity overruns on A22 and B22, KM's Anchorage Area Manager was informed that no one other than the Contracting Officer, Sandra Davidson, had the authority to make representations on behalf of USACE with regards to quantity overruns. In a December 10, 2004 letter to USACE, KM stated: "we have been informed that we are in error to deal with anyone other than Sandra Davidson, the CO, for future contracting issues with financial implications. To date we have operated under the guidelines established at the Partnering Meeting held May 14, 2004. At this meeting the USACE directed all serial letters to be sent to Lee Seeba, the ACO, and Lee would be responsible for any further distribution, as this was to be an internal USACE function." **(Appx. 18).**

USACE agreed in a January 12, 2005 letter that "The Area/Resident Office will coordinate routing your correspondence (depending on the nature of the letter) to the appropriate personnel."

USACE responded in a January 12, 2005 letter that "Serial letter and other correspondence are to be addressed similar to the manner your letter SAO-039 was addressed [to Mr. Flodin]." The letter went on to state that "The Area/Resident Office will coordinate routing your correspondence (depending on the nature of the letter) to the appropriate personnel."

Regarding the seawall replaced on the existing causeway, the owner stated the seawall was to be replaced in an August 27, 2004 letter. **(Appx. 19).** This was a clarification to the requirements of the contract. In a March 29, 2005 letter **(Appx. 20, 21)**, seven months after the first letter, the owner tried to construe the clarification as a contract modification outside the ACO's limit.

## 4.7 B22 quantity increases essentially the same as A22 quantity increases.

Due to the "layered" nature of the design for each of the Spur and Main Breakwater, except for the seawall quantities, in virtually any location where A22 rock was placed B22 rock was also placed. Consequently, as confirmed by the survey data and other quantity data, the overrun in B22 quantities is in virtually the same percentage as the overrun in A22 quantities for the main breakwater transition and the re-design for the tie-in item to eliminate the "cupping" design flaw on the existing causeway.

The Owner refuses to pay for any quantities in excess of the amount it has allowed under Modification P00024.

The Owner similarly refuses to pay for the complete toe excavation quantities needed to construct the Owner's design.

Toe excavation was performed consistent with the contract plans, with KM's intended method of construction for the main breakwater plan as provided in August 2004, and with RFI #1. USACE does not contest the location of the toe excavation, but it continues to refuse to pay for those quantities. Moreover, to the extent that the exact location of the toe excavation dictates the starting point for construction of all of the other slopes on the Spur and Main Breakwater, appropriate quantification of those toe excavations location and quantities should and does further confirm KM's quantity representations.

### 4.8 Owner has interpreted VEQ clause as requiring payments for added quantities at unit prices.

USACE has not formally provided its interpretation of the VEQ clause and its application to these revised quantities. It apparently retains the position that all excess quantities are to be paid at respective contract unit prices. The same apparently holds true for Remove Causeway Rock, Bid Item 7, since 37% in recognized added quantities have been paid at unit price.

### 4.9 Owner Interpretation of Peel Back is unreasonable and outside of industry standards.

USACE had established each of the bid quantities and the respective Bid Items. Bid Item 8, "Peel Back Causeway Rock for Spur Breakwater Construction, complete", was a Lump Sum item established by USACE in the Proposal Schedule. The words "peel back" do not appear anywhere else in the Contract Documents other than in that item of the Proposal Schedule. As bid and as constructed, KM treated the words "peel back" in a manner consistent with an industry standard interpretation of those words or with their "practical" meaning.

Peel back means "to remove". USACE has added the concepts of "haul, stockpile, sort, load again, re-haul, and place" to the definition of peel back.

Peel back means "to remove". In an April 27, 2005 serial letter SAO/C-0070 the Owner states that "... A22 stone replaced during the causeway spur construction was paid for under Bid Item 8 'Peel Back Causeway Rock for Spur Breakwater Construction, complete", and so will not be considered for payment twice." **(Appx. 22, 23).** USACE has interpreted "peel back" to mean not only "remove", but it has also added the concepts of "haul, stockpile, sort, load again, re-haul, and place" to the definition of peel back. Therefore, in application on this contract, USACE has taken the position that peeling back of the causeway rock to

construct the spur breakwater, which KM agreed to perform for $595,500, means that: KM agreed to remove all A22 plus B22 and to specially handle those materials, perform all the additional steps in the re-handling, re-sorting, and reinstalling all of the salvageable portions of those A22 and B22 quantities, including any and all product "loss", for that lump sum amount. The Owner's interpretation is untenable and unenforceable.

KM actually agreed to simply remove existing materials, as necessary to expose the core of the existing causeway, to allow the transition for and construction of the Spur.

### 4.9.1 Despite Material Being Credited And Salvaged By KM, Owner Refuses To Pay For Quantities Installed.

> To the extent that it could salvage materials which otherwise met the construction requirements, KM should be entitled to compensation as those materials are installed.

In constructing its bid, KM estimators were aware of each of the two Salvage provisions within the construction and technical Sections of the Owner's Contract Documents. §01016, ¶1.6.1 provided that "Salvageable material, <u>if not otherwise indicated</u>, shall become the property of the Contractor. The value of such salvage shall be reflected in the contract price." (Emphasis added.) As is detailed in ¶2.8 above, the "if not otherwise indicated" reference in §01016 ¶1.6.1 is defined in detail in §02220 ¶3.2 and following. Therefore, all salvageable material became KM's property that it was obligated to remove as "demolition". To the extent that it could salvage those materials and they otherwise met the construction requirements for the respective rock designations in other bid items, KM should be entitled to compensation for those quantities as they are installed within the neatline on the project.

> The Owner received the benefit of salvage in KM's original pricing, but it refuses to pay for those materials after they are installed.

At bid time, KM performed estimates for those quantities of A22 and B22 that could be reasonably salvaged and incorporated back in to work. These quantities were deducted from the estimated costs for drill and shoot, mining, hauling, and unloading operations. By reducing these quantities, KM in effect gave the owner a credit in unit priced bid items for A22 and B22.

Despite having been "credited" for salvage materials which KM was obligated to take title to by the terms of the contract, USACE refuses to pay for those specially handled and salvaged quantities which were able to be installed on the project. The Owner received the benefit of salvage in KM's original pricing mechanisms, but it refuses to pay for the value of those materials when they are installed within the Owner's design neatline template.

