# US Army Engineer District, Alaska

# Nome Navigation Improvements

**Contract No. DACW 85-03-C-0014**
**Company Job No. 376-2263**

## Certified Claim

## for

## Equitable Adjustment of the Contract Sum

## due to Differing Site Conditions

**(Includes replacement, sheets per DCAA Audit, dated 4-4-2007)**

**Prepared by:**

**Kiewit/Manson, A Joint Venture Company**
**1577 "C" Street, Suite 100**
**Anchorage, Alaska 99501-5127**

**October 2006**

# US Army Engineer District, Alaska

# Nome Navigation Improvements

**Contract No.: DACW 85-03-C-0014**
**Company Job No: 376-2263**

## Certified Claim

## for

## Equitable Adjustment of the Contract Sum

## due to Differing Site Conditions

**Prepared by:**

**Kiewit/Manson, A Joint Venture Company**
**1577 "C" Street, Suite 100**
**Anchorage, Alaska 99501-5127**

**October 2006**

EXHIBIT
1

**US Army Engineer District, Alaska**
**Nome Navigation Improvements**
**Contract No. DACW 85-03-C-0014**
**Company Job No. 376-2263**

**October 2006**

**Certified Claim**

**for**

**Equitable Adjustment of the Contract Sum due to Differing Site Conditions**

# Contents


| | |
|---|---|
| **Claim Cover letter** | : Certified Claim for Equitable Adjustment of the Contract Sum due to Differing Site Conditions |
| **Claim Attachment I** | : Breakdown of the Quantum Element; K/M letter dated April 7, 2006 |
| **Claim Attachment II** | : Rebuttal of Arguments and Conclusion posed by the Corps in C-0131 |
| **Claim Attachment III** | : Copy of the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006 |
| **Claim Attachment IV** | : Evolution of the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006 |
| **Claim Attachment V** | : Copies of Correspondences leading to the submittal of the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006 |

**KIEWIT/MANSON, A JOINT VENTURE**

P.O. Box 1689, 100 Lanes Way, Nome, Alaska 99762
(907) 443-7651 - Fax (907) 443-7663

October 27, 2006

C/SAO-~~126~~ 127

ACO
Southern Alaska Area Office
c/o US Army Engineer District, Alaska
P.O. Box 6898
Elmendorf, Alaska 99506-6898

Reference: Nome Navigation Improvements
Contract No. DACW 85-03-C-0014
Company Job No. 376-2263

Subject: F.A.R. Subsection 52.233-1: Certified Claim for Equitable Adjustment of the Contract Sum due to Differing Site Conditions

Dear Ms. Davidson,

K/M has received the Corps' letter reference C-0131 dated April 27, 2006, responding to K/M's March 28, 2006 Request for Equitable Adjustment due to Differing Site Conditions C/SAO-111 and accompanying Attachment C/SAO-112 (Summary of Changed Conditions). K/M disagrees with the arguments and the conclusion posed by the Corps in C-0131.

K/M hereby submits its Certified Claim for Equitable Adjustment of the Contract Sum due to Differing Site Conditions, under the terms of Federal Acquisition Regulation, Subsection 52.233-1 Disputes, and respectfully requests payment in the amount of $2,093,834.00.

The under-noted attachments are provided in support of this Certified Claim.

<u>Claim Attachment I - Breakdown of the Quantum Element; K/M letter dated April 7, 2006</u>
A Breakdown of the Quantum Element of this Claim is constituted in the 14-page document that was transmitted by K/M to the Corps on April 7, 2006. A copy of that document, accompanied by its own specific attachments, is provided in Claim Attachment I hereto.

<u>Claim Attachment II - Rebuttal of Arguments and Conclusion posed by the Corps in C-0131</u>
K/M provides its systematic rebuttal of C-0131, in Claim Attachment II hereto. A copy of C-0131 is also included. In the process of addressing and nullifying the arguments posed in C-0131, K/M has also supplemented and amplified upon the descriptions and measurements of the technical and chronological elements that were first constituted within K/M's March 28, 2006 Request for Equitable Adjustment due to Differing Site Conditions C/SAO-111 and accompanying Attachment C/SAO-112 (Summary of Changed Conditions); in so doing K/M has reinforced the merits of this present Claim.

<u>Claim Attachment III - Copy of the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006</u>
A copy of K/M's Request for Equitable Adjustment due to Differing Site Conditions, letter reference C/SAO-111 and the accompanying Attachment (Summary of Changed Conditions) reference C/SAO-112, each dated March 28, 2006, is provided in Claim Attachment III hereto.

<u>Claim Attachment IV - Evolution of the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006</u>
K/M provides a brief review of communications preceding the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006, in Claim Attachment IV hereto.

<u>Claim Attachment V - Copies of Correspondences leading to the submittal of the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006</u>
Copies of correspondences leading to the submittal of the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006, are provided in Claim Attachment V hereto.

<u>Certification per F.A.R. subparagraph 52.233-1(d)(2)(iii)</u>

I certify that the Claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the Claim on behalf of the Contractor.

Sincerely,

Patrick J McGarry

Pat McGarry
VP, NW Area Manager

# Claim Attachment I

## Breakdown of the Quantum Element:
## K/M letter dated April 7, 2006 and specific attachments - 14 pages total

KIEWIT/MANSON, A JOINT VENTURE
P.O. Box 1689, Nome, Alaska 99762
(907) 443-7651 - Fax (907) 443-7663

April 07, 2006 C/SAO-112

Administrative Contracting Officer
Southern Alaska Area Office
c/o US Army Engineer District, Alaska
P.O. Box 6898
Elmendorf, Alaska 99506-0898

Reference Nome Navigation Improvements
Contract No. DACW 85-03-C-0014
Company Job No. 376-2263

Subject: Dredging Request for Equitable Adjustment

Dear Ms. Davidson,

Under serial letter C/SAO-111, dated March 28th 2006, K/M submitted a Request for Equitable Adjustment regarding dredging obstructions and changed conditions. In regards to this issue, K/M is requesting an equitable adjustment for the sum of $2,093,834. Attached find:

1. Request for Equitable Adjustment Cost Summary
2. Attachment 1 – Joint Venture Equipment Rates
3. Attachment 2 – Parts Replacement Costs
4. Attachment 3 – Daily Ground Transportation
5. Attachment 4 – Composite Crew Rates

If you have any questions, please feel free to contact me at (907) 222-9350.

Sincerely,

Scott Fowlds

Scott Fowlds
Project Manager

4-7-06 Pg 1 of 14

**US ARMY CORPS OF ENGINEERS - Alaska District**
**Nome Navigational Improvements**

4/7/2006

# Request For Equitable Adjustment Due To Differing Site Conditions

**Additional Hydraulic and Clamshell Dredge Operation time due to Differing Site Conditions and Cost of Additional Utilization and Wear and Tear**

Project: Navigational Improvements, Nome, Alaska
Owner: Alaska District, C.O.E.

| | | |
|---|---|---|
| **Bechtolt affected dredge quantity:** | **153,265** | **cy** |
| **Bechtolt additional dredge time:** | **28** | **operating days of 2-12hr shifts** |
| **DB Viking affected dredge quantity:** | **298,267** | **cy** |
| **DB Viking additional dredge time:** | **30** | **operating days of 2-12hr shifts** |

| Description | Quantity | Production/Crews/Shifts | Mhrs | Lab | Eqpt | P & S | Mat | Sub | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | - Cost - | | | | | |
| Bechtolt Additional Hydraulic Dredge Costs | | | | | | | | | |
| Production: Affected Yardage | 153,265 | cy Bechtolt Dredge Crew total 6 men /shift | 4,032 | 272,765 | | | | | 272,765 |
| | 28 | days x 2 x 12hr x 6 men | | | | | | | |
| | | Camp @ $50/man-day | | 16,800 | | | | | |
| | | Dredge Bechtolt | | | 361,400 | | | | 361,400 |
| | 0.92 | months rent - 195 k/mo, operation - 6,500 /day | | | | | | | |
| | | Work Boat - Lisa | | | 37,320 | | | | 37,320 |
| | 0.92 | months rent @ 15 k/mo, operation - 840 /day | | | | | | | |
| | | Survey Boat | | | 27,680 | | | | 27,680 |
| | 0.92 | months rent @ 10 k/mo, operation - 660 /day | | | | | | | |
| | | Survey Gear | | | | 2,800 | | | 2,800 |
| | 28 | days P & S @ 100/day | | | | | | | |
| Bechtolt: premature component repair or replacement; excessive wear and tear | | | | | | | | | |
| Total wear and tear repair costs - (See attached summary) | | | | 54,120 | | 147,668 | | | 201,788 |
| | | c/f | | | | | | | **903,753** |



4-7-06 Pg 2 of 14

**US ARMY CORPS OF ENGINEERS - Alaska District**
**Nome Navigational Improvements**

4/7/2006

## Request For Equitable Adjustment Due To Differing Site Conditions

| Description | Quantity | Production/Crews/Shifts | Mhrs | Lab | Eqpt | - Cost - P & S | Mat | Sub | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | b/f | | | | | | | 903,753 |
| | | | | | | | | | |
| DB Viking Additional Clamshell Dredge Costs | | | | | | | | | |
| Production: Affected Yardage | 298,267 | cy DB Viking Dredge Crew total 4 men /shift | 2,880 | 194,458 | | | | | 194,458 |
| | 30 | days x 2 x 12hr x 4 men | | | | | | | |
| | | Camp @ $50 / man-day | | 12,000 | | | | | |
| Bech planned = 55 days | | Tow Boat Crew total 2 men /shift | 1,440 | 89,410 | | | | | 89,410 |
| Bech actual = 83 days | 30 | days x 2 x 12hr x 2 men | | | | | | | |
| DBV planned = 43days | | DB Viking (24hrs/day oper.) | | | 267,300 | | | | 267,300 |
| DBV actual = 72 days | 30 | days operation @ 220/hr | | | | | | | |
| Bech extra op = 83-55 = 28 days | 0.99 | months rent @ 110K/mo | | | | | | | |
| Bech extra rent = 83-55 = 28 days | | Viking Survey Gear | | | 3,000 | | | | 3,000 |
| DBV extra op = 73-43 = 30 | 30 | days P&S @ 100 /day | | | | | | | |
| DBV extra rent = 73-43 ≐ 30 days | | Clamshell Bucket (14 cy HD) | | | 19,800 | | | | 19,800 |
| | 0.99 | months rent @ 20 k/mo | | | | | | | |
| | | Clamshell spare 10cy bucket | | | 7,425 | | | | 7,425 |
| | 0.99 | months @ half rent: 7.5 k/mo | | | | | | | |
| | | Dump Barge Northport | | | 34,650 | | | | 34,650 |
| | 0.99 | months rent @ 35 k/mo | | | | | | | |
| | | Towboat Harry | | | 121,950 | | | | 121,950 |
| | 30 | days operation @ 135 /hr | | | | | | | |
| | 0.99 | months rent @ 25 k/mo | | | | | | | |
| | | Harry Survey Gear | | | | 3,000 | | | 3,000 |
| | 30 | days P&S @ 100 /day | | | | | | | |
| | | | | | | | | | |
| | | c/f | | | | | | | 1,644,745 |



4-7-06 Pg 3 of 14

**US ARMY CORPS OF ENGINEERS - Alaska District**
**Nome Navigational Improvements**

4/7/2006

# Request For Equitable Adjustment Due To Differing Site Conditions

| Description | Quantity | Production/Crews/Shifts | Mhrs | Lab | Eqpt | - Cost - P & S | Mat | Sub | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | b/f | | | | | | | 1,644,745 |
| Fuel price escalation | | Bechtolt approx utilization 1,500gal/day | | | | 63,840 | | | 63,840 |
| from $1.65 to $3.17 | 28 | days x 1,500gal/day @ $1.52 | | | | | | | |
| | | DB Viking/Harry/barge utilization approx 1,000gal/day | | | | 45,600 | | | 45,600 |
| | 30 | days x 1,000gal/day @ $1.52 | | | | | | | |
| Additional Staff Costs | | | | | | | | | |
| Bob Richardson | 28 | days @ $348/day | | 9,744 | | | | | 9,744 |
| Max Oviedo | 28 | days @ $288/day | | 8,064 | | | | | 8,064 |
| Transportation | 28 | days @ $352.72 / day | | 9,876 | | | | | 9,876 |
| Camp/subsistence BR | 28 | days @ $50/ 10 hr man-day | | 1,400 | | | | | 1,400 |
| Camp/subsistence MO | 28 | days @ $50/ 10 hr man-day | | 1,400 | | | | | 1,400 |
| **Subtotal** | | | | 670,036 | 880,525 | 262,908 | 0 | 0 | **$1,784,669** |
| **Add: Overhead** | 0.07226 | | | | | | | | **$128,960** |
| | | | | | | | | | **$1,913,629** |
| **Add: Profit** | 0.08250 | | | | | | | | **$157,874** |
| | | | | | | | | | **$2,071,504** |
| **Add: Bonding** | 0.01078 | | | | | | | | **$22,331** |
| **Total Amount of Request For Equitable Adjustment** | | | | | | | | | **$2,093,834** |

