**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KIEWIT/MANSON JV,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 06-796 C<br>(Judge Horn) |

PROPOSED STIPULATION OF FACTS (Corrected)

Pursuant to the Court's March 10, 2008 and May 9, 2008 orders, the parties attempted unsuccessfully to reach agreement upon a joint stipulation of facts. In an effort to comply with the Court's noon May 15 deadline, defendant combined the proposed stipulations that plaintiff sent us at 3:30pm EST May 14, with those additional proposed stipulations that we drafted after receiving plaintiff's May 14 proposal. In our haste to meet the Court's noon deadline,[1] we filed the combined proposed stipulations mistakenly captioned "Joint," and without a note explaining the circumstances. In fact, as is explained in footnote one to defendant's filing of this same day

[1] The Government understood, based upon the plain language of the Court's March 10, 2008 order, and its May 9, 2008 rescheduling of these filings for "noon" May 15, 2008 and a pretrial hearing at 4 p.m. May 16, 2008, that the Court meant Eastern Standard Time (EST) (indeed, to interpret otherwise that the Court had meant to schedule these events on Alaska time would imply that the hearing would take place at 8pm EST). Upon receipt of plaintiff Kiewit Manson JV ("KM")'s draft of proposed filings at approximately 3:30 pm EST May 14, 2008, we discovered that the plaintiff's proposed stipulations [which we have attached in their entirety] were not acceptable because of their vague and argumentative nature, and general absence of supporting citations. Thereafter, we prepared proposed stipulations of fact which we completed at approximately 11:07 EST, and transmitted a copy to plaintiff's counsel by email. When the noon deadline approached without hearing from plaintiff's counsel, we filed the proposed stipulations. In our rush to do so, we failed (1) to change the caption and other references to remove "joint," and (2) remove the signature line that appears at the end of the stipulations that plaintiff sent us. The filing was not intended as a joint filing, but as the Government's filing of both sides' proposed stipulations of fact. This filing corrects those omissions.

of a statement of issues of fact and law, the parties have not reached agreement upon joint filings.

**Defendant's Proposed Stipulations**

1. On September 9, 2003, KM, a joint venture, composed of two parties—Kiewit Pacific Company ("Kiewit") and Manson Construction Company ("Manson")—submitted a bid proposal to the COE for the Nome Navigational Improvements project. JX 231.

2. The Government awarded the contract to KM on September 30, 2003 and issued a Notice to Proceed on November 4, 2003. The contract was awarded in the amount of $35,878,300. JX3.

3. The project predominantly involved two activities: construction and dredging. According to KM's technical proposal, the joint venture planned to perform construction activities during 2004 and dredging during 2005. JX232.

4. The construction aspect of the project was performed by Kiewit personnel and concerned, in part, the placement of rock for the following tasks:

- construction of a breakwater extending approximately 3025 feet into the Bering Sea in a southwest direction from the Nome Harbor;
- construction of a spur breakwater extending approximately 270 feet from the end of the existing causeway in Nome;
- replacement of a causeway bridge.

5. The dredging portion of the project was performed by Manson personnel and involved the following tasks:

- dredging, excavating and disposing of approximately 573,400 cubic yards of material from the entrance channel and sediment traps located in and around the Nome Harbor;
- dredging, excavating and disposing of 25,900 cubic yards of material from the causeway dock area;
- dredging, excavating, surveying and disposing of 21,900 cubic yards of material from Area AVI through A-VIII. JX 232.

6. With regard to the construction component of the project, KM certified a claim on September 27, 2005 in which KM alleged that it was owed $5,263,454.00 due to "unpaid additional quantities of work plus costs associated with delays and impacts, defective and incomplete design, and other unreimbursed changes." The contracting officer denied KM's construction claim on June 9, 2006. Amended Complaint.

7. On October 27, 2006, KM submitted a certified claim for equitable adjustment based upon differing site conditions in connection with the dredging component of the project. KM claimed $2,093,834 in damages. The contracting officer denied KM's dredging claim on May 2, 2007.

8. On November 28, 2006, KM filed a complaint in this Court in connection with its construction claim. On July 6, 2007, KM filed its first amended complaint and added a cause of action concerning its dredging claim.

<u>Quantities Overrun Claim</u>

9. KM seeks damages for the alleged quantities overrun it encountered while placing rock at four different locations: (1) the main breakwater transition; (2) quantities removed as part of the "peel back" of the main breakwater and later installed as part of the spur

breakwater construction" (3) quantities in a design change to avoid "cupping" on the seaward side of the causeway tie-in; (4) and the seawall quantities first removed and later installed during construction of the spur transition. JX234.

