**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KIEWIT/MANSON JV,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 06-796 C<br><br>MEMORANDUM OF AUTHORITIES IN SUPPORT OF MOTION IN *LIMINE* TO PRECLUDE EXPERT TESTIMONY FROM JOHN MCTYRE AND TO STRIKE HIS EXPERT REPORT |

Defendants have proffered expert testimony from Mr. John McTyre. The substance of that testimony is set forth in his Expert Report (Ex. A). It is clear from the Report itself, as confirmed by Mr. McTyre's deposition testimony, that he possesses neither geotechnical nor dredging expertise. It also is clear that Mr. McTyre formulated his opinions regarding rock quantities based upon his own interpretation of the contract documents. His opinions as to the meaning and significance of the geotechnical data contained in the contract documents also are based upon his subjective interpretation of those documents. Accordingly, this Court should enter an Order precluding Mr. McTyre's testimony and striking his Report in the following particulars:

1. All of Mr. McTyre's testimony and the Report which sets forth his opinions regarding the Quantities Claim.

- His opinion, which is based upon an interpretation of the contract as to how the rock quantities installed by Plaintiff on the Main Breakwater Transition are determined for pay purposes (pp. 4-5 of his Report) to-wit: ". . . the neatlines were established by KM in its proposal. Quantities for payment at the transition should be based on the neatlines established

in KM's Proposal".

- His opinion, which is based upon Mr. McTyre's interpretation of the contract bid (CLIN) items, as to payment for "Quantities" (of rock) removed as part of the Peel Back and later installed as part of the Spur Breakwater" (at pp. 5-7 of the Report), which is grounded in Mr. McTyre's interpretation of a specific CLIN Item, to wit, his opinion that "payment for replacing the stone on the causeway which was removed as part of the Peel Back should be paid for as part of the lump sum Item #8, Peel Back" (at p. 7, first paragraph of the Report).
- His opinion, which is based upon Mr. McTyre's interpretation of CLIN 0008, as to payment for "The Seawall quantities first removed (and later installed) during construction of the Spur Transition" (at p. 7, #4 of the Report), which also is grounded in his interpretation of CLIN 0008. He opines "The Seawall quantities removed and replaced are essentially part of the peel back stone that was removed and replaced".

2. All of Mr. McTyre's opinion and Report regarding his interpretation of the geotechnical data in the bid documents (at pp. 10-15 in the Report).

3. All of Mr. McTyre's opinion and Report regarding means, methods and results of the KM dredging operation (at pp. 16-18 of the Report).

## ARGUMENT AND AUTHORITIES

Mr. McTyre's opinion regarding payment for rock quantities used to construct the Spur Breakwater Transition is an attempt to persuade the court that his two interpretations regarding payment are correct and should form the basis for deciding this issue. These

two are first, his interpretation of what the basis (which should be understood to mean "contractual basis") is for payment for rock quantities installed at the Main Breakwater Transition. His second interpretation is that payment is not based upon a provision of the contract, but instead is to be found in the contractor's Bid Proposal to the Corps ("should be based on the neatline established in KM's proposal"). What terms of payment, if any, possibly might be established by a contractor's proposal in response to a Corps bid solicitation, as well as how the contract payment line item should be interpreted, are entirely matters for the Court to decide.

Mr. McTyre's next opinion deals with payment for rock the contractor installed to construct the segment of the new Spur Breakwater which ties into the void in the existing causeway nose. This void was created by the Corps designers, whose purpose was to tie together the new Spur and the existing causeway structure. Mr. McTyre's opinion involves nothing more or less than an interpretation of a CLIN item. Specifically, CLIN 0008, which describes the work included under this item as follows:

> 0008 Peel back Causeway Rock for Spur Breakwater Construction, complete

Mr. McTyre interprets this contract wording to mean that the work called for and included consists not only of "Peel back" of the causeway rock, but also comprehends all of the sorting, stockpiling, haul back and installing of this rock as part of the Spur Breakwater-Causeway tie-together in the void area that was created by the Peel back operation.

And finally, as to the quantities of rock installed by the contractor to remove the seawall, which was removed as part of the peel back on the existing breakwater nose, Mr.

McTyre interprets that this work also is comprehended and paid for under the CLIN 0008 removal item.

**The Court's Gatekeeper Function: Standards Governing Expert Testimony.**

Numerous cases synthesize the standards governing expert testimony. The following excerpt is taken from *Lehman Bros. Holdings, Inc. v. Laureate Realty Services, Inc.* S.D. Ind. 2007 WL 4197580.

