# Expert Report
Prepared for
The Department of Justice
On Claims Related to the
Nome Navigational Improvements Project

April 15, 2008

Prepared by:
John McTyre
Construction Dispute Resolution & Support Services

EXHIBIT
tabbles
A

## Background:

On or about September 9, 2003, Kiewit-Manson, a Joint Venture (KM or the Contractor) submitted a proposal (the Proposal) for the Nome Navigational Improvements (the Project) to the Department of the Army, Alaska District, Corps of Engineers' (COE or the Government). The Government awarded the Contract (DACW85-03-C-0014) to KM on September 30, 2003 and issued a Notice to Proceed on November 4, 2003 (acknowledged receipt by KM on 11/6/03).

The Contract was awarded in the amount of $35,878,300. The award included Base Items 0001 through 0029. Of the 29 items in the Base Bid, 8 were lump sum and 21 were unit price items. The cost in the Contract for the unit price items was calculated by multiplying quantities estimated by the COE as shown on the "Proposal Schedule" by the unit price stipulated by the Contractor in its bid. The Contract amount was increased by a total of $6,511,421 to $42,389,721, by Contract Modifications 1 through 36.

The Work under the Contract was to be performed in the vicinity of Nome Alaska and consisted of the following major components:

- construction of a breakwater extending approximately 3025 feet into the Bering Sea in a southwest direction from the Nome harbor;
- construction of a spur breakwater extending (in a southward direction) approximately 270 feet from the end of the existing causeway in Nome;
- replacement of the causeway bridge;
- dredging a new entrance channel form the sea to the Nome harbor; and,
- miscellaneous tasks associated with closing the existing entrance channel.

The Contractor's proposal indicated that they generally intended to complete the first three items above (two breakwaters and the bridge replacement) in 2004 and the remaining two items (dredging and closing the existing entrance channel) in 2005, well in advance of the contractually required substantial completion date of April 27, 2007. The Contractor was granted substantial completion ahead of the Contract substantial completion date.

KM was a joint venture composed of two parties. One party was Kiewit Pacific Co. (Kiewit) and the other was Manson Construction Co (Manson). Generally, Manson

was responsible for the dredging and filling in of the existing entrance channel and Kiewit was responsible for the balance of the Work.

Two disputes arose during the performance of the Work. The first was related to the quantity of rock required to complete the two breakwaters. The second resulted from the Contractor alleging that it had encountered a differing site condition while dredging. The disputes did not get resolved so the Contractor submitted a certified claim for each dispute (rock quantities dispute on August 5, 2005 and differing site conditions dispute submitted on October 27, 2006).

In the summer of 2007, Construction Dispute Resolution & Support Services (CDRSS) was retained by the Department of Justice to analyze the disputes and render an independent opinion regarding entitlement and damages. This report summarizes CDRSS' findings regarding the two disputes in the matter.

In addition to a site visit and discussions with COE personnel, the following items were reviewed in preparing this report:

Daily Dredge Logs
Schedules
Correspondence
The Claims
Audit Reports
Contract Documents
Cost Reports
Depositions
Documents produced by Manson and Kiewit

## Quantities Claim:

On August 5, 2005, KM submitted a Request for Equitable Adjustment, which it later, on September 27, 2005, indicated should become a Certified Claim. That claim was for quantity overruns of certain items on the Project (Quantity Dispute). In its claim, KM requested $5,263,454 due to 'unpaid additional quantities of work plus costs associated with delays and impacts, defective and incomplete design, and other un-reimbursed changes'.

The Quantity Dispute was related to the construction of the extension of the existing causeway, referred to the 'spur' and the new breakwater (approximately 3,025 ft). According to KM the amount of A22 and B22[1] rock installed and Trenched in Toe excavation accomplished exceeded that quantities specified in the Contract (as currently adjusted). KM claimed that they were owed the cost of the added quantities at the Contract unit prices.

In its quantification of the claim, KM indicated that the amount of A22 rock exceeded the amount in the contract by 11,816 cubic yards. Using the unit price specified in the Contract, $308, KM requested $3,639,328 for the A22 overrun. KM claimed that the B22 rock overran the amount in the Contract by 6,583 cubic yards. Using the Contract unit price for the B22 rock, $65, KM requested $427,895 for the B22 overrun. The Trenched in Toe excavation allegedly over ran by 2,141 cubic yards and again KM used the Contract unit price, $30 per cubic yard, to arrive at the amount

[1] Specifications Section 02270 describes the A22 and B22 rocks as follows:

*"B" Rock (B22). "B" Rock designated as B22 on the Drawings shall be well graded within the following limits:*

| *Specified Rock Weight (Pounds)* | *Allowable Percent Smaller by Weight* |
|---|---|
| *7500* | *100%* |
| *4000* | *25 – 85%* |
| *3400* | *0 – 5%* |
| *3000* | *0%* |

*Armor Rock (A22). The average weight of the individual armor rock designated as A22 in the drawings shall be 44,000 pounds or greater. No stone shall weigh more than 54,000 pounds or less than 38,000 pounds. Each rock shall be weighed.*

claimed of $64,230. In addition, KM claims that due to the rock overrun, the mining equipment had to stay over the 2004/2005 winter, which resulted in an additional cost (including overhead and profit) of $1,075,854 (plus $56,147 for bond).

