Transcript of the Testimony of:

# JOHN H. MCTYRE

**April 24, 2008**

Volume:

<u>**Kiewit/Manson JV**</u>

<u>**v.**</u>

<u>**The United States of America**</u>

**Lorraine L. Schaffer, R.P.R.**

*Lorraine L. Schaffer, R.P.R.*
HANSEN & COMPANY
**Registered Professional Reporters**
4155 East Jewell Avenue, Suite 1016
Denver, Colorado 80222
Phone (303) 691-0202 * Fax (303) 691-2444

EXHIBIT
B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-796 C

KIEWIT/MANSON JV,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

---

DEPOSITION OF: JOHN H. McTYRE - April 24 & 25, 2008

---

PURSUANT TO NOTICE, the deposition of JOHN H. McTYRE was taken on behalf of the Plaintiff at 370 17th Street, Suite 4450, Denver, Colorado 80202, on April 24, 2008 at 1:00 p.m., April 25, 2008 at 8:18 a.m., before Lorraine L. Schaffer, Registered Professional Reporter and Notary Public within Colorado.

A P P E A R A N C E S

For the Plaintiff: HERBERT A. VIERGUTZ, ESQ.
DALE R. MARTIN, ESQ.
Barokas Martin & Tomlinson
1422 Bellevue Avenue
Seattle, Washington 98122
(206) 621-9907

For the Defendant: DAVID M. HIBEY, ESQ.
U.S. Department of Justice
Commercial Litigation Branch
1100 L Street NW, Room 12040
Washington D.C. 20530
(202) 307-0163

Also Present: Lawrence A. Gardner
David D. Beaudoin (4/24/08)

Q. Anything else that you recall ever testifying to?
A. I'm not really sure what I've been qualified as. You'd have to go back to look at the record.
Q. Where you are qualified as an expert --
A. Was I qualified as an expert?
Q. -- other than those three areas?
A. That I recall -- what three areas? Scheduling, loss of productivity --
Q. Damages.
A. -- damages. Standard of care for program manager. I don't -- I really don't know. Generally, there's a fairly long list of things that I'm going to be proffered as an expert on, and I don't really recall what it was, but those are things that I know have been included in those lists. For instance, I know that when I was qualified under Hirschfeld, that there was other thing, but I really don't recall specifically what the terms were.
Q. If I look at Trafalgar House, Hirschfeld, Biemann Rowell, Guy F. Atkinson, and Centex Rooney, and if I find what you are qualified to testify as an expert in, is that the sum and substance, the entire global universe of your being qualified as an expert in court proceedings?



A. Can you repeat that?
(The last question was read back.)
A. I'll say for the most part, yes. Now there is -- I did testify in an AAA Arbitration. It is not a court hearing, but it is an AAA Arbitration case.
Q. And that's the HCE, Inc. Park Center?
A. Yes.
Q. And that involved schedule analysis, correct?
A. Right. And basically evaluating the status of construction at the time of termination.
Q. Which is schedule, isn't it?
A. No. It was more than that.
Q. What is it?
A. Evaluating what the status of the construction loss was at the time of termination based on all the documents. It's not really scheduling. It's looking at all the documents available to determine what the status of construction was so that they could evaluate what the cost of construction was at the time. There was a dispute regarding that.
Q. And that's it, correct?
A. I've also testified in the Gilbane Building Company, but that was a fact witness, and they used my schedule analysis at the time. So I guess I was more of a fact witness, but I did testify on that case.



Q. Okay. Is there any other area in which you have ever been qualified as an expert?
A. Okay. I'm not sure if you included in the Centex Rooney case, that it was primarily extra work cost on that. An evaluation of costs and entitlement for extra work.
Q. And what was --
A. Pretty much like what this matter is.
Q. Well, and what was that based on? Costs of what type of extra work?
A. Several different categories --
Q. What --
A. -- of extra work. Included mechanical, I believe, electrical, concrete, volumes.
Q. So is that based on the schedule?
A. No. No. This is extra work. Just like there's extra rock in this case. It was my responsibility to evaluate, number one, entitlement; number two, what is the quantity, and what is the cost of that quantity. It did not involve scheduling. As I said, somebody else testified as to the schedule on that.
Q. What leads you to believe you qualify as an expert in quantities?
A. In quantities?



