IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KIEWIT/MANSON JV, )
)
Plaintiff, )
)
vs. )
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )
)

No. 06-796 C
Case 1:06-CV-00796-MBH

DEPOSITION OF ELAINE PFLUGH

Pages 1 - 63, inclusive

Wednesday, July 11, 2007, 9:20 a.m.

Anchorage, Alaska

Taken on behalf of the Plaintiffs
at
Barokas Martin & Tomlinson
1029 West 3rd Avenue, Suite 280
Anchorage, Alaska

COPY

EXHIBIT
C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KIEWIT/MANSON JV,
Plaintiff,
vs.
THE UNITED STATES OF AMERICA,
Defendant.

No. 06-796 C
Case 1:06-CV-00796-MBH

DEPOSITION OF ELAINE PFLUGH

Pages 1 - 63, inclusive

Wednesday, July 11, 2007, 9:20 a.m.

Anchorage, Alaska

Taken on behalf of the Plaintiffs
at
Barokas Martin & Tomlinson
1029 West 3rd Avenue, Suite 280
Anchorage, Alaska



A-P-P-E-A-R-A-N-C-E-S

For Plaintiff:

BAROKAS MARTIN & TOMLINSON
BY: Herbert A. Viergutz, Esq.
Dale R. Martin, Esq.
1029 West Third Avenue, Suite 280
Anchorage, Alaska 99501
(907) 276-8010

For Defendant:

U.S. DEPARTMENT OF JUSTICE
BY: Brian Smith, Esq.
1100 L Street NW, Room 4054
Washington, D.C. 20530
(202) 616-0391

U.S. ARMY CORPS OF ENGINEERS
BY: Toni B. London, Esq.
Post Office Box 6898
Anchorage, Alaska 99506-6898
(907) 753-2532

Also Present:

David D. Beaudoin, Esq.
Kiewit Corporation

Shawn Lannen
Kiewit Corporation

Reported By:

Deirdre J.F. Radcliffe
Verbatim Shorthand Reporter



I-N-D-E-X

EXAMINATION BY: PAGE
Mr. Viergutz......................................4

EXHIBITS: PAGE LINE
No. DESCRIPTION
63 Bid Schedule (retained by counsel).........57 23



Anchorage, Alaska, Wednesday, July 11, 2007, 9:20 a.m.

ELAINE PFLUGH,
called as a witness herein, having
been first duly sworn upon oath, was
examined and testified as follows:

EXAMINATION

BY MR. VIERGUTZ:
Q. Good morning, Ms. Pflugh.
A. Good morning.
Q. Have you ever had your deposition taken?
A. Yes.
Q. And when was that?
A. Ninth grade, I think. I don't know. A long time ago. 1985. 1985.
Q. It did not relate to any construction case while you were employed by the Corps?
A. No.
Q. Was it a family matter?
A. I saw a fight at school. I had to give my deposition. I was in eighth grade, ninth grade, you know.
Q. Scary experience at that time?
A. Yeah. It wasn't bad. It wasn't as scary as this.
Q. Hopefully today it will be a little more at ease. I ask you questions, you answer them to the best

Q. And how long do you recall this meeting may have lasted where you discussed the project?
A. I don't know.
Q. It wasn't a whole day, though?
A. No.
Q. An hour maybe?
A. Yeah, probably an hour.
Q. This might be a good time for a break if you're okay with that.
A. Yeah.
(Recess taken)
BY MR. VIERGUTZ:
Q. Could we look at Exhibit 56, please. This is it anyway. It's not the right numbered one, I mean, the original. These are what are called discovery requests to the government.
You had nothing to do with answering these; is that correct?
A. Yes.
Q. If you could turn to page 16, and it says, "Provide the etymology of the term 'peel back' as it appears in Bid Item Number 8." And small a says, "Name and job description of the individual who chose the term for usage in the proposal documents."
Would that be you? Did you choose the term



"peel back" in the --
A. Yeah. Yes, that would be me.
Q. Where did that term come from; do you recall?
A. That's what I chose to describe that.
Q. Did you get it from some book or did you just come up with it in your mind, or can you convey to me how that occurred?
A. That's what I chose to describe taking the rock off.
Q. And it says in b, then, the identification and description of any prior use of the term by the government in its procurement.
Had you seen that term used in anything you had ever read?
A. Yes. I'm sure I read it somewhere. I mean, I didn't just -- I don't know where I read it.
Q. You can't pinpoint where it came from?
A. No.
Q. Do you recall seeing it in any previous government project or could it have been just in a manual?
A. No.
Q. No what? I'm sorry.
A. No, I don't remember seeing it in any manual.
Q. Or government project?
A. No.



