**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| KIEWIT/MANSON JV,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 06-796 C<br>(Judge Horn) |

JOINT STATEMENT OF ISSUES OF LAW AND FACT

Pursuant to the Court's orders issued March 10, May 9 and May 16, 2008 orders, the parties respectfully submit the following in response to the Court's request for a joint statement of issues of fact and law by 1pm EST today. The parties did not reach agreement upon a single joint statement of issues. Accordingly, the parties agreed and have set forth below, separately, defendant's proposed joint statement of issues of fact and law, prepared after receiving plaintiff's proposed joint statement at 4:18 p.m. EST May 19, 2008. After reviewing these statements, we advised plaintiff early yesterday evening that we would not be able to agree to its proposed statements, and offered to draft a hopefully mutually acceptable statement. That statement, completed this morning and received by plaintiff between 11 and 11:26 a.m. EST, consists of 11 issues of fact and six issues of law. Second, we have set forth below, plaintiff's proposed statement. Finally, for the sake of completeness, we have set forth after plaintiff's proposed statement, additional more detailed defendant's statements of issues of fact and law, that we had eliminated from the 17 issues set forth in our May 20 proposed joint statement, in the hopes of reaching agreement on a unified joint statement.

I. DEFENDANT'S MAY 20, 2008 PROPOSED JOINT STATEMENT

A. ISSUES OF FACT

1. What documents or other proposal or proposal related information were provided to or otherwise available to Kiewit Manson for the preparation of its proposal upon Contract DACW 85-03-C-00014 soliciting generally certain dredging, excavation and construction for navigation improvements in Nome, Alaska (the "Contract").

2. What did Kiewit Manson understand with respect to the Contract's requirements, at the time of Contract award.

3. What did the Corps of Engineers (COE) understand with respect to the Contract's requirements, at the time of Contract award.

4. What were the terms of the Contract.

5. To what extent, if any, did KM's work differ from that which KM planned to perform for the prices it proposed.

6. What conditions were encountered during the Contract work.

7. Whether the site conditions encountered differed materially from those indicated by documents made available to KM prior to the Contract award.

8. To what extent, if any, did acts or omissions by either party alter the work set forth in the "Proposal Schedule" submitted in the KM proposal upon which the COE awarded the Contract.

9. What time and quantities were incurred by KM to perform the Nome Navigational Improvements project.

10. To what extent, if any, did the time and quantities incurred by KM to perform the Nome Navigational Improvements project, differ from those which would be required by the terms of the Contract.

11. To the extent, if any, that time and quantities incurred by KM to perform the Nome Navigational Improvements project differed from those which would be required by the terms of the Contract, what was the cause of such differences?

B. ISSUES OF LAW

1. What did the Contract obligate the parties to perform with respect to the Contract work, including generally without limitation the project dredging, excavation and construction.

2. What did the Contract provide with respect to the prices, costs, or time for the project work.

3. Whether KM is entitled to recover upon its claims for equitable adjustment for alleged changes, defective specifications, and variations in estimated quantities, and for breach of alleged warranties of "the plans and specifications" and "administration of the project." See First Amended Complaint (Compl.) at ¶ 14 ("First Cause of Action").

4. Whether KM is entitled to recover upon its claims for an alleged differing site condition or breach of contract, Compl. ¶ 15 ("Second Cause of Action"), or any claim styled as a nondisclosure, misrepresentation or otherwise in any amendment of the First Amended Complaint that is allowed by the Court.

5. If KM experienced any potentially compensable events, to what extent were such

events caused by or otherwise the sole responsibility of the Government under the terms of the Contract.

6. If KM is entitled to recover any damages, what amount is due.

The following was received by us from plaintiff as its proposal for a joint statement of issues of fact and law:

I. <u>PLAINTIFF'S PROPOSED JOINT STATEMENT OF ISSUES OF FACT AND LAW</u>

PLAINTIFF'S STATEMENT OF DISPUTED ISSUES OF FACT.

Disputed Issues of Fact Respecting the Quantities Claim.

1. What quantities of rock did KM estimate would have to be mined; what quantities of rock did KM figure would be salvaged from the Peel back operation; whether KM complied with the Salvage Material Provision of the contract (01016 Section1.6.1 "the value of such salvage material shall be reflected in the contract price") in preparing its estimate and submitting its Proposal for the Nome Project.