## 4.10 Owner Gave Direction for Seawall Replacement.

> The owner stated that KM was "to re-build the portion of the existing seawall that was dismantled..." It added: "the government considers this a clarification of work... and may result in additional A22 stone placed."

The seawall is shown on the as-builts of the existing causeway, but does not appear in the construction plan sheets. As demonstrated above, the seawall needed to be removed as part of the "Peel Back". Neither the plans nor specifications discussed whether or not the seawall was to be replaced during construction. This lack of information prompted KM to ask the owner what should be done as early as July 2, 2004 in a Weekly Owner's Meeting. **(Appx. 24, 25)**. The Owner answered under serial letter SAO/C-029 on August 27, 2004 that "You are to re-build the portion of the existing seawall that was dismantled for spur breakwater construction to pre-work conditions." The letter also confirmed that stone would be paid at bid prices. "The government considers this a clarification of work to be performed under Line Item 6 ... and may result in additional quantity of A22 stone placed.". **(Appx. 26)**.

KM performed this work at the Owner's direction, fully expecting to be compensated. On March 29, 2005, in serial letter SAO/C-065, the Owner confirmed that removal and reconstruction of the seawall was shown in KM's Technical Proposal. **(Appx. 20, 21)**. The Owner further confirmed that the contract required replacement of the seawall, then denied payment for replacement, stating that the seawall was removed exclusively for KM's access to the spur. The Owner is ignoring the fact that, regardless of the construction methods utilized, the seawall was removed as part of the "Peel Back" item. Appendix 7 illustrates the spur tie-in location had the seawall not been removed, which is further illustrated by the drawings 1 and 2 included in the Appendix. **(Appx. 27, 28)**. This illustration demonstrates that removal of the seawall was necessary for construction and for safety, and that it is within the scope of "Peel Back". KM is being refused payment for Work whose scope and method of payment was directed by the Owner.

## 4.11 Owner Gave Direction to Perform Tie-in Quantities to eliminate "cupping" design defect, but refuses to make payment.

> To avoid the "cupping" issue caused by the Owner's design, additional rock had to be placed. That element of the design was either wrongly conceived or simply left out.

During the course of construction it became apparent that the tie-in on the causeway spur was improperly designed by the Owner. To avoid the "cupping" issue caused by the Owner's design, additional rock had to be placed. That element of the design was either wrongly conceived or simply left out of the Owner's design considerations and quantity takeoffs. KM

submitted RFI #1 on June 4, 2004 and supplemented that submission on June 20, 2004. The Owner approved KM's proposed suggestion on June 21, 2004 and KM constructed that tie-in in accordance with RFI #1. The Owner still refuses to pay for those quantities.

### 4.12 Main Breakwater Transition rock quantities remain unpaid.

A22 and B22 rock dictated how the transition was to be built and KM constructed it consistently. USACE refuses to pay for the quantities of those materials KM installed.

The transition section of the main breakwater between approximate stations 38+24 and 39+24 similarly lacked sufficient detail for KM to appropriately construct that work. When it became apparent that the Owner had no design data for that area, KM started construction of it in November 2004 consistent with its understanding of the Owner's design concepts, as confirmed in KM's pre-construction survey submittal provided in August 2004. The size of the A22 and B22 rock dictated how the transition was to be built and KM constructed that transition area consistently. Again, without any supporting data or design cross-sections, USACE refuses to pay for the quantities of those materials KM installed in that transition area.

At a May 10, 2005 meeting, USACE promised to provide cross sections demonstrating its interpretation of the transition area and what would be acceptable. At this time, KM had not yet capped the top of breakwater, which provided an opportunity for changes to be made to the transition area. On May 21, 2005, lacking additional information from the Owner, KM had no choice but to continue work and completed the cap though the transition section. The promised cross sections have not been provided at this writing and the work remains as installed.

# V. EFFECTS OF CHANGES AND IMPACTS

## SUMMARY

This Section V. discusses the effects and impacts of actual events on KM's construction sequence and plan of operations.

The unexpected actual events and conditions described in Section IV. significantly impacted KM's plan and committed resources as follows:

- KM's equipment hours for the mining fleet have increased proportionately to the significant quantity overruns.
- The Owner has the benefit of but refuses to accept KM's surveyed quantities, without empirical opposing quantity information.
- Unpaid quantities of A22 rock are 11,816 CY and 6,583 CY for A22 and B22, respectively, at a minimum.
- Unpaid quantities of various rock grades aggregate a minimum underpayment of $4,067,223.
- Un-reimbursed impacts due to delayed demobilization and winter weather work aggregates more than $1.0 million.

### 5.0 Introduction.

The purpose of this section is to demonstrate how the actual conditions encountered impacted KM's plan. KM's means and methods, time to perform the work, and all related costs have been impacted as a result of rock quantity inaccuracies, defective design assumptions, uncompensated changes, and delayed or non-existent Owner response to various Contractor requests for compensation.

### 5.1 Since the Contract Documents were not accurate, KM's plan significantly altered.

> Inaccurate Owner quantities and defective design representations have significantly altered KM's construction of the Spur and Main Breakwater.

The inaccurate quantity representations and defective design assumptions have significantly altered the manner and timing of KM's construction of the Spur and Main Breakwater portions of the project. KM planned to have all rock-related portions of the project completed during the 2004 construction season prior to winter freeze up - - when not only the means and methods of construction would be significantly affected, but also

KM could not complete its work in 2004 as planned and it could not demobilize.

prior to the time the entire mining fleet and related equipment could be safely demobilized from the project prior to winter freeze up.

Due to quantity increases and other design defects, KM could not complete its work in 2004 as planned and it could not demobilize its equipment as planned.

### 5.1.1 Equipment Hours have increased significantly due to A22 Quantity Overruns.

KM's equipment hours related to the rock work on this project have increased in proportion to the overrun quantities.

All of the "rock" construction bid and scheduling elements were built upon two basic premises: 1) A22 rock was the "production" item at the quarry which defined the timing and availability of all rock for the project; and, 2) All manpower equipment and resources were committed based upon the assumption that contract quantities were reasonably accurate.