10,000



4-7-06 Pg 4 of 14

**Attachment 1**

**Joint Venture Equipment Rates**

September 4, 2003

## EXHIBIT D - MANSON EQUIPMENT RENTAL AND OPERATION RATES
### Anchorage District COE, RFP DACW85-03-R-0001
### Nome Navigation Improvements, Nome, Alaska

| Equipment | Monthly Rental ($) | Hourly Rental ($) | Hourly Operation ($) | Useage | Equipment Location | Fair Market Value |
|---|---|---|---|---|---|---|
| **DERRICK BARGE** | | | | | | |
| Derrick Barge ***Viking*** (230 ton) | 110,000 | | 220 | Duty Cycle | Seattle | $6,250,000 |
| **DREDGE** | | | | | | |
| Hydraulic Dredge ***Bechtolt*** | 195,000 | | 6,500 /day | | Seattle | $1,200,000 |
| **BOATS** | | | | | | |
| ***Harry M*** (2000 hp) | 25,000 | | 135 | | Seattle | |
| ***Lisa M*** (tender) | 15,000 | | 840 /day | | Seattle | |
| ***Lester M*** (survey boat) | 10,000 | | 660 /day | | Seattle | |
| **DUMP BARGES** | | | | | | |
| ***Eastport*** ABS Dump Barge (2000 cyd) | 35,000 | | | | Oakland | $1,911,000 |
| **MISC EQUIPMENT** | | | | | | |
| ***Clamshell Bucket*** (10 cy HD) | 15,000 | | | | | |
| ***Clamshell Bucket*** (14 cy HD) | 20,000 | | | | | |

Note - Due to the remote location of this project, the following conditions apply to the listed equipment rates. These conditions are in addition to the standard Kiewit/Manson JV equipment terms.

Monthly rental rates apply from the time of on-hire at the equipment's current location until the equipment is returned to the location of hire.
Derrick Barge, Dredge, Tender Boat and Survey Boat will be charged half rent while under tow to and from jobsite.
Clamshell Bucket will be charged half rent while under tow and during periods of non-use.
Hourly operation rates include a fuel allowance of $1.65 per gallon of diesel.
Hourly operation rates do not include the excessive cost for repairs and equipment maintenance due to the remoteness of Nome. These costs would be in excess of normal costs Manson experiences on the West Coast.
Equipment rates for dump barges and clamshell buckets do not include operation costs. The cost of maintenance and repairs, parts and supplies are not included and should be carried as a job cost. This equipment shall be returned in the same condition as existed at time of hire.
Monthly rental rates and hourly operation rates do not include the cost of marine survey equipment. These cost should be carried under the Services, Tools and Supplies category.

4-7-06 Pg 6 of 14

**Attachment 2**

**Parts Replacement Costs**

US ARMY CORPS OF ENGINEERS - Alaska District
Nome Navigational Improvements

4/7/2006

Costs of Excess Parts Replacements

## Excessive Wear and Tear on Hydraulic Dredge Bechtolt Components and Equipment

### 1. Additional Costs of Repair and Replacement of Components, Equipment and Parts due to Excessive Damage, Wear and Tear

| | Invoice / Quote Date | Component Cost (inc sales tax) | Expected Yardage Life (CY) | Proportionate wear per 325,000 CY (%) | Actual wear incurred (%) | Excess wear (%) | Net replacement parts cost |
|---|---|---|---|---|---|---|---|
| | | a | b | c = 325,000 / b | d | e = d - c | f = a x e |
| Component parts affected | | | | | | | |
| Pump shell | | $25,000 | 5,000,000 | 7% | 25% | 19% | $4,625 |
| 4 Vane impellor | 12/20/04 | $9,256 | 1,000,000 | 33% | 100% | 68% | $6,248 |
| Impellor hub adaptor | 03/25/05 | $3,696 | 1,000,000 | 33% | 100% | 68% | $2,495 |
| Suction cover | 11/23/04 | $9,484 | 5,000,000 | 7% | 25% | 19% | $1,755 |
| Suction liner front | 12/20/04 | $5,319 | 1,000,000 | 33% | 100% | 68% | $3,590 |
| Bearing side cover | | $9,792 | 5,000,000 | 7% | 15% | 9% | $832 |
| Bearing side liner | | $5,440 | 1,000,000 | 33% | 100% | 68% | $3,672 |
| Shaft sleeve | 12/20/04 | $1,251 | 1,000,000 | 33% | 100% | 68% | $844 |
| Packing gland & lantern ring | 12/20/04 | $2,063 | 1,000,000 | 33% | 100% | 68% | $1,393 |
| Pump bearings | | $11,444 | 8,000,000 | 4% | 75% | 71% | $8,118 |
| Roller Chain drive | 03/25/05 | $4,596 | 1,000,000 | 33% | 100% | 68% | $3,103 |
| New cutter (inc 1 set cutter edges) | 03/31/05 | $37,372 | 5,000,000 | 7% | 50% | 44% | $16,257 |
| Replacement Cutter edges | 06/22/05 | $3,074 | | | 100% | 100% | $3,074 |
| Replacement Cutter edges | 06/28/05 | $1,567 | | | 100% | 100% | $1,567 |
| Replacement Cutter edges | | $3,074 | | | 100% | 100% | $3,074 |
| Replacement Cutter edges | 05/03/05 | $2,142 | | | 100% | 100% | $2,142 |
| Replacement Cutter edges | | $3,074 | | | 100% | 100% | $3,074 |
| Replacement Cutter edges | 07/20/05 | $4,640 | | | 100% | 100% | $4,640 |
| Replacement Cutter edges | 08/06/05 | $3,074 | | | 100% | 100% | $3,074 |
| Hydraulic discharge components - hose | | $39,060 | 1,000,000 | 33% | 100% | 68% | $26,366 |
| Hydraulic discharge components - pipe | | $72,000 | 2,000,000 | 16% | 40% | 24% | $17,100 |
| Hydraulic discharge components - pipe | 12/03/04 | $44,000 | 2,000,000 | 16% | 60% | 44% | $19,250 |
| Hydraulic discharge components - pipe | 03/03/05 | $26,000 | 2,000,000 | 16% | 60% | 44% | $11,375 |
| **Proportionate Additional Cost of Repair and Replacement of Components, Equipment and Parts** | | | | | | | **$147,668** |

### 2. Estimated Additional Labor costs

**Complete pump and bearing disassembly and reassembly for parts replacement**

| | | | | |
|---|---|---|---|---|
| Estimated additional labor time | 800 manhours | | | |
| Composite hourly rate | $67.65 /hr | | | |
| **Total additional disassembly and reassembly:** | 800 manhours | x | $67.65 /hr | = **$54,120** |

4-7-06 Pg 8 of 14

# Attachment 3

## Daily Ground Transportation

**Transportation**

| DESCRIPTION | # | RATE ST | RATE OT | HRS-ST | HRS-OT | TOTAL |
|---|---|---|---|---|---|---|
| F-250 Pickup | 02-3748 | $ 14.95 | | 8.0 | | $ 119.60 |
| F-250 Pickup | 02-3754 | $ 14.95 | | 8.0 | | $ 119.60 |
| Ranger Pickup | 02 | $ 14.19 | | 8.0 | | $ 113.52 |
| | | | | | | **$ 352.72** Daily Cost |

# Attachment 4

## Composite Crew Rates

**US ARMY CORPS OF ENGINEERS - Alaska District** 4/7/2006
**Nome Navigational Improvements**

Calculation of Composite Crew Rates

| | | | | | Manson | | | JV | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Base | Rate/hr Standard | Rate/hr Time+1/2 | Base | Rate/hr Standard | Rate/hr Time+1/2 |
| **Harry M** | | | | | | | | | | |
| Tracy Brown | Captain | Capt/Op | | | $30.30 | $54.36 | $71.91 | - | - | - |
| Jess Garvin | Captain | Capt/Op | | alternated | $30.30 | $54.36 | $71.91 | - | - | - |
| Randi Hartt | Captain | Capt/Op | | | $30.30 | $54.36 | $71.91 | - | - | - |
| Daniel Ross | Engineer Deck Hand | Eng DH | | alternated | $28.48 | $51.72 | $68.22 | - | - | - |
| Kasey Collins | Deck Hand | DH | | | $27.72 | $50.62 | $66.68 | - | - | - |
| Shane Smith | Operator/Mechanic | Op Mech | | | $31.79 | $54.50 | $72.47 | - | - | - |
| Mike Syron | Engineer Deck Hand | Eng DH | | in for Dan | $28.48 | $51.72 | $68.22 | - | - | - |
| **Viking** | | | | | | | | | | |
| Steve Skredsvig | Captain Clamshell Dr | Capt/Op | | | $35.21 | $59.39 | $79.30 | - | - | - |
| Mike Steltz | Crane Op | Leverman Clamshell | 105 | | - | - | - | $33.25 | $57.69 | $81.53 |
| Frank Barney | Crane Op | Leverman Clamshell | 105 | | - | - | - | $33.25 | $57.69 | $81.53 |
| Brian Schwiger | Deck Engineer | Asst Eng | 102 | | - | - | - | $31.04 | $54.52 | $76.78 |
| Howard Baker | Deck Engineer | Asst Eng | 102 | | - | - | - | $31.04 | $54.52 | $76.78 |
| Don Duncan | Deck Hand | Asst Mate | 103 | | - | - | - | $30.41 | $53.62 | $75.42 |
| Don Banderob | Deck Hand | Asst Mate | 103 | | - | - | - | $30.41 | $53.62 | $75.42 |
| **Bechtolt** | | | | | - | - | - | | | |
| Don Johnson | Captain Hydraulic Dr | Capt/Op | 101 | | - | - | - | $31.71 | $55.48 | $78.22 |
| Ben Steevens | Leverman (Hyd dredge) | Leverman Hyraulic | 101 | | - | - | - | $31.71 | $55.48 | $78.22 |
| Bill Steveens | Leverman (Hyd dredge) | Leverman Hyraulic | 101 | | - | - | - | $31.71 | $55.48 | $78.22 |
| Bill Seymour | Watch Engineer | Asst Eng | 102 | | - | - | - | $31.04 | $54.52 | $76.78 |
| Fulton Williams | Watch Engineer | Asst Eng | 162 | | - | - | - | $31.04 | $56.85 | $79.11 |
| Larry Hall | Mate, then Fill Engineer | Mate | 162 | | - | - | - | $31.71 | $57.81 | $80.55 |
| Mike Hall | Fill Engineer | Mate | 105 | | - | - | - | $33.25 | $57.69 | $81.53 |
| Ron Norden | Deck Hand | Asst Mate | 103 | | - | - | - | $30.41 | $53.62 | $75.42 |
| Perry Burress | Deck Hand | Asst Mate | 103 | | - | - | - | $30.41 | $53.62 | $75.42 |
| John Dreitliein | Mate | Mate | 162 | | - | - | - | $32.46 | $58.89 | $82.16 |
| Jacob Booth | Mate | Mate | 102 | for Larry | - | - | - | $31.04 | $54.52 | $76.78 |

Refer to Force Account Billing Rates, provided by G Hendricks 9-12-05
Base and Burdened Rates provided by Adam (Kiewit) 9-12-05