10. Bid Item No. 0006 of the proposal schedule directs the contractor to "Construct Main Breakwater and Spur Breakwater "A22" Layer, complete." A22 refers to the approximately 22 ton armor rock layer for construction of the breakwater and spur. The bid schedule identified a quantity of 30,600 cubic yards (CY) of A22 rock to be used for this bid item. KM bid a unit price of $308.00 per cubic yard of A22 resulting in a bid amount of $9,424,800.00 for this item. JX 231.

11. Bid Item No. 0008 of the proposal schedule directs the contractor to "Peel back Causeway Rock for Spur Breakwater Construction, complete. Bid ietm No. 0008 has a lump sum unit price and KM bid this item at $595,500.00. JX 231.

12. Bid Item No. 0007 of the proposal schedule directs the contractor to "Remove causeway rock, complete." The bid schedule identited a quantity of 17,000 cy to complete the task of removing rock so that a bridge could be constrcuted. KM bid a unit price of $5.00 per cy resulting in a bid amount of $85,000.00. JX 231.

Seawall

13. The seawall is part of the 'causeway rock' as identified in the Bid Item # 8. JX 10.

14. The seawall is part of the causeway rock that had to be removed as part of the peel back so that the spur breakwater could be constructed. It is possible that the new spur breakwater could be installed without removing the seawall but it would be extraordinarily difficult and costly. Id.

15. KM's calculations on page 304 of their estimate do not include the 24 ft section on the top of the causeway that would correspond to the seawall. If KM had estimated it properly, KM probably would have come up with an additional 2,000 cy. JX 230 at page 304.

16. The contract documents do not suggest that the rock that forms the seawall is not part of the existing causeway, or that it should be treated differently than the other rock on the existing causeway.

17. KM claims that it needed to replace the seawall and that it should be compensated at the unit price for corresponding stone even though the peel back of the seawall was directly connected to the causeway. JX 234.

<u>Main Breakwater Transition</u>

18. The Contract drawings do not show cross sections of the Main Breakwater between stations 38 + 25 and 39 + 25. KM submitted a proposal on September 9, 2003 showing their interpretation of how the transition form station 38 + 25 to 39 + 25 was to be accomplished. JX 232 at page 63. The COE accepted KM's proposal complete with KM's interpretation of the Main Breakwater transition between stations 38 + 25 and 39 + 25.

19. Without approval to modify the proposed transition, KM started to build it differently than shown in their proposal. KM built the transition using more A22 rock than it proposed..

20. When the COE expressed their dissatisfaction with KM's transition construction, the KM requested clarification (RFI 14 – 4/14/05) because it believed its own proposal was 'unconstructible.' JX 192. KM claims that it is impossible to install A22 rock in spaces that 'transition to a zero thickness' (per M. Hartley's report). JX 248 and 249. The COE responded that if KM felt that its proposal was inadequate, then KM should submit another plan for

building the transition. JX 192. The COE did not provide a detail showing how the transition was to be built, and the KM did not propose an alternative detail. KM built the transition using the maximum amount of A22, the most costly rock, which was significantly different than their original proposal.

21. The contract drawings show other areas where the space for an A22 ‘transitions to a zero thickness’ (reference sections G and F on H-5; A on H-6) that did not create a problem for KM. JX 10.

<u>Cupping at Seaward Tie In</u>

22. On June 4, 2004, KM submitted an RFI (Request for Information) requesting direction on the construction of the seaward side of the spur tie-in. As requested, on June 21, 2004, the COE provided the requested direction. JX 15.

23. As part of the COE’s response, KM was instructed that ‘(t)he reach form 53+00 back to 51+50 should still have a crest of 20 ‘ but the side slopes can vary to provide a smooth transition…’ JX 15.

24. The seaside spur tie-in (53+00 – 51+50) was to have a bottom that reached further out than the typical cross section (G on H-5) and because the COE wanted to maintain the 20 ft crest, the slope of the spur could not be remain 2 to 1 as shown on the typical cross section – thus the instruction regarding the variance of the slopes. JX 15.

25. The instructions stated that the slopes (plural) were to vary. JX 15. If the instruction were that the slope (singular) was to vary then KM would have to increase the thickness of the A22 to accomplish the tie-in and the other rock layers would maintain the 2 to 1 slope.

26. Ken Eisses indicated that he had discussed with KM the need to maintain the layer thickness and that KM confirmed that they understood this direction. Eisses Deposition at 114.