> The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Civil Procedure and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 579 (1993).Federal Rule of Evidence 702 ("Rule 702"), provides: The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Civil Procedure and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 579 (1993).Federal Rule of Evidence 702 ("Rule 702"), provides:
>
> > If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> FED.R.EVID. 702.
>
> Before admitting expert testimony, *Daubert* requires that the district court function as a gatekeeper to ensure that expert testimony is both relevant and reliable. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.2000)."In other words, as a threshold **matter** 'a district court is required to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue.' " *Id.* (quoting *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 590 (7th Cir.2000))
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

> training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The issue in *Lehman* was admissibility of the proffered expert opinion regarding whether terms in an agreement (Mortgage Loan Purchase and Sale Agreement "MLPSA") apply to the disputed loan. The basis for seeking exclusion was the accepted principle that interpretation of the contract invades the province of court and jury.

> Lehman seeks to exclude this opinion because it impinges upon the role of the jury, *see* Loeb v. Hammond, 407 F.2d 779, 781 (7th Cir.1969) ("The question of **interpretation** of the **contract** is for the jury and the question of legal effect is for the judge."); *International Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.*, 1992 WL 22223, at *3 (N.D.Ill. Jan. 31, 1992) ("An **expert witness** may not testify simply regarding his reading of a contract."))

The party proposing the expert testimony tried to deflect this issue with an argument that, after it had been acknowledged that an opinion regarding interpretation of the contract would be inadmissible, what his expert really was offering amounted to opinion testimony regarding custom and practice. The Court ruled:

> The issue is whether the MLPSA applies to the Hickory Ridge transaction. Laureate's use of Mr. Tarter's testimony to support this argument is improper. Expert testimony regarding custom and practice in other transactions is relevant only to the extent there is some uncertainty about what the parties agreed to. There is no such uncertainty here, as Laureate's former officers and directors agree with Lehman that the MLPSA does apply to the Hickory Ridge Loan.
>
> ***3** In short, Laureate's revised characterization of Mr. Tarter's expert opinion-that it is "customary in the commercial lending industry that loan transaction documents make reference to the specific agreement that governs such transaction"-is being proffered solely to support the conclusion that the MLPSA does not apply to the Hickory Ridge Loan transaction. That conclusion, however, directly contradicts the sworn testimony of the fact witnesses involved in the negotiation and

> execution of the MLPSA and the unambiguous language of the contract. As such, Mr. Tarter's custom and practice testimony in this instance is not admissible.

Chief Judge Damich of this Court amplifies the point in *Sparton Corp. v United States*, 77 Fed. Cl. 1 (2007). In a section of the opinion he entitled "Legal Argument Dressed as Expert Testimony", he summarized the averments of the government as follows:

> Defendant avers that Professor Nash's opinions are legal arguments in the guise of expert testimony. Although Defendant acknowledges that a government contract expert may offer testimony to assist the Court in construing terms that have acquired a special meaning through trade practice and custom, Defendant asserts that the expert report fails to establish that Professor Nash is qualified to speak about trade practice and custom, nor is there any indication that any contract terms require construction based on trade practice and custom.

What the government averred regarding Professor Nash in *Sparton* is precisely what it seeks to do through the expert testimony of Mr. McTyre here. Clearly, the government is proffering a witness, under the guise of an expert, who is proposing to tell the Court how to decide the case. Far less so here than in the *Sparton* case, there is not a single word or phrase in the bid items at issue that can be said to have acquired a "special meaning through trade practice and custom". Nor has there been any suggestion by the government that the rudimentary phraseology of CLIN 0008 "requires construction based on trade practice and custom". The issue here is how much the contractor is entitled to be paid under the various bid items of the Corps contract. Mr. McTyre's opinion is of no assistance to the Court in deciding this issue.

There is an abundance of case law dealing with this issue. *Loeb v. Hammond*, 407 F.2d 779 (D.Cal. 1969) is an oft-cited precedent. On appeal was an issue as to whether the trial court properly refused to allow an attorney to testify as an expert regarding the

legal significance of papers which had been executed by one of the parties:

> It was not error to refuse to permit Thomas Boodell, an attorney representing Eugene Howard, to testify as an expert witness as to the legal significance of the various papers signed by Hammond and Loeb on June 1, 1962. The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony. 3 Corbin on Contracts, § 554, 226-27 (1960).