The largest part of the claimed amount ($4,121,223) emanated from the dispute in the amount of A22 and B22 rock, which according to KM was caused by the following four issues:

1. 'the main breakwater transition;
2. the quantities removed as part of the peel back and later installed as part of the spur breakwater;
3. the quantities in the design change to avoid the "cupping" on the seaward side of the causeway tie-in;
4. and the Seawall quantities first removed (and later installed) during construction of the spur transition.'

The cost for the equipment to remain over the 2004/2005 winter, according to KM was related to the rock quantity overrun, so the additional amount of $1,075,854 (plus bond) was also indirectly related to the same issues.

KM claims that the trenched in toe increase was related to the transition at the spur and the preconstruction survey of the main breakwater. Accordingly, the trenched in toe part of the claim was also related to items 3 and possibly item 1 above.

The issues identified by KM as the causes of the dispute are addressed below:

*1. The main breakwater transition:*

The Contract Drawings do not show precisely how the transition from the wide section (A on H6) to the narrower section (B on H6) of the main breakwater was to be accomplished. KM, in its proposal of September 9, 2003, showed their interpretation of how the transition was to be constructed.

After the transition construction started, not in accordance with KM's proposal, KM submitted an RFI (# 14 – 4/14/05) requesting direction on how the transition was to

be constructed. The Government responded that if KM felt that their proposal was unconstructible, then KM was to submit a plan for building the transition.

The disputed quantity as described by KM was related to placing A22 rock in the configuration shown in KM's proposal. The proposal showed A22 rock being placed in a space that gradually reduced to a point, being too small for the A22 rock. In other words, the A22 will not fit within the neat lines shown in KM's proposal.

The Contract indicated that payment was to be based on the lines shown on the drawings, or neat lines. This was confirmed in KM's claim where they state that 'the payment provisions of the Contract confirm that, on a monthly basis, work constructed to the Contract-defined lines and grades in approved quantities would be paid for…' In this case, KM prepared drawings of its interpretation of the Contract drawings, thus establishing neat lines. If KM could not fit the A22 rock entirely within the neat lines which they proposed, then the amount of rock that was outside the neat lines would not be paid for (but there must be A22 within the neat lines). It should be noted that if the A22 takes up space of other rock types, then there will be a savings in the other rock types.

The amount of A22 that was outside of the neat lines should have been considered in the Contractor's unit price for A22, particularly since the neat lines were established by KM in its proposal.

Quantities for payment at the transition should be based on the neat lines established in KM's proposal.

*2. The quantities removed as part of the peel back and later installed as part of the spur breakwater:*

KM requested payment under the A22 unit price for replacing stone that was removed from the causeway as part of the peel back.

Stone that was removed from the causeway, and had to be reinstalled on the causeway after or during the spur construction should be paid for as part of the peel back lump sum item. The new spur construction neat lines are defined in the construction documents. Payment for the new spur construction should be paid for with the unit

prices. Whatever the contractor chooses to remove from the causeway in order to install the new spur construction, using their selected means and methods, is to be covered under the peel back lump sum.

The peel back was appropriately established in the Contract as a lump sum in order to allow the contractor to select a means and method that would be most compatible with its strengths. It would be unreasonable for the Contract to dictate the means and methods for the spur transition construction.

If the stone removed as part of the peel back was to be paid for under the unit prices, it would create a contract without a fixed amount – the cost of construction could not be determined from the bid amount. The amount of stone placement could not have been quantified until after the contract was awarded and the Contractor disclosed or until the Contractor decided how much stone it would remove. The fixed quantity of stone placement established by the Contract would be open ended because the Contractor would have complete control of the amount of stone removed that would subsequently have to be replaced. The replacement of the peel back stone could not have been in the unit price quantities because the amount of stone removed was controlled by the Contractor.

KM knew that the A22 quantities in the proposal form did not include replacing the peel back stone. Their estimate of the A22 without the replacement of the peel back quantities exceeded the Contract quantity of A22. In effect, KM knew that the cost of replacing the peel back stone was either in the peel back lump sum item, or it was not included in the Contract. Their claim, that it was not part of the peel back, suggests that they bid the Project knowing that it could not be built for the cost they submitted.

KM included enough in its estimate to cover the replacement of the stone that was removed from the causeway in the Peel Back line item (item # 8) of the Contract. KM's estimate for the peel back was $99,355 (without general conditions and profit). The amount included in the Peel Back line item # 8 submitted to the Government was $595,500 (includes general conditions and profit).

In April 2004, before the work started, KM budgeted $55,750 (without general conditions and profit) for the peel back. By mid summer of 2004, KM had billed the

Government $595,500 for the Peel Back line item at a time when they had spent only $54,718 (without general conditions and profit).