Q. Uh-huh.
A. In evaluating the entitlement and cost of extra work? Is that your question? I'm trying to understand the question.
Q. That's fine to frame the question that way.
A. I guess based on my experience.
Q. What experience?
A. My experience since I got out of school. Evaluating entitlement and cost and quantities of extra work has been a very substantial portion of my experience since I got out of school.
Q. Now you've been qualified as an expert in scheduling?
A. One of the things, yes.
Q. Productivity analysis, damages, standard of care?
A. And extra work cost and entitlement.
Q. And is that based on Centex Rooney --
A. Yes.
Q. -- your last statement you made?
A. Yes.
Q. Is that it?
A. As I said, there's other things that I was proffered as an expert for, and I don't really have a complete list.





6f41e722-8d16-4e21-b775-0f20fd5f5974

Page 146

A. The surface area?
Q. Yes.
A. And depth for what?
Q. For the average end area.
A. In the average end, you are taking a cross-sectional area. I'm not sure what you are referring to with the surface area.
Q. Okay. Then --
A. Surface to me would tell me the top.
Q. Okay. Page 5, the bottom, it says -- still on this same issue -- Stone that was removed from the causeway, and had to be reinstalled on the causeway after or during the spur construction should be paid for as part of the peel back lump sum item. The new spur construction neat lines are defined in the construction documents.
Where in the construction documents?
A. There's two cross-sections shown for the spur construction on the contract documents. In addition to that, there's a note indicating that there's to be a smooth transition on the seaside of the spur where it meets the causeway.
Q. That's Exhibit 10 --
A. Here are the cross-sections for the spur break.

Page 147

Q. When you say here, you are looking at H-5?
A. Section F and G. And there's a note -- note 5, I believe, on -- see note 5, Provide a smooth and uniform transition between causeway and new spur breakwater rock so that there is not an indentation where ice can accumulate. That was the cause of the Request For Information from Kiewit/Manson Number 1.
Q. Can you draw the neat lines on that H-5?
A. Sure. Are you asking for the neat lines for A22? B22?
Q. Yes.
A. Because they appear on this section. (Deponent complied.) And the neat lines up here, the way they are shown here, on section F, they're --
Q. Can you put your initials on there, too?
A. (Deponent complied.)
MR. MARTIN: Are there any on H-6?
A. We're just talking about the spur, right? That's all there is on the spur. Page 6, that's the main breakwater.
(Deposition Exhibit 257 was marked.)
Q. (BY MR. VIERGUTZ) Page 6, on the top, we're back on your report, Exhibit 254.
A. I'm sorry, hold on. Got it.

Page 148

Q. First sentence says, Whatever the contractor chooses to remove from the causeway in order to install the new spur construction, using their selected means and methods, is to be covered under the peel back lump sum. Now, is this a statement of fact or is this a conclusion you have drawn?
A. It's a conclusion I've drawn from taking a look at the contract documents.
Q. And what is it based on?
A. When he removes the rock from the causeway, I understand that to be covered under the peel back lump sum item. And it appears to me that consistent with typical construction, the contractor selects his means and methods on how to accomplish the spur construction, and in that process, he's got to remove stone from the causeway.
Q. And do you agree that this is your interpretation of the contract documents?
A. That's my interpretation of the construction documents.
Q. Are you saying in this sentence that the contractor has the right to choose as little or as much? He has the discretion?
A. As little or as much of what?
Q. He can remove as little or as much as he

Page 149

chooses? He has total discretion?
A. Within reason. I think you are not going to expect a contractor to go in there and remove all the rock from the causeway and get paid for putting all of that back. But he does have -- within what he can show is his selected means and methods, he can remove more rock than say another contractor that would remove perhaps half that much based on another means and method. But it is pretty much up to the contractor, you know, how much you've got to remove on that peel back section.
Q. Do you understand that the owner had a concern, a very large concern over how much could be removed?
A. I'm sure he did. I'm sure the owner did.
Q. So what stopped the contractor from your interpretation of removing everything, or close to it?
MR. HIBEY: It wasn't his interpretation.
A. Wait. What stopped the contractor from removing everything?
Q. (BY MR. VIERGUTZ) Yes.
A. Probably two reasons. One, he would have to put it all back. And two, there's -- he probably knew there would be a concern on the part of the owner for removing more than would be necessary. So no, the





6f41e722-8d16-4e21-b775-0f20fd5f5974

rock you are going to remove and this is how you are going to build it. You are going to put a crane here, you are going to put a crane there, and you're going to put one rock at a time here until you get this exact precise configuration. That was not done.