Q. And d says your understanding of the term, specifically what you believe it to mean.
What did it mean to you?
A. It meant to me that they would take off the armor rock, and I don't remember if they were supposed to take off the armor rock and the B rock. I think they were. It meant that they were to remove the armor rock and the B rock.
Q. And is that what you intended to communicate by using that term?
A. Yes. I have to say I don't remember that I used "peel back." I don't remember.
Q. Was there any reason you chose not to define that term "peel back" in the proposal documents?
A. I thought it was clear. Maybe it wasn't.
Q. Do you recall using the term "smooth transition"?
A. Yes.
Q. Now, with regard to the previous questioning on peel back, do you recall having discussions with Mr. Eisses on that term?
A. No, I don't.
Q. Do you recall anyone in the spec or the contracting section or anywhere within the Corps discussing that term with you prior to your incorporating



it into the proposal documents?
A. No. No one commented on that. Everybody seemed to -- everybody understood it.
Q. I very much appreciate your direct answers. It makes things move along much faster than waffling, which sometimes you run into.
MR. SMITH: Not in this case, fortunately.
BY MR. VIERGUTZ:
Q. Now, with regard to the term "smooth transition," did you come up with that term?
A. Yes.
Q. And do you recall where you came up with it?
A. No.
Q. But you chose that term?
A. Yes.
Q. And do you recall seeing it in any previous government project?
A. Yes.
Q. Where would you have seen it; do you recall?
A. On other plans and specs.
Q. On jobs that you were working on?
A. No, that other people worked on that I had seen.
Q. And is that term one used during -- you saw it during the time you were working at the Corps?
A. Yes.

And when you say "these cross-sections," what are you looking at?
A. Well, it says, "Salvage all causeway rock and reuse as shown on sheets H-5 and H-6." And sheets H-5 and H-6 show all the breakwater cross-sections for the whole.
Q. So it would be O, P, Q, F, and G?
A. It would be O, P, Q, F, G, A, B, C, D, E.
Q. How is it shown there?
A. It's shown in the cross-sections that show where the rock goes.
Q. Shows where it goes, but the use of the salvaged rock from the peel back, where is it shown?
A. It is saying that they can use it in any of the places that -- I guess I didn't say, use this part on exactly. Most likely they would have had to use it on the spur breakwater since it was more the same size rock.
Q. But you're saying it could be used in A, B, C, D, E, O, P, Q, F, or G?
A. Well, my intention was that they would use it where it would -- where it would match the size, if it would match the size of -- that I've shown.
Q. Anywhere they wanted to as long as --
A. As long as it meets the specs. That was my intention when I say salvage and use it on any place that it will meet the specs.



Q. And that's the contractor's rock; he can use it where he wants to?
A. Yeah. Or if he doesn't want to, I guess. I don't know.
MR. VIERGUTZ: Okay. We have this -- can we go off for a second?
(Off the record)
BY MR. VIERGUTZ:
Q. Before you is the bid schedule, and did you prepare that?
A. I can't say for sure that this is the one that I prepared. This looks very similar. I was not there when this went out to bid, so I cannot say that this did not change from the one that I prepared.
Q. I understand.
A. I was most likely the person that generated this, and it's possible somebody else could have changed something on here.
Q. Sure. What parts of that would you have generated?
A. I would have generated, you know, items 1, 2, 3, 4. All of these. All of it, it looks like.
Q. All of it?
Was it in that form when you left?
A. Yes.



Q. As far as you know, nothing was changed, but it's possible?
A. Yes. I mean, I don't remember the exact numbers that I put in here. I don't remember the exact. And I think there might -- there could have been some added. Like this B-12, that was probably something that Julie did. And this sheet pile barge ramp and some of that stuff may have been added.
Q. Do you agree that the only basis for paying the contractor for rock payment is unit price?
A. Yes.
Q. And it's the same unit price regardless of the rock source, correct?
A. Yes.
Q. And the contractor doesn't establish any method of paying for the rock payment except unit price, correct?
A. Correct. Well, unit price and quantity.
Q. Can you look at items 7 and 8, please?
Both of these are for removal of causeway rock, but bid with different units. Why is that?
A. I don't remember why I put it like that.
Q. Is it possible someone changed that after you left?
A. It is possible. I thought I calculated, like, how much rock I could expect to come off there, and I



thought that I went through and figured out if any of those sizes would go in -- you know, could be reused, and I don't remember why I would have not put a quantity in there.
Q. Did you ever review the independent government estimate?
A. Yes.
Q. Did you provide input to that estimate?
A. Yes.
Q. Do you recall any discussion whatsoever on -- with regard to that estimate of reuse of salvaged rock?
A. I don't remember that being a big -- we may have discussed it, but it wasn't a big issue. I mean, I --
Q. Doesn't stand out in your mind?
A. No. It's not like it was a big...
Q. Do you recall what you talked to the estimator about?
A. I recall that I took a copy of the plans and specs to estimating and that they did the government estimate based on the plans and specs. I don't remember -- I don't remember sitting down and explaining all of my intentions to them. The way I remember it is I took a package -- that was the same package that the contractor would have gotten -- to them and they did the estimate.