2. What was the intent of the Corps representative who designed the project, and who chose the wording for the rock construction and causeway rock removal Bid Items (CLINs) and the wording of the Notes on the contract drawings; and was KM's understanding of these contract provisions consistent with the designer's intended meaning of those words.

3. Did Defendant's representatives timely and sufficiently respond to pre-bid communications from bidders regarding rock quantities and payment under rock CLINs for rock removed from the causeway that was to be reused?

4. Whether KM's understanding of the rock placement and rock removal CLINs is reasonable?

5. Whether Defendant's understanding of the rock placement and rock removal CLINs is reasonable?

6. Whether the contemporaneous conduct of party representatives during the 2004 construction season is indicative of their reasonable understanding regarding construction of the spur breakwater and the main breakwater transition, and regarding the payment to which KM was entitled on account of that work?

7. Whether or not KM's rock placement on the spur breakwater was reasonably in accordance with the contract documents and RFI #1; and whether the amount of payment KM seeks for that work exceeds the amount it is entitled to be paid, and if so, by how much?

8. Whether the means and methods KM intended to use constructing the main breakwater transition was made known to Defendant's representatives before the work was performed; whether Defendant's representatives timely directed that the work should be done by different means and methods; and whether there is any evidence from which a conclusion can be drawn that KM should be paid some lesser amount than is claimed for this work?

9. Whether a basis exists for treating the seawall removal and the seawall construction differently than peel back removal of rock in the causeway nose and construction of the spur breakwater in the causeway nose cavity that resulted from the peel back removal operation?

10. Whether KM calculations of the rock quantities within the contract pay limits is sufficiently complete and accurate to be used as a basis for determining contract pay quantities consistent with a reasonable understanding of the contract documents?

11. Whether Defendant has presented a calculation that is sufficiently complete and accurate to be used as a basis for determining contract pay quantities consistent with a reasonable understanding of the contract documents?

12. Whether the DCAA audit authenticates a higher unit price for rock quantities installed by KM that exceed 115% of the Defendant's originally estimated quantities?

Disputed Issues of Fact Respecting the Dredging Claim.

13. Whether KM reasonably considered the geotechnical information in the bid documents in formulating its estimate and the Proposal for the Nome Project?

14. Whether the conditions encountered by KM during its dredging operation in Nome Harbor differed materially from those shown and indicated in Defendant's bid documents?

15. Whether the geotechnical data included by Defendant in the bid documents was sufficient information to reasonably describe the conditions to be encountered in the area to be dredged; or whether Defendant should have done additional geotechnical testing and/or should have performed some form of test dredging within the footprint of the area to be dredged?

16. Whether the geotechnical information contained in the bid documents was accurately presented; and if not, whether KM was misled thereby to its detriment?

17. Whether the three documents that were not included as part of the bid documents, and were not disclosed to bidders by addendum to the bid documents, contained information which foreseeably may have influenced the bidders' evaluation of dredging conditions to be encountered within the footprint of the area to be dredged?

18. Whether the completion of the required dredging in a shorter duration than the time allowed by the contract establishes that the difficulty of dredging materials actually encountered by KM did not impact its dredging operation?

19. Whether KM planned and scheduled a shorter duration for its dredging operation than was shown in its original proposal to Defendant?

20. Whether KM's method of calculating the productivity loss for the Bechtolt provides a reasonable basis for calculating the compensable cost overrun attributable to the differing site condition?

21. Whether KM's method of calculating the productivity loss for the Viking provides a reasonable basis for calculating the compensable cost overrun attributable to the differing site condition?

22. Whether KM's method of calculating the fuel cost escalation and the extraordinary wear and tear on equipment provides a reasonable basis for compensating KM for the cost overrun attributable to the differing site condition?

23. Whether KM's "Rebid Estimate" in the amount of $2,068,300 is a reasonable assessment of the amount by which its dredging work Proposal to Defendant would have been increased if the bid documents had accurately presented the geotechnical information; and/or if the undisclosed documents had been made available to bidders prior to the Proposal?