Mobilizing equipment and manpower resources to a location such as Nome is extremely expensive. Once those resources are committed to such a remote location, if they cannot be used to the maximum efficiency, the costing and timing assumptions are invalidated. KM's equipment hours for the mining fleet and the support equipment are based upon anticipated costs, production rates, cycle times, and availability of manpower resources for each of those equipment considerations. KM's equipment hours related to the rock work on this project have increased in proportion to the overrun quantities. Similarly, because of the significant increase in A22 and B22 quantities, all of KM's mining equipment and all related drill/shoot materials and resources, have similarly increased. Since KM has only been paid a portion of the added quantities, the greatest percentage of those additional committed resources and men and materials remain uncompensated.

### 5.1.2 KM could not demobilize its Truck Fleet, Mining Equipment, and related equipment, which remained on winter standby.

KM's inability to timely demobilize its entire mining fleet and other equipment has caused that equipment to go into a standby state from the completion of the majority of the rock work in November, 2004. As a direct result of the increased quantities of the major rock production items, all rock work could not be completed in 2004 and the equipment was utilized to finish those

All ownership and time-related costs associated with that equipment remaining onsite for an additional seven months are directly attributable to USACE's inaccurate quantities, defective design, and refusal to pay for extra work.

items in early 2005. The entirety of all ownership and time-related costs associated with that equipment remaining onsite for an additional seven months are directly attributable to USACE's inaccurate quantity computations, defective design, and refusal to timely recognize and pay for the extra and added work. In addition, all KM personnel assigned exclusively to the "rock" portions of the work and any attended costs directly resulting from the work not being completed in the 2004 construction year also remain uncompensated and are a direct cost impact to the Owner-caused issues.

## 5.2 Without reliable quantities and cross-section data from the Owner, KM became obligated to exclusively demonstrate and confirm all unit quantities.

KM has been put into a position of trying to disprove a negative. Since the Owner has no opposing information, KM has to prove that there is no explanation other than that its quantities are accurate.

The impact of the Owner having no quantity data and only limited cross-section data is that KM has consistently been put into a position of demonstrating all quantities to the Owner. Although it is typical for a contractor to submit for payment its completed quantities and to supply the quantity data in support of those payment quantities, the absence of any Owner data and the absolute refusal to accept KM's quantity data has had a significant and costly impact. KM has basically been put into a position of trying to disprove a negative; i.e., the Owner refuses to accept KM's quantity computations but, since the Owner has no opposing information, KM has to prove that there is no explanation other than that its quantities are accurate.

In the December 15-16, 2004 meeting among KM and USACE representatives, the Owner's in-house design person confirmed that he was only "guessing" as to where the bid quantities had been derived from. He added that he had put in virtually "zero man hours" calculating the quantities that formed the estimated quantities and the actual constructive quantities on the project. The only quantity computations that the Owner offers are those that it "derived based on estimated calculations using the contract drawings", as stated in the Owner's serial letter SAO/C-0057 on February 24, 2005. **(Appx. 29, 30).** In fact, most of the quantities reflected by USACE were rough, rounded numbers earlier provided by KM. Despite repeated representations by the Owner that it would reasonably discuss the quantities issues, nothing has been resolved other than partial overruns allowed in Modifications P 00015 and P 00024.

As of mid-July 2005, the aggregate value of unpaid contract quantities of A22 and B22 at bid unit prices alone is $4,067,223.00.

### 5.3 As a result of added uncompensated rock quantities, KM has unpaid units of various rock grades aggregating a minimum amount of $4,067,223.00.

The minimum cost impact to KM for the additional uncompensated quantities of A22 and B22 alone was noticed to the Owner in a December 10, 2004 letter, C/SAO-040. **(Appx. 31, 32).** At that time, pursuant to a request by USACE concerning the end of November pay estimate, KM had "reduced the quantities to reflect a maximum of 100% of the final bid quantities on some items as directed by USACE. Quantities not shown on the pay estimates as a result of this directive currently results in $4,193,085.16 of under billing. KM has informed the USACE repeatedly of this issue and offered to provide additional information upon request." That letter added: "KM is currently proceeding under the presumption that we will be paid for this work, and must come to a resolution on this issue."

Small modifications to the contract have since been made. As of mid-July 2005, the aggregate value of unpaid contract quantities of A22 and B22 at bid unit prices for A22 and B22 is $4,067,223.00.

### 5.4 KM has been forced to finance unpaid portions of the work.

Portions of the unpaid quantities have been installed since October 2004. KM has solely borne the cost of the work without compensation from the Owner. It is unclear to KM what, if any, reparations will be made for monies eight months past due. KM informed the USACE ACO in December that interest was due on all monies that were awaiting a modification. The ACO acknowledged that interest would be due KM if it was found that quantities are owed.

KM and Terra-Surveys expended considerable time trying to work with the defective quantities and inadequate details in the plans.

### 5.5 KM and Terra-Surveys Expend Additional Time Due to Lack of Details and Design Flaws.

KM and Terra-Surveys each expended considerable time trying to work with the defective quantities and inadequate details provided in the plans. Additional time spent developing design templates not only has a significant financial impact, but it also has detracted from both KM and Terra-Surveys working on other projects or other elements of this contract.

For months USACE made repeated representations that it would timely consider KM's noticed quantity overruns for compensation.

## 5.6 KM was continually operating in an environment where no person with apparent Owner authority was on-site.

In December, 2004 USACE notified KM that the USACE representatives with whom they had been dealing had no authority to make any representations to KM since many of those communications had not specifically involved the Contracting Officer. For months USACE made repeated representations that it would timely consider KM's noticed quantity overruns and that the directions for actual or constructive changes for the work would be reasonably compensated. (See ¶4.6, above). The impact to KM was that it continued to perform work on the project, and continued to deal with the Owner's defective design assumptions and defective quantity assumptions, but KM was apparently performing that work without reasonable expectation that it would be fairly compensated by USACE. USACE's position for why compensation would not be made have only been forthcoming in 3 "position letters" issued between mid-March 2005 and the end of April 2005, categorically refusing to pay for any of the additional contested quantities beyond 115%.

Additional meetings have not resulted in any significant modification to A22 and B22 pay quantities.

Additional meetings and correspondence between KM and USACE have resulted in a second Modification to A22 and B22 quantities, yet the bulk of cost impacts to KM remain unpaid.

## 5.7 Work Installed Consistent with Plans and Specifications Remains Unpaid.

The toe excavation quantities and the Main Breakwater transition quantities discussed in Actual Events ¶4.10, 4.11, and 4.12 were installed as specifically directed and approved by the Owner. Those quantities nonetheless remain unpaid. The cost impacts and effects are included, in part, in Impacts ¶5.3.