4-7-06 pg 12 of 14

**US ARMY CORPS OF ENGINEERS - Alaska District** 4/7/2006
**Nome Navigational Improvements**

Calculation of Composite Crew Rates

| | **Crew:** | **VIKING/NORTHPORT** | | MEN | ST | | OT | |
|---|---|---|---|---|---|---|---|---|
| 12hrs day only | Captain Clamshell Dr | Capt/Op | | 0.5 | $59.39 | $29.70 | $79.30 | $39.65 |
| 12hrs day/night | Crane Op | Leverman Clamshell | 105 | 1 | $57.69 | $57.69 | $81.53 | $81.53 |
| 12hrs day/night | Deck Engineer | Asst Eng | 102 | 1 | $54.52 | $54.52 | $76.78 | $76.78 |
| 12hrs day/night | Deck Hand | Asst Mate | 103 | 1 | $53.62 | $53.62 | $75.42 | $75.42 |
| | | | | **3.5** | | $195.53 | | $273.38 |
| | | | | | | / 3.5 Men | | / 3.5 Men |
| | | | | | | $55.86 | | $78.11 |

| | Men | Hrs | Sh | | | |
|---|---|---|---|---|---|---|
| st | 3.5 | 8 | 5 | 140 | $55.86 | $7,821.00 |
| ot | 3.5 | 4 | 5 | 70 | $78.11 | $5,467.60 |
| ot Sat & Sun | 3.5 | 12 | 2 | 84 | $78.11 | $6,561.12 |
| 7 days 12hr/day | | | | 294 | | $19,849.72 |
| | | | | MH | | 294 |
| | | | | | ave rate | $67.5161 /hr |
| | | | | | **say** | **$67.52 /hr** |

| | **Crew:** | **HARRY M** | **MEN** | **ST** | | **OT** | |
|---|---|---|---|---|---|---|---|
| Tracy/Jess/Randi | Captain | Capt/Op | 1 | $54.36 | $54.36 | $71.91 | $71.91 |
| Daniel / Mike | Engineer Deck Hand } | Eng D H | 0.5 | $51.72 | $25.86 | $68.22 | $34.11 |
| Kasey Collins | Deck Hand | DH | 0.5 | $50.62 | $25.31 | $66.68 | $33.34 |
| Shane Smith | Operator/Mechanic | Op Mech | 0.5 | $54.50 | $27.25 | $72.47 | $36.24 |
| *Jess Garvin and Randi Hartt alternated* | | | **2.5** | | $132.78 | | $175.60 |
| *Dan Ross and Kasey Collins alternated* | | | | | / 2.5 Men | | / 2.5 Men |
| *Mike Syron filled in for Dan Ross* | | | | | $53.11 | | $70.24 |

| | | | | | | |
|---|---|---|---|---|---|---|
| st | 2.5 | 8 | 5 | 100 | $53.11 | $5,311.20 |
| ot | 2.5 | 4 | 5 | 50 | $70.24 | $3,511.90 |
| ot Sat & Sun | 2.5 | 12 | 2 | 60 | $70.24 | $4,214.28 |
| 7 days 12hr/day | | | | 210 | | $13,037.38 |
| | | | | MH | | 210 |
| | | | | | ave rate | $62.0828 /hr |
| | | | | | **say** | **$62.09 /hr** |

4-7-06 Pg 13 of 14

**US ARMY CORPS OF ENGINEERS - Alaska District** 4/7/2006
**Nome Navigational Improvements**

Calculation of Composite Crew Rates

| | **Crew:** | **BECHTOLT** | | MEN | ST | | OT | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Don Johnson | Captain Hydraulic Dr | Capt/Op *day only*** | 101 | 0.5 | $55.48 | $27.74 | $78.22 | $39.11 | | *12hrs daytime only* |
| Ben Steevens | Leverman (Hyd dredge) | Leverman Hyraulic | 101 | 0.5 | $55.48 | $27.74 | $78.22 | $39.11 | } *** | |
| Bill Steevens | Leverman (Hyd dredge) | Leverman Hyraulic | 101 | 0.5 | $55.48 | $27.74 | $78.22 | $39.11 | | |
| Bill Seymour | Watch Engineer | Asst Eng | 102 | 0.5 | $54.52 | $27.26 | $76.78 | $38.39 | } *** | |
| Fulton Williams | Watch Engineer | Asst Eng | 162 | 0.5 | $56.85 | $28.43 | $79.11 | $39.55 | | |
| Larry Hall | Mate, then Fill Engineer | Mate | 162 | 0.5 | $57.81 | $28.91 | $80.55 | $40.27 | } *** | |
| Mike Hall | Fill Engineer | Mate | 105 | 0.5 | $57.69 | $28.85 | $81.53 | $40.77 | | |
| Ron Norden | Deck Hand | Asst Mate | 103 | 0.5 | $53.62 | $26.81 | $75.42 | $37.71 | } *** | |
| Perry Burress | Deck Hand | Asst Mate | 103 | 0.5 | $53.62 | $26.81 | $75.42 | $37.71 | | |
| John Dreitliein | Mate | Mate | 162 | 0.5 | $58.89 | $29.44 | $82.16 | $41.08 | } *** | |
| Jacob Booth | Mate | Mate | 102 | 0.5 | $54.52 | $27.26 | $76.78 | $38.39 | | |
| | | | | **5.5** | | $306.98 | | $431.20 | | |
| | | | | | | / 5.5 Men | | / 5.5 Men | | |
| | | | | | | $55.82 | | $78.40 | | |

| | Men | Hrs | Sh | | | |
|---|---|---|---|---|---|---|
| st | 5.5 | 8 | 5 | 220 | $55.82 | $12,279.33 |
| ot | 5.5 | 4 | 5 | 110 | $78.40 | $8,624.00 |
| ot Sat & Sun | 5.5 | 12 | 2 | 132 | $78.40 | $10,348.80 |
| 7 days 12hr/day | | | | 462 | | $31,252.13 |
| | | | | MH | | 462 |
| | | | | | ave rate | $67.645 /hr |
| | | | | | **say** | **$67.65 /hr** |

*** Each of these crew pairs combined to work a total of 24hrs/day

4-7-06 pg 14 of 14

# Claim Attachment II

## Rebuttal of Arguments and Conclusion posed by the Corps in C-0131

# Claim Attachment II

## Rebuttal of Arguments and Conclusion posed by the Corps in C-0131

Page 1, Para 1: "Regarding the debris found ..."

We acknowledge the writer's computation that the 358 hours (~15 days) of dredge production time lost to clear blockages in the hydraulic dredge mechanism of the hydraulic dredge vessel Bechtolt equates to 8% (8.5%) of total available aggregate hours of clamshell dredging and hydraulic dredging added together. Aside from slower progress achieved in the difficult conditions encountered, these 358 hours (~15 days) constituted an addition of over 27% above and beyond the estimated 55 day (26+29) dredge time for that hydraulic dredge vessel. This magnitude of time loss incurred in that hydraulic dredge vessel's productivity, was attributable to a mass and concentration of boulders, large rocks, cobbles and metal debris far in excess of "Incidental", and was not reasonably foreseeable from the data and descriptions provided by the Corps in the Contract Documents.

Page 1, Para 2: "Pages 36 and 37 ..."

We refer to the Corps' April 27, 2006 opinion: "The actual percentage of time encountering debris with the Bechtolt would have been further reduced if you had followed the plan in your proposal".

Analysis of the 12 test boring investigations scattered in and around the Sand Spit zone revealed that there was only one location, situated in the midst of the segment (AP 1001) where the maximum number of blows occurred between EL -2.00ft MLLW and EL -8.00ft MLLW (approx EL-4). Maximum particle size was not provided. No record of "no recovery" or "poor recovery" was given. Maximum blow counts were found elsewhere at depths above EL -2.00ft MLLW or below EL -8.00ft MLLW, and maximum particle sizes (when identified) ranged from 1" to 2.5". This engineering data that was provided by the Corps did not infer that hard digging or a massive proliferation of large boulders, rocks or cobbles would be encountered.

The decision to allocate the Bechtolt to the task of dredging below EL-2 was based on the engineering data provided by the Corps. K/M's selection of land-based or sea-going dredging equipment for the dredging of the Sand Spit between EL-2 and EL-8 does not relieve the Corps from its contractual obligation to correctly represent the character and compositions of debris and materials in the Contract Documents.

Bechtolt overall productivity in the Entrance Channel zone has been demonstrated as approximately 2,680cy/day. In the four days of dredging below EL-2 in the midst of the Sand Spit as cited by the Corps' referenced letter, the Bechtolt averaged over 3,000cy/day despite increased clean times in that sandy location; that is, it achieved approximately 12% greater average daily production in that segment than in the rest of the Entrance Channel. If the Bechtolt had only achieved a small fraction of its Entrance Channel daily average productivity in those four Sand

Spit days, the Corps' April 27, 2006 opinion would be valid. That was not the case: average productivity actually increased a little while dredging below EL-2 in the Sand Spit.

Given the digging conditions inferred by the engineering data provided by the Corps, and the statistics of above-average productivity now on record in the cited Sand Spit segment of the Entrance Channel, the allocation of the Bechtolt to dredge the Sand Spit segment below EL -2.00ft MLLW is considered to have been prudent and well justified. In this respect, the Corps' April 27, 2006 opinion, in defense of its statement that the JV's Request for Equitable Adjustment has no merit, is rejected as both conjectural and irrelevant.

Page 1, Para 3: "In your letter..."

By citing 'other factors' of dredge work that the contractor handles, we believe the writer seeks to dilute the recorded impacts of the differing site conditions on the maintenance, the mechanical integrity and the overall productivity of our dredge vessels, and to divert and distract us instead into contemplation of anchor placement, the maintenance of arms, movement of scows, the dredging industry's increasing dependency on computer technology, and, the deployment of a discharge pipe. Suffice to say, such considerations (and utilizations) are not specific to the Nome Navigation Improvement project; what's more they prevailed in roughly commensurate measure for the hydraulic dredge vessels whether at work in the Entrance Channel, or in the East Sediment Trap wherein her 'Measure Mile' production capabilities were determined. Similarly, certain common considerations (anchorage, scows, computers, etc.), prevail during clamshell dredging activities and these are taken into account, as far as is foreseeable, based on prior experience, in the establishment of a clamshell dredge's historic productivity and the estimation of future dredge productivities.

Page 2, Para 1: "A debris area..."

Whether ill-located, incorrectly sized and/or simply misrepresented, the enclosed area of metal debris arrowed on the Contract Documents adjacent to the sunken barge, was in fact spread across the center of the proposed new channel to be dredged rather towards its sloped south bank. It was therefore in a different place, and ill-defined, as a tangible element of work to be performed. To the extent that it was misrepresented in these ways, that 'known' debris did constitute a different condition, and did pose a greater than forecasted impediment to the progress of the vessel allocated to the channel dredging task. It was the unknown magnitude of this misrepresentation and the chance that there were still other unannounced proliferations of debris that might be encountered, that inspired K/M's April 28, 2005 C/SAO-069 enquiry.

The debris area was a different site condition. The impact on dredge productivity attributed to misrepresentation of dredging scope and the uncertainty of likely nearby deposits was not however recorded, and there is therefore no dedicated break-out from daily dredge records devoted to this element, in isolation.

Page 2, Para 2: "Page 49 of your proposal..."

Equipment selections were made and estimated productivity achievements, be they 'Measured Mile' or historically founded, were generated on the basis of engineering data from boring investigations and specification descriptions issued by the Corps. The sizes, type and origins of the materials that the Corps expected we would encounter were clearly specified in the documents. The concentration of listed materials was clearly described as 'incidental'.

Dredge equipment selections and productivity achievements were validated in zones where conditions were found to be consistent with what the Corps stated in the Contract Documents. K/M did recognize the "potential for variations", within the bounds of the conditions depicted in the Contract Documents. With this in mind, K/M considers the productivity of approximately 2,680cy/12-hour shift compared to 3,000cy/12hour shift estimated, acceptable. K/M's Project proposal does not presume to re-define, re-write or re-categorize these specified conditions and concentrations. Furthermore, the 'potential for variations' outside the bounds of what is written, listed, described, and quantified in the Contract Documents, Specifications texts, and logs of historic boring investigations was not contemplated therein. The statement 'you were prepared to deal with varied site conditions' lacks precision and is therefore without merit.

Page 2, Para 3: "The Viking daily reports..."

The writer's opinion is preceded by statements that selectively address data from three (3) out of the seven (7) 'HLO' logs to which the bidders were referred in the Contract Documents. One C-0131 statement reads: "These boring logs show glacial till starting at -2.5, -1 and -1.5 feet elevations below the mud line respectively, and extend to the project depth."
Material characteristics inferred by the 1982 offshore logs HLO 1 through HLO 7 performed by the Corps' engineers of reference, Harding Lawson, were described in K/M's C/SAO-111 dated March 28, 2006. Those 1982 findings are now further analyzed for the purposes of addressing the opinions expressed in C-0131.

The depths and soil characterizations noted on the 1982 HLO boring logs do indeed indicate that their investigation borings extended to and beyond the present project dredge depths. Starting elevation and bottom elevation (signaled by the annotation of different material characteristics as the investigation record proceeds downward) of any glacial till or rubble deposits that were encountered, is also marked in the 1982 HLO logs. Till, is defined by Harding Lawson Associates as: "Gray gravelly silty sands and silt; occasional clean sand and silty gravel. Medium dense to very dense. Contains angular rock fragments (gravels)." Harding Lawson's definition is absent any mention of 'cobbles', in contradiction to how the Corps describes Till. The classification of Till so defined by Harding Lawson as "Grey gravelly silty sands..." etc., is further categorized within a range that includes gravels with over 12% fines and sands with over 12% fines. It is named as "silty sands", "silty gravels" and "poorly graded gravel-sand-silt mixtures" by the USCS extracts in Section 02222 Page 144 of the Contract Specifications. Harding Lawson's particle size analyses were provided in Section 02222, Pages 159 through 166 of the Contract Specifications, defining the percentage of classified sub-sea materials in those seven (7) offshore logs HLO 1

through HLO 7 passing sieve sizes from No.200 to maximum 1-1/2". A pictorial illustration of all seven (7) logs, HLO 1 through HLO 7, was provided in Plate 3, page on 99 of the Contract Specifications, charting somewhat crudely, the perceived sloping grades of the noted materials, inferred by the distribution and findings of the seven (7) logs.