Peel Back and Salvage

27. KM claims that they should get paid for returning the A22 (and B22) stone that was removed as part of the Peel Back (Item # 8) using the unit prices for the new breakwater construction. Deposition of Shawn Lannen and JX 234. KM did not include the peel back rock in their estimated quantity of A22. JX 230 at 294-305. KM included money in its estimate of Item # 8 for returning the stone that was removed as part of the peel back. *Id.*

28. On page 15 of its claim, KM states that 'it reasonably assumed' that Bid Item # 8, Peel Back, 'meant simply to remove the rock in preparation for the breakwater construction.' JX 234.

29. As part of its claim, KM seeks payment for returning the stone (A22 - 8,900 cy including seawall) to rebuild the existing causeway at the unit price ($308) stipulated in the Contract for the construction of the new spur breakwater (reference February 24, 2005 COE letter). JX 234.

30. KM's estimate shows that the A22 quantity did not include the stone from the Peel Back. The 10,000 cy of A22 rock that are quantified for the peel back on page 304 (estimate book) are not included in the total A22 rock shown on page 294 for the new spur construction – 27,129 cy. The amount shown on page 294 for the spur A22 was calculated on page 305. KM did not 'reasonably assume' that rock peeled back was to be returned at the unit price for the new breakwater construction. JX 230.

31. KM's estimate shows that it had enough money in Bid Item # 8 to return the stone that was removed from the existing causeway to rebuild it. Page 96 of Kiewit's estimate shows that

Kiewit estimated $99,355 (without indirects and margin) for Bid Item # 8. KM's bid included $595,500 (with indirects and margin) for Bid Item # 8. The indirects and margin are 53 % of the direct costs (after accounting for mobilization). By adding the indirects and margin to Kiewit's estimate (assuming even distribution) the estimated cost of Bid Item # 8 becomes $152,403 – leaving $443,097 to return the stone to the existing causeway. On page 107 of the estimate the cost to return the stone would be approximately $120,000 ((4.135 + 4.651)x8,900x1.53). JX 230.

32. KM did not include peel back in the A22 unit price quantity and they included more than enough money in Bid Item 8 to return the stone to rebuild the existing causeway. JX 230.

33. The new spur cannot be completed without returning the causeway stone that was peeled back. KM claims that KM did not include the return of the peeled back A22 in Bid Item # 8. KM's estimate shows that it did not include the return of the peel back in the A22 (Bid Item # 6). JX 230.

2. Salvage:

34. The term 'salvage' has been used in two different ways.

35. Salvage (Salvage 1) has been used to refer to all the stone that was removed as part of the peel back. Kiewit estimated Salvage 1 to be 10,000 (page 294 of estimate book). JX 230. The actual quantity was just over 10,000 per KM's Quantity Sheets (Peel Back – 10,120 and Haul – 10,337).

36. Salvage (Salvage 2) has also been used to refer to the stone that was removed as part of

the peel back that would not be able to go back because the new spur construction would be occupying the space where it came from. Salvage 2 is a subset of Salvage 1. Kiewit estimated has 4,350 cy of A22 that would not be mined in its estimate on page 107 which appears to be Kiewit's estimate of Salvage 2. JX 230.

37. KM claims that only 4,350 cy of the 10,000 cy they estimated was to be removed would be useful factoring in the unknowns of rock condition, breakage and handling. Al Jeffries was asked and he did not know of any waste. KM's records (Quantity Sheets) confirm that they placed 47,429 cy of which 10,337 was from the peel back.

38. The COD's decision states 'that the contractor has not demonstrated that the cost of reusing the preexisting rock has been included in the bid unit costs.' KM's estimate includes the Salvage 2 rock but not the entirety of Salvage 1. Jx 230. Kiewit estimated how much of the peeled back rock (Salvage 1) would not fit back (Salvage 1) after the new spur was in place, and KM worked that into the unit price for the new spur construction. In other words, KM reduced the A22 mining amount by 4,350 cy. Id.

Pre Bid Conduct

39. On July 25, 2003, approximately 6 weeks before the bids were due, KM sent an email informing the COE that KM's estimate of the 'quantities for A22, B22, and A10 are greater than the USACE by more than 10%.' JX 34.

On the day before, July 24, 2003 Kiewit totaled the quantities it estimated as follows:

- A22: Kiewit estimate – 44,787 cy (COE estimate – 30,600 cy)
- B22: Kiewit estimate – 30,900 cy (COE estimate 20,600 cy)

- A10: Kiewit estimate – 2,954 cy (COE estimate 550 cy). JX 230.