This Court, in *Stobie Creek Investments, LLC & JFW Enterprises, Inc. v. United States* (____ Fed. Cl. ___ 2008 WL 902960) observed that the underlying principle was equally applicable "if not more so in cases tried to the court". After reviewing authorities describing the court's gatekeeper function, the opinion continues:

> Expert testimony that testifies about what the law is or directs the finder of fact how to apply law to facts does not "assist the trier of fact to understand the evidence or to determine a fact in issue" within the contemplation of Fed.R.Evid. 702. Expert testimony that amounts to an opinion of law is especially disfavored:
>
> > A witness cannot be allowed to give an opinion on a question of law.... In order to justify having courts resolve disputes between litigants, it must be posited as an a priori assumption that there is one, but only one, legal answer for every cognizable dispute. There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge.... To allow anyone other than the judge to state the law would violate the basic concept.
>
> *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir.1988) (omissions in original) (reversing trial court's admission of expert testimony on legal issues at trial). The United States Court of Appeals for the District of Columbia Circuit is even less receptive to allowing expert testimony on the law, observing that "[e]ach courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards."*Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C.Cir.1997) (reversing trial court's admission of expert testimony on legal issues at trial). This holds just as true when the finder of fact is the court, if not more so; the court is well equipped to instruct itself on the law. The United States Court of Appeals for the Federal Circuit holds the same view on

> expert testimony pertaining to questions of law. *See* Mola Dev. Corp. v. United States, 516 F.3d 1370, 1379 n. 6 (2008) (affording no weight to affidavit of former government official interpreting thrift regulations); Rumsfeld v. United Techs. Corp., 315 F.3d 1361, 1369 (Fed.Cir.2003) (reversing agency board's admission of expert testimony by professors, former employees of Cost Accounting Standards Board, and government contracts accounting consultant interpreting Cost Accounting Standards in federal procurement).

Even in securities cases, where there seemingly would be a particular need for expert testimony regarding the complexities and vagaries of financial transactions, the courts assiduously apply the Rules in carrying out their gatekeeper function. In *Marx & Co., Inc. v. Diner's Club Inc.,* 550 F.2d 505 (2nd Cir. 1977) the 2nd Circuit reversed part of the judgment below on grounds that the trial court had erred in permitting expert testimony that invaded the court and jury province of contract interpretation:

> Counsel made timely objection "that's a legal conclusion." Similarly, the witness opined that "the best efforts obligations requires you to pursue the registration statement unless there is cause beyond your control."[FN12]This testimony did not concern practices in the securities business, on which Friedman was qualified as an expert, but were rather legal opinions as to the meaning of the contract terms at issue. It was testimony concerning matters outside his area of expertise. See Federal Rule of Evidence 702. Moreover, it would not have been possible to render this testimony admissible by qualifying Friedman as an "expert in contract law." It is not for witnesses to instruct the jury as to applicable principles***510** of law, but for the judge. As Professor Wigmore has observed, expert testimony on law is excluded because "the tribunal does not need the witness' judgment. . . . (T)he judge (or the jury as instructed by the judge) can determine equally well. . . ." The special legal knowledge of the judge makes the witness' testimony superfluous. VII Wigmore on Evidence s 1952, at 81. See 3 Corbin on Contracts s 554, p. 227 (1960). ("Construction (of a contract) is always a matter of law for the Court").
>
> * * *
>
> Friedman (the expert) himself conceded that his opinions were based in part on his "experience and use of the English language."His conclusion that Diners Club had no legal excuses for nonperformance

> was based merely on his examination of documents and correspondence, which were equally before the judge and jury. Thus Friedman's opinion testimony was superfluous. See VII Wigmore on Evidence, s 1918.[FN15]As Professor McCormick notes, such testimony "amounts to no more than an expression of the (witness') general belief as to how the case should be decided." McCormick on Evidence, s 12 at 26-27. The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case. McCormick on Evidence s 12, at 27.
>
> * * *
>
> The basis of expert capacity, according to Wigmore (s 555), may "be summed up in the term 'experience.' " But experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable (person) in a robe whose exclusive province it is to instruct the jury on the law.

In a footnote, the court likened this form of expert testimony to the "oath-helpers" of an earlier day, citing Notes of Advisory Committee on Proposed Rule 704, F. R. Evid.