Payment for replacing the stone on the causeway which was removed as part of the Peel Back should be paid for as part of the lump sum Item # 8, Peel Back. Any excess stone that was removed for the peel back, which was used within the new spur construction neat lines, should be paid for by with the unit prices for the appropriate stone type.

*3. The quantities in the design change to avoid the "cupping" on the seaward side if the causeway tie-in:*

The amount of stone required to build the spur transition without the "cupping" should be included in the pay quantities.

The thickness of the A22 and B22 layers used for calculating the payment quantities should be as directed by the COE. The COE indicated (on June 21, 2004, prior to the start of the spur) that while the slopes of the stone might vary at the seaside transition, the thickness of the stone layers should be in accordance with the Contract drawings.

Any excess stone due to thicknesses greater than indicated in the drawings would not be within the neat lines and therefore excluded form payment as part of that type of stone.

*4. The Seawall quantities first removed (and later installed) during construction of the spur transition:*

The Seawall quantities removed and replaced are essentially part of the peel back stone that was removed and replaced. The discussion in item 2 above applies to this item as well.

Payment for replacing the Seawall stone on the causeway which was removed as part of the Peel Back should be paid for as part of the lump sum Item # 8, Peel Back.

The quantities of Trenched in Toe excavation should include the amount necessary to build the seaside spur transition as described in the COE's June 21, 2004 response the RFI # 1. The quantities should also include the amount required to build the main breakwater transition in accordance with KM's Proposal.

KM did not demonstrate that it could not have finished mining the stone for the Project in time to demobilize before the 2004/2005 winter. Neither did KM demonstrate that it could have mined the original stone quantity specified in the contract prior to the 2004/2005 winter. Documents substantiating the amount of rock quarried daily, by type were requested and not provided.

KM personnel indicated that there were 'other reasons' why the equipment could not be demobilized. Among the other reasons was the fact that Kiewit was using the mining equipment for other projects in the vicinity.

If KM had demobilized the mining equipment before the 2004/2005 winter it would have had to remobilize/demobilize it again to obtain the additional stone required to reconstruct the main breakwater (performed in 2005/2006).

The cost report indicates that amount in excess of the budget for the items related to KM's quantity dispute was significantly less than the amount claimed. However, the cost to reconstruct the breakwater in accordance with the contract requirements cost in excess of $2,000,000.

*Summary of Quantity Dispute:*

Below is a comparison of the quantities claimed as presented in KM's claim, as included in the Contract and as estimated by CDRSS:

| | KM Claim | Contract Amount | CDRSS Estimate |
|---|---|---|---|
| A22 Rock (CY) | 48,752 | 35,613 | 35,469 |
| B22 Rock (CY) | 33,039 | 26,117 | 28,630 |
| Trenched in Toe (CY) | 13,241 | 11,100 | 12,274 |

The above contract amounts include increases in the contract quantities.

In summary, the proper quantity adjustments based on CDRSS's estimate are minor and would result in an additional payment to KM in the amount of $154,213.

## Differing Site Conditions Claim:

On October 27, 2006, KM submitted a Certified Claim for Equitable Adjustment of the Contract Sum due to Differing Site Conditions (DSC). In the DSC claim, KM stated that the conditions encountered while dredging differed 'materially from those indicated in the Contract.' KM claimed that the dredging operations were less efficient due to the DSC, which prolonged its operations in Nome approximately one month. In addition, KM claimed that, due to the DSC, it incurred additional costs associated with excessive wear of its equipment. The amount claimed by KM for the extra dredging time and the excessive equipment wear was $2,093,834.

In support of their claim, KM submitted copies of several photographs and made others available to illustrate the actual conditions. The photographs generally showed cobbles, rocks, boulders, and other debris. In addition, KM provided some sieve analysis of the material actually encountered and daily logs that indicated the number and amount of times spent clearing obstructions. KM claimed that the support provided established that the conditions were "materially different than those indicated in the Contract."

*Indications of the Character of Material in the Contract:*

The specifications address the Character of Materials to be anticipated in the dredging operation in Specification Section 02222, paragraph 1.3 which read as follows:

> *1.3 Character of Materials*
>
> *AM #2...Exploration logs for the area to be dredged and excavated along with a portion of a Design Memorandum dated August 1982 and various geotechnical data describing the project vicinity are enclosed in Appendix 02222A Subsurface Conditions. A photograph showing the known area of metal debris and the partially sunken barge depicted on the drawings is enclosed in Appendix 02222B. A Soil Investigation dated May 1982 that contains exploration logs and geotechnical data for the project area is enclosed in Appendix 02222C. Character of materials data do not necessarily represent the project area materials to be encountered over the entire project area. The composition of materials may vary significantly over the project area. Incidental sunken logs, boulders, rocks, snags, cobbles, gravel, sand, silt, glacial till, miscellaneous metal debris from harbor, mining, and fishing operations should be expected throughout the excavation and dredging areas. Glacial till is characterized as unstratified sediments such as cobbles, gravel, sand, silt, and clay intermingled in a dense, tight matrix. The metal debris consists of miscellaneous material from mining*