He was allowed -- the contractor was allowed to select his means and methods. Because he may be able to think of a way that would be less costly than what the Corps might decide as a means and methods for removing the causeway. That was not done. It was appropriate to allow the contractor to select his means and methods.

Q. And that particular sentence, first paragraph, first full paragraph, first full sentence, is there any deposition transcript that you read that took that position?
A. That it was appropriate -- that the peel back was a lump sum?
Q. The entire sentence you are reading.
A. The peel back was appropriately established in the contract as a lump sum in order to allow the contractor to select a means and method that would be most compatible with its strengths.
Q. That it's covered under the peel back?
A. Okay. What's the question?



Q. Is there any deposition transcript that you read from which you take that position?
A. Which position? The sentence or what you just asked me about the peel back?
Q. The peel back.
A. Could you repeat that?
Q. That it's covered under CLIN 8.
A. Covered under?
Q. CLIN 8.
A. I -- the peel back is covered under CLIN 8, and I think that's consistent with what the Corps --
Q. Is there any deposition transcript that you read that takes that position?
A. Takes the position that the peel back is covered under CLIN 8? I don't think there's any deposition that I've read that is inconsistent with that.
Q. Really? I'm going to read for you Mr. Harvey's deposition pages 96 and 97. I treated it based on the advice that I had from a resident there, that it was -- from my resident engineer, that it was to be paid at the unit price, and that is what I -- that's how I operated.
A. Is there a question regarding that?
Q. Does that change your previous answer?
A. No. Not at all.



Q. Doesn't it?
A. No.
Q. Why?
A. My -- do you want to read my question and answer? That does not change my --
Q. Mr. Harvey is saying it's covered under the unit price.
A. The peel back is covered under the unit price?
Q. Yes.
A. Why is there a -- why is there a lump sum item for peel back?
Q. You are saying it's covered under the CLIN 8, the removal and replacement?
A. I'm saying the peel back is covered under CLIN 8, or item number 8 from the proposal form.
Q. And the replacement also?
A. Oh. That's not what you asked me.
Q. Is the replacement covered under CLIN 8?
A. I think it is, yes.
Q. Okay. Is there any deposition transcript that you are aware of that takes that position?
A. I'm not aware of any.
Q. Is there any written document that evidences that position?
A. Any written document that evidences that



position. Yes.
Q. What?
A. February '05.
Q. I'm sorry?
A. The letter from the Corps dated February '05.
Q. Who authored it?
A. Contracting officer. I'm not sure of the precise date. Contracting officer spells out, itemizes the different line items on there.
Q. Are you talking about the Contracting Officer's Decision?
A. No.
Q. Did you read that decision?
A. Yes.
Q. Do you find it inconsistent with your position?
A. The Contracting Officer indicates in the peel back section that an excessive amount of rock was removed, A22. I'm not sure precisely what rock she's referring to or if she specifies a rock. She says an excessive amount of rock was removed, and that should not be paid for. I agree with that.
Q. We're talking --
A. If there was an excessive amount of rock, it should not be paid.
Q. We're talking about replacement and it being





6f41e722-8d16-4e21-b775-0f20fd5f5974

Page 158

covered under unit price or CLIN 8.
A. She didn't address that specifically.
Q. Okay. We'll look into that.
A. Okay. But she did address it in a previous letter.
Q. And what did she say, according to your recollection?
A. According to that letter, there was not an intent to pay for the stone that was being replaced. That's the way I interpret that letter.
Q. Is there any other document upon which you base your opinion?
A. I can't think of anything right now, but that's -- that is what the Contracting Officer said at one time.
Q. We're going to go into that a little more.
MR. VIERGUTZ: Let's take a break.
(Recess taken taken at 9:20 a.m. until 9:30 a.m.)
Q. (BY MR. VIERGUTZ) I've got to go back and forth a bit, but can you tell me where in the contract documents the contractor was directed to provide neat line drawings?
A. I don't think it -- I don't think the contract necessarily requires them to provide the neat line