24. Whether KM's $2,068,300 bid re-estimate is a reasonable measure of damages attributable to Defendant's misrepresentation and/or nondisclosure?

Disputed Issues of Fact Respecting the Delay/Winter-over Claim.

25. Whether KM planned to demobilize its mining and hauling equipment at the end of the 2004 construction season on the Nome Project; and whether it could and would have carried out that plan but for the extra mining and haul requirements that resulted from the overrun in rock quantities?

26. Whether performance of work in the Nome area other than the original Nome Project work motivated KM not to demobilize the mining and hauling equipment as had been

planned?

27. Whether KM's claimed amount of $1,075, 854 is a reasonable evaluation of the damages KM incurred because this equipment was "captured" at the Nome Project site over the 2004-05 winter; and whether Defendant's allegation that KM benefitted from leaving the equipment at Nome is supported by sustainable, quantifiable evidence which warrants any reduction in that amount?

28. Whether KM's delay/winter-over damages, if any, are recoverable in the alternative: either as a distinct claim for $1,075,854 as stated; or alternatively, as an increase in the unit price for rock placed by KM in quantities exceeding by more than 15% Defendant's original estimated quantities (in accordance with the Variation in Estimated Quantities clause)?

PLAINTIFF'S STATEMENT OF DISPUTED ISSUES OF LAW

29. Is the interpretation KM placed upon the rock unit price construction bid items (CLIN 0006 A-22; CLIN 0013 B-22, etc.) and the Peel back Causeway bid item (CLIN 0008), in the context of the contract as a whole, a reasonable one?

30. Is the interpretation Defendant placed upon the rock unit price construction bid items (CLIN 0006 A-22; CLIN 0013 B-22, etc.) and the Peel back Causeway bid item (CLIN 0008), in the context of the contract as a whole, a reasonable one to the exclusion of any other reasonable interpretation?

31. Is KM's interpretation by which it understands rock removed from the causeway pursuant to CLINs 0007 and 0008 is "Salvageable Items and Material" under TS 02220 3.2, 3.2.1 and 3.2.1.1, read in conjunction with the contract documents as a whole, a reasonable one?

32. Is Defendant correct in concluding that, interpreting the contract documents as a whole, ". . . the disposition of peel back rock is governed solely by Sheet H-3 Note 1 "Salvage All Causeway Rock and Reuse as Shown on Sheets H-5 and H-6" (COD Ex. #45, p. 14); and are there other reasonable interpretations which reach a different conclusion?

33. Whether Defendant is correct in contending that the KM Proposal, which was incorporated as part of the contract, establishes a cost estimate and schedule baseline for KM performance which must be used as a measure of any claimed schedule or cost impact; or whether the Proposal descriptions can be reconfigured to conform with the way the project actually was scheduled, and to conform with the means and methods actually utilized during construction of the Nome Project?

Disputed Issues of Law Respecting the Dredging Claim.

34. Whether the interpretation KM placed upon the geotechnical data in the bid documents which describes the dredging conditions to be encountered was a reasonable one?

35. Whether the conditions encountered by KM during its dredging operation differed materially, within the meaning of the contract Differing Site Conditions clause, from what KM reasonably interpreted the bid documents to show and indicate?

36. Whether Defendant owed a duty to provide bidders with information in its possession which dealt with and described site conditions in the Nome Harbor area; and whether Defendant owed a duty to accurately present the geotechnical data which it did include within the bid documents.

DEFENDANT'S ADDITIONAL PROPOSED JOINT STATEMENT OF ISSUES OF FACT

A. KM's Dredging Claim

1. Whether KM encountered reasonably foreseeable conditions at Nome Harbor or conditions that differed materially from those indicated by the Contract documents, including the contract terms, specification, excavation pit logs, photographs, and a description of the character of materials to be encountered.

2. Whether and to what extent KM's performance of the dredging project KM's performance was affected adversely and materially by the conditions that it encountered.

3. Whether KM reviewed prior to Contract award paragraph 1.3 of Specification 02222A which states that the "[character of materials data do not necessarily represent the project area materials to be encountered throughout the entire project area."

4. Whether and to what extent KM considered all of the geotechnical data available to it, including excavation pits dug 400 meters to the west of the causeway.