## 5.8 VEQ clause impact, if any, remains uncertain.

The impact, if any, of the VEQ clause remains uncertain since the Owner has paid for approved quantity increased at unit prices to date. Additional increases recognized and paid to KM should be paid at unit prices, at a minimum, unless higher reimbursable costs are demonstrated.

USACE has improperly rejected KM's request for payment of quantities to create the "smooth tie-in" at the seaward side of the causeway.

### 5.9 Due to unreasonable interpretation of undefined words, KM remains unpaid for large quantities of A22 and B22 rock.

As discussed in Actual Events ¶4.8, 4.9, and 4.11, the Owner has taken an unreasonable interpretation of the term "peel back" and has improperly rejected KM's request for payment of the quantities of A22 and B22 installed to create the "smooth tie-in" at the seaward side of the causeway. Those unpaid quantities are included in Impacts ¶5.3, among others.

# VI. QUANTIFICATION

## SUMMARY

This Section VI details the quantification of the added effects and impacts caused by the difference between actual events and the representations in the Contract Documents.

The detailed quantifications include the following:

- Uncompensated A22 and B22 quantities at unit prices.
- Additional costs associated with equipment standby and demobilization.
- Other un-reimbursed contract quantities and cost categories.

KM's total Request for Equitable Adjustment is $5,263,454.22.

### 6.0 Introduction.

This section provides itemized cost impacts for respective items of work that remain unpaid - - comparing the difference between how the Owner represented that the work was to be performed (Section 2) and how it actually was able to be performed (Section 4), along with the distinction between how KM planned to perform the work (Section 3) but could not, all of which resulted in the performance of impacted work (Section 5).

**KM's total Request for Equitable Adjustment is $5,263,454.22.** (Appx. 33, 34).

As of mid-July 2005, unpaid quantities of A22 alone are 11,816 CY. The remaining unpaid amount is $3,639,328.00.

### 6.1 Uncompensated A22 quantities for Bid Item 006 aggregate $3,639,328.

As of mid-July 2005, unpaid quantities of A22 alone are 11,816 CY at the bid price of $308/CY. **The remaining unpaid amount is $3,639,328.00.**

- **Main Breakwater.**

The USACE plan quantity of 15,250 CY was in effect increased to the quantity of 17,852 CY per USACE's approval of KM's August 8, 2004 Submittal No. 2270-08 "Pre-Construction Survey". The USACE-approved contract increase was actually 2,602 CY at $308/CY or $801,416.00.

- **Causeway Spur Breakwater.**

The USACE plan quantity of 15,350 CY was in effect increased by the USACE when it approved RFI #1 on June 21, 2004 per SAO/C 0017. **(Appx. 35, 36).** By accepting RFI #1, and when quantifying the actual A22 CY installed to the neatline template, USACE actually approved and accepted a contract increase of 14,227 CY at $308/CY or $4,381,916.00.

- **A22 Summary.**

The neatline quantification determined the quantities reflected above even though the actual quantities installed are greater than shown, to USACE's benefit. The total A22 approved by the USACE is 47,429 CY. Of that total quantity, only 35,613 CY (or an increase of 5,013 CY) has been paid as of mid-July, 2005. The Schedule of Values included in the Appendix identifies the payments received through mid-July, 2005. **(Appx. 37, 38).**

## 6.2 Additional costs associated with equipment standby and demobilization are $1,075,854.47.

Additional equipment standby and added demobilization costs amount to $1,075,854.47.

Due to the overrun, rock handling and mining equipment that would have otherwise been demobilized was stranded in Nome. This equipment includes a fleet of trucks and flat deck trailers, CAT 5130 front shovel, Manitowoc 4600 duty cycle crane, four CAT 777 off road trucks, CAT 992 loader, CAT D10 dozer, and various other support equipment. A barge chartered by KM in October 2004 to deliver permanent materials was to be used to transport this equipment. By not having been able to use that barge, KM will incur the additional costs of demobilizing equipment on commercially available barges.

The quantity overrun of the A22 Layer increased KM's costs to perform the increased scope of work. It also directly impacted the time to perform the entire scope of work caused by the same increase. The amount of direct cost un-reimbursed to KM is $901,289.63 before overhead, profit and bond is affixed. **<u>The total cost of $1,075,854.47, which includes these added costs are shown in</u> the Appendix. (Appx. 39).**

- **Builder's Risk Deductible Direct Expense.**

Were it not for the overrun quantities, work on the end of the main breakwater would have been completed prior to the

October 29-30, 2004 storm. While KM's Builder's Risk insurance policy covered the bulk of damage caused to the work, the **$40,000.00** deductible is solely attributable to the overrun. Copies of the invoice for these costs are included in the Appendix. **(Appx. 40).**

- **Extended Builder's Risk Direct Expense.**

As construction of the breakwater was incomplete at the end of the 2004 season, a second Builder's Risk policy was obtained for the project. Costs for this extended policy are **$70,770.00**. Copies of the invoice for these costs are included in the Appendix. **(Appx. 41, 55).**

- **Terra-Surveys Added Survey Direct Expense.**

The overrun quantities required additional construction time along with additional surveys performed by Terra-Surveys, KM's survey subcontractor. Costs for the additional surveys not anticipated at bid time are **$13,345.26**. A breakdown of these estimated costs are included in the Appendix. **(Appx. 42, 43).**

- **Terra-Surveys Added CADD Direct Expenses.**

The incomplete details provided in the plans for the Spur breakwater required additional time to be spent by Terra-Surveys in developing design templates. These templates were required by contract to be incorporated into interim and post construction survey submittals. Costs for the additional CAD work not anticipated at bid time are **$10,283.46**. A breakdown of these estimated costs are included in the Appendix. **(Appx. 44).**

- **Quarry Equipment Standby Costs.**

Using USACE equipment ownership rates, the total equipment standby costs are **$469,973.02**. Breakdowns of these costs are shown in the Appendix. **(Appx. 45-45j)** This cost only includes standby time, adjusted to exclude hours that equipment was able to be used, thereby lowering KM's costs and the overrun impacts.