In compiling the estimate of dredge productivity in this outer portion of the new Entrance Channel, K/M also took into account the data and geological conditions indicated by log HLO 2, located inshore of HLO 3 and adjacent to the dredge stations cited in C-0131. The portion of the dredge channel adjacent to that HLO 2 log location was to be dredged to EL -12.5ft MLLW. The log of that historic 1982 investigation stated that the mud line, signifying the starting depth of dredging in the proximity of that log location, was at EL -11.4ft MLLW, approximately 1 foot above desired dredge grade. Till, so defined by Harding Lawson as "...gravelly silty sands..." etc., was cited at about EL -47.5ft MLLW; that is about 36 feet below that EL -11.4ft MLLW mud line, and about 35 feet below the project desired dredge grade. Till did not therefore exist inside, above or even within a significant distance beneath the dredge envelope at this location. As further direction for the bidders as to material character: "rubble', labeled as requiring the maximum number of blows per foot for this entire HLO 2 log, was cited far below the Till, starting at approximately EL -56.00ft MLLW. This log indicated the depths at which we should, and the depths at which we should not encounter 'rubble', in adjacent dredge locations of the Entrance Channel.

Offshore log HLO 3, located approximately 500ft south of log HLO 2, cited a mud line elevation of EL -12.5ft MLLW, one foot below the mud line cited in log HLO 2. Southward and offshore of log HLO 3, the mud-line drops off sharply towards and beyond the location of log HLO 4 where the mud-line was cited as EL -22.5ft MLLW, and continues to drop going southward to EL -32.5ft MLLW as cited in the offshore log HLO 6. The grade level of Till also drops roughly in line with these mud-line contours. Referring to logs HLO 3 and HLO 4, till was cited at or just below bottom of dredge grade level at Sta +34.00 (beginning of dredge slope), and approximately 2 feet below bottom of dredge grade at Sta +38.00 (bottom of dredge slope). Further, Till was indicatively cited at approximately 12 feet below the proposed dredge grade at Sta +48.00 (the extreme south end of the proposed channel). The citation of depths ( "-2.5, -1, and -1.5 feet" ) in C-0131, correspond only to the distance below the sloping mud-line. As the proposed levels of the intended dredge grades did not fall along the length of the portion of the channel logged by logs HLO 2 through HLO 6, the only perceived exposure to dredging in Till so defined by Harding Lawson as "...gravelly silty sands..." etc., was in a small zone near the base of the dredge slope. The opinion stated in C-0131 is founded on an inaccurate and incomplete selection of numeric data, and is without merit. K/M refutes the inference in C-0131 that presence of Till was extensive throughout the extent of the logs, and rejects the statement that "Encountering hard digging in this area is represented in the Contract Documents" as unsupported and incorrect.

See F.O.F. Pg 10

<u>Page 2, Para 4: "The photographs .."</u>

By the definitions provided by the Corps' engineer of reference, Harding Lawson, and by the categorizations stipulated in the US standard sieve opening sizes, the Particle Size Analyses

incorporated into Section 02222, Pages 159 through 166 of the Contract Specifications indicated that nearly 100% of the gravel materials to be found in the channel would pass between 6mm (1/4") and 40mm (1-1/2"). Cobbles, rocks and boulders not passing a US standard sieve opening size 76mm (3") were not evidenced on the particle analyses and their existence according to the Contract Specifications would be "incidental". The photos provided in substantiation of this present claim, depict an abundance of huge rocks, and expansive concentrations of cobbles with a girth of approximately 3" and above. The photographs show deposits of cobbles in such large volumes as to make the C-0131 statement: "the photos show the gravel and cobbles that remained when the sand was washed out" inconsequential and irrelevant. By no standards, could these concentrations and extensive volumes of large boulders and cobbles reasonably be described as "Incidental". The photographs are representative of the material character, and of the sizes and concentrations of rocks, boulders and cobbles that caused the dramatic reductions in productivity below what was possible when conditions (such as in the East Sediment Trap) were as depicted on the Contract Documents. K/M disputes the mitigation attempted in C-0131. K/M holds that the character of materials to be dredged in the channel was misrepresented in the Contract documents and refutes the Corps' April 27, 2006 dismissal of the photographic evidence.

Page 2, Para 5: "Specification Section 02222 .."

While characterizing the debris, the text of the contract specifications Section 02222 paragraph 1.3 directs bidders to Appendix A with attachments containing published records of historic investigations performed by the Corps' engineers of reference. Those detailed records describe the types, dates, locations and extent of investigations performed. Logs contained within those records give the names of all the various categories and compositions of the debris and materials that those engineering firms encountered according to US Standard Sieve Sizes and Numbers, and they incorporate the definitions of the Unified Soil Classification System (USCS) on page 144 of Section 02222. The logs contained annotated graphs, tables and comprehensive, meticulous prose descriptions identifying all the depths where those categorized debris and materials were encountered and how the composition, coarseness, grain size, gradation and plasticity of debris and materials were believed to vary within a precision of one foot.

K/M believes that it was reasonable for bidders to rely on engineering information of this nature about how the sub-sea conditions varied and how debris and material compositions varied, as reference for the estimation of equipment allocations, productivities, and crew distributions, and thereby to give the Corps their lowest, reliable, safe and professional price. If the Corps had not intended for bidders to study and use that documented engineering data for estimating purposes, then the Corps might have written something in the Contract Specifications to clearly and unambiguously disconnect itself from the engineering data of logged debris and material compositions it was providing to the bidders, or it may simply have excluded the historic investigation data and descriptions altogether from the bidding documents. K/W believes that would have been disadvantageous for the Corps who would not get value or consistency from such an approach: such a disconnection or exclusion would have dissuaded bidders, prices that were received for the project were likely to have been very disparate, and overall much higher in view

of the risks emanating from a lack of precision in defining the character and limits of variance of the debris and material conditions.

If it is not reasonable for bidding contractors to study and estimate prices based on such meticulous engineering information, then that information would have no place in the bidding documents, serving only to mislead and confuse bidders about the perceived project scope.

In view of the level of detail inferred by those professionally extracted and comprehensively annotated investigations, and the limits of variance of material character defined therein, any variance in debris and material composition beyond what is depicted by those investigations, is neither contemplated nor quantified for bidders to estimate. The massive extent, the huge individual dimensions, and the extensive proliferation of impediments such as enormous rocks, boulders, high concentrations of cobbles and man-made debris within the dredge envelope was not suggested by these historic investigations. Therefore, while the material composition encapsulated by these published historic definitions and by the Corps' own Specification text was forecasted to "vary significantly over the project area", the bounds within which the bidders were directed to expect that composition to vary, were clearly defined by that same text, as "Incidental".

Both the historic and the 'present day' descriptions of the character and limits of variance of debris and materials composition provided in the Contract Documents misrepresent and are far removed from the actual conditions that were encountered. In the actual conditions encountered, productivity for the Dredge Bechtolt was reduced by about half from 2,680 cy/12-hr shift in the East Sediment trap where conditions for dredging 140,000 cubic yards of material were consistent with the bidding information, to around 1,340 cy/12-hr shift in the balance 153,000 cubic yards of its dredging operations, bringing its overall average productivity for its total of 293,000 cubic yards dredged to approximately 1,760 cy/12-hr shift. Productivity for the DB Viking was reduced by over 40% from a conservatively estimated 3,500 cy/12-hr shift to around 2,043 cy/12-hr shift over the 298,000 cubic yards of its dredging operations.

In the actual conditions encountered, the variance in debris and material composition extended far beyond the definition and bounds of "Incidental". Time spent dealing with the actual conditions encountered, is very much out of character. K/M disagrees with the argument posed by the Corps.

<u>Page 2, Para 6 "In your letter C/SAO-111</u>.."

In a culminating argument, the corps gives reference to an extract from K/M's September 2003 proposal packet and offers up a side-by-side comparison of dredge outcomes.

When reviewing the project, approximately four to five months were assumed to be available for dredging the roughly 600,000 cubic yards stipulated for the base items listed in the Contract Documents, and this corresponded to an average scheduled productivity in a rough magnitude of about 4,500cy/day. The ranges of productivity ventured in the proposal extract serve merely to outline these rudimentary arithmetical observations and are not intended to constitute or define K/M's technical ascertainment of respective estimated productivities and durations for the

dredging operations described in the Contract Documents. Those observations do not address the technical implications of southward (Seattle-bound) tandem vessel demobilization that had to be programmed to occur before the mid-September onset of winter climatic conditions; they do not address the lists and descriptive stipulations of material character provided in the Contract Documents by the Corps; and they do not address the records of historic engineering investigations and borings dating back to 1982 that were incorporated into the Contract Documents by the Corps as referenced appendices. As such this proposal extract provides neither grounds nor technical substance for side-by-side comparison of dredge outcomes. K/M refutes the attempted comparison as hollow and ill-conceived.

In summary, K/M sees neither merit nor justification for the arguments and the conclusion posed by the Corps in its letter reference C-0131 dated April 27, 2006.

K/M respectfully notifies its intention to Claim payment for differing site conditions in accordance with the stipulations of the Disputes Clause (FAR 52.233-1) in the Contract.

DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, ALASKA
SOUTHERN ALASKA AREA OFFICE
P.O. BOX 6898
ELMENDORF AFB, ALASKA 99506-0898

REPLY TO
ATTENTION OF:

April 27, 2006

Anchorage Resident Office C-0131

SUBJECT: Response to C/SAO-111 and C/SAO-112 Dredging Differing Site Condition and Request for Equitable Adjustment, Contract DACW85-03-C-0014, Nome Navigation Improvement, Nome, Alaska

Kiewit/Manson JV
1577 "C" Street, Suite 100
Anchorage, Alaska 99501-5127

Gentlemen:

The purpose of this letter is to respond to your letters C/SAO-111 and C/SAO-112 regarding a Differing Site Condition for Dredging and a Request for Equitable Adjustment.

Regarding the debris found during dredging, from your letter C/SAO-111 Appendix 2 we tabulated the total hours available for dredging as 4,224 (88 days for Bechtolt X 24 hours per day, and 88 days for the Viking x 24 hours per day). The tabulated amount of time to clear blockages was 358 hours (the total time to pump clean and head clean the Bechtolt). This results in 8 percent of the dredging time being used for debris cleaning which includes the known debris field. The land-based dredging of the sand spit cut would further reduce the percentage of time dealing with project-wide debris.

Pages 36 and 37 of your proposal show the Bechtolt was scheduled to dredge the sandspit cut from the elevation –8 feet and deeper. You chose to dig the sandspit to –2 feet by land based means, and dredge with the Bechtolt below –2 feet. As evidenced by the Betcholt's daily logs on July 9 through July 12, you encountered significant debris during the dredging of the sandspit cut. Your choice to deviate from your proposal resulted in many head and pump cleans on the Bechtolt. The actual percentage of time encountering debris with the Bechtolt would have been further reduced if you had followed the plan in your proposal.

In your letter C/SAO-111, Appendix 2, three columns of time to clear blockages are presented, and the balance of the time in the day is mathematically calculated and labeled as regular operation hours. A face value reading of this table would lead one to conclude that dredging was occurring anytime when clearing of blockages and pump wash backs were not being done, concluding that there is a direct correlation between time to clear blockages and

pump wash, and the quantity of material dredged. However, when the dredge daily reports are examined, there are activities such as moving anchors, moving the dredge, working on the engine, working on dredge swing arms, computer problems, moving the pipe, extending the pipe, moving the discharge scow, and general repairs occurring almost every day. This review concluded there is a significant amount of time and many other factors affecting the time to dredge besides the annotated wash backs, pump cleans, and head cleans in your letter.

A debris area, although mislocated but apparently not mis-sized, was found as indicated in your letter C/SAO-069. This was a known debris area at the time of bidding, and so cannot be a differing site condition.

Page 49 of your proposal also states "The resources we intend to employ give us tremendous flexibility in performing the work given the potential for variations in the material type, sea conditions, and possible miscellaneous debris removal." This statement indicates you were prepared to deal with varied site conditions.

The Viking daily reports were reviewed; between the dates of June 27 and July 31, difficult dredging conditions were noted on almost every daily log. During this time, the Viking was working between Stations 33+00 and 48+00. The boring logs corresponding to this section of the project include HLO-3, HLO-4 and HLO-5, which are parallel to the dredging to be done and are representative of the dredging conditions in this area. These boring logs show glacial till starting at –2.5, -1 and –1.5 feet elevations below the mud line respectively, and extend to the project depth. Further, Section 02222 Paragraph 1.3 defines glacial till as "unstratified sediments such as cobbles, gravel, sand, silt and clay intermingled in a dense, tight matrix." Encountering hard dredging in this area is represented in the contract documents.