40. Kiewit's estimate exceeded the COE's estimate by 46% for A22; 50% for B22; and 437% for A10 yet KM's email suggested a mere 10% bust.

KM cost report:

*41.* KM made more then $3.5M on this Project. DX 2037.

42. The Contract amount is $42,389,721 (through Contract Modification # 36). According to KM's last cost report (through 7/27/07), KM spent $38,249,420 and forecast that they would spend an additional $630,860 for a total of $38,880,280. KM's projected profit was $3,509,441. DX 2037.

43. KM budgeted $34,346,556 and anticipated earning a profit of $8,043,165 ($42,389,721 - $34,346,556). KM missed its budget by $4,533,724. DX 2037.

44. The principal areas where KM missed its budget were the following:

- $2,203,433 for rework (this amount is only the direct cost the indirects are 38% of the directs - so the loss for the rework could be as high as $3M)
- $1,186,549 for the bridge (with indirects the loss could be as high as $1.6M). DX 2037.

45. Other KM costs are as follows:

- Mining/Drill & Shoot/Process Rock under budget by $289,239 (with 38% indirects, ~$400,000).
- A22 (other than mining, drill/shoot, process) over budget $183,190 (w/ 38% $252,802).
- B22 (other than mining, drill/shot, process) under budget $25,354 (w/ 38% ~ $35k).
- Peel Back: They charged $595,500 and spent $54,718.

Mobilization: They charged $7,664,000 and spent $2,737,171. DX 2037.

-

Dredging Claim

46. KM used a 16 inch hydraulic pipeline dredge with a standard basket cutterhead called the Bechtolt to dredge approximately ½ of the total volume dredged.. The Bechtolt is a hydraulic dredge that pumps dredged material through a pipeline to the assigned disposal areas. JX 204.

47. KM also used a clamshell dredge called the Viking, with a cable attached bucket, to dredge the entrance channel primarily from station 34+00 to 48+00 and west including the causeway dock area. KM brought a 14 cubic yard clamshell bucket and a 10 cubic yard clamshell bucket for the Nome project. A cable attached clamshell dredge lowers the open clamshell bucket to the bed, closes the bucket to capture sediment, returns the bucket to the surface and releases the sediment into the dump barge for transport to the disposal site. A clamshell is typically used for dredging dense or hard materials because the large bucket closure can excavate a significantly more dense sediment than can the hydraulic

dredge cutterhead. Also, unlike a hydraulic dredge, a clamshell does not run the risk of having material clog the suction pipeline while digging or disposing material. JX 232.

48. In KM's certified claim, KM calculated damages incurred by the Viking by comparing the Viking's productivity on the project to the Viking's "historical productivity." JX 204. KM contended that the dredge Viking historically dredged at a rate of 7,000 cy per day (two 12-hour shifts daily). Id. KM has not been able to produce any documentation supporting the Viking's alleged historical productivity.

49. KM has not identified more than a handful of photographs showing any delays or obstructions associated with the Viking. COE engineer Alan Jeffries prepared a report memorializing his observation of a purported delay associated with the Viking during his July 25, 2005 site visit. JX 35. According to Mr. Jeffries, a report was made that the Viking was encountering rock. Mr. Jeffries boarded the Viking and observed the crew dispose 20-25 buckets onto a scow and that the material contained only sand.

50. KM brought a 14 cubic yard and a 10 cubic yard clamshell bucket to be used with the Viking. The 10 cubic yard bucket is a heavier bucket, and allows a better bite into the denser sediments. Deposition testimony of Leonard Juhke. KM, however, used the 10 cubic yard bucket only twice, and it was never used because of difficult dredging conditions. Deposition testimony of Patrick McGarry. The 10 cubic yard bucket was used to spell the 14 cubic yard bucket when the larger bucket was placed out of service for minor repairs.

51. The COE accepted KM's proposal that it would take 119 work days to complete the dredging with both the Bechtolt and the Viking working 24/7s. JX 232. They actually

completed the dredging in 88 work days (Bechtolt – 86 and Viking 88 days) working 24/7s. According to the REA KM claims that they could have completed the dredging in 58 (88 – 30) work days but were prevented from doing so because of the differing site conditions. JX 204.

52. The daily dredge reports prepared by KM confirm that the effective dredging time was within the range expected by the COE for dredging new area (as opposed to maintenance dredging). The total effective dredge time (time in which the dredge was involved in dredging exclusive of pump cleans, cutter cleans, clearing the suction, and wash backs) was 68,766 minutes. The total non-effective time (time in which the dredge was involved in pump cleans, cutter cleans, clearing the suction, and wash backs) was 26,290. The ratio of effective time to effective plus non-effective was over 60 %. The COE guideline for acceptable effective dredge time for new work is between 57% and 83%.