> FN17."The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day."Notes of Advisory Committee on Proposed Rule 704, Fed.R.Evid.

There is no argument the government can make which would justify allowing Mr. McTyre to replicate the oath-helper role in this case.

**Mr. McTyre has fully acknowledged that his opinions offered on the "Quantities Claim" are based upon his interpretation of the contract.** What Defendant has asked Mr. McTyre to do with the quantity calculations issue in this case has not relationship with any area of his expertise. Mr. McTyre confirmed in his deposition that he is an expert witness in four areas: scheduling, claims analysis, damages and standard of

care. (McTyre 46:5-10). But, with one exception which will be dealt with later in this Memorandum, he has not been asked by his client to render an evaluation and provide an opinion in any of the areas where he does have expertise. As it concerns the Quantities Claim, what Mr. McTyre apparently was asked to do, and most assuredly what he has done, is to interpret the parties' contract for the Court.

Mr. McTyre's opinion regarding the quantities of rock for which Plaintiff is entitled to be paid are set forth at pp. 3-9 of his proffered expert report. At his April 24-25 deposition in Denver, Colorado, he was questioned about the basis for these opinions. Mr. McTyre was asked, at several points during his testimony, whether the underlying basis amounted to an interpretation of the contract. The answer to this question, we suggest, is clear from the Report itself: the source of these opinions does rest in an interpretation of the contract, and Mr. McTyre did not attempt in his testimony to suggest otherwise.

The first of the three interpretations at which Plaintiff's Motion is directed deals with establishing the neatlines that define the pay limits for rock placed on the Main Breakwater Transition. Mr. McTyre's opinion is that these neatlines are "established in KM's Proposal", and he concedes that this opinion is based upon his interpretation of the contract documents (Dep. pp. 158:24-159:5, See Ex. B).

> Q: Can you tell me where in the contract documents the contractor was directed to provide neatline drawings?
>
> A: I don't think it – I don't think the contract necessarily requires them to provide the neatline drawings. The neatline drawings in any case, can be interpreted from the contract documents.

The same is true regarding Mr. McTyre's second and third opinions on the Quantities Claim. He asserts that KM is not entitled to be paid for spur breakwater rock and seawall

rock placed into the causeway area where the Corps designer called for rock to be removed ("Peel back") so that the new spur and the existing causeway could be tied together. His interpretation of the contract documents is that payment for this work is covered under the CLIN 0008 removal item (Dep. pp. 148:4-23).

> Q: First sentence (on p. 6 of the McTyre Report) says, "whatever the contractor chooses to remove from the causeway in order to install the new spur construction, using their selected means and methods, is to be covered under the Peel back lump sum". Now, is this a statement of fact or is this a conclusion you have drawn?
>
> A: It's a conclusion I've drawn from taking a look at the contract documents.
>
> Q: And what is it based on?
>
> A: When he removes the rock from the causeway, I understand that to be covered under the peel back lump sum item. And it appears to me that consistent with typical construction, the contractor selects his means and methods on how to accomplish the spur construction, and in that process, he's got to remove stone from the causeway.
>
> Q: And do you agree that this is your interpretation of the contract documents?
>
> A: That's my interpretation of the construction documents.

At p. 156:21-22 this question and answer appear:

> Q: Is the replacement covered under CLIN 0008.
>
> A: I think it is, yes.

Again, Mr. McTyre agrees that it is an opinion based upon his interpretation of the contract documents. (Dep. p. 161:4-11)

> Q: What is your answer?
>
> A: That replacing the stone in the causeway is part of the peel back.
>
> Q: You considered this section (CLIN 0006) in arriving at your –

A: Yes –

Q: -- interpretation of the contract documents, correct?

A: Right.

The discussion at this point picks up again at pp. 177:16-178:14 in an exchange that concludes with Mr. McTyre answering "Yes" to the question "That's based on your interpretation of the contract documents?"