*and harbor operations. It is located within the harbor in a pile with dimensions of approximately 30 x 30 x 10 feet. It is submerged at higher tide levels. The partially sunken barge is a steel flat deck barge with approximate dimensions of 140 x 35 x 7 feet. It may be filled or partially filled with sand and silt, and may be structurally or otherwise unsuitable to float…AM #2*

Attachment 02222A consisted of the following:

- three groups of borings as follows (borings are located on Contract drawing LV-1):
  - Four borings (AP 1000 to AP 1003) taken in early December 1997: The borings were taken along the sand spit (strip of sand above sea level between the Snake river and the sea) in the general vicinity of the dredging with one (# A-1001) located directly in the area that was dredged. The boring information indicated that the soil, to a depth of 5 to almost 7 meters (approximately 15 to 20 feet) below MLLW (Mean Lower Low Water), was primarily sand with some gravel. The dredging in this area was to go to a depth of 10.5 feet below MLLW.
  - Four borings (AP 1004 to AP 1007) taken in mid April 2000: The borings were taken along the sand spit in the general vicinity of the dredging with one located on the outer perimeter of the area that was dredged. The borings indicated that the soil, to a depth of almost 10 to just over 12 ft below MLLW, was primarily sand with gravel noted mostly above MLLW. Large material (gravel or cobbles) prevented recovery of full sample intervals in several instances in this group of borings. Root fragments appear in AP-1004.
  - Four borings (AP 1008 to AP 10011) taken on August 7, 2001: The borings were taken along the sand spit within the area that was dredged. The boring information indicated that the soil to a depth of just over 9 to just over 10 feet below MLLW, was primarily sand with gravel.
- Four Surface Grab Samples (SED 1 to SED 4): The samples were taken in December 1997. The samples of surface of the seabed were taken underwater at depths of between 5 and 15 ft below MLLW. SED 1 and 2 were taken several hundred feet away from the dredging area, SED 3 was taken between 50 and 100

feet from the area that was dredged and SED 4 was taken in the area that was dredged. The surface samples were of poorly graded sand.

- Design Memorandum of August 1982: The Memorandum, prepared by Tippets, Abbett, McCarthy, Stratton, Engineers (TAMS) described a geotechnical investigation and recommendations undertaken with regard to a planned construction of an offshore terminal and causeway.

  The relevant findings of the Memorandum were summarized on figure 5.3. Figure 5.3 showed the boring holes and the relative depth of the "Recent" deposits, "Glacial Till." Glacial Till is described as 'gray gravelly silty sands and silt: occasional clean sand and silty gravel. Medium dense to very dense. Contains angular rock fragments (gravels) and other types of soil'. The figure illustrated some relatively significant variances in the elevation of the Glacial Till between borings HLO-1, HLO-2 and HLO-3. These variances in elevations were more than 5 feet per 100 feet horizontal.

  The borings also indicated that the Glacial Till was as high as 15 feet (HLO-3) and 23 feet (HLO-4) below MLLW in locations as close as 300 ft from areas that were dredged to a depth of 22.5 ft.

- Memorandum of August 5, 1991: The Memorandum, prepared by Howard Grey & Associates, Inc. described three test pits excavated for a possible routing for the outfall from a waste water system expansion. The test pits were dug approximately ¼ mile north of the causeway.

  The pits were dug to a depth of five feet starting at 10 (station 12+50) and 14 (stations 18+00 and 19+00) feet below sea level. The top 1.5 to 2 feet was dense fine grained sand. Below that there was a 1 to 1.5 foot layer of 'compact to dense, sandy gravel with cobbles, may contain random boulders…" The bottom was either very dense Till, consisting of silts, clays, sands, gravels, cobbles, and possibly boulders or compact to dense, silty sand.

  Photos included in this memorandum showed cobbles and boulders after smaller material was washed away.

- Geotechnical Investigation of January 9, 1986: The investigation was prepared by Harding Lawson Associates in relation to proposed construction of a Container

Freight Station and a Vehicle Maintenance Shop. The borings (not located on LV-1) for the investigation were obtained on November 8 and 9, 1985. The first seven borings are clustered 100 to 200 feet northwest of the start of the causeway or approximately 1000 feet from the nearest dredging area. Two other borings were shown approximately 600 to 800 feet from the dredging area and the last two are not shown on the investigation plan.

The first six borings went to a depth of 45 to 50 feet with the water level shown at a depth of 5 feet at boring #1 and 8.5 at boring #5 (water level not shown on other four). The first six borings showed primarily sand and some gravel. Boring # 2 indicated that "gravel to 6" plus" was present at a depth of approximately 25 feet. Boring # 4 noted "numerous rocks to 10" plus" at a depth of approximately 15 feet in the area that was designated as predominantly sandy.

Boring #7 through #11 went to a depth of between 15 and 19 feet with a water level at a depth of 11 feet at boring #7 and 6 feet at boring #9 (water level not shown on other three). Borings #7 through #11 showed primarily sand with some gravel. Wood fragments, wood chunks and twigs were noted on the logs.