Page 159

drawings. The neat line drawings in any case, can be interpreted from the contract documents.
Q. You've not seen it in any instructions to bidders?
A. Not in those terms.
Q. What do you mean, in those terms?
A. To provide neat line drawings.
Q. Then going back on -- there's Spec Section 02270, and the instruction to bidders 00100, it says, There's no government furnished or designated rock source for this project. The contractor shall obtain rock which meets all the requirements specified herein. Was this clause given consideration when you reached your interpretation of the contract documents on CLIN 8?
A. Could you read that again?
MR. VIERGUTZ: Would you reread that, please.
(The last question was read back.)
A. Yes. I don't see any inconsistency with my opinions and that statement.
Q. (BY MR. VIERGUTZ) And in that same section, the bid proposal base item says in CLIN 6, Construct main breakwater, spur breakwater, and causeway abutment are A22 layer, end quote, and the word complete is underlined. Does your conclusion presuppose that the segment of the spur that ties into the existing causeway

Page 160

is not part of the spur breakwater construction, complete?
A. Returning the stone to the causeway that was removed for the peel back is not part of that. It's part of CLIN 8.
MR. VIERGUTZ: Would you reread that question, please.
(The last question was read back.)
A. Is there a question?
Q. (BY MR. VIERGUTZ) I'm asking you to answer that question yes or no.
A. I answered it to the best of my ability. You are probably going to have to break it down to something that I can -- I'm not really sure.
Q. Tell me what you don't understand about the question. Does your conclusion that it's under CLIN 8 --
A. That what's under CLIN 8?
Q. What we've been talking about, removal and replacement. -- presuppose that the segment of the spur that ties into the existing causeway is not part of the spur breakwater construction, complete, under CLIN 6?
MR. HIBEY: That question --
A. I really did answer to the best of my ability.
Q. (BY MR. VIERGUTZ) What is your answer?

Page 161

A. That replacing the stone in the causeway is part of the peel back.
Q. You considered this section in arriving at your --
A. Yes.
Q. -- interpretation of the contract documents, correct?
A. Right.
Q. And under the same spec section it has a provision, The contract allows for the use of salvaged rock, quote, 1.6.1 salvageable material. Salvageable material, if not otherwise indicated, shall become the property of the contractor. The value of such salvage shall be reflected in the contract price. Did you consider this clause in arriving at your interpretation of the contract documents?
A. Yes, I did.
Q. Have you read the Source Selection decision document, Exhibit 5?
A. I'm not sure in detail, but I know --
Q. It's 93 to Arruda's deposition. We're going to get into that one. That's Arruda's statement. The source selection document is attended by -- I'll show you at page 3 -- it's the Corps basically, the PDT. You are familiar with that term?





6f41e722-8d16-4e21-b775-0f20fd5f5974

Page 166

A. That's correct.
Q. And you talked to Mr. Jeffries, correct?
A. Yes.
Q. I don't recall that you told me you've talked to anyone else at the Corps. And if you have, I'd like to know who.
A. I believe I said I spoke to Dale Hartman.
Q. Okay.
A. And Toni London. And I believe I mentioned some other individual that Julie Anderson was with when I did the -- performed the site visit. Other than that, I don't think I spoke to anybody -- well, wait. Sorry. Carpenter, Mr. Carpenter, I spoke to him from the Corps. I believe that's all I -- all the individuals that I spoke to from the Corps.
Q. And how did you go about making your interpretation of the contract documents as it relates to this conflict? How did that weigh in to your interpretation?
A. How did what weigh in to my interpretation?
Q. This conflict internally at the Corps.
A. I considered that, and I considered all the other documents, contract documents, all the documents that I've read, all the documents that were presented by Kiewit/Manson, and I arrived at that opinion.

Page 167

Q. If you didn't talk to Mr. Harvey, Mr. Seeba, anyone from construction, the contracting office, the counsel on this contract issue, how do you know that their interpretation was unreasonable?
MR. HIBEY: Whose interpretation?
MR. VIERGUTZ: Office of counsel, contracting, construction.
MR. HIBEY: But whose -- I don't understand your question.
Q. (BY MR. VIERGUTZ) It relates to -- do you understand what we're talking about?
A. I'd like for you to clarify that.
Q. Exhibit 151, what you read.
A. That, to me, states that there's a conflict. And now your question is, regarding that?
Q. Will you reread my question, please. Strike that.
How do you know whether their -- "their" being contracting, construction, office of counsel -- interpretation was reasonable or unreasonable since you didn't talk to them?
A. Based on my review of the documents and the people that I spoke to, I came up with an opinion. And I know -- I am aware that there was a conflict internally, and I realized that I didn't speak to

Page 168

everybody that was involved in that conflict. But based on my review of the documents, I arrived at that opinion.
Q. Is your interpretation of the contract documents the only reasonable interpretation on this issue?
A. To me, it is the reasonable interpretation of the construction documents.
Q. So the contracting, construction, and office of counsel would be unreasonable?
A. I don't know what basis they had. They could have a reasonable interpretation based on the documents that they reviewed. I don't know. You'd have to ask them.
Q. But as you sit here, yours is the only reasonable interpretation that you are aware of?
A. I think my interpretation as stated in the report is reasonable.
Q. Is it the only reasonable one?
A. Somebody else may have a reasonable interpretation if they don't review all the documents or if they review different documents than I did. And it could be reasonable based on their review and knowledge and background and everything else. I think that's what goes into what I consider my opinion to be reasonable.