5. Whether prior to commencing dredging, KM reviewed a January 2004 Geotechnical Report prepared by the COE.

6. Whether KM's proposal reflects an understanding that it was to perform new dredging as opposed to maintenance dredging at Nome Harbor.

7. Whether KM's measured mile methodology for calculating damages was based upon a comparison of dredging productivity between the East Sediment Trap and other dredging areas that provided a reasonable basis for comparison.

8. Whether KM's total effective dredge time was within the range of time that COE regulations for dredging new area indicate should be expected.

B. Quantities Overrun Claim

a. Seawall

1. Whether removal of the seawall as part of the peel back contract line item is part of the causeway rock as identified in Bid Item #8.

b. Main Breakwater Transition

2. Whether KM secured the COE's agreement to a contract to construct the main breakwater submitted on September 9, 2003 at a unit price of $308.00 per cy.

3. Whether KM's proposal to construct the main breakwater transition was "unconstructable.".

c. Cupping at the Seaward Side of the Spur Tie-in

4. Whether KM complied with the COE's response to Request for Information #1, when KM increased the thickness of A22; and whether KM notified the COE before it increased the thickness of A22.

d. Peel Back and Salvage

5. Whether KM, which did not include the peel back rock in its estimate for the quantity of A22 rock (Bid Item 6), should be compensated at the unit price ($308.00 per cy) for A22 rock for removing that rock from the peel back of the causeway (Bid Item 8) and replacing the same A22 and B22 rock from the causeway.

6. Whether KM misled the COE when it sent a pre-bid email to the contracting officer informing the COE that its estimate of the "quantities for A22, B22, and A10 are greater than the USACE by more than 10%," in light of the fact that the day before, Kiewit had estimated the quantities to exceed the COE's estimate by 46% for A22; 50% for B22 and 437% for A10.

E. Winter Over

7. Whether KM performed work for other Kiewit projects near Nome and benefitted from keeping its equipment at Nome during the 2004-05 winter.

8. Whether the "other reasons" for not demobilizing equipment, as described by Kiewit's John Brauchle contributed to the decision to winter over.

DEFENDANT'S ADDITIONAL PROPOSED JOINT STATEMENT OF ISSUES OF LAW

1. Whether KM's proposal that was accepted for the project contract was premised upon estimates and schedules that are consistent with its claims.

2. Whether KM's claims are consistent with a reasonable contractor's interpretation of the contract documents.

3. Whether KM's claim is consistent with the contract documents read as a whole, and is reasonable.

4 Whether a reasonable contractor should have relied upon the test boring data concerning soil conditions at and around the dredging prism as an indication of the soil conditions that would be encountered.

5 Whether the boring information, exploration logs, photographs, and specifications, and historical site information made available to KM during bidding made the conditions KM encountered reasonably foreseeable.

6 Whether KM performed an appropriate pre-bid site investigation or analysis.

7 Whether KM, as an experienced dredging contractor, should have recognized that subsurface conditions could be different than those indicated in the contract boring logs.

8. If KM establishes a differing site condition, whether KM met its burden of segregating the days of alleged delay which are solely attributable to the alleged differing site condition.

9. Whether KM met its burden of proof that it suffered compensable damages as a result of the site conditions encountered, in the amount claimed.

10. Whether the measured mile analysis utilized by KM failed to demonstrate any damages.

11. If KM experienced any potentially compensable events, to what extent were such events caused by or otherwise the sole responsibility of the Government.

12. If KM is entitled to recover any sums, what amount is due.

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/ David M. Hibey
DAVID M. HIBEY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 307-0163
Fax: (202) 514-8624

May 20, 2008

Attorneys for Defendant

s/Herbert A. Viergutz
Herbert A. Viergutz
Attorney for Kiewit/Mason JV
Barokas Martin & Tomlinson
1029 West Third, Suite 280
Anchorage, AK 99501
Phone: 907-276-8010
Fax: 907-276-5334

Counsel for Plaintiff

May 20, 2008

CERTIFICATE OF FILING

I hereby certify that on this 20th day of May 2008, a copy of the foregoing "Defendant's Statement Of Issues Of Law And Fact" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David M. Hibey