Although listed in KM's Technical Proposal for potential use in bridgework, the Manitowoc 4600 would have been demobilized without adversely affecting production. In October 2004, with work continuing on the main breakwater, KM made the decision to rent a Manitowoc 4000W from Crowley to begin pile driving for the new bridge's abutments. Subsequently, the 4000W

was used for the majority of bridgework, including setting cap beams, backwalls, fuel lines, and pre-cast deck panels. KM utilized the 4600 to set the girders, but this work would have been performed by the 4000W in conjunction with a second piece of machinery in assist, such as a wheeled loader or excavator. During construction of the old causeway, Kiewit utilized a crane in conjunction with a loader, and on a more recent project at Glacier Creek, two excavators were utilized to set bridge girders.

- **Quarry Equipment De-Mob Costs.**

Using commercial quotes for barge transportation, the additional costs for demobilization are **$261,240.18**. A breakdown of these estimated costs are included in the Appendix. **(Appx. 46, 47, 48).**

- **Heat and Hoard Costs.**

Work during the winter months on the main breakwater required the use of a diesel fired heater to keep air lines on the 4600 crane from freezing. Additionally, the generator used to supply electrical power to the crane was left running twenty-four hours a day until work was halted. Costs associated with winter work are **$32,797.98**, and are detailed in the Appendix. **(Appx. 49).**

- **Maintenance Freight Costs.**

Major repair work was done on the 4600 crane, and on one the CAT 777 trucks. Both of these pieces of equipment would have been demobilized and repaired at our district shop in Portland, Oregon. Repair work done in Nome mandated that parts be flown in. Costs associated with these additional freight charges is **$17,893.77**. A breakdown of these charges is provided in the Appendix. **(Appx. 50).**

- **Maintenance Rate Repair Costs.**

Major repair work was done on the 4600 Crane and one of the CAT 777 trucks. Both of these pieces of equipment would have been demobilized and repaired at KM's district shop in Portland. Wage rates for mechanics paid in Nome are higher than those paid at the district shop. Costs associated with these additional mechanic rate charges and Manitowoc supervision total **$14,449.80.** A breakdown of these charges is provided in the Appendix. **(Appx. 51-51c, 57-57d).**

KM's audited overhead, profit, and bond factor, added to the base amount, create a total of $1,075,854.47.

- **Summary of other Additional Costs due to the increased A22 approved quantities.**

The base amounts shown in the subsections above equal $930,753.47. KM's 2004 audited overhead rate of .07226 **(Appx. 58)** on that amount equals **$67,256.25**. KM's profit factor of .07800 **(Appx. 56)** is applied to the new cost total of $998,009.72 and adds **$77,844.76** to the cost before the bond is affixed. The subtotal for the additional costs is $1,075,854.47

## 6.3 Unpaid Bid Item 004 Trenched-in Toe Quantities Aggregate $64,230.

The unpaid quantities of Trenched-in Toe are 2,141 CY, totaling $64,230.

As of mid-July 2005, the unpaid quantities of Trenched-in Toe bid item 004 are 2,141 CY at the bid price of $30/CY. **The remaining unpaid amount is $64,230.00.**

- **Main Breakwater.**

The USACE plan quantity of 4,900 CY was increased to 6,497 CY per the approval of KM's August 8, 2004 Submittal No. 2270-08 "Pre-Construction Survey". The USACE-approved contract increase bid item 004 is 1,597 CY at $30/CY or $47,910.00

- **Causeway Spur Breakwater.**

The USACE plan quantity of 6,200 CY was increased by the USACE when it approved the RFI #1 quantity of 6,744 CY on June 21, 2004 per SAO/C0017. The USACE approved contract increase bid item 004 is 544 CY at $30/CY of $16,320.00.

- **Summary of Trenched-in Toe Excavation.**

The As-Built quantity determines the actual pay quantities even though the neatline quantities drawn are somewhat larger. The total Trenched-in Toe Excavation approved by the USACE is 13,241 CY. Of that quantity, 2,141 CY remains unpaid as of mid-July, 2005.

## 6.4 Uncompensated B22 Quantities for Bid Item 0013 aggregate $427,895.00.

As of the end of July, the unpaid quantities of B22 are 6,583 CY at the bid price of $65/CY. **The remaining unpaid amount is $427,895.00.**

- **Main Breakwater.**

The USACE plan quantity of 9,100 CY was actually increased to 14,039 CY per USACE's approval of the August 8, 2004 Submittal No. 2270-08 "Pre-Construction Survey". The USACE-approved contract increase is 4,939 CY at $65/CY or $321,035.00.

- **Causeway Spur Breakwater.**

The USACE plan quantity of 11,500 CY was actually increased by the USACE when it approved RFI #1 quantity of 18,661 CY on June 21, 2004 per SAO/C0017. The USACE-approved contract increase is 7,161 CY at $65/CY or $465,465.00.

- **B22 Summary**

The neatline quantification determined the quantities reflected even though the actual quantities installed are greater than shown. The total B22 approved by the USACE is 32,700 CY. Of that quantity, 26,117 CY has been paid as of mid-July, 2005, leaving 6,583 CY unpaid.

## 6.5 UNCOMPENSATED BOND COSTS TOTAL $56,146.75.

The increase in the price of the contract by $5,207,307.47 increases KM's joint venture bond costs. Kiewit's 70% portion of the shared rate of .0107823 is based upon the factor of $12.96/1000. Manson's 30% portion of the shared rate is based on $4.95/1000 plus the addition of an 18% surcharge, which then increases the rate to $5.84/1000. **(Appx. 52, 53).** The Bond amount of **$56,146.75** is an added cost to the contract due to the increased quantities and costs.

# VII. CONTRACTUAL ENTITLEMENT

**SUMMARY**

This Section VII details the contractual and legal authority for the added effects and impacts caused by the difference between actual events and the representations in the Contract Documents.

The detailed contractual entitlement includes the following:

- KM made reasonable interpretations of the plans and specifications
- The owner warrants the adequacy and accuracy of their contract documents.
- Contractors are to be compensated under the Changes Clause for added quantities
- Contract ambiguities will be interpreted against the drafter as long as the interpretation is reasonable

## 7.0 Introduction.

When the Owner failed to respond, KM was obligated to simply construct its bid consistent with what was represented in the Contract Documents.

This Section provides the contractual and legal authority for KM's entitlement to the additional costs and impacts it has experienced which remain uncompensated on the project.

## 7.1 KM made an interpretation that conforms to the limited details provided in the plans.

The Contract Documents prepared by USACE were the basis for KM's bid, as well as that of any other bidders. During the pre-bid process, KM alerted the Owner with its July 25, 2003 email and follow-up correspondence that KM's interpretation was that quantities of various major rock items could increase by at least 10%. When the Owner failed to respond, KM was obligated to simply construct its bid consistent with what was represented in the Contract Documents.