The photographs in your letter C/SAO-111 Appendix 3 were reviewed. The photograph labels do not show where the Betcholt was dredging when the photos were taken. Your letter states 153,265 cubic yards of material was dredged by the Bechtolt. The Appendix 3 photos do not show the 153,265 cubic yards of sand and other material discharged by the Bechtolt; rather, the photos show the gravel and cobbles that remained when the sand was washed out. These photos are not representative of the mix of material or the ratio of sand to cobbles throughout the project dredging area.

Specification Section 02222, Paragraph 1.3 characterizes the debris and indicates it may vary significantly and should be expected over the entire project area. This paragraph indicates there is a wide variety of debris, gravel, cobbles and boulders expected over the entire site. The actual conditions encountered are as described in the contract documents, and the time spent dealing with the debris, gravel, cobbles and boulders is not out of character.

In your letter C/SAO-111 Appendix 1 there is a calculation of the additional dredge time by the Viking and Bechtolt dredges due to a claimed differing site condition. Pages 36 through 38 of your technical proposal were reviewed to determine the time you planned to be dredging. Below are excerpts from your proposal:

- **Dredging the Entrance Channel** was scheduled with the Bechtolt dredge, utilizing 119 workdays between June 1 and October 31, at the scheduled rate of 5,000 CY per day, 7 days per week, 24 hours per day.
- **Dredging the Entrance Channel Sand Spit only below –8 elevation** was scheduled with the Bechtolt dredge, utilizing 119 workdays between June 1 and October 31, at the scheduled rate of 5,000 CY per day, 7 days per week, 24 hours per day.
- **Dredging the East Sediment Trap** was scheduled with the Bechtolt dredge, utilizing 119 workdays between June 1 and October 31, at the scheduled rate of 3,500 CY per day, 7 days per week, 24 hours per day.
- **Dredging the Dock Area** was scheduled with the Viking derrick barge, utilizing 119 workdays between June 1 and October 31, at the scheduled rate of 4,000 CY per day, 7 days per week, 24 hours per day.
- **Dredging the Entrance Channel (Snake River)** was scheduled with the Viking derrick barge, utilizing 119 workdays between June 1 and October 31, at the scheduled rate of 4,000 CY per day, 7 days per week, 24 hours per day.

Appendix 2 of Letter C/SAO-111 shows in a tabular format the dredge Bechtolt started work on June 16, 2005 and ended work on September 10, 2005, for a total of 88 days. Likewise, the dredge Viking started work on June 16, 2005 and ended work on September 4, 2005 for a total of 82 days.

The Bechtolt was scheduled to work 119 days, but finished in 88 days, which is 31 days sooner than scheduled. The Viking was scheduled to work 119 days, but finished in 82 days, which is 37 days sooner than scheduled. Both dredges finished much sooner than scheduled, so there was no impact to the schedule.

In summary, your above referenced serial letters were reviewed and the Government response is your request for equitable adjustment and claimed differing site condition has no merit. If you disagree with this position you may take further action in accordance with the Disputes Clause (FAR 52.233-1), in your contract.

Sincerely,

Roger D. Williams
Contracting Officer

# Claim Attachment III

## Copy of the Request for Equitable Adjustment due to Differing Site Conditions dated March 28, 2006

**KIEWIT/MANSON, A JOINT VENTURE**
P.O. Box 1689, Nome, Alaska 99762
(907) 443-7651 - Fax (907) 443-7663

March 28, 2006 C/SAO-111

Administrative Contracting Officer
Southern Alaska Area Office
c/o US Army Engineer District, Alaska
P.O. Box 6898
Elmendorf AFB, Alaska 99506-0898

Reference: Nome Navigation Improvements
Contract No. DACW85-003-C

Subject: Differing Site Conditions - Dredging
Request for Equitable Adjustment

Dear Mr. Flodin,

K/M acknowledges the Corps' letter dated September 19, 2005 responding to K/M notifications referenced C/SAO-084, -086, -087 and -093 dated respectively July 9, July 23, August 3, and August 30, 2005. In those referenced letters K/M gave repeated and ongoing notice of subsurface conditions at the above site which differ materially from those indicted in the Contract. Prompt and ongoing verbal and written notices were provided to the Corps in the form of statements by authorized representatives of K/M in informal discussions, formal weekly meetings, daily dredging reports and monthly summary reports.

K/M was required to continue performance of the dredging operations in these materially differing conditions and to initiate remedial actions aimed at safeguarding the project schedule. Pictorial records and photographs were created and maintained by K/M so that there would be a retrospective illustration of daily conditions described in K/M's notifications and logs. These were incorporated into the daily QC reporting and were available any time the Contracting Officer was able to visit Nome. Additionally, the Corps' appointed Quality Assurance Representative (QAR) was taken on board the dredge vessels daily to witness the dredging activities. The photographs depict some of the heavy boulders and large rocks that were removed from the dredging equipment, together with massive concentrations of large and medium sized cobbles, rope, lumber, metal and tires. These snap-shot views can not however communicate the magnitude of the actual day to day physical conditions that caused disruption, impacts on the dredge equipment, repeated, premature repair or replacement of major mechanical components, and the reductions in output while dredging in the inner channel zone, the sand spit zone and the offshore zone of the New Entrance Channel. At no time however did K/M shut down operations.

The Corps' letter dated September 19, 2005 responding to K/M's earlier notifications, came two weeks after the completion of dredging activities and stated the Corps' position that the Contract documents do convey adequately the conditions encountered and that impacts of delays due to the encountered material do not have merit. K/M does not agree with that position.

The text of Specification section 02222.1.3 states that the 'composition' of materials may vary significantly over the project area. That same text is specific however, not only in naming the sunken natural materials, including cobbles, it believed should be expected throughout the excavation and dredging areas, but also in defining their concentration as "incidental". In execution however, K/M found the mass and concentration of boulders, large rocks and cobbles to be far in excess of "incidental". The summary statement in the second paragraph of the Corps' letter is vague: Specification section 02222.1.3 does not describe metal debris as a wide variety of material. On the contrary, the Specification was again specific in stipulating the nature of sunken man-made materials to be expected throughout the excavation and dredging areas. Further, a photograph with arrows signaling a visible 'known' rectangular shaped area of metal debris, and the location of a partially sunken barge, is enclosed in Appendix B, depicting the visible and known magnitude and character of the work believed by the Corps to be involved in removing that old metal structure and the metal debris accumulated nearby. The text also directs bidders to Appendices 02222A and C which contain published exploration logs for the area to be dredged and excavated dating back to 1982, along with a 'portion' of a design memorandum and various geotechnical data describing the project vicinity.

Production rates and the 'Measured Mile' Standard

K/M utilized the above detailed engineering data, descriptions and photographs provided by the Corps within the pages of those Specifications and Appendices, in conjunction with historic productivity records retained from previous dredging projects, to estimate dredging equipment capabilities in the New Entrance Channel, and determine the apportionment of dredging tasks between clamshell and hydraulic cutter-head methods.

K/M's analysis of the engineering data together with historic records retained from previous projects, indicated that in conditions such as those depicted in the published exploration logs, Specifications and Appendices, daily dredge productivity for the Hydraulic Dredge Bechtolt would be in the region of 3,000cy/12-hr shift (6,000cy/double 12-hr shifts), and that daily dredge productivity for the accompanying Clamshell Dredge DB Viking would be in the region of 3,500cy/12-hr shift.

Daily dredge production rates achieved by the Hydraulic Dredge Bechtolt in the East Sediment Trap where the character of the materials dredged was found to be consistent with that depicted in the text of the Specification section 02222.1.3 and in the referenced Appendices, were in the region of 3,000 cy/12-hour shift, consistent with K/M's historic project records and estimated project productivity for that dredge equipment. K/M considers the roughly 2,680 cy/12-hr shift attained in the Sediment Trap as affirmation of a 'Measured Mile' baseline standard of productivity for that Hydraulic Dredge equipment operating in the conditions inferred by the Contract Documents. No such 'Measured Mile' baseline standard could be established for the DB Viking and therefore K/M's calculations of impact to Clamshell Dredge activities arising out of the differing conditions, are based upon the conservatively estimated productivity of 3,500cy/12-hr shift for this project, extracted from historic productivity records retained from previous dredging projects.

The production rates for both vessels were dramatically compromised in all other zones of the site, both by increased stoppages to dislodge and remove large items from the hydraulic cutting, pumping and discharge equipment, and by the unexpected volume and concentration of cobbles found in the sea bed of the inner and outer channel and not inferred by the published exploration logs.

From the very outset, the extent and the concentrations of subsurface garbage, hard materials, large rocks and scattered metal debris being encountered by the dredge equipment during the early dredging operations were very different from the descriptions and concentrations depicted in the text of the Specification section 02222.1.3 and in the referenced Appendices.

The August 1991 memo

The Corps cites the August 5, 1991 memo provided in the bidding documents. K/M did review that 1991 memo. The cobble percentages cited in the Corps' letter are merely extracts from one of three investigations that were done almost a half mile away from the contractual dredge zones and as such these extracts do not completely or accurately represent the full extent of the detailed material content or the summary findings noted in the report.
The contract documents contain detailed published exploration logs arising from numerous investigations done on different occasions before and since that date, located either inside or within the immediate proximity of the inner channel and the New Entrance Channel dredge zone. K/M considers those investigations to be more pertinent to conditions in the contract dredge zone and of far greater relevance for bidders when estimating productivities, resources and prices for performing the work.

The report done on those investigations from almost a half mile away to the North-west, states that at Station 12+50 where water was about 10 feet deep, the engineers proceeded by digging a hole about 4.5 to 5 feet deep. The report states that the engineers retained any bucket load of material that contained cobbles and dumped back into the sea any bucket loads of material that did not contain cobbles. Numbers of bucket loads retained and numbers of bucket loads dumped back into the sea were not recorded. The report does cite some apparent derived maximums however: in all of that investigative operation at station 12+50, the engineer cites a 13 x 13 x 6" boulder and "at one point" 16 cobbles. The summary of investigations at that station states however "In general the soils profile consisted of 1-1.5 feet of dense fine grained sands over about one foot of compact dense sandy gravels with cobbles. At about 3.0 feet a very dense, grayish till of undetermined depth consisting of silts/ clays, sands, gravel, cobbles, and possibly boulders was encountered. A thin layer, approximately 6 inches or so, of soft black sandy silts to silty sands with organics were also encountered above the till material." This description combined with the chart provided in the accompanying Figure 1 would place the cobbles between about -11.50 MLLW and -14.50 MLLW which is below the proposed dredge depth at the inner channel and sand spit (-10.50 MLLW) and just barely at or below the bottom of the dredge depth in the corresponding portion of the New Entrance Channel (-12.50 MLLW). Actual proportions or "incidence" of cobbles in the material being dug are not specified: the only allusion to "incidence" is found in the text adjacent to the accompanying Figure 1 of the report which cites sandy gravel with cobbles. Incidence of boulders is described as: "random" and "possibly".

The report indicates that after about an hour of excavating a 5 foot deep hole in the sea bed, in 14 feet of water at Station 18+00 and 19+00 located some 100 feet farther away to the southwest of the first investigation, numerous cobbles and gravel sized particles were exposed on the barge deck. This description combined with the chart provided in the accompanying Figure 1 would place these gravels and cobbles between approximately -16.00 MLLW and -17.50 MLLW which is again below the proposed dredge depth at the inner channel and sand spit (to be dredged to -10.50 MLLW) and also below the bottom of the dredge depth in the corresponding portion of the New Entrance Channel (to be dredged to -12.50 MLLW). At best, these findings, so far separated from the contractual dredge zones now in discussion, and at depths which are below the dredge depths of this present contract, might be vaguely representative of conditions expected below the causeway dock located at the south-most end of the proposed New Entrance Channel. For most accurate and conclusive characterization of conditions depicted as existing that far offshore at that extreme south end of the causeway dock, bidders would have been well advised to review these 1991 Station 18+00 and 19+00 findings in conjunction with investigation results from at least four of the seven 1982 rotary air drill investigations (HLO 4, 5, 6, 7), and one or two of the 1997 grab samples (SED-3 and SED-4). HLO-4 through HLO-7 depict Till as occurring below -16.50MLLW, and rubble occurring below -44.00 MLLW. HLO-4 through HLO-7 cite medium dense material with no evidence of cobbles or boulders within the dredge envelope depths and the gradations provided with the grab samples SED-3 and SED-4 show 100% passing No. 60 (0.3mm) and No.4 (5.0mm) respectively.

In view of its remoteness, the lack of specificity, the excessive depths at which that boulder and some cobbles were found, and the inconsistency of its findings in comparison to investigations done more closely to and within the new inner and outer channel dredge zone, the findings of this 1991 exploration are considered by K/M as inadequate grounds for the Corps' September 19, 2005 position.