53. KM's methodology for calculating the Bechtolt's loss of productivity is based upon a "measured mile" analysis. JX 204. In its claim, KM chose the dredging productivity it had in the East Sediment Trap, towards the end of the dredging project, as its measured mile. Id. KM then compared that dredging productvity with what KM achieved dredging the Inner Harbor, Channel and Option Areas A-VI – A-VIII. Id.

54. The East Sediment Trap is located offshore and involved the dredging of approximately 139,000 cubic yards of material. Dredging in the Inner Harbor, as its name suggests, involved more obstructions. Dredging in the entrance channel involved more moves than the East Sediment Trap. Dredging in Option Areas A-VI-VIIII involved only 21,900 cubic yards of material. Indeed, KM understood that this dredging would be more

difficult than the East Sediment Trap when it proposed in its bid schedule to complete dredging in the option areas at $13.00 per cubic yard as compared to dredging the East Sediment Trap at $7.00 per cubic yard. .

55. Contract Specification 02222, paragraph 1.3 (Amendment #2) identifies the characters of materials anticipated to be found within the dredging prism. It reads as follows: *1.3 Character of Materials*

*AM #2…Exploration logs for the area to be dredged and excavated along with a portion of a Design Memorandum dated August 1982 and various geotechnical data describing the project vicinity are enclosed in Appendix 02222A Subsurface Conditions. A photograph showing the known area of metal debris and the partially sunken barge depicted on the drawings is enclosed in Appendix 02222B. A Soil Investigation dated May 1982 that contains exploration logs and geotechnical data for the project area is enclosed in Appendix 02222C. Character of materials data do not necessarily represent the project area materials to be encountered over the entire project area. The composition of materials may vary significantly over the project area. Incidental sunken logs, boulders, rocks, snags, cobbles, gravel, sand, silt, glacial till, miscellaneous metal debris from harbor, mining, and fishing operations should be expected throughout the excavation and dredging areas. Glacial till is characterized as unstratified sediments such as cobbles, gravel, sand, silt, and clay intermingled in a dense, tight matrix. The metal debris consists of miscellaneous material from mining and harbor operations. It is located within the harbor in a pile with dimensions of approximately 30 x 30 x 10 feet. It is submerged at higher tide levels. The partially sunken barge is a steel flat deck barge with approximate dimensions of 140 x 35 x 7 feet. It may be filled or partially filled with sand and silt, and may be structurally or otherwise unsuitable to float…AM #2. JX 206.*

56. The geotechnical data identified in 1.3 and enclosed at Appendix 02222A (Subsurface Conditions) also provided boring information. Id.

57. KM personnel have testified that the geotechnical data did not accurately depict the conditions encountered during dredging. Deposition testimony of Robert Lofgren, Leonard Juhnke. The language of paragraph 1.3 itself cautions that the geotechinal data provided does “not necessarily represent the project areamaterials to be encountered over the entire project area.” Id.

58. The borings identify a wide range of sediment conditions, density and grain size.

59. According to its estimator Robert Lofgren, KM failed to consider all the geotechnical data made available to it, in particular, excavation pits dug 400 meters to the west of the causeway which showed the presence of boulders, cobbles, and other obstructions greater than those found by a 2 ¼ inch split spoon sampler used for the other soil borings provided. Deposition of Robert Lofgren.

60. KM did not consider the presence of glacial till, a particularly difficult material to dredge, that was indicated in borings HLO-1 – HLO-4. Fourth, KM failed to take into account the presence of dense sediment with high blow counts in the dredge prism that are very difficult to dredge with a pipeline cutterhead dredge. Fifth, Specification 02222A pages 54-55 show photographs of material excavated from test pits adjacent to the project. These photographs show significant percentages of gravel and cobbles consistent with the character of materials description in paragraph 1.3.

61. The description of the character of materials in paragraph 1.3 was not carefully considered by KM as well. In particular, KM witnesses have set forth a tortured reading of the following sentence from the paragraph: "Incidental sunken logs, boulders, rocks, snags, cobbles, gravel, sand, silt, glacial till, miscellaneous metal debris from harbor, mining, and fishing operations should be expected throughout the excavation and dredging areas. Glacial till is characterized as unstratified sediments such as cobbles, gravel, sand, silt, and clay intermingled in a dense, tight matrix." KM witnesses have testified that the word "incidental" modifies each of the words following it, except for sand and gravel.