When he was questioned regarding the conflict within the Corps Project Delivery Team for the Nome Project over their conflicting interpretation of contract pay items, Mr. McTyre was asked about the reasonableness of his own contract interpretation (Dep. pp. 168:7-169:7):

> Q: Is your interpretation of the contract documents the only reasonable interpretation on this issue?
>
> A: To me, it is the reasonable interpretation of the construction documents.
>
> Q: So (the interpretation made by) contracting, construction and office of counsel would be unreasonable?
>
> A: I don't know what basis they had. They could have a reasonable interpretation based on the document they reviewed. I don't know. You have to ask them.
>
> Q: But as you sit here, yours is the only reasonable interpretation that you are aware of?
>
> A: I think my interpretation as stated in the Report is reasonable.
>
> Q: Is it the only reasonable one?
>
> A: Somebody else may have a reasonable interpretation if they don't review all the documents or if they review different documents than I did. And it could be reasonable based on their review and knowledge and background and everything else. I think that's what goes into what I consider my opinion to be reasonable. And they may have – like I said, they may have a reasonable interpretation

> based on their review or their knowledge or their background, which to them may be very reasonable.

Plaintiff submits that the Court may readily observe, without Mr. McTyre's testimony, that his opinion regarding the Quantities Claim at pp. 3-9 of his proffered Report are an undisguised attempt to interpret the contract for the Court. These testimonial acknowledgements of the point effectively prevent the government from attempting to put a different spin, or some sort of different face, on the Report.

**Mr. McTyre's Interpretative Opinions Cannot Conceivably be of any Assistance to the Court in Resolving the Pay Quantity Dispute.** The cases seem to suggest that proffered interpretations of the contract are apt to be even less "helpful" and less likely to be of "assistance" when they contradict the evidence. The court in *Lehman* made an observation to this effect when it noted that the proffered expert conclusion (interpretation of MLSPA) ". . . directly contradicts the sworn testimony of the fact witnesses involved in the negotiation and execution of the MLPSA and the unambiguous language of the contract". Mr. McTyre's opinions contradict evidence that has been sworn to by representatives of his own client who drafted the language which he purports to interpret, or into which he perhaps purports to provide "custom and practice" insight.

Mr. McTyre's conclusion that CLIN 0008 comprehends both the peel back removal operation as well as constructing part of the new Spur Breakwater, in the first instance, defies a reasonable reading of the contract language:

> 0008 Peel back Causeway Rock for Spur Breakwater Construction, complete,

That language only could be a description of the lump sum activity ("peel back causeway rock") preparatory to a succeeding activity ("spur breakwater construction").

Just as the Lehman expert conclusion contradicted percipient witnesses, so does Mr. McTyre's argument that CLIN 0008 covers partial construction of the new spur breakwater run contrary to the intent of the Corps' designer, Ms. Elaine Pflugh, who, when asked about her choice of the term "peel back" for CLIN 0008, responded (Pflugh Dep. p. 42:8) (Exhibit C hereto):

> That's what I chose to describe taking the rock off.

Her deposition goes on to affirm that the rock items, such as CLIN 0006, were to pay the contractor for installing the rock (Pflugh Dep p. 55:12).

> Q: Do you agree that the only basis for paying the contractor for rock placement is the unit price?
>
> A: Yes.
>
> Q: It's the same unit price regardless of the rock source, correct?
>
> A: Yes.
>
> Q: And the contract doesn't establish any method of paying for the rock placement except unit price, correct?
>
> A: Correct. Well, unit price and quantity.

As noted previously, Mr. McTyre has acknowledged the potential that there may be more than one reasonable interpretation of the contract provisions governing payment for rock quantities. Plaintiff does not accept that there is more than one reasonable and realistic interpretation, and that one assuredly is not the interpretation Mr. McTyre would have the court adopt – but that is not a matter to be resolved in connection with this Motion.

What Mr. McTyre has acknowledged is that different factions within the Corps Project Delivery Team for the Nome Project had split over how the pay quantities were to

be interpreted. Julie Anderson is the Corps Project Manager. Ex. #151 contains her Minutes of a December 14-15, 2004 meeting. In these minutes she records the conflicting interpretation within the Project Delivery Team. Ms. Anderson writes (the references are to "Contracting and Construction", which are the Corps Administrative Contracting Officer, the Area Engineer and the Resident Engineer, who are having direct involvment in construction of the Nome Project; "OC" is office of counsel, the Alaska District Counsel; "PM" is Ms. Anderson; "EN" is an engineer from the Corps Hydraulics and Hydrology section):

> Issue 2: Spur Breakwater Transition Rock Quantities.
>
> Construction and contracting appear to want to pay the contractor for this rock.
>
> Issue 3: Causeway and Seawall Rock Quantities.
>
> - Construction and contracting want to pay the contractor for the seawall rock.
> - Engineering and PM feel the rock was only moved for the convenience of the contractor, and is not a pay item.
>
> Issue 4: Rock Peel Back Quantities.
>
> - The contractor wrote during bidding "our interpretation of the specifications is that contractor will be paid for Causeway Exc. and if the material is re-used, the contractor will be paid under the corresponding bid item.
> - Contracting, construction and OC?? agree with the contractors assertion that this statement applies to the entire contract, and now way contractor entitled to payment.
> - The salvage clause in the contract states all salvaged items become the property of the contractor.
> - EN and PM feel the contractor statement only refers to the Causeway Exc. (bid item 7), and not to the entire contract, as

> was written. Therefore, the contractor is not entitled to payment for the rock.