Attachment 0222B is a photograph of the partially sunken barge and metal debris that was visible at low tide.

Attachment 0222C was an earlier (May 1982) version of the TAMS report that was included in Attachment 0222A. Plat 3 was the same as figure 5.3 of the August report, which summarized the most relevant information of the report.

The geotechnical data provided little information regarding the conditions in the actual entrance channel dredging area. Only six borings were provided within the dredging area and the six were clustered in the sand spit, an area from approximately station 18+00 to 22+00, or approximately five percent of the total dredging area. The information from the borings in general indicated that the soil in the vicinity of the dredging area at elevations below MLLW was primarily sand with some gravel.

The boring data would not record samples larger than two to two and a half inches because they could not be collected in the sampler. Larger material might cause the auger to stop if very large and contact was made near the center – none stopped in the data included. It might also, if contact was made off center, cause a higher blow count until the obstruction, be it a cobble or boulder, was displaced to allow the auger to advance. An example can be seen in AP-1007 at approximately 9 feet below the water level (35 blows per 6" followed by 7, and 5); AP1009 at approximately four feet below the water level (40 blows per 6" followed by 21, 16 and 11); and boring HLO-4 at approximately 19 feet below the water level (74 blows per ft followed by 50 and 28).

The most reliable way to confirm the presence of boulders, cobbles and other obstructions greater than two to two and a half inches was by excavating a test pit. Unfortunately, the only test pit data was approximately 400 meters from the causeway. The test pit data, while 400 meters away, did confirm the presence of cobbles and boulders in significant quantities.

The information provided in the specification appendices suggests that the elevation of Glacial Till could change rather dramatically at a rate of more than 5 feet per 100 feet horizontally. It also confirms that Glacial Till was encountered at elevations of 15 and 23 ft below MLLW within 300 feet of the area where dredging was to go to 22.5 feet below MLLW.

Below is a summary of the conclusions that one could draw from the geotechnical data included in the Contract:

- The most common material in the dredging area was sand with a lesser amount of, but still significant quantities of gravel.
- Nothing in the geotechnical data precludes the presence of material larger than two to two and a half inches in any quantities. In fact, it would be reasonable to expect that material larger than sand and gravel, namely cobbles and boulders would be encountered in quantities that could vary significantly.
- It would also be reasonable to expect that Glacial Till would be encountered within the dredging prism.

- The geotechnical data does not address debris or material likely to be encountered while dredging the entrance channel in the harbor area (north of the sand spit).

The geotechnical data when taken in conjunction with the description of the 'character of material' as described in Specification Section 02222 paragraph 1.3 was sufficient information to advice potential bidders to expect a wide variation of material and a wide variation in the quantities of different materials. It also provided sufficient warning regarding the potential for debris within the dredge prism.

*Productivity Analysis:*

The largest part of KM's DSC claim was the cost to dredge for approximately one extra month because the work performed was inefficient due to the DSC. KM used two different dredges to accomplish the Work under the contract. The Bechtolt was a 16 inch, cutter head hydraulic dredge and the Viking was a clamshell dredge.

The extended performance of the Bechtolt was calculated using a measured mile analysis. This method of analysis measures the performance in an unimpacted area, in this case, the east sediment trap, and compares it to the impacted performance elsewhere. For the Viking, KM's analysis compared the actual performance to the Historic Productivity. The productivity study for both vessels was analyzed and a summary of the findings is presented below.

*Bechtolt Productivity Analysis:*

In its claim, KM quantified the damages incurred to the Bechtolt by using a 'measured mile' analysis. In its measured mile, KM indicated that the material in the East Sediment Trap 'was found to be consistent with Engineering Data provided in the Contract Documents.' Accordingly, the productivity (cubic yards per day – double shift) achieved at the East Sediment Trap was compared to the productivity achieved in the Inner Harbor, Channel (Bechtolt portion) and Option Areas A-VI thru AVIII. The analysis suggests that if KM had encountered 'material consistent with the Engineering Data' when dredging in areas other than its measured mile, then their productivity was to

be the same as in the measured mile area, resulting in an earlier completion – 28 days earlier.

The measured mile analysis was not applied properly in this case. It is essential, when using the measured mile that the two tasks - the measured mile task and the one it was compared to - be the same before a factor such as the character of material was isolated. For example, if the measured mile involved a task that was much easier than the one it was being compared to, then the greater productivity achieved in the measured mile task cannot be compared to one where it was expected that the productivity would be lower before isolating the influence of the factor in question.

Dredging the Inner Harbor, Channel and Options A-VI thru A-VIII was more difficult than dredging the East Sediment Trap for the following reasons:

1. Learning Curve: There was no question that the crew selected by Manson was experienced at dredging. Some had even worked on the Bechtolt before its complete overhaul for this project. Nonetheless, all projects experience some element of a learning curve when starting to use equipment that was used very infrequently over the last decade or when starting a new project in a new environment. The experience is akin to an experienced driver driving a new car. The driver in the new car is not likely to drive rapidly until he (or she) is familiar with the controls, car's power, stopping ability, ability to corner, etc.