Page 169

And they may have -- like I said, they may have a reasonable interpretation based on their review or their knowledge or their background, which to them may be very reasonable.
Q. Can we go to Exhibit 45. I just put that in front of you. That's the Contracting Officer's Decision. And page 19, if you would, paragraph 8. Before we do that, I'm going to ask you a question. In your review of the contract documents, did you see where -- did you see if there was any place that the seawall was to be reconstructed, rebuilt?
A. I don't recall anything that specifically said that the seawall had to be reconstructed.
Q. Now we're at Exhibit 45, page 19, paragraph 8, and the first sentence, it says, The design of the main breakwater transition from station 38 plus 24.27 to 39 plus 24.54 was not designed by the Government but rather was submitted by the Contractor and approved through contract award. Do you agree or disagree with that statement?
A. I think it's generally accurate, yes.
Q. Correct me if I'm wrong, but I believe you said you did not read the Elaine Pflugh, Karl Harvey, or Ken Eisses deposition transcripts; is that correct?
A. I've read parts of Eisses, and I read most of





6f41e722-8d16-4e21-b775-0f20fd5f5974

Page 174

A. They are referring to the previous sketch attached to RFI 1, but this is the one that eventually evolved from that.
Q. And it says here in the Contracting Officer's Decision, 45, it says, The Government provided comments on questions and a sketch revising the Contractor altered design. Is that your understanding, that the government provided a sketch?
A. I'm not sure who provided that. I think it was Kiewit/Manson. But I'm not really sure who provided it.
Q. Would you go to page 15, please. Do you understand the Contracting Officer's Decision to be her final word on payment?
A. I believe so, yes.
Q. Okay. 15 --
MR. HIBEY: I'll just object to the last question because it calls for a legal conclusion.
Q. (BY MR. VIERGUTZ) Excuse me, I was reading. Prior to number 8, the last sentence there, it says the contractor paid for moving and storage and reinstalling the peel back rock; is that correct?
A. It says, The value of this rock is solely the effort required to move the previous existing rock to a place of storage, move it again to the place of

Page 175

reinstallation, and the reinstallation itself. That's what the last sentence says.
Q. This is directly in conflict with your position on CLIN 8; isn't that correct?
A. I'll have to read the whole thing. The value of this rock -- I'm not sure what rock is being referred to -- is solely the effort required.
Q. Please do. Start on the end of 7 on the preceding page. It's preexisting rock. Before you do that, you considered this CO Decision?
A. I've read that.
Q. Did you consider it in authoring your report?
A. Anything that I have read would have formed -- would have been a basis of my decision.
Q. Did you do any type of analysis or examination to see the extent to which this Contracting Officer's Decision was supported by the record?
A. I did notice that she does make reference to a lot of documents. I didn't check every document that she references.
Q. So you didn't take that as an area of your responsibility or conclude that you -- that the CO Decision was supported by the record?
A. If there was something in reading that decision that, you know, would have been contrary to my

Page 176

understanding of the record, I probably would have checked it.
Q. As you sit here today, do you recall anything in that CO Decision that is in conflict with your interpretation of the contract documents as expressed in your report?
A. Well, let me finish reading this.
Q. Okay.
A. But --
Q. That's fair.
A. -- her position on this, on the peel back was stated. Well, if you are asking about that last sentence, The value of this rock is solely the effort required to move this preexisting rock to a place of storage, move it again to the place of reinstallation, and the reinstallation itself, I would have to agree with that, that statement.
In terms of how it's -- in terms -- in reference to this contract and in reference to the peel back rock, the value of that rock, I mean, you estimate it however you want. The contractor can estimate it however he wants. But the cost to the contractor would be what is referred to here. The cost to the contractor is solely the effort required to move the preexisting rock to a place of storage, move it again to the place