In that same July 25, 2003 email, KM stated that it interpreted that any material excavated from the causeway that it could re-use would be paid for under the "corresponding stone item" for each. (Bid Items 7 and 8). That interpretation is supported by contract and in law.

Absent a contractor being able to rely on the Owner's documents, it would otherwise be necessary for each contractor to insert a large contingency cost factor into its bid.

Any bidding contractor has to be able to rely on the Owner's contract representations as accurate representations of the actual conditions that the contractor should expect to encounter. Absent a contractor being able to rely on the Owner's documents,

it would otherwise be necessary for each contractor to insert a large contingency cost factor into its bid. Analogous to the rationale for the existence of a differing site conditions clause and the mutual benefit to the Owner and any bidding contractor because of that clause, a bidding contractor's ability to be able to rely on the Owner-represented quantities and design is indispensable to ensuring that the Owner receives the lowest competitive price. Thus, the contractor can submit its bid without large contingencies thereby making it more competitive. The mutual benefits to each of the contracting parties inures to the benefit of the project and, in the instance of a federal contract, to the taxpayers.

In the instance of this contract, and with the overlying considerations of the Variation and Estimated Quantities provisions of FAR 52.211-18, KM was assured that it could bid the contract based upon the quantities and design represented in the bid documents since minor variations (payable at unit prices) can be anticipated and any variations which exceeded that 15% + or – of represented quantities would be reasonably compensated under that VEQ clause.

A22 was the "production" item in the mining operation that drove all cost and quantity assumptions. KM credited those anticipated salvage amounts in arriving at its anticipated mining costs.

As is further demonstrated by KM's rock quantity bid documents and as is discussed in §3 above, KM structured its unit price for Bid Item 6 (A22 rock) in a manner that A22 was the "production" item in the mining operation which drove all cost and quantity assumptions. Simply stated, as KM performed its quarry operations to create the Owner-estimated quantities of A22, the smaller rock quantities and those rocks that had less exacting specifications than the A22, were created as a by-product of the A22 production process. Therefore, as A22 rock was drilled and shot, it would create B22, A10, etc. from the excess rock mined in the process. Additionally, to the extent that KM did not have to drill and shoot A22 rock due to the anticipated use of some salvaged A22 rock quantity at the construction site, KM credited those anticipated salvage amounts (at least 4,350 cy) in arriving at its anticipated mining costs. As bid, KM determined that its bid price of $308 per cubic yard of A22 fairly reflected its direct costs plus a reasonable amount for indirect costs and profit.

All of KM's assumptions in this regard and the manner in which its estimators constructed the various bid item Unit Prices are all consistent with reasonable contracting and estimating practices.

## 7.2 In a bid/build contract, Owner is responsible for and warrants the accuracy of its Contract Documents, per the Spearin Doctrine.

The Spearin Doctrine: When an Owner issues drawings and specifications it impliedly warrants that the drawings and specifications are accurate and suitable for their intended purpose.

It is well-settled throughout the construction industry in federal courts and as adopted by virtually all state courts, when an Owner issues drawings and specifications for use on a contract it impliedly warrants that the drawings and specifications are accurate and that they are suitable for their intended purpose. US v. Spearin, 218 U.S. 132 (S.Ct. 1918); Consolidated Diesel Electric Corp. ASBCA No. 10486, 67-2 BCA 6,669 (1967); Samuel v. Poorvu, 190 Ct.Cl. 640, 420 F.2d 993 (1970); Armstrong Construction Co. v. Thompson, 390 P.2d 276 (Wa 1964).

Attempts by Owners to limit the bidders' reliance on the accuracy of the information presented are routinely rejected under the premise that the implied warranty attaches simply because the Owner has undertaken the responsibility for preparing and supplying the drawings and specifications. Consolidated Diesel, *supra*. The contractor, as part of a contractual equitable adjustment for defective drawings and specifications, is entitled to be compensated for the added costs and delays incurred as a result of working in accordance with the defective drawings and specifications. See Beylik Drilling, Inc., IBCA No. 747-12-68, 70-1 BCA 8,126 (1970).

> Consolidated Diesel: When one of the parties undertakes to prepare the specifications, that party is responsible for the correctness, and the other party is under no obligation to check and verify the work product.

As the Board summarized in Consolidated Diesel, after affirmatively citing Spearin, at 30,951-52:

> "The (Owner's) implied warranty of the adequacy of its specifications is based on its responsibility for the specifications rather than any presumed 'superior knowledge' in the sense of greater expertise. When one of the parties to a contract undertakes to prepare the specifications, that party is responsible for the correctness, adequacy and feasibility of the specifications, and the other party is under no obligation to check and verify the work product of the other party who assumed responsibility for the preparation of the (documents)..."

## 7.3 The Owner is to accurately reflect the Scope and Quantities, and to pay for work performed within its original and amended designs.

> KM agreed to perform consistent with the Owner's design and it reasonably anticipated that the quantities reflected were accurate.

As the Spearin discussion above indicates, the Owner assumes responsibility to accurately reflect both the Scope and the Quantities in its contract documents. Furthermore, assuming that the contractor performs work consistent with the contract and with the Scope and Quantity representations of the Owner, it is entitled to be compensated by the terms of the contract if it performs the work. In this instance, KM agreed to perform consistent with the

Owner's design and it reasonably anticipated that the quantities reflected were accurate. Notwithstanding that the Owner first notified KM after the fact that it had no confirming quantity, design, or cross-section data due to having lost all of that data, the Owner still had the duty to fairly represent the scope of work in the contract.

During the course of construction, when the design was changed as a result of a defective design such as the "cupping" on the spur causeway tie-in, USACE similarly assumed the duty to fairly compensate KM under the terms of the contract for any related additional quantities and impacts resulting from KM's efforts to comply with any defective (or revised) design.

## 7.4 The Changes clause is to be used to compensate the Contractor for Owner revisions to defective design and for added quantities.

> The Changes clause has very broad application to handle changes in contract quantities and to handle instances of defective design.