Corps' interpretation of sampling results emanating from the Sand Spit

The Corps has argued that the sampler used for the AP 1000 through AP 1011 test borings was only 2-1/2" in diameter and that we should have inferred the concentrations of large rocks, boulders and cobbles that we encountered when dredging, from notes such as fractured gravel in sampler, refusal, poor sample recovery or no sample recovery. K/M believes that it was up to the respective geotechnical experts to decide at the time of performing these investigations, whether or not to make these inferences, and to publish conclusions giving sizes and definitive concentrations of large rocks, boulders and cobbles that would later be fundamental to prospective bidders' calculations of dredging productivity and total job cost.

We find no specific references to fractured gravel in the cited sampling results. We do find Harding Lawson Associates' reference to "fractured black micaceous schist" obtained at about -58.00 MLLW in the 1982 4-inch rotary wash investigation HLO-2; we find their further reference to "fractured gray micaceous schist" obtained at about -72.50 MLLW in the 1982 4-inch rotary wash investigation HLO-5, and we also find their reference to " rock fragments to 2 inches" in Till, obtained at about -50.00 MLLW in the 1982 4-inch rotary wash investigation HLO-6. These three references to fractured schist and rock fragments in Till are located far below the dredge depths of the New Entrance Channel.
We find only 1 cited example of refusal ("sampler would not advance") out of 40 investigations provided in the Specifications, occurring at -9.30 MLLW, one foot from the bottom of the dredge zone depth, during the 7 Aug 2001 AP 1010 investigation on the sand spit.
We find 1 cited example of poor recovery at +4.50 MLLW. That was located above water level on the sand spit and did not affect sub-sea dredging.
We find two references to no sample recovery below 0.00 MLLW; both in the AP 1007 where a 2.5" rock was wedged in the spoon, and one reference to no recovery above 0.00 MLLW up on the sand spit in the AP 1006 investigation.
There are no specific references to fractured gravel within the depths of the dredge envelop. There was only one example of refusal near the bottom of the dredge depth, and only two references to no sample recovery (rock in tip of spoon) below 0.00 MLLW. These 3 out of a total of a total of 40 investigations provided in the Contract Documents infer only very negligible incidence of cobbles. K/M refutes the Corps' interpretation of the 12 augered investigations as grounds for its September 19, 2005 position.

Glacial Till

The Corps described Glacial Till as "unstratified sediments such as cobbles, gravel, sand, silt and clay intermingled in a dense tight matrix". In 1982, Harding Lawson Associates described Glacial Till as "Gray gravelly silty sands and silt; occasional clean sand and silty gravel. Medium dense to very dense. Contains angular rock fragments (gravels)." The Corps' definition asserts that Glacial Till has cobbles whereas Harding Lawson Associates made no such assertion.

Glacial Till was indeed cited in the 1982 offshore investigations of Harding Lawson Associates, but at depths below the dredge envelope depths. HLO-1, located adjacent to the portion of the New Entrance Channel to be dredged to -12.50 MLLW cites Till starting at -22.80 MLLW, some 10.3 feet below the bottom of the dredge depth at that portion of the New Entrance Channel. HLO-2, also located adjacent to the portion of the New Entrance Channel to be dredged to -12.50 MLLW cites Till starting at -49.00 MLLW, some 36.5 feet below the bottom of the dredge depth at that portion of the New Entrance Channel. HLO-3, also located adjacent to

the portion of the New Entrance Channel to be dredged to -12.50 MLLW cites Till starting at -16.50 MLLW, some 4.0 feet below the bottom of the dredge depth at that portion of the New Entrance Channel. HLO-4, located adjacent to the portion of the New Entrance Channel to be dredged to -22.50 MLLW cites Till starting at -22.50 MLLW, corresponding to the bottom of the dredge depth at that portion of the New Entrance Channel. HLO-5, also located adjacent to the portion of the New Entrance Channel to be dredged to -22.50 MLLW cites Till starting at -34.50 MLLW, some 12 feet below the bottom of the dredge depth at that portion of the New Entrance Channel.

K/M has reviewed the Corps' September 19, 2005 cited interpretations of the Contract documents, Specifications and Appendices. K/M rejects as imprecise, the Corps' blanket statement that "difficult dredging conditions are cited several times in the specifications", and disagrees with the Corps' assertion that Glacial Till was cited within the dredge envelope depths. K/M sees no grounds for the Corps' September 19, 2005 position.

The task of dredging and disposing of the materials encountered by K/M in its commitment to attain the depths and profiles stipulated in the contract, was performed through conscientious, additional allocation of manpower and equipment. No time or resources were wasted in the performance of this work. This work has been completed without detrimental impact on the rest of the project schedule.

K/M respectfully requests the Corps to acknowledge K/M's entitlement and to issue a Change Order enabling K/M to transmit the corresponding additional costs.

Attached please find an explanation of the Differing Site Conditions and impacts on productivity, together with accompanying Appendices I through IV.

Sincerely,

Shawn Lannen
Area Manager

**3-28-06**

# ATTACHMENT TO REBUTTAL OF CORPS LETTER DATED SEPTEMBER 19, 2005

## Summary of Changed Conditions and Request for Equitable Adjustment

### Background

The character of materials that were to be encountered for the dredging operations of this project are described in sub-para 1.3 of Specification Section 02222. This summary description is amplified in greater detail by the engineering investigations which comprise reports of explorations, borings, samplings, particle size analyses, logs and photos in Appendices 02222 A through C dating back to 1982, 1985, 1986, 1991, 1996, 1997, 2000 and 2001. The engineering data provided in those reports and samplings indicated that the dredging operations were to be performed in soil conditions which, compared with our experience in similar conditions, justified our estimated production rates. Kiewit/Manson determined that the Dredge Bechtolt would be able to dredge the majority share of the Inner Channel/Harbor zone as well as the portion of the Sand Spit remaining below EL-2.00. The Causeway Dock, the Outer Channel south of the Sand Spit and a portion of the inner channel waterway where a contract photograph depicted the corroded remains of a partially sunken dredge and a 'known' outcrop of metal debris, was to be cleared by the larger clamshell dredge, DB Viking.

Even accounting for maintenance and repairs historically encountered in conditions matching those inferred by the Contract Documents, the Hydraulic Dredge Bechtolt was expected to sustain an overall average productivity of around 3,000cy/12-hour shift. By contrast the productivity of the Hydraulic Dredge Bechtolt was so severely impaired as to reduce this figure to approximately 1,760cy/12-hour shift. The Clamshell Dredge DB Viking was conservatively expected to sustain an overall average productivity of around 3,500cy/12-hour shift. By contrast the productivity of the DB Viking was so severely impaired as to reduce this figure to approximately 2,040cy/12-hour shift.

### Excessive Amounts of Boulders, Rocks, Large Cobbles, Metal Debris and Garbage, and Hard Material

In the first six days of scheduled dredge operations in the Inner Channel the Dredge Bechtolt encountered excessive amounts of metal debris and cobbles of all sizes in the material being dredged. The hydraulic discharge rate was severely impaired as the large concentrations of metal and wooden debris, cobbles, rocks and boulders continued to impede the flow of material through the mechanical and hydraulic components. Furthermore, dredging productivity was severely impaired as cobbles, boulders and large amounts of metal debris become impaled in the cutter head, lodged in the circulating pump, or wedged inside the discharge pipe, necessitating frequent and lengthy maintenance/repair stoppages. Under these conditions average hourly operating productivity over the first 6 days stood at only 161cy/hr (even after deducting time spent doing routine pump clean outs and wash backs). By day 8 of the dredging operations, June 23, 2005 that average hourly operating productivity had dropped to 154cy/hr. It was by that time apparent that the material being encountered both by the Hydraulic Dredge Bechtolt and the Clamshell Dredge DB Viking was very different in character from what was depicted in the Contract Documents and that these differing conditions might have a detrimental effect on the Project Schedule. Kiewit/Manson notified the Corps to that effect while reviewing the three-week schedule during the Weekly Owners meeting number 39 dated June 21, 2005 and stated that it would be necessary to operate the DB Viking on full time double shifts starting at the south end of the outer harbor to make up for the shortfall in production being achieved.

The DB Viking started double shift operation on day 9, June 24, 2005.

The sunken dredge identified in the plans as "metal debris field" was found to be some distance further north of the location depicted on the project plans. Pieces of that vessel and a large concentration of undocumented corroded metal elements and objects were found to be located more extensively centrally in the waterway and constituted a far greater impediment to the productivity of the hydraulic dredging operations. Consequently, after three weeks of dredging operations in the channel area where this extensive amount of metal debris, rocks, boulders and garbage was encountered, the Dredge Bechtolt only attained an average hourly operating productivity of 168cy/hr.

During dredging operations in the Project, the DB Viking dredged a total of approximately 298,267 cubic yards in approximately 73 days of active dredging operations (very roughly 2,040cy/12-hour shift). The balance approximately 153,265 cubic yards of dredging required to dredge the Harbor areas and complete the New Entrance Channel (excluding the East Sediment Trap) were achieved by the Dredge Bechtolt during its dredging operations up to August 11, 2005 and corresponded to an average operating productivity of approximately 1,340cy/12-hour shift, less than half of the estimated operating productivity (around 3,000cy/12-hour shift).

**<u>Comparative Outcomes and Daily Productivity for the Hydraulic Dredge Bechtolt and the Clamshell Dredge DB Viking</u>**

Compare : 1. dredging results from the inner channel, sand spit and outer channel where conditions were depicted by the AP1000 through AP1011 boring data and the SED-4 grab sample particle data,

with : 2. dredge results in East Sediment Trap depicted by HLO-2.

Note: In order to best demonstrate below the disparity between outcomes achieved by the Hydraulic Dredge Bechtolt in the Harbor/ Channel dredge zones and outcomes achieved in the East Sediment Trap, time expended cleaning the pump, performing wash backs and clearing the cutter head is removed.

1. Hydraulic Dredge Bechtolt average hourly operating productivity achieved throughout regular dredging activities in the Inner Channel, the former Sand Spit, and the Outer Entrance Channel to Sta33+40 after deducting time spent cleaning the pump, performing wash backs and clearing the cutter head: **<u>163 cy/hr</u>**

2. Hydraulic Dredge Bechtolt average hourly operating productivity achieved throughout regular dredging activities in the East Sediment Trap, after deducting time spent cleaning the pump, performing wash backs and clearing the cutter head: **<u>345 cy/hr</u>**

Comparative hourly operating productivity achieved by the Dredge Bechtolt in the Inner Channel, former Sand Spit and Outer Channel to Sta33+40 (163cy/hr) is approximately 47% of that which was achieved in the East Sediment Trap.

It may be noted here that the material encountered in the extreme south-east portion of the East Sediment Trap, just adjacent to the west side of the Main Entrance Channel where the DB Viking was operating, was found to be so hard that the hydraulic dredge cutter head and ladder were seen to bounce and shake. In responding to K/M's notification, RFI #36 dated September 7, 2005, the Corps issued directions dated September 8, 2005 that the area in question should be deleted and that a similar area located at the north end of the East Sediment Trap, be added.

Average hourly operating productivity achieved by the Clamshell Barge DB Viking, even after removing 6 days lost to bad weather, was approximately 187cy/hr, that is approximately 65% of the 290cy/hr (3,500cy/day ÷12hrs) conservatively estimated to be attainable on this project, based on historic project records, and the engineering data, reports and sampling data provided in the Contract Documents.

These comparative dredge outcomes and actual achieved productivity rates are further developed in Appendix I hereto. K/M has established a 'Measured Mile' baseline standard for the Hydraulic Dredge Bechtolt and provided a conservative historic productivity range for the Clamshell Dredge DB Viking so that overall impact of the differing site conditions on the dredge durations for each of these respective vessels, can be identified.

**Data Sampling – Independent Laboratory Report**

The engineering data, reports and sampling data pertinent to the Dredging operations, were provided in the Contract Specifications for AP1000 through AP1011, the SED-4 grab sample and the HLO-2 boring. Per Specifications, the character of material in the northern portions of the new Entrance Channel and Sand Spit was depicted in engineering data, reports and particle size charts emanating from borings AP1000 through AP1011 and the SED-4 grab sample. The character of material in the East Sediment Trap was depicted in engineering data, reports and particle size charts emanating from the HLO-2 boring. All the above engineering data indicated that dredging to the depths required in these locations would generate high dredging productivity.

Kiewit/Manson has commissioned an independent laboratory (Alaska Testlab) to perform a strict characterization of random material samplings taken from four locations inside the East Sediment Trap between August 12 and August 14, 2005. Particle size distributions were documented by Alsaka Testlab per ASTM-D422. Two of the four samplings showed 100% passing 3in.; one showed 100% passing 1-1/2in.; and one showed 100% passing 1in. Two of the four samples each contained one 4" cobble. One sample contained 9 cobbles ranging in size from 4" to 9". The fourth sample contained no cobbles. The results of the independent laboratory reports are provided in Appendix IV hereto.