<u>Plaintiff's Proposed Stipulations</u>

The following proposed stipulations we received from KM yesterday at 3:30 PM. We include the following submission from KM based upon its indication that its submission complied with the Court's Order. We object to the form, substance, and recitation of facts therein.

**A. Undisputed Facts**

1. A Contract was entered into between the Government and Kiewit/Manson, JV on September 30, 2003, Contract No: DACQ85-03-C-0014.

2. The Contract was entered into as a result of an RFP submitted by the Government, with K/M being awarded the Contract as a result of its Proposal submitted.

3. Prior thereto, the Government, through its designer on the project, Elaine Pflugh, authored plans and specifications to be contained within the FRP.

4. Elaine Pflugh left her employment with the Government around the time that the design was completed.

5. The project was assigned to Allan Jeffries of the H&H Department of the Corps of Engineers, and Mr. Jeffries acknowledges he never did any calculations nor checked the accuracy of Ms. Pflugh's work product prior to the plans and specs going out to bid.

6. Ken Eisses is the Chief of H&H and assigned Allan Jeffries to replace Elaine Pflugh.

7. The only individual from H&H who participated on the design for this project in any substantial manner were Elaine Pflugh; Allan Jeffries; and Ken Eisses.

8. Allan Jeffries did not participate in the construction of the design documents, other than as relates to the bridge.

9. Ken Eisses oversaw the work of Elaine Pflugh, but did not actively take part in the construction of the plans and specifications.

10. The Contractor contends it has and will continue to incur additional expense due to unpaid additional quantities of work, delays and impacts due to the Government's defective and incomplete design and other un-reimbursed charges.

11. Both Kiewit and Manson submitted certified claims to the Government, with a vast majority of those claims to be found having no merit pursuant to Contracting Officer decisions.

12. K/M submitted Contract Schedules in accordance with its contractual requirements.

13. K/M submitted pre-bid questions to the Government, some of which were answered and others receive no response from the Government.

14. On July 26, 2003, K/M submitted prebid questions including a request as to whether there were any cross sections available for any portion of the work. Allen Jeffries responded on August 1 through then Contracting Officer, Gale West, that "no cross sections are available other than those provided in the plans and specifications".

15. Among those items to which the Government chose not to forward a response was a pre-bid question by K/M that advised the Government that K/M determined that its quantities exceeded the Government quantities by greater than 10%. By email from Shawn Lannen to then Contracting Officer, Gale West dated July 25, 2003, the contractor informed the Government that the quantities for A-22, B-22, and A-10 rock were greater than the Government calculation by more than 10%.

16. Only two items on the Government proposal schedule were lump sum items, i.e., mobilization/ demobilization; and peelback causeway rock for spur breakwater construction. All other items were unit price bid items.

17. An Engineer's Estimate was provided which document was authored by Government employee, Al Arruda.

18. Other than the bridge, the parties are in agreement that this is not a design/build project.

19. Mr. Karl Harvey was the Government Project Engineer on the project.

20. Mr. Lee Seeba was the administrative contracting officer who was responsible for communications with the contractor.

21. Mr. Seeba was ultimately replaced through direct intervention by Mr. Pete Perez, with Mr. Seeba being replaced by Mr. Ron Flodin.

22. The contracting officer was Ms. Sandra Davidson.

23. Mr. John Brauchle was the K/M project engineer.

24. Mr. Darrin Hansen was the K/M Project Manager who was ultimately replaced toward the end of the project by Mr. Scott Fowlds.

25. Mr. Shawn Lannen, Area Manager for Kiewit, was the most senior individual in the State of Alaska who was responsible for the project on behalf of K/M.

26. Although the Government contends that the design documents are complete, Mr. Jeffries, as well as Government Experts, were unable to provide cross-sections absent defying the laws of physics.

27. K/M contends it is owed the amounts referenced in the attached spreadsheets as relates to the quantities; winter-over; and dredging claims. (Attach newly constructed Gardner tables)

28. The Government never provided K/M with any quantity calculations during the performance of the project.

29. On August 25, 2004, Karl Harvey forwarded an email to Lee Seeba, and Lee Seeba agreed on even date with the position of Karl Harvey that it did not matter where the contractor obtained the rock as long as it met spec and was placed in the proper place, i.e., the contractor is allowed to salvage removed rock.

30. The Specifications state that K/M owns salvaged rock, consistent with Spec Section 1.6.1

31. On August 25, Mr. Harvey provided an email to Ms. Julie Anderson confirming that the Government could not pay a different price for the salvage rock than the quarry rock "if the rock was to be removed as part of the contractor, it's up to them to decide what to do with it once removed. As long as it meets spec and is placed correctly they will be paid the contract unit price."