Plaintiff submits that there is nothing that is least bit helpful or of assistance to be gained by allowing Mr. McTyre to add his interpretation to the conflict that amongst representatives of his own client. His report does not suggest that he is attesting to a custom or practice that places a unique understanding of the contract language he purports to interpret. If Professor Nash's testimony was of no help to the Judge Damich, *a fortiori,* Mr. McTyre's interpretation can be of no help to the court here. The opinion and Ruling in *Sparton Corp*. furnishes a useful summation for the issue at hand (77. Fed. Cl. 1, *Id.* at 7-9 omitting extensive citations):

> In general, federal courts have found expert testimony on issues of law, either giving a legal conclusion or discussing the legal implications of evidence, to be inadmissible. (Citation omitted). Although Fed.R.Evid. 704 was amended so as not to preclude expert testimony on the ultimate issue,[FN9] the amendment was not intended to allow an expert to advise the court on what outcome to reach. (Citation omitted). While patent law experts have occasionally been used in bench trials to inform the judge on the intricacies of patent law, "[a]n expert's opinion on the ultimate legal issue is neither required nor indeed 'evidence' at all." (Citation omitted). And, the Federal Circuit "has on numerous occasions noted the impropriety of patent lawyers testifying as expert witnesses and giving their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide." (Citation omitted).
>
> * * *
>
> Government contract experts have been allowed to testify in federal courts regarding the meaning of contract terms when the meaning depends on trade practice. (Citing cases involving specialized meaning, specialized usage, building practices in the railroad trade, etc.)
>
> * * *
>
> The reason to allow such testimony is that extrinsic evidence of trade

> practice and custom may "illuminate the context for the parties' contract negotiations and agreements (Citation omitted) when a contract term has a industry meaning which was omitted from the contract or which differs from its ordinary meaning. (Citation omitted) In the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible, as is expert testimony regarding the legal significance of the contract language. (Citations omitted).
>
> Whereas, in a jury trial, expert testimony on the law may be excluded in part to prevent jury confusion, the primary reason for exclusion of such testimony in a bench trial is that it invades the province of the court and is not helpful. (Citations omitted). The discretion of the court to exclude expert testimony that is unhelpful is supported by the Federal Rules of Evidence.

[At this point, the court notes the distinguished qualifications of Professor Nash, not least being this court's "Golden Eagle" award in 2005. The opinion continues:

> Nevertheless, the substance of Professor Nash's testimony consists of his legal conclusions based on the evidence of record. Specifically, he testifies as to whether inclusion of the Patent Rights clause was discretionary or mandatory based on the procurement regulations, whether Mod. 4 was issued under the Changes clause, whether Mod. 4 transformed the contract into a research and development contract, whether the parties' actions during contract performance support incorporation of the Patent Rights clause into the contract, and whether the *Christian* doctrine applies so as to import the Patent Rights clause into the contract as a matter of law. Professor Nash's testimony is not directed to interpretation of contract terms based on trade practice or usage, nor does the expert report suggest that there are any contract terms with specialized meaning.
>
> * * *
>
> In essence, the Court finds Professor Nash's testimony to serve the sole purpose of advising the Court on how to interpret the ASPR and the contract provisions and whether to apply the *Christian* doctrine. Such legal conclusions are the province of the Court. Expert testimony is an improper mechanism for offering legal arguments to the Court. Plaintiff's counsel can make each of the arguments proffered by Professor Nash during the trial. It would be unfair to Defendant for the Court to award Plaintiff's legal arguments the elevated stamp of "expert."

* * *

> Accordingly, the Court deems it proper to exclude the testimony of Professor Nash.

Likewise, Plaintiff submits, the Motion to Preclude the Testimony of Mr. McTyre on the Quantities Claim, as set forth on pp. 3-9 of his proffered Report, should be granted.