   The learning curve concept when applied to experienced workers was described below (from the Canadian Journal of Civil Engineering, Vol. 21, 1994):

   > *...there is some confusion in the construction industry regarding the use of this term. Because different construction work typically takes place under unique conditions at a unique site, it is useful to differentiate between productivity improvement due to "learning" and that due to "experience". As crafts apprentices learn their trade, productivity increases. However, when skilled crafts perform a specific task on site and repeat it a number of times, there is a similar productivity increase. The former is due to "learning the skill", while the latter is due to acquiring "experience of the particular site conditions" associated with the work activity at the time.*

   Because the Inner Harbor was the first area to be dredged, and the East Sediment Trap was the last, it was reasonable to expect that the latter would exhibit greater productivity because of the affect of the learning curve. It should

be noted that the task of actually dredging (effective time) was affected as well as tasks like clearing obstructions and maintenance (non-effective time) which consumed a significant amount of the total dredge time.

The learning curve was not considered or factored in the measure mile analysis prepared by KM.

2. Obstruction in the Inner Harbor vs. Off Shore: The Nome harbor has been historically used for mining and fishing operations and thus was likely to have greater amounts of debris than the sediment off shore. The East Sediment Trap, because it was off shore, was less likely to have such obstructions and therefore greater productivity. It was not valid to compare the productivity of an area that was likely, based on experience and the specifications, to have more obstructions with an area that was likely to have less obstruction.

   The impact of the greater quantity of obstructions expected in the Inner Harbor versus obstructions off shore was not considered or factored in the measured mile analysis prepared by KM.

3. Dredging Smaller Areas: There were several reasons why dredging smaller areas such as A-VI thru A-III (total – 21,600 cubic yards) should be less productive than a large area such as the East Sediment Trap (139,000 cubic yards). Among the reasons for greater productivity in larger areas were the following:

   - Less boundaries/limits of operation
   - Less set up time including establishing dredging boundaries – one set up per 139,000 cubic yards vs. three set ups per 21,600 cubic yards.

   KM's unit price for dredging in Areas A-VI and A-VIII was higher ($13 per cubic yard) than the unit price for dredging the East Sediment Trap ($7 per cubic yard). The higher unit price for areas A-VI thru A-VIII reflected an expected lower productivity for the smaller, more confined areas.

   The impact of the lower productivity anticipated in the smaller areas was not considered or factored in the measured mile analysis prepared by KM.

4. Metal Debris Field: The Contract documents identified a specific area with metal debris in the Inner Harbor. Manson's Project Manager, Bob Richardson indicated

that working around the metal debris, where it was shown on the photograph was a disruption.

The loss of productivity associated with a known metal debris field was not considered or factored in the KM analysis.

5. Moves within Entrance Channel: The dredging performed by the Bechtolt along the inner harbor/entrance channel included a distance of 2,400 feet (station 10+00 to 34+00). Dredging shallower areas along a greater distance was less efficient than dredging in the same location because it involves a greater number of moves. In addition to the 2,400 feet of moves, the Bechtolt went back to complete dredging in areas it had already passed, thereby increasing the distance and amount of moves in excess of the 2,400 feet.

   The reduction in productivity associated with the greater quantity of moves required at the Entrance Channel was not considered or factored in the KM analysis.

6. Moves from one Area to Another: In order to dredge at the East Sediment Trap the equipment would have to move one time, whereas in dredging the other areas they would have to move approximately four times.

The above factors are independent of the geology encountered while dredging and should have been considered in a comparison of the productivity of the East Sediment Trap with the other areas. Considering the above factors, the East Sediment Trap should have a higher productivity than the Inner Harbor, Channel and Areas A-VI thru A-VIII even if they were to dredge identical material. In fact using KM's records it appears that KM planned to perform the East Sediment Trap more efficiently than the other three areas dredged by the Bechtolt.

After the dredging started in the inner harbor and the channel and well before the start of the east sediment trap, KM's budget for the dredging changed. With full knowledge of the subsurface geology and substantial knowledge of the conditions other than the subsurface geology (ie impact of moves, learning curve, etc), KM budgeted that the East Sediment Trap could be dredged more than one and a half times more efficiently than the other areas (inner harbor, channel, areas A-VI-VIII). Accordingly, if KM claims

that the East Sediment Trap was as they anticipated based on their understanding of the information contained in the specifications then it should have taken 53 days to dredge the other areas, where it actually took 57. Considering the above factors and possibly others, as was apparently done by KM, the amount of time it actually took to dredge was relatively close to the amount of time it should have taken based on KM's measured mile.

It should be noted that the 57 days that it actually took to dredge the areas other than the east sediment trap, included two days where the Bechtolt was assisting the Viking move a sunken barge (very little dredging was accomplished). Also, KM performed work for the City of Nome during the 57 days, which should not be included in the analysis of a claim against the COE, particularly since it was not clear if the quantity for the City of Nome work was included in the measured mile analysis. A more accurate accounting of the actual number of days that it took to dredge the areas other than the east sediment trap was 52.