Page 177

of reinstallation, and the reinstallation itself. That is the cost to the contractor.
Now what he chooses to put in as the contract amount in the contract, you know, that's something different. But the cost to the contractor, that is his effort.
Q. Do you then acknowledge that the contractor is to be paid for these activities?
A. For removing the rock and replacing the rock, absolutely.
Q. For all of those activities in that sentence?
A. Okay. To move the preexisting rock, to place it in a place of storage, move it again to the place of re-installation, and the reinstallation itself, he should get paid for that. I mean, in the way I interpret the contract, he should get paid for that.
Q. And your position is that -- your interpretation of the contract documents is that the contractor is paid for that under CLIN 8?
A. Mostly.
Q. What not?
A. The portion that he removes -- I'm sorry. With the term "reinstallation," yes, entirely.
Q. What is he not paid for under CLIN 8?
A. What is he not paid for?





6f41e722-8d16-4e21-b775-0f20fd5f5974

Page 178

Q. Anything? Any of those activities?
A. No. What I was getting at is, the rock that's removed from the causeway, placed in storage, and then used to build the spur itself, the new spur, that would be paid for under the unit price. But not the rock that's being used to replace the causeway. Does that make the distinction clear?
Q. That's based on your interpretation of the contract documents?
A. Yes.
MR. VIERGUTZ: This is a previous exhibit, David, 138.
Q. (BY MR. VIERGUTZ) This is Exhibit 138 to Mr. Jeffries' deposition. Have you reviewed this before?
A. I haven't had a chance to review all of the deposition exhibits. I'm not sure if this is part of another document I reviewed. I'm not thoroughly familiar with this document.
Q. Do you recall reviewing it before?
A. I have probably seen parts of it.
Q. Well, take a little time and look at it and then tell me what you understand it to be.
A. Okay. It appears to be a take-off including all the different rock types, the toe excavation, and it

Page 179

appears to be the quantities that were finally arrived at by the Corps for the A22. I recall it's in the neighborhood of 35,000, and that seems to be the figure that's being used over here. And you know, it seems to have a list of assumptions or notes or basis of the take-off.
Q. Does it indicate that the contractor is to receive no payment for placing rock in the peel back area?
A. Exclude all peel back rock from the quantity comps for the spur breakwater. That's what it says.
Q. And is this consistent with your interpretation of CLIN 8?
A. They exclude all peel back rock from the quantity comps for the spur breakwater. That tells me that the A22 unit -- A22 rock as being paid for under the unit price would not be included, or peel back rock would not be included in that.
Q. Do you know what the final position of the Corps is? Is it what's in your report on CLIN 8?
A. I guess you'd have to discuss it with the Corps. But I mean there are -- this document tells me that peel back shouldn't be included. There's a document dated February '05 that suggests that the Corps does not want to pay for the peel back rock being

Page 180

returned to build the causeway.
You know, I think that's a matter of interpretation. The Corps in their -- in the Contracting Officer's final decision, when they address that, they say that Kiewit/Manson peeled back an excessive amount of rock, and to the extent that happened, I tend to agree that they shouldn't get paid for that.
Q. Do you recall reviewing a document Lessons Learned from the Corps? Is that part of the documents you reviewed?
A. I don't recall.
Q. You reviewed CLIN 8, obviously, correct, in your work?
A. CLIN 8.
Q. Is that correct?
A. I reviewed what, the term on the proposal sheet?
Q. Right.
A. Yes.
Q. And it says, Peel back causeway rock for spur breakwater construction, complete; is that accurate?
A. That's correct.
Q. And is there any ambiguity there as far as you are concerned, your interpretation of this contract

Page 181

document?
A. Like anything else on that proposal sheet, it has to be read and understood with the other -- the rest of the contract requirements.
Q. And where else does the contract address the peel back causeway rock for spur breakwater?
A. I think you'd have to take it in context of everything else that you have to do on there. Do you have a complete job when you bid that? I think that's one of the considerations that a prudent contractor would take. Do you have a complete job when you are bidding that?
MR. VIERGUTZ: Read the question back, would you, please.
(The last question was read back.)
Q. (BY MR. VIERGUTZ) Can you point me to any place?
A. It's got -- it has to be related to everything else that's on that proposal sheet.
Q. On these two pages?
A. Yes. It has to be built in accordance with the contract.
Q. Is it described anywhere else in the contract, that you are aware of?
A. I don't believe described in detail anywhere.





6f41e722-8d16-4e21-b775-0f20fd5f5974