The primary remedial provision for KM here is the Changes clause under FAR 52.243-4. That clause gives the Contracting Officer broad authority to make written or oral changes to the contract within its general Scope. In addition to allowing for written change orders, ¶(b) of the Changes clause provides for either written or oral orders from the Contracting Officer that cause a change to be "treated as a change order under this clause", as long as the contractor does provide written notice. Thus, the Changes clause has very broad application to handle changes in contract quantities and, as is detailed in ¶(d) of the clause, to handle instances of defective design.

In the instance of defective design, ¶(d) of the Changes clause obviates the need for a specified time within which notice of defective specifications has to be provided to the Owner. That clause also goes onto say that: "In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased costs reasonably incurred by the contractor in attempting to comply with defective specifications."

> "Defective" specifications should include not only a demonstrated design defect, but also quantities so patently inaccurate that they constitute a design defect.

Therefore, from a cost reimbursement standpoint, if the contractor demonstrates defective specifications he is entitled to all reasonable costs associated with attempting to comply with those defective specifications. The concept of "defective" specifications should include not only instances where there is a demonstrated design defect, but also where represented contract quantities are so patently inaccurate that they constitute a design defect for that reason alone. (I.e. the quantity inaccuracies are a result of design defects and inadequate "takeoffs" by the Owner.) In either

circumstance, whether as a result of additional quantities which should be compensated under the Changes and VEQ clauses or where the quantities are so grossly understated that they rise to the level of a defect, KM should be compensated here for all additional quantities of A22, B22, and other rock quantities for which it has not yet received compensation.

The concept of an Owner's defective specifications constituting a constructive change to the contract has long been recognized by the federal courts. Most of the cases on point have followed the theory that a specification which contains incorrect information or from which vital information is missing is defective. In other cases, courts have used the logic that nondisclosure of information is an indication of assumption of risk by the Government, *Ortronis, Inc.*, ASBCA 12745, 72-2 BCA ¶9564, or even treating nondisclosure as a constructive change of a district type, *General Precision, Inc.*, ASBCA 12078, 70-1 BCA ¶8144; *Walden Landscape Co.*, ENGBCA 3534, 75-2 BCA ¶11,538; *Beckman Constr. Co. v. General Servs. Admin.*, GSBCA 11796, 93-3 BCA ¶26,205. One case even treated the nondisclosure as a breach of the Government's affirmative duty to cooperate. *Automated Servs., Inc.*, GSBCA EEOC-2, 81-2 BCA ¶15,303.

## 7.5 Constructive Owner changes are to be compensated under the terms of the Contract.

The requirement for a written order for additional or changed work does not prevent an equitable adjustment when the government representative has orally ordered a change.

As is discussed in Actual Events, §IV above, there were repeated representations by the Contracting Officer and her representatives that requested the added quantities would be timely considered and presumably paid for. When the Owner's "position papers" were issued in March and April of 2005, the Owner had then taken the position that the additional quantities requested could not be compensated by the Contracting Officer's interpretation of the provisions of the contract concerning "peel back", "transition" the "tie-in", and payment for "demolitioned" seawall quantities.

The concept of USACE here having ordered changes "constructively" is also well accepted by the courts. In the context of federal government contracts, the requirement for a written order for additional or changed work does not prevent a contractor from receiving an equitable adjustment when the government representative has orally ordered a change and promises an equitable adjustment as soon as a fair amount can be determined. See W.H. Armstrong & Co. v. U.S., 98 Ct.Cl. 519 (1943).

Disagreement on how to interpret the contract has also been addressed by the federal courts.

Disagreement on how to interpret the contract has also been addressed by the federal courts. The courts found in the case

of Len Co. & Assocs. v. U.S., 385 F.2d 438 (Ct. Cl. 1967), at 443: "The court has considered it to 'be idle for the contractor to demand a written order from the contracting officer for an extra when the contracting officer was insisting that the work required was not additional…' and, therefore, has often dispensed, on these occasions, with the formality of issuing a written change order under the standard clause. *Fleisher Eng'r. & Constr. Co. v. United States*, 98 Ct. Cl. 139, 158 (1942); *Valley Eng'r, Inc. v. United States*, 151 Ct. Cl. 228, 238 (1960).

## 7.6 Owner's Actions or Failures to Act and Apparent Authority.

Whether viewed as a constructive change or a direct order by the Contracting Officer, KM here repeatedly requested direction and was not given timely responses.

There are numerous cases reported in the federal courts that deal with the Owner's failure to provide assistance when requested, or the results of its inaction or silence in the case of a contractor's request for a change or some other act to be performed by the Owner. Again, whether viewed as a constructive change by the USACE for its failures or delays in acting, or whether seen as a result of a direct order by the Contracting Officer or someone with his/her authority, KM here repeatedly requested payment or interpretation on various performance items and repeatedly was not given timely responses.

From early in the project, it was apparent persons other than the designated Contracting Officer would be the primary points of contact for KM on the project. The fact that the Contracting Officer would be some 600 air miles from the site of the project limited the Contracting Officer's ability to be on-site on a regular basis.

There is a number of cases that have addressed the question of whether personnel present on the project did or did not have a formal, written delegation of authority as a "representative" of the Contracting Officer. Various courts and the boards of contract appeals have found that those persons nonetheless are authorized representatives of the Contracting Officer.

Numerous courts and the boards of contract appeals have found that various persons can be authorized representatives of the Contracting Officer.

Compare *H. Landau & Co. v. United States*, 886 F.2d 322 (Fed. Cir. 1989) (employees with contract administration authority held to bind the Government when they stated that Government would guarantee payment for materials); *Walter Straga*, ASBCA 26134, 83-2 BCA ¶16,611 (project manager deemed to be proper official to respond to technical inquires and "was a representative of the contracting officer"); and *Contractors Equip. Rental Co.*, ASBCA 13052, 70-1 BCA ¶8183 (statement by contracting officer that official was "the person to satisfy" and deferral to him for

equipment needs held "tantamount to a delegation de facto" as contracting officer's authorized representative).

Although the contract did incorporate FAR 52.246-12, which relates to the absence of authority by the government inspector to make any change to any term or condition of the contract documents, KM relied on communications with the Administrative Contracting Officer and the designated Resident Engineer in the absence of dealing with the Contracting Officer. Only after the additional quantities of work were actually completed in 2004, KM was then informed that any communications it had concerning changes and additional quantities on the project had to be submitted to the Contracting Officer, as is confirmed in KM's December 10, 2004 serial letter. **(Appx. 54).**

## 7.7 The rules of contract interpretation require that undefined terms be given their "normal" or industry standard meanings.