Kiewit/Manson believes that these four samplings fairly represent the character of materials dredged out of the East Sediment Trap. Consistent with the indications provided by the independent laboratory report, overall hourly Hydraulic Dredge productivity (even after deducting time spent doing routine pump clean outs and wash backs) has been satisfactory in the East Sediment Trap (345cy/hr compared to an hourly average of 168cy/hr elsewhere) and the gradations documented in the independent laboratory report are believed to also be consistent with the information provided in the Contract Specifications for boring analysis HLO-2. That analysis accurately depicted material of a character that could be dredged with high productivity. Overall in the East Sediment Trap, the Hydraulic Dredge Bechtolt achieved an average daily operating productivity of 2,680cy/12-hour shift, which Kiewit/Manson considers to be within an acceptable range of its estimate of around 3,000cy/12-hour shift.

By contrast, Kiewit/Manson has already attached to its daily and monthly reports photographs of the material being encountered during the dredging of the northern and central portion (the former sand spit) of the new Entrance Channel. Kiewit/Manson's equipment has incurred crippling delays, and excessive damage and wear and tear not consistent with operations in material of the character depicted in the Contract Specifications for boring analyses AP1000 through AP1011, the SED-4 grab sample. The photographs attached hereto in Appendix III show the inordinate quantities of large metal debris, large rocks and heavy boulders encountered within material that contained a very high concentration of 5" to 8" cobbles. Material of this character was neither indicated nor inferred by the engineering data, samplings or reports provided in the applicable Contract Specifications, and its concentration seriously impaired hydraulic dredging productivity and discharge rates to the extent that the Dredge Bechtolt achieved an average daily operating productivity of only 1,340cy/12-hour shift in the northern and central portions (inner channel and the sub-sea portion of the former sand spit) of the new Entrance Channel.

**Request For Change Order**

Kiewit/Manson gave verbal notifications and alerts to the Contracting Officer during the early days of encountering these differing site conditions including bringing these concerns to the table in the Owners Meeting dated June 21, 2005. Written follow-up notifications were provided to the Contracting Officer in Kiewit/Manson letters dated respectively July 09, July 23, August 03, and August 30, 2005. Kiewit/Manson believes it has addressed these unforeseen differing site conditions with all due care and diligence in accordance with the requirements of the contract terms.

No objection was issued by the Contracting Officer, in respect of Kiewit/Manson's proposed full-time double shift intervention of the Derrick Viking, as a means to effectively mitigate any likely detrimental impact to the overall dredging and construction schedule.

Kiewit/Manson now requests the issuance of a Change Order under Contract Clause 52.236-2.

# Appendix I – Calculations of Dredge Productivity Impacts based on 'Measured Mile' and Historic Project Productivity Records

**US ARMY CORPS OF ENGINEERS - Alaska District** 6/27/2007
**Nome Navigational Improvements**

**Calculation of Additional Dredge time incurred by Hydraulic Dredge Bechtolt due to Differing Site Conditions where material dredged was not consistent with the Engineering Data provided in the Contract Documents:**

| | | | | |
|---|---|---|---|---|
| 1. | Identification of *"Measured Mile"* Hydraulic Dredge Productivity in locations where dredged material *was* found to be consistent with Engineering Data provided in the Contract Documents: | | | |
| | East Sediment Trap | Vol = | 139,229 | CY per daily reports |
| | Hydraulic Dredge Time (operating days) | | 26 | double shift operating days |
| | *"Measured Mile"* Achieved Hydraulic Dredge Productivity | | **5,355** | CY/day (double shift) 139,229 / 26 |
| 2. | Identification of locations where Hydraulic Dredge Productivity incurred losses and delays due to Differing Site Conditions: | | | |
| | Inner Harbor, Channel and Option Areas A-VI thru A-VIII | | 153,265 | CY per pay quantities |
| | Actual Outcome Hydraulic Dredge Time (operating days) | | 57 | double shift operating days |
| | Actual Achieved Hydraulic Dredge Productivity | | **2,689** | CY/day (double shift) 153,265 / 57 |
| 3. | *"Measured Mile"* Hydraulic Dredge Time applied to areas where Differing Site Conditions were encountered: | | | |
| | Inner Harbor, Channel and Option Areas A-VI thru A-VIII | | 153,265 | CY per daily reports |
| | *"Measured Mile"* Achieved Hydraulic Dredge Productivity | | 5,355 | CY/day (double shift) |
| | *"Measured Mile"* Hydraulic Dredge Time (operating days) | | **29** | double shift operating days |
| **Additional Hydraulic Dredge Bechtolt time due to Differing Site Conditions:** | | ( 57 - 29 ) | **28** | **double shift operating days** |

**US ARMY CORPS OF ENGINEERS - Alaska District**
**Nome Navigational Improvements**

## Calculation of Additional Dredge time incurred by Clamshell Dredge DB Viking due to Differing Site Conditions where material dredged was not consistent with the Engineering Data provided in the Contract Documents:

| | | | |
|---|---|---|---|
| 1. | Historic Productivity achieved by DB Viking and 14CY bucket, in conditions of similar character to those inferred by the Engineering Data provided in the Contract Documents: | | |
| | DB Viking dredging productivity historically ranges between approximately | | 3,000 to 4,500CY/12-hr shift |
| | Conservatively estimated productivity based on historic averages: | 3,500 | CY/12-hr shift |
| 2. | Estimate of Number of Double Shift operating days to perform the actual dredged quantity | | |
| | Total volume of material dredged by DB Viking: | 298,267 | CY pay quantities per KWT |
| | Estimated Total Shifts based on historic productivity | 85 | 12-hr shifts 298,267 / 3,500 |
| | Estimated number of operating days of double 12-hr shifts | 43 | double 12-hr shift operating days |
| 3. | Net Duration of Dredging performed by DB Viking in unforeseen concentrations of Boulders, Rocks, Large Cobbles, Metal Debris and Garbage, and Hard Material | | |
| | Total actual number of operating days of double 12-hr shifts | 88 | double 12-hr shift operating days |
| | Less: | | |
| | removing sunken barge/dredge | (0.5) | *7/27 one shift* |
| | July 4, 2005 holiday | (1) | *7/4 both shifts* |
| | standby | (7) | *9/5 thru 9/11 both shifts* |
| | weather stoppage | (6.5) | *7/11, 7/12 (one shift), 7/13, 8/6-8, 8/28* |
| | Net actual number of operating days of double 12-hr shifts | 73 | double 12-hr shift operating days |
| | *6/16 thru 9/11 = 88 double shift days inclusive* | | |
| **Additional Clamshell Dredge DB Viking time due to Differing Site Conditions:** | ( 73 - 43 ) | **30** | **double shift operating days** |

## Appendix II - Abstracts of Daily and Hourly Dredge Productivity

## II. 1. Abstract of Daily and Hourly Dredge Productivity – Dredge Bechtolt

Compare : 1. dredging results from in inner channel, sand spit and outer channel where conditions were depicted by the AP1000 through AP1011 boring data and the SED-4 grab sample particle data,

with : 2. dredge results in East Sediment Trap depicted by HLO-2.

1. Dredge results in Inner Channel, Sand Spit, and Offshore portion of New Entrance Channel June 16, 2005 to August 11, 2005 (Refer to boring log AP 1000 to AP 1011, and SED-4 grab sample)

| Date | Production (cy/day) | Time to Clear Blockages (min) wash back | pump clean | clean head | Total | Regular Operation (hrs) | Hourly Productivity (cy/hr) |
|---|---|---|---|---|---|---|---|
| 6/16/2005 | 3000 | 5 | 30 | 205 | 240 | 20.00 | 150 |
| 6/17/2005 | 2500 | 10 | 0 | 112 | 122 | 21.97 | 114 |
| 6/18/2005 | 4750 | 74 | 60 | 85 | 219 | 20.35 | 233 |
| 6/19/2005 | 2700 | 57 | 110 | 35 | 202 | 20.63 | 131 |
| 6/20/2005 | 3500 | 37 | 245 | 39 | 321 | 18.65 | 188 |
| 6/21/2005 | 3000 | 35 | 150 | 70 | 255 | 19.75 | 152 |
| 6/22/2005 | 3000 | 40 | 375 | 30 | 445 | 16.58 | 181 |
| 6/23/2005 | 1600 | 179 | 160 | 0 | 339 | 18.35 | 87 |
| 6/24/2005 | 2000 | 15 | 300 | 0 | 315 | 18.75 | 107 |
| 6/25/2005 | 2500 | 70 | 80 | 180 | 330 | 18.50 | 135 |
| 6/25/2005 | 2500 | 70 | 80 | 180 | 330 | 18.50 | 135 |
| 6/26/2005 | 2000 | 150 | 345 | 250 | 745 | 11.58 | 173 |
| 6/27/2005 | 2000 | 75 | 450 | 110 | 635 | 13.42 | 149 |
| 6/28/2005 | 4000 | 20 | 150 | 80 | 250 | 19.83 | 202 |
| 6/29/2005 | 3500 | 80 | 312 | 110 | 502 | 15.63 | 224 |
| 6/30/2005 | 5000 | 35 | 240 | 40 | 315 | 18.75 | 267 |
| 7/1/2005 | 5200 | 20 | 150 | 40 | 210 | 20.50 | 254 |
| 7/2/2005 | 3200 | 30 | 300 | 80 | 410 | 17.17 | 186 |
| 7/3/2005 | 3500 | 40 | 270 | 110 | 420 | 17.00 | 206 |
| 7/4/2005 | 4500 | 40 | 165 | 50 | 255 | 19.75 | 228 |
| 7/5/2005 | 2800 | 35 | 225 | 20 | 280 | 19.33 | 145 |
| 7/6/2005 | 2000 | 80 | 345 | 0 | 425 | 16.92 | 118 |
| 7/7/2005 | 2500 | 30 | 90 | 60 | 180 | 21.00 | 119 |
| 7/8/2005 | 2200 | 25 | 120 | 40 | 185 | 20.92 | 105 |
| 7/9/2005 | 2500 | 100 | 430 | 90 | 620 | 13.67 | 183 |
| 7/10/2005 | 3300 | 75 | 270 | 170 | 515 | 15.42 | 214 |
| 7/11/2005 | 4000 | 80 | 540 | 160 | 780 | 11.00 | 364 |
| 7/12/2005 | 3500 | 150 | 250 | 0 | 400 | 17.33 | 202 |
| 7/13/2005 | 4000 | 110 | 195 | 85 | 390 | 17.50 | 229 |
| 7/14/2005 | 5300 | 100 | 145 | 30 | 275 | 19.42 | 273 |
| 7/15/2005 | 3200 | 85 | 160 | 35 | 280 | 19.33 | 166 |
| 7/16/2005 | 2750 | 40 | 135 | 30 | 205 | 20.58 | 134 |
| 7/17/2005 | 4000 | 50 | 155 | 55 | 260 | 19.67 | 203 |
| 7/18/2005 | 4500 | 55 | 120 | 40 | 215 | 20.42 | 220 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7/19/2005 | 5200 | 75 | 80 | 20 | 175 | 21.08 | 247 |
| 7/20/2005 | 3500 | 10 | 145 | 115 | 270 | 19.50 | 179 |
| 7/21/2005 | 3300 | 75 | 90 | 80 | 245 | 19.92 | 166 |
| 7/22/2005 | 3500 | 50 | 55 | 25 | 130 | 21.83 | 160 |
| 7/23/2005 | 2500 | 50 | 90 | 40 | 180 | 21.00 | 119 |
| 7/24/2005 | 1000 | 10 | 0 | 0 | 10 | 23.83 | 42 |
| 7/25/2005 | 2500 | 80 | 110 | 30 | 220 | 20.33 | 123 |
| 7/26/2005 | 1000 | move with Viking into inner harbor | | | | 0.00 | n/a |
| 7/27/2005 | 200 | relocate sunken dredge | | | | 0.00 | n/a |
| 7/28/2005 | 2000 | 55 | 0 | 45 | 100 | 22.33 | 90 |
| 7/29/2005 | 2500 | 60 | 280 | 50 | 390 | 17.50 | 143 |
| 7/30/2005 | 3200 | 120 | 150 | 90 | 360 | 18.00 | 178 |
| 7/31/2005 | 4000 | 50 | 145 | 55 | 250 | 19.83 | 202 |
| 8/1/2005 | 2000 | 125 | 230 | 90 | 445 | 16.58 | 121 |
| 8/2/2005 | 2000 | 55 | 190 | 115 | 360 | 18.00 | 111 |
| 8/3/2005 | 2500 | 100 | 180 | 175 | 455 | 16.42 | 152 |
| 8/4/2005 | 2500 | 100 | 110 | 100 | 310 | 18.83 | 133 |
| 8/5/2005 | 1000 | 150 | 290 | 45 | 485 | 15.92 | 63 |
| 8/6/2005 | 2000 | 145 | 235 | 130 | 510 | 15.50 | 129 |
| 8/7/2005 | 2200 | 55 | 170 | 85 | 310 | 18.83 | 117 |
| 8/8/2005 | 3000 | 105 | 260 | 65 | 430 | 16.83 | 178 |
| 8/9/2005 | 1500 | 0 | 65 | 15 | 80 | 22.67 | 66 |
| 8/10/2005 | 3000 | 35 | 95 | 145 | 275 | 19.42 | 155 |
| 8/11/2005 | 1500 | 40 | 105 | 60 | 205 | 20.58 | 73 |