32. Ms. Elaine Pflugh, the designer of the Project for H&H, concurred with the above statement of Karl Harvey at her recent deposition.

33. RFI No. 1 was forwarded by K/M to the Government on June 4, 2004, the purpose of which was to request direction on the final line and grade for construction of the spur breakwater transition as shown on sheet H2 of the plans.

34. On June 21, 2004, Lee Seeba, on behalf of the Government, through letter SAO/C-0017 responded to the RFI No. 1 thus enabling K/M to move forward with its work pursuant to RFI No. 1.

35 On August 11, 2004, QAR Roger Floyd confirmed in email that the "survey results were exact and precise. . . utilizing this equipment does not allow for any error".

36. On October 6, 2004, Mr. John Brauchle provided to Mr. Karl Harvey the quantity information available to K/M which disclosed that the Contract rock quantity of A-22 and B-22, would be exhausted prior to start of the main breakwater. On November 17, 2004, the Government executed a Basic Change Document concurring that the survey quantities of A-22 and B-22 for in-place materials on the spur breakwater have approached or slightly exceeded the contract quantity amount as estimated on the bid schedule. The main breakwater A-22 and B-22 has not yet been placed and needs to be increased. Surveys on the spur show the material quantity as acceptable.

37 By email dated December 9, 2004, Contracting Officer, Sandra Davidson, stated that the BCD increased the quantity for A-22 and B-22 so that it only "increased the contract quantity by 115% at this time. This totals $35,190 CY for A-22, and $23,690 CY for B-22. . . what I recall from our Tuesday meeting, we are going to do the 115% right now, and will continue discussions on further increases when they submit calculations. . ."

38. At some point after November 17, 2004, when the Government issued the Basic Change Document, the Government took the position that the contractor would not be paid for quantity increases.

39. By email dated April 1, 2005, Allan Jeffries made it clear that he did not question the K/M quantities as follows: "I don't question their quantities, just wanted to make sure that they used the template according to H-5 and limits on H-4".

40. By email dated August 30, 2004, Ms. Julie Andrews stated to Allan Jeffries: "We thought on the sea wall we'd start by putting the scope together but then holding off on giving it to them until at least October 1, or maybe after the last cargo barge leaves. That way they will have taken select equipment they want from the quarry and we'll have a better idea of where they are at on the breakwater. They are supposed to stay in the quarry until early November. That way their decisions aren't based on the added work. Then we can add on the work if we are still inclined in October".

41. The Government stated by email dated May 26, 2005 "We didn't complete the design. They proposed an unconstructible method to which we took no objection; they built it in a way that was constructable, before we could provide them with an alternative design; they will assert that their schedule was dependant upon their time and completion of this work; we now want to make their payment based on a design we provide after the fact; this part of the contract was not design-build or could otherwise be characterized as a performance requirement.

42. The DCAA Audited the Kiewit and Manson claims without a Technical Analysis from the Government , although the DCAA requested that a Technical Analysis be performed. In the end, only a small amount of the K/M costs were questioned.

43 Within the RFP documents was a Geotechnical Findings Report.

44. K/M bid the project believing that its hydraulic cutter-head dredge could be employed to a much greater extent than actual conditions allowed, the clam-shell dredge was required to be used at a much greater cost.

45. The dredging work was governed by specification section 02222.

46. The contractor provided a number of notices to the government that it was encountering differing site conditions during the performance of the dredging work in accordance with contract requirements.

**B Disputed Facts**

1. The contractor contends that the Government omitted supplying two Geotechnical Findings Reports which related specifically to the dredging site and would have substantially impacted the contractor's bid for work to be performed had those Reports been disclosed. In the Geotechnical Report submitted with the RFP, there was no mention of cobbles or boulders, but in the two Reports omitted to accompany the RFP, the exploration logs referenced numerous cobbles and boulders greater than three inches, as well as other debris.

2. The contractor contends a differing site condition was encountered during the dredging portion of this contract. The constructor contends that an excessive amount of cobbles, boulders, and other unanticipated debris were encountered during dredging of the inner harbor channel zone, the sand spit zone and the off shore zone of the new entrance channel. The contractor contends reduced production rates during hydraulic dredge work by the Bectholt and clam shell dredge work by the Viking as a result of the materials encountered. The Government maintains the dredge material encountered by the contractor was as indicated in the contract documents. The Government maintains that the contractor did not prosecute the work as stated in their proposal. The Government maintains that the schedule included in the contractor's proposal is the contact schedule. The government maintains the contractor completed the work prior to the contract completion date and prior to the scheduled completion date in their proposal so no delay occurred.