**2. All of Mr. McTyre's opinion and Report regarding his interpretation of the geotechnical data in the bid documents (at pp. 10-15 in the Report).**

The grounds for preclusion can be briefly stated. Mr. McTyre's proffered Report captioned "Differing Site Conditions Claim" includes a section he calls "Indications of the Character of Material in the Contract" commencing at p. 10 and concluding on p. 15. This entire section consists of Mr. McTyre's opinion as to how the geotechnical data contained in the Corps of Engineer bid documents should be interpreted. Such testimony should be deemed inadmissible because (i) it simply interprets the contract, which is the province of the Court; and (ii) Mr. McTyre is not qualified, and cannot qualify, as a geotechnical expert. He thus has no special knowledge or expertise which would be of assistance to the Court's understanding of geotechnical data.

The first of these two grounds has been explained in the preceding section of this Memorandum. Mr. McTyre's Report dealing with "character of material" is a series of evaluations (interpretations) which Mr. McTyre would have the Court adopt. Such statements as "the information from the borings in general indicate . . . "; and "the information provided in the specification appendices suggests . . ." permeate the opinion. These offerings anticipate a conclusion that ". . . there was sufficient information to advice (sic) potential bidders. . ."; and that "the geotechnical documents . . . also provided sufficient

warning regarding the possibility –" these are purely interpretative, argumentative assertions of the type that were stricken by the courts in the cases previously discussed.

To the extent the Court may see a value to expert input on the geotechnical features of the contract documents, Mr. McTyre is not the person to provide it. He cannot qualify as a geotechnical expert, and does not hold himself out to be one.

Q: Do you consider yourself an expert in soils engineering?

A: No, I'm not a geotechnical expert (at McTyre Dep. 75:11)

His opinion at pp. 10-15 of the proffered Report should be precluded, and that portion of his Expert Report stricken.

**3. All of Mr. McTyre's opinion and Report regarding means, methods and results of the KM dredging operation (at pp. 16-18 of the Report).**

The grounds for preclusion once again involve Mr. McTyre's qualification as an expert. At pp. 16-18 of his Report, Mr. McTyre proffers his analysis of Manson's dredging operation. He addresses:

1. Learning Curve
2. Construction in the Inner Harbor vs. Offshore
3. Dredging Smaller Areas
4. Metal Debris Field
5. Moves within Entrance Channel
6. Moves from one Area to Another

From his reviewing these aspects of Manson's dredging operation, Mr. McTyre draws purported conclusions regarding the productivity levels the contractor should have achieved in the various segments of the dredging prism, and the efficiencies that should have been

anticipated and realized. Such evaluations only could be made by an individual with dredging experience and expertise. Mr. McTyre has neither.

Of the four areas where he testified he qualified as an expert – scheduling, claims analysis, damages, and standard care – Mr. McTyre drew only upon one for purposes of his work on this case. In his Report, he did give "claims analysis"-type opinions regarding the measured mile basis used by Plaintiff to calculate the amount of the cost overrun which is attributable to the differing site conditions, and he did give a "claims analysis"-type opinion on discrete items of the claim, such as extraordinary damage to the dredging equipment. Plaintiff disagrees with his conclusions, but does not contend some points contained within these particular features of his Report fall outside his "claims analysis" expertise.

Not so, however, with his opinions on the dredging operation. In his deposition, Mr. McTyre:

> Q: How about in dredging operations?
>
> A: I'm not an expert in dredge (McTyre Dep. 75:14).

His opinion at pp. 16-18 of the proffered Report should be precluded, and that portion of his Expert Report stricken.

**CONCLUSION**

We are scheduled for a lengthy trial. The Court has been searching for ways and means of streamlining the testimony. Dispensing with needless and unhelpful "argument in the guise of expert testimony" is an appropriate and justifiable way of accelerating the process. We submit and urge that Plaintiff's Motions in *Limine* should be granted.

Respectfully submitted this 15th day of May, 2008.

s/Herbert A. Viergutz

Herbert A. Viergutz
Attorney for Kiewit/Mason JV
Barokas Martin & Tomlinson
1029 West Third, Suite 280
Anchorage, AK 99501
Phone: 907-276-8010
Fax: 907-276-5334

**CERTIFICATE OF FILING**

I hereby certify under penalty of perjury that on May 15, 2008, a copy of the foregoing was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Herbert A. Viergutz
Herbert A. Viergutz