In addition, KM's analysis adjusted the quantity of days of dredging the East Sediment Trap for repairs but did not adjust them for repairs during the dredging of the other areas.

The measured mile analysis if adjusted properly would not show that there was a significant difference between the east sediment trap and the other areas. The following adjustments would be necessary to have a proper measured mile:

1. Factor for impacts to the productivity other than subsurface geology. Such factors are reflected by KM's adjusted budget after the start of dredging and before the east sediment trap.
2. Two day interruption to assist the Viking remove the sunken barge.
3. Three days should be deducted for work that was performed for the City of Nome.
4. Adjustment for repairs while dredging the areas other than the east sediment trap.

A properly adjusted measured mile would suggest that KM was not entitled to additional time due to inefficiency associated with subsurface conditions based on their claim that the east sediment trap was representative of what they anticipated. This was confirmed by a review of the daily dredge logs that do not show a substantial difference

in the quantity of obstructions or time to clear them on a daily basis for the east sediment trap than in the other areas.

As further support for the notion that the sub surface conditions were not significantly different than actually anticipated by KM, in mid July 2005 after KM had full knowledge of the actual subsurface conditions, they proposed to work for the City of Nome for essentially the same unit price that they bid for the Project. If KM encountered conditions that were so drastically different than they had anticipated, as explained in their claim, then the unit price provided in July should have risen dramatically to reflect the inefficiency experienced.

KM's claim for excessive wear of the hydraulic dredging equipment (Bechtolt) was unsupported by any objective empirical data, or manufacturer's data. It was based solely on the opinion of employees of the party that prepared the claim. The excessive wear of the equipment lacked invoices for components that were claimed. The excessive wear element of KM's claim should be rejected due to lack of support and because a differing site condition was not encountered.

*Viking Productivity Analysis:*

In its claim, KM quantified the damages incurred to the Viking by comparing its performance on the Project with its "historical productivity." KM claims that the Viking could not achieve its "historic productivity" because the material encountered differed materially from that indicated in the Contract.

The Viking was a mechanical dredge that used a cable connected clamshell bucket to remove the subsurface soil. It dredged the entrance channel primarily from station 34+00 out to 48+00 and west including the causeway dock area

Further investigation into the alleged DSC experienced by the Viking reveals the following:

1. Failure to document the DSC: Numerous photographs were produced to demonstrate the character of the material encountered by the Bechtolt but relatively few photographs were produced of the material encountered by the Viking. The backup included in KM's claim showed several photographs of the material encountered by the Bechtolt and apparently none documenting the DSC encountered by the Bechtolt.

   The COE did not witness or document the existence of DSC related to the Viking. The following excerpt was taken from a site visit report prepared by Alan C. Jeffries of the COE (July 25, 2005):

   > *The Contractor received a call on the radio that the Viking dredge was encountering rock in the entrance channel. We motored over to the dredge to inspect the material coming out of the bucket and being dumped into the scow. The operation was observed from the deck of the Viking for about 30 minutes beginning at 1700. During that time, we saw about 20 to 25 buckets dumped. It appeared that fine grain material (sand) was being encountered. All bucket loads of material observed being dumped into the scow appeared to contain only sand.*

2. Glacial Till: According to the geotechnical data, glacial till was encountered at -15 and -23 ft below MLLW in borings taken within 300 feet of the area where KM was to dredge with the Viking to an elevation of -22.5. The data also indicated that the elevation of the glacial till changed rather dramatically in the area – in excess of 5 feet per 100 feet horizontal. It would be reasonable to expect some amount of glacial till in the dredging.

3. KM had two buckets available to use with the Viking in Nome. The 14 cubic yard bucket was intended to be used the majority of the time because if the material was sufficiently loose/soft, as was expected, the 14 cubic yard bucket was more efficient. A 10 cubic yard bucket was also available in case harder/more dense material was encountered. While the daily reports indicated that "hard" material was encountered, it evidently was not sufficiently hard/dense to require a change to the 10 cubic yard bucket. The 10 cubic yard bucket was

only used briefly when the 14 cy bucket was being repaired (Leonard Juhnke deposition).

KM did not demonstrate that the conditions encountered in the area that the Viking was dredging were different than what should have been anticipated based on the information provided in the specifications.

The damages calculations prepared by KM for the Viking had significant inconsistencies as follows:

1. Historic Productivity: the damages were calculated by comparing the productivity achieved by the Viking on the Project to the "Historic Productivity." The "historic productivity" appears to be a creation for this claim. KM's dredging expert was unfamiliar with the term as presented in this claim. The data to support the figures described as "historic productivity" were requested but not produced.

   For historical records to establish the productivity of the Viking, they would have to demonstrate dredging material similar to that indicated in the geotechnical data (including glacial till), which calls for significant variation. They would have to demonstrate dredging in conditions that were similar to those on this Project for conditions other than the geotechnical data. Examples of the conditions that would have to be similar in addition to the geotechnical data would include but not be limited to: bucket size, depth, proximity to structures/obstructions, sea conditions, single scow, scow dump distance, etc. Such records were not produced.