In interpreting the words "Peel back" under Bid Item 8, the Owner is unreasonable and the interpretation is unenforceable.

One of the universally-accepted rules of contract interpretation is that terms which are not otherwise defined by the contract are to be given an interpretation of "common usage" unless some other specific intention is indicated. The Restatement, *Second, Contracts* §202(3) states: "Unless a different intention is manifested, (a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning; (b) technical words and words of art are given their technical meaning when used in a transaction within the technical field."

In interpreting the meaning of the words "Peel back" under Bid Item 8 of the Proposal Schedule prepared by USACE, the Owner has interpreted that term to mean not only "remove", but "remove, haul, unload, sort, stockpile, re-load, re-haul, and replace". As applied to this contract, that is a completely unreasonable and unenforceable interpretation. It is not consistent with the definition provided in the Restatement of Contracts, second and it is neither an industry-accepted nor defined technical term.

A word search of the entire library of USACE Engineer Manuals does not show a single instance of the words "Peel back" in any of those manuals. It is clearly a term that was used for purposes of this project to define the simple act of removing causeway rock for the purpose of exposing an area in which the spur breakwater construction could be safely completed.

There is no fair interpretation of any dictionary definition or common use of the term that would include the broad definition that USACE is trying to apply here.

Webster's Ninth Collegiate Dictionary defines "peel" as a transitive verb including the following meanings: "to strip off an outer layer of" and "to remove by stripping". There is no fair interpretation of any dictionary definition or common use of the

term that would include the broad definition that USACE is trying to apply here.

Therefore, as discussed in ¶ 4.9, 4.9.1, and 4.10 above, KM is clearly entitled to its interpretation of how those materials were to be handled and payment for those items under the respective bid items for rock after they have been removed, handled multiple times, and re-hauled and replaced at various locations on the causeway spur or the main breakwater as applicable.

## 7.8 The maxim of contra proferentem provides that contract ambiguities will be interpreted against the Owner as drafter.

If there is an ambiguity in a contract, any such ambiguity will be interpreted against the drafter as long as the interpretation offered by the non-drafting party is reasonable.

The concept of *contra proferentem* simply provides that if there is an ambiguity in a contract, any such ambiguity will be interpreted against the drafter as long as the interpretation offered by the non-drafting party is reasonable. To the extent that the definition of "Peel back" could in any way be interpreted as ambiguous, KM's interpretation is certainly reasonable in these circumstances.

Additionally, to the extent that the actual anticipated quantities for the various rock items that were incorrectly reflected by USACE in the Contract Documents could be interpreted as ambiguous to the extent that KM asked for clarification prior to bid and received no answers from USACE, also confirms the fact that KM is entitled to its reasonable interpretation.

The government drafted all of the Contract Documents. KM had the right to rely on all of the Contract Documents and did so, but it has not been compensated significant amounts of money to which it is reasonably entitled.

## 7.9 Variation in Estimated Quantities clause is to be interpreted consistent with the Foley case.

The Foley case resolved previous inconsistent interpretations among cases involving the VEQ clause.

Various cases that have interpreted the intent of the VEQ clause under FAR 52.211-18 resulted in different holdings, best illustrated by the difference between the case of Victory Construction Co. Inc., v. United States, 510 F.2d 1379 (1975) and another case entitled Bean Dredging Corporation, ENG BCA No. 5507,89-3 BCA ¶22,034. Those cases had inconsistent holdings, with Victory allowing the contractor to take the position that the sentence of the VEQ clause which provides that an adjustment will be based only upon the "increase or decrease in cost due solely to

the variation", and that it was entitled to its unit price except to the extent that there was a demonstration that increased or decreased costs related solely to the variation. The Bean Dredging case on the other hand, stood for the proposition that the contractor would receive its unit price up to 115% (in the case of an overrun) and that thereafter it would have to demonstrate its costs in order to justify the unit price.

The apparent conflict between those cases was resolved in the case entitled Foley Co. v. United States, 11 F.3d 1032 (1993). In that case, Foley was contracted to remove sludge from certain lagoons for $308 per ton. The final quantity overran by some 300%, and the government determined that Foley's costs for the excess tonnage was only $295. It therefore requested a reduction in the contract unit price for the excess quantity. Foley, relying on the Victory case, argued that their unit cost for the excess quantity was not reduced as a result of the overrun, hence the government was not entitled to reduce the price for the work. The court found in favor of the contractor in Foley, reinforcing the validity of the Victory case and effectively putting an end to Bean Dredging. The Foley court stated, at 1040: "The holding in Victory unequivocally rejects the notion that the VEQ clause permits replacement of a negotiated unit price with a complete re-pricing based on actual costs plus a reasonable profit."

Per Foley, KM is entitled to its unit prices of $308 per unit and $65 per unit for A22 and B22, respectively, to be altered only by a demonstration that KM had costs that exceeded those amounts solely due to the variation above 115%.

As applied to the circumstances here, unless there is a demonstration by the government that KM had costs which increased or decreased "due solely to the variation above 115%...of the estimated quantity", KM is entitled to its unit prices of $308 per unit and $65 per unit for A22 and B22, respectively, to be altered only by a demonstration that KM actually had "costs plus a reasonable profit" that exceeded each or either of those amounts solely due to the variation above 115%. In fact, when all equipment standby costs and related Owner-caused delays to the projected are computed as part of the bid item costs for each of those items, KM is able to demonstrate that its price per unit is in fact well in excess of either the $308 per unit and the $65 per unit for the respective bid items.

## 7.10 Contractor Performance Evaluation.

The owner has implied in both written and verbal communication that KM may receive a poor performance evaluation on this contract. KM has performed high quality work under demanding conditions with limited owner support. KM continued to perform the work without being paid. Upon completion of the contract KM expects an evaluation consistent with the performance on all aspects of the work not to be influenced or skewed by contract issues beyond KM's control.

KM is entitled to an equitable adjustment to the contract amount aggregating $5,263,454.22.

## 7.11 Conclusion.

As a result of the defective design and incorrectly estimated quantities for A22 and B22, among other items from the USACE, delayed performance and additional equipment costs, and as a result of inappropriate and unsupportable interpretations of contract provisions by USACE, KM is entitled to an equitable adjustment to the contract amount aggregating **$5,263,454.22. (Appx. 33, 34).**