Bechtolt average hourly operating productivity for regular operation activities in the Inner Channel, the former Sand Spit and the Offshore portion of New Entrance Channel after deduction of time spent cleaning the pump, performing wash backs and clearing the cutter head: **163 cy/hr**

2. Dredge results in East Sediment Trap August 12, 2005 to August 21, 2005
Dredging from North End to south End of Trap
(Refer to boring log HLO-2)

| Date | Production (cy/day) | Time to Clear Blockages (min) wash back | pump clean | clean head | Total | Regular Operation (hrs) | Hourly Productivity (cy/hr) |
|---|---|---|---|---|---|---|---|
| 8/12/2005 | 7,500 | 100 | 375 | 10 | 485 | 15.92 | 471 |
| 8/13/2005 | 11,450 | 100 | 325 | 20 | 445 | 16.58 | 690 |
| 8/14/2005 | 8,900 | 140 | 260 | 75 | 475 | 16.08 | 553 |
| 8/15/2005 | 9,100 | 90 | 190 | 10 | 290 | 19.17 | 475 |
| 8/16/2005 | 5,500 | 100 | 305 | - | 405 | 17.25 | 319 |
| 8/17/2005 | 6,729 | 55 | 105 | 425 | 585 | 14.25 | 472 |
| 8/18/2005 | 12,280 | 100 | 265 | 25 | 390 | 17.50 | 702 |
| 8/19/2005 | 7,700 | 175 | 175 | 85 | 435 | 16.75 | 460 |
| 8/20/2005 | 7,000 | 35 | 65 | 40 | 140 | 21.67 | 323 |
| 8/21/2005 | 6,077 | 10 | 150 | 5 | 165 | 21.25 | 286 |
| 8/22/2005 | 3,465 | 100 | 290 | 20 | 410 | 17.17 | 202 |
| 8/23/2005 | 0 | repair | 0 | 0 | 0 | 0.00 | * |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8/24/2005 | 0 | repair | 0 | 0 | 0 | 0.00 | * |
| 8/25/2005 | 0 | repair | 0 | 0 | 0 | 0.00 | * |
| 8/26/2005 | 4,542 | 100 | 235 | 20 | 355 | 18.08 | 251 |
| 8/27/2005 | 2,000 | 45 | 145 | 15 | 205 | 11.58 | 173 |
| 8/28/2005 | 0 | repair | 0 | 0 | 0 | 0.00 | * |
| 8/29/2005 | 9,723 | 0 | 25 | 0 | 25 | 13.58 | 716 |
| 8/30/2005 | 3,350 | 50 | 200 | 30 | 280 | 19.33 | 173 |
| 8/31/2005 | 2,146 | 50 | 210 | 10 | 270 | 19.50 | 110 |
| 9/1/2005 | 4,000 | 5 | 120 | 10 | 135 | 21.75 | 184 |
| 9/2/2005 | 3,511 | 15 | 50 | 0 | 65 | *7.42 | 473 |
| 9/3/2005 | 3,289 | 75 | 150 | 35 | 260 | 19.67 | 167 |
| 9/4/2005 | 6,850 | 135 | 90 | 20 | 245 | 19.92 | 344 |
| 9/5/2005 | 2,070 | 100 | 230 | 5 | 335 | 18.42 | 112 |
| 9/6/2005 | 3167 | 75 | 125 | 15 | 215 | 20.42 | 155 |
| 9/7/2005 | 3722 | 100 | 180 | 65 | 345 | 18.25 | 204 |
| 9/8/2005 | 5200 | 140 | 230 | 20 | 390 | 17.50 | 297 |
| 9/9/2005 | 7000 | 75 | 190 | 10 | 275 | 19.42 | 361 |
| 9/10/2005 | 4000 | 0 | 50 | 15 | 65 | *13.42 | 298 |
| 9/11/2005 | 0 | weather | 0 | 0 | 0 | 0.00 | * |

* days with extensive weather/repair time

Bechtolt average hourly operating productivity for regular operation activities in the East Sediment Trap, after deduction of time spent doing routine clean outs and wash backs: **345 cy/hr**

Note : Hydraulic Dredging of the East Sediment Trap as depicted above, started in the north portion and central portions and progressed toward the south and south-east portions. Hourly productivities were found to become lower as dredging operations in the Trap moved to the south-east segment of the Trap which was nearer to the dredge zone of the adjacent New Channel where the differing site conditions had been previously experienced.

Despite this reduction in hourly operating productivity on days when the dredge was operating in the portion of the Trap that was closest to the New entrance Channel dredge zone, forecasted overall daily average hydraulic dredge productivity (approximately 3,000 cubic yards per 12-hour shift) was still achieved in the East Sediment Trap compared with approximately half of that (approximately 1,450 cubic yards per 12-hour shift) which had been achieved in the New Entrance Channel.

## II. 2. Abstract of Daily and Hourly Dredge Productivity – DB Viking

Note: The DB Viking started dredge operations on single 12-hour shifts, and went on to double 12-hour shifts commencing June 24, 2005.

| Date | production (CY) | | pro / hr | | days on site | days of production | avg prod/hr |
|---|---|---|---|---|---|---|---|
| 6/16/2005 | 3,365 | | 280 | cy/hr | 1 | 1 | |
| 6/17/2005 | 2,326 | | 194 | | 2 | 2 | |
| 6/18/2005 | 1,552 | | 129 | | 3 | 3 | 201 |
| 6/19/2005 | 0 | repair | 0 | | 4 | 4 | 151 |
| 6/20/2005 | 0 | repair | 0 | | 5 | 5 | 121 |
| 6/21/2005 | 2,251 | | 188 | | 6 | 6 | 132 |
| 6/22/2005 | 3,001 | | 250 | | 7 | 7 | 149 |
| 6/23/2005 | 3,849 | | 321 | | 8 | 8 | 170 |
| 6/24/2005 | 5,834 | start dbl shift | 243 | | 9 | 9 | 178 |
| 6/25/2005 | 4,641 | | 193 | | 10 | 10 | 180 |
| 6/26/2005 | 5,156 | | 215 | | 11 | 11 | 183 |
| 6/27/2005 | 5,430 | | 226 | | 12 | 12 | 187 |
| 6/28/2005 | 4,916 | | 205 | | 13 | 13 | 188 |
| 6/29/2005 | 5,065 | | 211 | | 14 | 14 | 190 |
| 6/30/2005 | 6,027 | | 251 | | 15 | 15 | 194 |
| 7/1/2005 | 4,903 | | 204 | | 16 | 16 | 194 |
| 7/2/2005 | 4,872 | | 203 | | 17 | 17 | 195 |
| 7/3/2005 | 6,176 | | 257 | | 18 | 18 | 198 |
| 7/4/2005 | 0 | off July 4 | 0 | | 19 | | 198 |
| 7/5/2005 | 4,872 | | 203 | | 20 | 19 | 199 |
| 7/6/2005 | 4,812 | | 201 | | 21 | 20 | 199 |
| 7/7/2005 | 6,502 | | 271 | | 22 | 21 | 202 |
| 7/8/2005 | 5,005 | | 209 | | 23 | 22 | 202 |
| 7/9/2005 | 4,857 | | 202 | | 24 | 23 | 202 |
| 7/10/2005 | 6,191 | | 258 | | 25 | 24 | 205 |
| 7/11/2005 | 0 | weather | 0 | | 26 | | 205 |
| 7/12/2005 | 1,140 | | 48 | | 27 | 24.5 | 198 |
| 7/13/2005 | 0 | weather | 0 | | 28 | | 198 |
| 7/14/2005 | 2,414 | | 101 | | 29 | 25.5 | 195 |
| 7/15/2005 | 5,169 | | 215 | | 30 | 26.5 | 195 |
| 7/16/2005 | 6,249 | | 260 | | 31 | 27.5 | 198 |
| 7/17/2005 | 6,176 | | 257 | | 32 | 28.5 | 200 |
| 7/18/2005 | 6,220 | | 259 | | 33 | 29.5 | 202 |
| 7/19/2005 | 5,185 | | 216 | | 34 | 30.5 | 202 |
| 7/20/2005 | 6,145 | | 256 | | 35 | 31.5 | 204 |
| 7/21/2005 | 6,160 | | 257 | | 36 | 32.5 | 206 |
| 7/22/2005 | 6,278 | | 262 | | 37 | 33.3 | 207 |
| 7/23/2005 | 6,235 | | 260 | | 38 | 34.5 | 209 |
| 7/24/2005 | 6,160 | | 257 | | 39 | 35.5 | 210 |
| 7/25/2005 | 5,138 | | 214 | | 40 | 36.5 | 210 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/26/2005 | 5,081 | rem sunk bg | 212 | 41 | 37.5 | 210 |
| 7/27/2005 | 4,265 | rem sunk bg | 178 | 42 | 38 | 209 |
| 7/28/2005 | 5,094 | | 212 | 43 | 39 | 209 |
| 7/29/2005 | 6,354 | | 265 | 44 | 40 | 211 |
| 7/30/2005 | 6,295 | | 262 | 45 | 41 | 212 |
| 7/31/2005 | 4,961 | | 207 | 46 | 42 | 212 |
| 8/1/2005 | 6,042 | | 252 | 47 | 43 | 213 |
| 8/2/2005 | 4,886 | | 204 | 48 | 44 | 213 |
| 8/3/2005 | 4,931 | | 205 | 49 | 45 | 212 |
| 8/4/2005 | 3,776 | | 157 | 50 | 46 | 211 |
| 8/5/2005 | 2,313 | | 96 | 51 | 47 | 209 |
| 8/6/2005 | 0 | weather | 0 | 52 | | 209 |
| 8/7/2005 | 0 | weather | 0 | 53 | | 209 |
| 8/8/2005 | 0 | weather | 0 | 54 | | 209 |
| 8/9/2005 | 3,702 | | 154 | 55 | 48 | 208 |
| 8/10/2005 | 4,448 | | 185 | 56 | 49 | 207 |
| 8/11/2005 | 5,035 | | 210 | 57 | 50 | 207 |
| 8/12/2005 | 6,414 | | 267 | 58 | 51 | 209 |
| 8/13/2005 | 4,976 | | 207 | 59 | 52 | 208 |
| 8/14/2005 | 6,445 | | 269 | 60 | 53 | 210 |
| 8/15/2005 | 6,504 | | 271 | 61 | 54 | 211 |
| 8/16/2005 | 5,185 | | 216 | 62 | 55 | 211 |
| 8/17/2005 | 6,221 | | 259 | 63 | 56 | 212 |
| 8/18/2005 | 5,156 | | 215 | 64 | 57 | 212 |
| 8/19/2005 | 4,946 | | 206 | 65 | 58 | 212 |
| 8/20/2005 | 6,131 | | 255 | 66 | 59 | 212 |
| 8/21/2005 | 0 | repair | 0 | 67 | 60 | 209 |
| 8/22/2005 | 4,887 | | 204 | 68 | 61 | 209 |
| 8/23/2005 | 6,071 | | 253 | 69 | 62 | 209 |
| 8/24/2005 | 3,452 | | 144 | 70 | 63 | 208 |
| 8/25/2005 | 3,673 | | 153 | 71 | 64 | 208 |
| 8/26/2005 | 5,156 | | 215 | 72 | 65 | 208 |
| 8/27/2005 | 3,571 | | 149 | 73 | 66 | 207 |
| 8/28/2005 | 0 | weather | 0 | 74 | | 207 |
| 8/29/2005 | 1,214 | | 51 | 75 | 67 | 205 |
| 8/30/2005 | 2,282 | | 95 | 76 | 68 | 203 |
| 8/31/2005 | 2,742 | | 114 | 77 | 69 | 202 |
| 9/1/2005 | 2,209 | | 92 | 78 | 70 | 200 |
| 9/2/2005 | 1,429 | | 60 | 79 | 71 | 198 |
| 9/3/2005 | 566 | | 24 | 80 | 72 | 196 |
| 9/4/2005 | 566 | | 24 | 81 | 73 | 193 |

DB Viking average hourly operating productivity: 187 cy/hr

x