3. K/M contends that the plans did not provide K/M with sufficient data to enable it to construct the Government's work.

4. K/M contends that it installed work according to the neatlines as to the following quantities: A-22 Rock - 47,429 cubic yards, with 11,816 cubic yards unpaid. B-22 Rock - 32,700 cubic yards confirmed installed by survey, with 6,583 cubic yards unpaid. The trenched - in toe yields unpaid quantities of 2,141 cubic yards.

5. K/M maintains that the construction of the spur breakwater, causeway bridge and main breakwater were to be started and completed in the 2004 construction season ending in mid-October 2005. K/M further maintains that mining and related rock place equipment were to be demobilized prior to winter freeze up in October 2004.

6. K./M contends that the quantity overrun resulted in the contractor's inability to demobilize equipment thus resulting in its winter-over claim.

7. The Government maintains that the Contractor did not construct the main breakwater transition per the design included in their technical proposal utilizing A8, B22 and A22 rock. The Government further maintains that the Contractor failed to identify one submittal as a variation and subsequently failed to ask for Government direction prior to constructing the main breakwater transition entirely of B22 and A22 rock. The contractor suggests the Government review pages 89-100 of the deposition transcript of Ron Flodin.

**B Disputed Facts**

8. The Government maintains that the Contractor removed unnecessary quantities of preexisting A22 and B22 rock for the spur breakwater tie-in. The Government also maintains that the Contractor reused quantities of preexisting unnecessarily removed A22 and B22 rock and is claiming these quantities for payment at the contract unit price. The contractor suggests the Government review the deposition transcripts of Karl Harvey and Elaine Pflugh.

9. The Government maintains that a Contractor proposed an altered design to remove `cupping' at the spur breakwater transition but that it generally conforms to the contract intent. The contractor does not understand what the issue may be.

10. The Government maintains that the Contractor removed unnecessary quantities of preexisting seawall rock for the spur breakwater tie-in. The Government also maintains that the Contractor replaced quantities of preexisting unnecessarily removed seawall rock and is claiming these quantities for payment at the contract unit price. Once again, the contractor suggests the Government review the Karl Harvey deposition transcript.

11. The Government maintains that the Contractor has not demonstrated that the cost of reusing the preexisting rock has been included in the bid unit costs. The Government also maintains that the Contractor has refused to provide accounting data to the Defense Contract Audit Agency (DCAA)and has not cooperated with DCAA to ascertain the actual per unit costs for certain bid items. The contractor fully cooperated with DCAA. The deposition transcript of Karl Harvey and Elaine Pflugh moot this alleged issue.

12. The Government maintains that the Contractor emplaced material outside of the neat lines of the altered design. The contractor disagrees and suggests the Government has no such proof.

13. The Government maintains that the Contractor emplaced additional quantities of trenched-in toe due to the altered spur breakwater tie-in design. The contractor suggests this is no longer an issue and it was certainly resolved, if there even was an issue, in Mr. Flodin's and Harvey's Depositions.

14. The Government maintains that the Contractors construction schedule does not show completion of bridge construction prior to the close of the 2004 construction season and that neither the Contractor's schedule nor proposal narrative indicates a demobilization of mining and related rock placement equipment in October, 2004. The contractor suggests the Government has not properly read its schedule.

15. The Government maintains there is additional specific direction contained in the contract documents related to the disposition of existing causeway `peel back' rock in Note 1 on Sheet H-3, `SALVAGE ALL CAUSEWAY ROCK AND REUSE AS SHOWN ON SHEETS H-5 AND H-6.' The Government further maintains that the installation of A22 rock within 115% of the contract quantity within the neat lines, whether new or preexisting, is to be paid at the contract unit price. The contractor suggests the depositions of Elaine Pflugh and Karl Harvey moot this alleged issue.

**B Disputed Facts**

16. The Government contends that the contract documents are silent as to the design of the Main Breakwater transition, however, the Contractor included the design in their technical proposal prior to contract award. The contractor asserts it was not the designer and accepted no such responsibilities. No deponent testified otherwise. Mr. Flodin's deposition moots this alleged issue.

[End of plaintiff's draft proposed stipulations].

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ David M. Hibey
DAVID M. HIBEY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 307-0163
Fax: (202) 514-8624

May 15, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 15th day of May 2008, a copy of the foregoing "PROPOSED STIPULATION OF FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David M. Hibey