   According to KM's claim, the material encountered by the Viking was different than "inferred by Engineering Data in the Contract Documents" every single day. There was not one day that the Viking dredged 7000 cubic yards as expected according to KM's claim. It appears that either KM's "inferences of the Engineering Data" or the "Historical Productivity" that the claim was based on were unreasonable.

2. Double Shifts: The calculations used to quantify the damages were based on 73 double shifts. The six days worked from June 16 to June 23, 2005, were single shifts as were the seven days from August 29 to September 4. In its calculations KM included these days as double shifts. This reduces the amount of extra time that KM was claiming for the Viking by 6 and one half days.

3. Repair Days: The calculations used to quantify the damages were based on 73 'days of production'. During three of the 73 days, there was no production because the dredge was down for repairs. This reduced the extra time that KM was requesting for the Viking by 3 days.

4. Causeway Dock: The estimate for dredging the Causeway Dock was not based on 'historical productivity' – 3500 cubic yards per 12 hour shift. It was based on dredging 25,900 cubic yards in 13 - 12 hour shifts – 1992 cubic yards per shift. A proper adjustment would reduce the number of double shift days by 13 and reduce the quantity of dredged material by 25,900 cubic yards.

5. Sunken Barge Removal: On July 26 and 27, 2005, the Viking removed a sunken barge for most of two shifts. On the damages calculations, KM counted one and a half days of productive dredging. A proper adjustment to the analysis would delete two shifts and whatever minor amount of dredging was accomplished for those two shifts.

6. Work for the City of Nome: On August 9, 2005, the Viking was performing work for the City of Nome. The lower productivity of that day (1851 cubic yards per shift) was included in the calculations for the damages being charged to the COE. A proper adjustment would delete that day and the amount of dredging that was accomplished.

7. Incomplete Double Shifts: There are several days when the Viking did not work a full double shift, yet it was included as a double shift of productive dredging in

KM's analysis. The reasons for the reduced shifts, as identified in KM's daily dredge logs were either repairs, unexplained, working other areas, etc. Examples of those days are: July 11, 14, August 4, 5, 9, 24, 25, 27, 29 (1/2), September 2 (1/2), 3 (1/2) and 4 (1/2).

If items 2 through 7 are properly considered in KM's analysis, the amount of extra time requested for the Viking would be reduced significantly.

KM's analysis of the Viking is not valid. There was insufficient documentation to establish a differing site condition for the material dredged by the Viking. There was no basis, justification or backup to support the "historic productivity" used for the analysis. The fact that there was not one day when the Viking achieved the "historic productivity" suggests that it was unreasonable. KM's analysis to justify the damages incurred was faulty and inconsistent.

*Summary – DSC Claim:*

The geotechnical data included in the specifications have little information about the actual area to be dredged. There is a significant amount of information about the subsurface conditions in the vicinity. In general the geotechnical information describes the subsurface conditions as primarily sand with some gravel. There was some indication in the borings of material larger than gravel, ie cobbles and boulders, but such information was not captured in the samples due to the size of the sampler. The data suggests the likelihood of glacial till in the dredge prism. The specifications included warnings about the likelihood of encountering varying material.

In reviewing the backup for the material encountered by the Bechtolt, it appears that the amount of cobbles and boulders might exceed what would be expected from a review of the geotechnical data, but not what would have been expected if considering the warnings in paragraph 1.3 of Specification Section 02222. In its analysis, KM stated that the material encountered in the east sediment trap was representative of the material anticipated. An appropriate use of the measured mile comparison supports the notion that

KM also took heed of the warnings in Specification Section 02222, and that they also anticipated the conditions actually encountered by the Bechtolt.

There was not sufficient support to establish that that material encountered by the Viking was different than what should have been anticipated based on a review of the geotechnical data and the specifications. The damages claimed by KM related to the Viking were based on 'Historical Productivity," which was unsupported, unverifiable and unreasonable. The damages are overstated for a number of reasons in addition to the lack of support for the "Historical Productivity."

There is insufficient evidence to support the DSC claim prepared by KM.

## Summary:

Quantities Dispute:

The quantities dispute was addressed in the four parts identified by KM as having caused the dispute and are summarized below:

1. The quantities required to construct the main breakwater transition should be calculated using KM's proposal.
2. The peel back stone replaced on the causeway, should be paid for as part of the peel back lump sum item (Item # 8), and not the stone unit prices.
3. The amount of stone required to build the seaside spur transition as directed by COE should be paid for the appropriate unit prices in the Contract.
4. The seawall stone replacement is just an extension of the peel back and should be paid for accordingly.

The trenched in toe quantities for the spur transition and main breakwater transition should be included in the quantities for payment.

Based on the quantities estimated by CDRSS, KM is owed approximately $154,213.

The cost of keeping the mining equipment over the 2004/2005 winter should not be paid by the COE.

Differing Site Conditions Claim:

The differing site conditions claim should be rejected because there was not a differing site condition. In addition, the analysis offered to substantiate the costs, is sufficiently faulty, inconsistent and lacking in supported to render its conclusions invalid.