UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KIEWIT/MANSON JV, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No.: 06-796C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1301 through 1602/1720

Place: Anchorage, Alaska

Date: June 2, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KIEWIT/MANSON JV, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No.: 06-796C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

3rd Floor, Suite 330
Peoples Center
8517 20 Street
Anchorage, Alaska
Elmendorf AFB

Monday,
June 2, 2008

The parties met, pursuant to notice of the Court, at 8:35 a.m.

BEFORE: HONORABLE MARIAN BLANK HORN
Judge

APPEARANCES:

<u>For the Plaintiffs</u>:

HERBERT VIERGUTZ, Esquire
DALE R. MARTIN, Esquire
Barakas Martin & Tamlinson
1029 West Third, Suite 280
Anchorage, Alaska 99501
(907) 276-8010

APPEARANCES: (Cont'd.)

<u>For the Defendant</u>:

DAVID HIBEY, Esquire
BRIAN A. MIZOGUCHI, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20005
(202) 307-0163/3319

<u>Also present</u>:

TONI B. LONDON, Esquire
U.S. Army Corps of Engineers
CEPOA-OC
P.O. Box 6898
Elmendorf AFB 99506-089
(907) 753-2532

JOHN H. MCINTYRE
Construction Dispute Resolution
and Support Services
2275 Research Boulevard Suite 500
Rockville, Maryland 20850
(202) 222-8604

C O N T E N T S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
| --- | --- | --- | --- | --- | --- |
| For the Plaintiffs: | | | | | |
| Shawn Lannen | 1320 | 1342 | -- | -- | -- |
| | -- | 1462 | 1478 | 1493 | -- |
| Patrick J. McGarry | 1496 | -- | -- | -- | -- |

## E X H I B I T S

| PLAINTIFFS' EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 1035 | 1324 | 1330 | Revision to the quantities of rock requested |

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
| --- | --- | --- | --- |
| 2003 | 1579 | 1586 | Sheet from daily dredge log |
| 2035 | 1473 | 1474 | Cost report |
| 2037 | 1475 | 1476 | Cost report |

P R O C E E D I N G S

(8:35 a.m.)

THE CLERK: All rise.

THE COURT: Go ahead and be seated. Good morning.

ALL: Good morning, Your Honor.

THE COURT: Hope you all had a good weekend. Anything preliminary before we go to the cross of Mr. Lannen?

MR. HIBEY: Good morning, Your Honor.

THE COURT: Good morning.

MR. HIBEY: I wanted to first point out, in the gallery is Mr. Greg Hartman, he's government's expert on dredging and he'll be with us for the next couple of days. Also wanted to advise the Court we had another deposition this weekend of Mr. Hartley.

Mr. Hartley has prepared two reports in this case, the first involving the quantities issue, and then he also prepared a rebuttal report on geotechnical issues. I bring that to your attention because during the course of his deposition he made a revelation that had not been indicated in his previous two reports at all.

He indicated that, based on some independent research he had been doing recently, that he had

determined that certain boring logs were misplotted or misrepresented on the plans that were given to him that are on the plans that are JX10.

THE COURT: Okay. Now, just so I'm with you, you're much closer to this than I am, those boring plans were done by the Plaintiff? The Defendant?

MR. HIBEY: They were done I guess you could say for the Defendant. They were contracted out.

THE COURT: Okay, but these are the ones that Defendant handed over to the contractor during the bid process?

MR. HIBEY: Yes, Your Honor. Exactly.

THE COURT: Okay. Just so I know exactly what we're talking about.

MR. HIBEY: Yes, Your Honor.

THE COURT: All right.

MR. HIBEY: Our point is that we're respectfully asking the Court to exclude any testimony he would provide on that specific issue about how the boring logs were either correctly or incorrectly identified on the plans.

This is not even the eve of trial, it's in the middle of trial, and the government would suffer tremendous prejudice trying to ascertain information

that would either rebut that or join that issue. We're asking the Court to limit the testimony of the expert witness to his actual expert reports, and there are two of them. There's plenty of stuff for him to opine on.

THE COURT: With all these names, this is Hartley, right?

MR. HIBEY: Yes, Your Honor.

THE COURT: Okay. Let me make sure again that I understand this. This is information that he developed subsequent to submitting the expert report?

MR. HIBEY: Reports. Yes, Your Honor.

THE COURT: Okay. I'm sure there's a response from the Plaintiff to this motion?

MR. MARTIN: Yes, Your Honor, there is. He was kind enough to advise me before we started that counsel would be making this oral motion. What I think would put it in perspective is this.

THE COURT: You like this seat better than that seat? You can be in either place while we do this.

MR. LANNEN: I'll wait.

THE COURT: All right.

MR. LANNEN: Thank you.

MR. MARTIN: Clearly, the contractor's

differing site condition case is based upon the predicate that the conditions encountered in the dredging footprint were different than what had been shown and indicated in the contract documents. It's always been a mystery to some extent as to why that was.

THE COURT: Can I stop you for one minute?

MR. MARTIN: Sure.

THE COURT: Let me ask this question. Is there independent evidence that the Plaintiff is or was going to submit, either through one of their experts or one of the onsite people, to expose this defect in the borings?

MR. MARTIN: What the Plaintiff will be able to expose as far as the folks who are out there performing the work, Your Honor, is that the conditions they were hitting were not what they expected based upon the information they had.

THE COURT: But not anything that looked at the borings?

MR. MARTIN: No, nothing technical. I will say that there have been experts in the case on both sides for a time, and what Mr. Hartley's rebuttal report says, and I believe what I said in my opening statement, is we have found that there were two pieces

of misinformation, distinguishing that, Your Honor, from the undisclosed information which we didn't receive.

The information in the contract documents was portrayed inaccurately in two respects. One respect is that the blow count, which is a mechanism the soils investigators for the owner used to define the density or hardness of the material, the blow counts had been improperly presented. That was point one.

Point two is the point brought up here, and point two is that the elevation were glacial till, this hard compacted material, was encountered was much higher than had been shown by the borings which were presented in the contract documents the contractor received from the owner.

Now, nobody from the Corps geotechnical folks to the experts and so forth really knew why that was except that they knew it happened. Obviously Mr. Hartley, in his forensic due diligence, has kept after that issue. What he has discovered is the original causeway was supposed to be this long and they ran borings out along the causeway.

There was a change and the length of the causeway was reduced and the test borings that were

taken were present in the contract documents as though they had been taken along that reduced length. The effect of that is of course the holes that were way out here in the water were actually back in here.

That is the reason why the glacial till, which was supposed to be, except for one small little wedge, below the depth of the dredging prism, that is to say the depth to which the dredging was supposed to descend, was in fact way above the dredging prism. That law explains what happened.

What nobody knew all along is simply the reason why the condition existed. It already has been identified at the project by the experts. He just found out why it is and he can present that. So it's nothing new or different, it's just the explanation.

THE COURT: Mr. Hibey?

MR. HIBEY: Your Honor, Mr. Martin's very fine exposition is nowhere found in any report that was prepared by the expert. In fact, Mr. Martin provided us with more information than we received from experts on this subject at deposition.

THE COURT: Well, obviously Mr. Martin's description and discussion right now is not testimony, and that's not at issue.

MR. HIBEY: I understand, but I think what

is at issue is that this is a new opinion based on new calculations that has been revealed to us for the first time on Saturday evening. We received a backup piece of paper last night.

THE COURT: See, and I was hoping that you all had settled this case over the weekend.

MR. MARTIN: We did talk, Your Honor.

MR. HIBEY: Your Honor, we're not standing here saying that Mr. Martin couldn't cross-examine our experts on this area or on this subject, but in terms of having the Plaintiff's expert opine affirmatively on this issue, we believe we would be suffering great prejudice. We're working very hard right now just to keep up with the facts and witnesses as we knew them when discovery ended and then when the amended complaint was brought forth.

THE COURT: Well, the amended complaint doesn't really change anything that you didn't know before. It just kind of articulates it. It was a badly drafted complaint the first three times. It's a little bit better the final time.

MR. HIBEY: Okay.

THE COURT: That's all you're really getting in the amended complaint which is why I allowed it.

MR. HIBEY: I understand, Your Honor, and

we're not rearguing that point by any stretch. To us it underlines the prejudice that we feel we're --

THE COURT: I understand your argument. Let me ask you this. I guess you present me with an even more interesting dilemma on the motions in limine that are out there on your two experts.

MR. HIBEY: Yes, Your Honor.

THE COURT: As I said, I think there are some legal issues on the McTyre motion that are not related to timing or anything of that sort, but rather, to whether they're legal conclusions as opposed to the normal sort of province of the experts. The other motion, which is the one on Mr. Hartman, is essentially the same motion that you're making, basically that it's too late, it's prejudicial.

This is later than the Hartman piece but essentially the same thing. As we've discussed many times before, there's been a lot of late stuff going on on a lot of different sides. If I leave you Mr. -- why can't I get these Harts right -- Mr. Hartman, but say Mr. Hartley can't tell us the truth essentially, or what he believes to be the truth, whether it is or isn't, I'm not sure I'm being fair.

In other words, if I give you Hartman, then I should probably give them Hartley in his newest

iteration. My job here is to level the playing field, number one, and number two, to get what is actually the truth. I'm very, very reluctant under any scenario to exclude or allow an expert to testify to something that an expert essentially doesn't believe, which is what you're in some form asking me to do.

If you had your druthers, would you rather have Hartman and Hartley or neither?

(Laughter.)

MR. HIBEY: Well, in terms of I guess a level playing field, we would prefer to have Mr. Hartman testify.

THE COURT: You want to talk to your folks and talk about this? Because that's the answer I want to hear because I do think to exclude one and not the other is not terribly appropriate. It particularly offends me, frankly, to have someone ask me to have an expert testify to what the expert doesn't believe.

In other words, this expert now believes he understands this problem, and to have him up here and say, you've got to circumscribe yourself, don't tell us the whole truth, just tell us part of the truth, that bothers me a whole lot, but I'll give you Hartman in return. Talk, and then we'll hear also from -- well, let's hear from Mr. Martin first.

MR. MARTIN: I just wanted to make one point here. I'm not sure it would make a difference if Mr. Hartley, our expert, had gone outside and done some research and discovered some fact or something like that. The reality is that he found what he found.

He discovered the reason and explained the problem from the information that the Corps of Engineers had in their hands and when they published the contract documents.

THE COURT: I mean, the answer in part here is it's really unfortunate that he didn't do it earlier, it's equally unfortunate that neither side took the trouble to understand this problem earlier having identified it, but here we are, and so we have a dilemma. We have what will now be known as the Hartman/Hartley dilemma, and we need to make a choice. So why don't you all talk.

MR. MARTIN: Your Honor, if I might. If it will make it easier, I withdraw the Hartman motion. Based on what happened last Tuesday morning, I can understand why that seems offensive to the Court and I'll withdraw it on that basis.

THE COURT: Well, don't withdraw it just yet because I want to put a deal here --

MR. MARTIN: Okay. We'll do that. All

right.

THE COURT: -- and get a fair result.

MR. MARTIN: All right.

MR. HIBEY: So it's withdrawn?

THE COURT: No, it's not withdrawn. It's the rhetoric, Mr. Martin, that I was concerned about as much as anything else. The timing, too, but this timing is the same kind of problem. I mean, we're basically having a lot of things happening late. We understand it was an expedited schedule from your point of view.

It wasn't an expedited schedule if you look at when the trial date was originally set. You can't ever assume that it's going to be pulled off the trial calendar because counsel either have changed, or haven't done their job, or whatever the problem is. You get a trial date, and you get it long enough in advance, that generally sticks.

When I was on your side of the house I often wished for longer trial dates but I never, ever, a single time got them, so I have a 100-percent record of not having been able to get a change in those trial dates once they're set.

MR. MARTIN: That would explain some things, Your Honor.

THE COURT: Well, I think people are fairly serious, particularly in the federal system where, you know, things just kind of have to keep moving. Be that as it may, you know, our problem is I've told you many times before it was a combination of you had this date a long time ago, but more important, we were having trouble getting a courtroom so we needed to stick to it. Why don't you all just go chat for a moment and see what you want to do.

MR. MARTIN: I need to, if I might, just have one moment, Your Honor, to explain Mr. Hartley. It isn't as though that were tardy. We're talking about information, geotechnical data, that's been in people's hands, the Corps, for years and years. We're talking about geotechnical data of course that's been published then in the bid for four years. He just happened to be the guy who put the pieces of the puzzle together and figured out what happened.

THE COURT: I mean, what bothers me here across the board, as I just said, is that there's a mystery, and yet, nobody took the trouble to figure it out until the eleventh hour. The Corps should have probably figured it out, too. The experts for the government could have figured it out, the experts for the Plaintiff could have figured it out.

I'm someone who doesn't like mysteries out there, I don't like to leave them on the table in any context. But here we are, this is where we are at this point, and we need to figure it out.

MR. MARTIN: Excuse me, Your Honor. I barely understand it now. In my own defense, I couldn't have figured it out.

THE COURT: Well, you and I are the liberal arts junkies, as we've described before, so we're not supposed to be. They're supposed to explain it to us.

MR. MARTIN: Explain it to me.

MR. HIBEY: History, English, double major.

THE COURT: You're with us all the way.

MR. MIZOGUCHI: Economics.

THE COURT: It's a whole room full of foolish lawyers. What can I tell you!

MR. HIBEY: If I may have two minutes to confer with --

THE COURT: Absolutely. Please do. Please do.

MR. HIBEY: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

THE COURT: Mr. Hibey?

MR. HIBEY: Your Honor, we accept your Solomonic proposal.

THE COURT: I don't know that it's Solomonic, but you both lose, you both win. So we'll have Mr. Hartman and Mr. Hartley, and we'll go for the truth. I rather like that result.

MR. HIBEY: Okay. We do, too, Your Honor. Thank you.

THE COURT: All right. Thank you. Mr. Martin, I think reminded me, and he's correct, that he has a few moments of direct to go before we get to the cross.

MR. MARTIN: Preliminarily, Mr. Hibey can join me in this or not as he sees fit, but we did receive some encouragement from the Court on Friday. And we talked not only at a lengthy deposition where we were blessed with the revelation as to why the glacial till was there, but also yesterday, so that subject is not forgotten.

THE COURT: Well, good. It's always there and should never be forgotten. I do understand that as we get deeper and deeper into it it gets more and more remote. All right, Mr. Martin, the conclusion of your direct of Mr. Lannen.

//

//

//

Whereupon,

SHAWN LANNEN

having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:

THE COURT: Your witness.

MR. MARTIN: Thank you, Your Honor.

DIRECT EXAMINATION (RESUMED)

BY MR. MARTIN:

Q Mr. Lannen, do you still have Exhibit 234 there, which is the contractor's request for actual adjustment that became the claim that is the subject matter of this litigation?

A I do.

Q All right. And if you'll turn to Bates 3866 and 3867, which were the two sheets we were looking at on Friday?

A Okay.

Q Just to refresh us, recapitulate, if you would, sir, the four items that are calculated in those two sheets, 3866, 3867, at 6.1, 6.2, 6.3 and 6.4?

A 6.1 is the A22 rock item; 6.2 is, as known now, the winter over; 6.3 is the trenched in tow; 6.4 is the B22 layer; and there also is 6.5, bond costs,

small costs at the end.

Q Now, I asked you if you have JX45 at hand there, which is the contracting officer's decision.

A I do.

Q And would you turn to Bates 286 and 287, which are the summary of the claim. First off, is it your understanding that the contracting officer's decision is written as a decision in respect to the claim which is Exhibit 234?

A That is my understanding.

Q All right. And do you still have the two sheets from the Exhibit 234 claim, 3866 and 3867, handy there?

A I do.

Q All right. The contracting officer's decision at Bates 286 contains a recapitulation of the claim as presented by the contractor, does it not?

A 286 and 287 do. That's correct.

Q And in order to clarify the record, there are some figures and some columns in the contracting officer's decision which I think we need to straighten out so that if you're looking at the claim and you're looking at the contracting officer's decision you have apples and apples, all right?

A Okay.

Q Now, first off, if you look at page Bates 287, in the long column, which is the left-hand of the two columns, is the $5,263,454.22 claim total the same as the claim total that's presented on Bates 3866 and 67 of the Exhibit 234?

A The $5,263,454.22 is the same total as Bates 3867.

Q All right. Now, there's two other areas in the contracting officer's decision that bear numbers which are different than that. What I'd like you to do is clarify for the record what those differences are. First off, toward the middle of the page on 286 there's a claim total of $5,207,307.47.

A Correct.

Q What is the difference there between that figure and the $5,263,000, which is the actual claimed amount?

A The $5,207,307.47 can also be found on 3867, subtotal for REA quantifications, but it leaves off the bond costs, which are directly below that before you come to the sum of $5,263,454.

Q If I understood you correctly then, if I added the bond costs to the $5,207,000, I would develop the $5,263,000 figure?

A That's correct.

Q So that reconciles those two figures. Now, there's a column to the right of 286, 287, which says sum. Do you see that?

A Yes.

Q Okay. And let me first ask you this. If I took 6.1(a) main breakwater and (b) causeways spur breakwater on page 286 of the COD, what are those, if you understand them?

A Would you repeat that again, please?

Q If you understand what they are, can you explain the two subparts 6.1(a) and (b), the 801,416 and the 4,381,916?

A Written back in the body of our claim, the 801,416 and the 4,381,916 were our representation of the maximum amount of rock that may have been installed but not the request for the amount of rock that were installed.

So if you went back to the very start before any rock was in the water, and you followed these RFIs, and you built them out to their maximum extent and took whatever engineering interpolation you wanted to, that got you to a maximum number that could ever happen.

It was an effort to show it could have been as much as this, but it really wasn't, and we're

asking for this.

Q But that was never a claimed amount, was it?

A It was not a claimed amount, no.

Q Okay. And is the same true if you look over on page 287 under 6.4(a) and (b) which deals with the B22 rock?

A The same is true of that.

Q So for all practical purposes, if we want to compare apples with apples we can simply eliminate from the COD, the contracting officer's decision, the summed column and the subparts (a) and (b) of the 6.4 and 6.1 paragraphs on 286 and 287. Is that a fair summation?

A That's correct. None of those are requested numbers.

(The document referred to was marked for identification as Plaintiff's Exhibit No. 1035.)

BY MR. MARTIN:

Q Now, I asked you, also, Mr. Lannen, to have at hand there Plaintiff's Exhibit 1035. Do you have that there?

A I do.

Q Okay. What is that document, sir?

A 1035 is the revision to the quantities of rock requested.

MR. MARTIN: All right. Let me stop you there for a minute so we can get this in context now.

THE COURT: 1035.

MR. MARTIN: Yes, Your Honor.

THE WITNESS: Yes. Bates --

THE COURT: Wait a minute. Hold on. I don't have a 1035 on my exhibit list.

MR. MARTIN: Plaintiff's Exhibit 1035?

THE COURT: No. What's the date, and what's the title?

MR. MARTIN: Your Honor, it's a one-page chart that says summation of KM adjusted claim.

THE COURT: It may have been put into the exhibit book, I don't even know about it and I certainly don't have it on me.

MR. MARTIN: I have an extra copy here.

THE COURT: I'm looking at a copy of it. It's dated what? Looking at the exhibit list, trying to conform it, does it have a date?

MR. MARTIN: It's May 19, 2008, Your Honor, up in the upper left-hand corner.

THE COURT: All right. And what's the common description of it?

MR. MARTIN: This is the summation of the KM adjusted claim.

THE COURT: And it's 1035, right?

MR. MARTIN: Yes, Your Honor.

THE COURT: All right. Go ahead.

BY MR. MARTIN:

Q Let me put this in context now. Looking back at the date of the claim document, Exhibit 234, that was done in 2005, correct?

A That's correct.

Q And at that point were there surveys taken from which quantities were calculated?

A Interim surveys, not final surveys.

Q And the reason for that, I take it, was because the main breakwater was going to be reworked in its upper reaches the following year?

A Yes, and I'm not sure if the surveying contractor was done with all of their last and final numbers by that point anyway.

Q So Exhibit 234, the claim document, and the $5,263,000 figure, which sums that claim that you then y submitted, is now superseded, is it, by calculations made on the final survey taken after the main breakwater was completed?

A That's correct.

Q So that was a survey done at what point?
A Summer of 2006, probably August.
Q And the process, I take it, was the same in terms of calculating the quantities, was it?
A That's correct.
Q Except that you were working from different final survey neat lines, is that correct?
A That's correct.
Q And did that result in an adjustment then to the figures that have been set forth on pages 3866 and 3867 of Exhibit 234?
A It did result in changes.
Q Okay. Can you show us what those differences are by addressing PX1035, please?
A Surely. On the far right-hand side of PX1035 lists the quantity unpaid to date, so comparing that to Bates 3867 for the very first line, TOW X, we had requested 2,141 in the original. That is adjusted to 2,137 today.
Q Just finish that line with the total expressed in dollars for the record, would you?
A Surely. Requested with the claim was a dollar amount of $64,230. The new revised total is $64,110.
Q All right. Will you do the same for the A22

rock in CLIN 6, please?

A The adjustment to the A22 rock was a quantity due at the start of the claim from Bates page 3866 of 11,816 cubic yards with a payment request of $3,639,328. The new revised is 10,505 yards to a reduced amount of $3,235,540.

Q Okay. Will you do then the same for the B22 CLIN 13, please?

A The B22 layer at the time of the claim was 6,583 cubic yards, $427,895. That's found on 3867. The new revise B22 is 6,853 cubic yards for amount of $445,445.

Q All right. Now, there are five additional items on the lower half of the box on PX1035, Bates 30700. Will you explain what those are, please?

A By the time the Corps of Engineers knew we were going to Court I believe all of the five lower items listed were quantities that were agreed to but had not yet been paid, and since we were going on with proceedings, the Corps of Engineers chose not to pay it. Withheld payment.

Q Now, was this just the estimate process interrupted by pendency of the litigation so that it was never consummated, is that right?

A That's correct.

Q To your knowledge, is there any dispute about any of those items, three of which I see are additional amounts and one of which I see is a credit to the government?

A No.

Q And then for the record, the total amount then of the current claim based upon the construction quantities, setting aside dredging and setting aside the winter over claim, is what, sir?

A Including those would be $3,933,571.

Q All right. And the PX1035, sheet 30700, also tallies the two items, winter standby and the revised differing site condition claim based on the dredging, is that correct?

A It does.

Q So the revised claimed amount in this litigation based on those figures is what, sir?

A $6,887,737.

Q Now, I want to spend a moment here on the contracting officer's decision. I take it we all can assume the claim was denied, which is the reason we're here, correct?

A Correct.

Q All right. There are a few pieces of the contracting officer's decision I think we should call

the Court's attention to for ongoing reasons. This is Exhibit JX45, and I'm asking you to turn to sheet 282, which is page 4 of the COD.

THE WITNESS: We're done with the other exhibit?

MR. MARTIN: Yes. I will offer 1035, Your Honor.

THE COURT: Any objections?

MR. MIZOGUCHI: I'm sorry, Your Honor. Which exhibit?

THE COURT: 1035.

MR. MARTIN: It's the chart.

MR. MIZOGUCHI: No objection.

THE COURT: All right. Admitted, even though it wasn't on my sheet.

(The document referred to, previously identified as Plaintiff's Exhibit No. 1035, was received in evidence.)

MR. MARTIN: I object.

BY MR. MARTIN:

Q All right, Mr. Lannen. You're left there with just one exhibit to manage here for the moment. The point I would like you to address is 1(b), spur breakwater tie-in, transition peel-back. Now, these

are under the caption in the contracting officer's decision Government Positions, correct?

A Correct.

Q And this one says the government maintains that the contractor removed unnecessary quantities of preexisting A22 and B22 rock for the spur breakwater tie-in. Would you explain to the Court what your understanding of that contention and that issue is?

A Well, I believe as written here they contend we did not follow RFI 1 and therefore excavated material outside the boundaries, as depicted on RFI 1.

Q And is this in any respect involving the means and methods the contractor chose to perform that work?

A No. I believe it's just the boundary outlined by RFI 1 that was the June 2004 deal that said limits of removal, and I think that as written here the contracting officer is saying we excavated outside of that boundary.

Q Was it a Corps position during performance of the project that you overexcavated in the peel-back because you chose to perform with a land-based operation as opposed to building the spur from the water?

A I'm not sure if that was ever in writing,

but the Corps did make that statement at different meetings that we had with them, that if we would have performed this work from the water it would have required a smaller excavation on the existing causeway or the peel-back.

Q In that regard, just take a moment, if you would, and grab JX232, which is your proposal document. And, if you would, turn to Bates 3735, which is page 56 of the proposal document. My question to you, sir, is did Kiewit/Manson explain to the Corps in its proposal document the way in which it was going to approach this construction work?

A Yes, we did. Under 4.2.3 we stated in the first paragraph that Kiewit/Manson will build the breakwaters beginning from the shore and building this feature from land will allow our team to construct the breakwater in weather conditions that would otherwise shut down marine placement operations.

Really what that means is a few years earlier we lost a $2 million barge in Nome getting rock for another job. So we'd taken the barge out to Cape Nome to load it, a storm came up extremely quickly, washed our barge up onto the rocks, and it was a total loss.

So when we started our plan here, one, we

thought it was more expensive, but, two, we thought it did not impact the schedule as much to work in a land-based operation.

Q So that was always your plan?

A Always our plan.

Q Including the point at which it was accepted by the government?

A Correct.

Q Now, would it have made any difference in terms of the amount of peel-back that was necessary even if you had constructed the spur from the water?

A Well, no. We submitted RFI 1 which described the limits of that peel-back.

Q Are you able to illustrate that using the model?

A There were times where nobody really from the Corps, to the best of my knowledge, argued about this.

Q So the record is clear for us, what have you done?

A We've excavated per RFI 1.

Q But if you look at the gray without any colored pieces, gray alone, what does that depict?

A The gray depicts the existing causeway after excavation.

Q Excavation for?

A Peel-back. So it was alleged at different meetings that I attended that the seawall, as it sits up here, would not have had to have been excavated but really you have to tie in to the inner layers to begin the inner layer work. What that would have left is unsupported material above your head which is just going to fall down. So to dig back into the inner layers to tie this in and tie-in here, all of this falls on top of you.

Q And what you've done there is to set the piece representing the seawall on top of the excavation to demonstrate the overhang?

A Yes. The original piece of the seawall.

Q Thank you. Let me ask you to turn forward in the contracting officer's decision to page 6, which is Bates 284. We're still under the portion of the contracting officer's decision which is labeled Government Positions. This talks about preexisting rock, paragraph 7, preexisting rock, at the top of page 284, correct?

A Correct.

Q What do you understand preexisting rock to refer to since most rock, I suppose, preexists?

A I understand preexisting rock to be the rock

that existed on the causeway before we got to the project.

Q All right. And there are three sentences in this paragraph which set forth the government position on preexisting rock, the first of which talks about disposition of the existing causeway peel-back, which is what you were just showing up here on the model, correct?

A That's correct.

Q And it goes on to say Note 1 on sheet 3, H-3, salvage all causeway rock and reuse as shown on sheets H-5 and H-6, is that correct?

A That's what it says.

Q And this describes this as an additional specific direction. Now, what is your position with respect to that assertion

A Sheet H-3, JX --

Q Do you want to get the drawings out? Ten.

A -- 10. If you turn to that sheet, which is Bates No. 81 --

Q Start with the box in the lower left-hand corner. This is a drawing that depicts a particular kind of activity. What is it labeled?

A Right. This is the demolition plan for the project. They're telling you what you're to demolish.

And then the drawings go on to show you the causeway removal that's not here but back down the causeway where the new bridge abutments need to be built, and it also shows the existing old jetties that were at the mouth of the Snake River that were one of those very last work items that you could construct.

Q As far as your understanding of the contract as the sponsor for the joint venture, did the demolition drawing and the note on the demolition drawing have any relationship to, I'm quoting from the COD now, "disposition of existing causeway peel-back rock"?

A No. It doesn't even reference the peel-back area of the job.

Q Okay. And then the next two sentences, I think it would be well for you to read this fully and carefully, the second sentence, so that we can digest what you're saying.

A Do you want me to read it aloud?

Q Would you, please?

A The government further maintains that the installation of A22 rock within 115 percent of the contract quantity within the neat lines, whether new or preexisting, is to be paid at the contract unit price.

Q Let's just talk about that sentence for the moment.
A All right.
Q Is that in fact identical to the KM position in this litigation?
A That's what we're requesting.
Q Is that in fact identical to what we called Position 1 on Friday, that during the work you were paid for the rock, new or preexisting, within the neat lines at the rock prices?
A That's correct.
Q Okay. Now, the next sentence actually goes on to talk about and explain why the 115 percent is mentioned in the second sentence. Would you read that and explain what your understanding is of that sentence, please?
A The government asserts that any quantity above 15 percent variation of the contract amount has the potential to have a new unit price determined following review and verification of actual costs incurred for the varied quantity.
Q And in fact is that your understanding of the contract?
A Yes, that either side can request a change in price once that 15-percent limit has been met.

Q And in fact that's just a sort of restatement of the variation in estimated quantities clause, is that your understanding?

A Yes.

Q All right. Now, one more topic I'd like to get into here as it relates to the contracting officer's decision. Would you turn to page 11 of the decision, Bates 289? We are now in that portion of the decision which the contracting officer labels Findings of Fact, correct?

A Correct.

Q All right. And I want you to turn to the second full paragraph toward the bottom third of the page there where it says the government admits that an increase in removal and replacement of preexisting A22 and B22 rock did occur due to the altered design for the tie-in; however, the government's position is that this increase is less than the total quantity claimed by the contractor. See that?

A I do see that.

Q It goes on to say instead, the government maintains that it is at most liable for the difference between the original design tie-in and the altered design tie-in. Now, to your knowledge, was any calculation ever made by the government to quantify

the difference that it acknowledges it's liable for?
A I've never seen that quantity.
Q Going on to the next paragraph on Bates 2 again, the government admits that the altered design in the spur breakwater tie-in increased the quantity of trenched in tow required to be installed. Did you ever see a calculation by which they acknowledged and quantified the amount of the trenched in tow you were entitled to recover?
A No.
Q Okay. If I turn to page 12 of the COD, Bates 290, I see the same thing as it relates to the seawall where the government in effect says there's an increase that is due, but the increased quote is less than the total quantity claimed by the contractor. Again, nothing, I take it, ever received?
A No.
Q And then finally, if you would just turn to Bates 295, page 17. There's a series of paragraphs that start with A) the main breakwater transition. Now, this is the decision part of the contracting officer's decision, correct?
A That's correct.
Q And as it relates to the main breakwater transition, which is Topic A on 295, it says that

can't be determined because the contractor is currently in the process of rebuilding the upper reaches. That work has been done since 2006, correct?

A That's correct.

Q And then nothing has ever been done by the government to quantify what you're entitled to, is that correct?

A Not to my knowledge.

Q The next paragraph, B, refers to spur breakwater tie-in, transition peel-back, and it says the claim for the spur breakwater tie have partial merit. Merit is found for the increased quantity of the peel-back necessary to accommodate the altered section. Was any quantification done of that?

A Not to my knowledge.

Q *C* talks about cupping the spur at the breakwater. Again, the contracting officer finds partial merit, correct?

A Correct.

Q But nothing was done to quantify it?

A No.

Q Getting down to *D*, the seawall quantities. Is that the same story? They find partial merit, but no pay?

A Right.

Q No quantification. And then *D*, I'm sorry, three, trenched in tow, on page Bates 296, says the increase in quantities of trenched in tow excavation claimed by the contractor for the spur breakwater has merit. That's full merit. Were you ever paid anything on that?

A No.

Q Did you have occasion to talk to Ms. Davidson and ask her how this was going to be followed up?

A I did.

Q What did you learn?

A I talked to Sandy about this and asked her when they would quantify or how we could understand what this meant because, to me, when it said partial merit, does that mean I get one yard or 10,000? So there could be a big potential range of pay. They did not have the quantities then at that time, and I never heard from them after that.

MR. MARTIN: Okay. That's all my questions, Your Honor.

THE COURT: Again, thank you. You have cross?

MR. MIZOGUCHI: Yes, Your Honor. If I could just have a minute to bring all my stuff up there?

THE COURT: Sure. You want a moment to stretch?

THE WITNESS: I'm okay for now.

THE COURT: Okay. Good.

THE WITNESS: Thank you. Do I need to pull any certain books early?

THE COURT: He'll tell you when.

THE WITNESS: All right.

THE COURT: He'll take you through it.

MR. MIZOGUCHI: Actually, I could say if I knew in the exact order it will be, but no concerns.

THE WITNESS: Okay.

THE COURT: Probably be most of the same that you've seen.

THE WITNESS: I'm sure it would, I'm used to it.

THE COURT: You don't want to have any leaks at all on the spot.

THE WITNESS: Couldn't say.

CROSS-EXAMINATION

BY MR. MIZOGUCHI:

Q Let's follow up on that last subject, the contracting officer's decision. When you spoke with Ms. Davidson, at that point in time was your claim pending before this Court?

A No.

Q And you understand that it's this Court now that will decide the correctness of these matters, including whether the contracting officer's decision was right or wrong?

A I hope so.

Q We sometimes call that de novo, and you'll hear that term sometimes. I wanted to ask you --

THE COURT: Let's stop for a moment just so you understand what he's saying without using these nice Latin words which I'm primarily opposed to. Basically what he's saying, it was the contracting officer's decision. That's done. Right now you've submitted all of the issues to this Court for determination, which may or may not agree with the contracting officer. That's essentially all he said. Fair enough?

MR. MIZOGUCHI: Yes. Thank you, Your Honor.

THE COURT: All right.

THE WITNESS: Thank you.

BY MR. MIZOGUCHI:

Q There are a few things in my mind about your testimony last Friday that I'd like to just make sure we recall them correctly and a few things you brought up today, just preliminary, I want to get nailed down.

On day one of the trial, and I don't think this was ever handed out to the Court, but we received kind of a summation of the Plaintiff's claim from Plaintiff's counsel. One of those items was called rock quantities and it set forth the contract unit price. Do you know the document I'm speaking of?

A (Nonverbal response.)

Q No? Well, among other things, there was a contract unit price and it was escalated per the VEQ, which, I take it, is the variation in estimated quantities clause correct?

A That's what the VEQ is. I have not seen the document that you have in your hand.

MR. MIZOGUCHI: Do you have another copy, Mr. Martin.

THE COURT: Well, you're going to have to have more than one other copy if we're going to slice through his testimony here.

MR. MIZOGUCHI: That's okay, Your Honor.

BY MR. MIZOGUCHI:

Q I'm just going to ask you very briefly, is it your understanding that KM, which means Kiewit/Manson when I use that term, is claiming that the variation in estimated quantities costs permits it to obtain a recovery different from the unit price?

A The variation of quantities clause would allow the owner or the contractor to adjust the unit prices -- I doubt the contractor is ever going to ask that their unit price goes down, but the government may choose to ask or the contractor may choose to say I've spent more money.

Our claim was not written that way. Our claim is a unit price with a winter over. If you would have lumped the winter over back and spread it against the unit price it would be more of a pure request that the unit price goes up, if you will. Hopefully I explained that correctly.

MR. MIZOGUCHI: Yes. may I have one moment, perhaps, with counsel and we can stipulate to this matter?

THE COURT: Yes. Okay. If you're talking about a document that the Court hasn't seen, we're going to have to remedy that.

MR. MARTIN: Your Honor, he has in his hand, I can see, that sheet I handed out in my opening statement. It's not a piece of evidence.

THE COURT: Okay.

MR. MARTIN: We have not submitted evidence on what the adjustment would be under the variation in estimated quantities clause. It can be calculated

from evidence in the record consisting of the CLOUTIES and the TCAA audit, which is Exhibit --

THE COURT: Let me ask you a question. Are you claiming a VEQ variation under this complaint?

MR. MARTIN: Right now we're submitting it as stated on Plaintiff's Exhibit 1035. We're saying that we would be entitled to it, and you can do that with the DCAA audit figures, but we're not submitting that to the Court, we're submitting what PX1035 says.

THE COURT: Okay. I may be really dense, but the claim that's submitted to the Court is a VEQ claim or not?

MR. MARTIN: No.

THE COURT: How are you getting your numbers? You're not getting it under the VEQ clause?

MR. MARTIN: No, we are not, Your Honor, and I did bring that up in my opening argument --

THE COURT: Right.

MR. MARTIN: -- but we have not presented evidence. There is evidence, again, from which it can be calculated, but we haven't presented --

THE COURT: Then why do we want to consider it at all?

MR. MARTIN: That's a fair questions, Your Honor, and you probably do not. I will submit that to

you.

MR. MIZOGUCHI: Your Honor, we want to consider it.

THE COURT: Okay.

MR. MARTIN: They may want to do that.

THE COURT: But that's not how the claim was submitted.

MR. MARTIN: No, it was not.

THE COURT: I just want to make sure I understand that. I understand that you may want to. That's not my issue. The claim was not based on a VEQ.

MR. MARTIN: No. The claim was always based on the $308 original unit price for CLIN 6, Your Honor, and PX1035, which is in evidence now, is still based on $308 for the --

THE COURT: PX235, you said?

MR. MARTIN: 1035. I'm sorry, Your Honor.

THE COURT: 1035. I misheard you. Sorry. Okay.

BY MR. MIZOGUCHI:

Q Now, Mr. Lannen, you helped write or you were the final author of the August 5, 2005, request for equitable adjustment regarding the quantities dispute on the Nome project, correct?

A That is correct.
Q And that is Exhibit 234? In fact, if you'll get Joint 234.
A That's correct.
Q And if you'll turn to Bates page 3822 there's a Section 7.9, a variation in estimated quantities clause.
A Could you tell me the Bates page again, please?
Q Sure, 3822. It's also page numbered 55 of the claim.
A Okay.
Q And there's a discussion here of the variation in estimated quantities clause. Do you see that in your copy?
A I do.
Q Is it fair to say that Kiewit/Manson agrees the variation in estimated quantities clause is applicable to its contract for the Nome project?
MR. MARTIN: Objection. It's a legal conclusion, but we do agree.
BY MR. MIZOGUCHI:
Q Is it your understanding that your Nome project construction contract contains a variation in estimated quantities clause?

A I do understand that.

Q And, among other things, you've addressed it in your certified claim?

A Correct. Put this away?

Q You may. Now, do you recall last Friday morning I think it was we had some testimony about the JX34 July 25, 2003, email from you to Gail West?

A Okay.

Q Do you recall, sir? You can grab JX34, if you'd like. In fact, let's do that.

A Okay.

Q Do you recall your testimony on Friday about that?

A Yes.

MR. MIZOGUCHI: Okay. And, again, this is what I've described as some preliminary things. I just want to make sure that we've got it down correctly. Now last Friday, and this is with respect to, this is Bates 6836, Your Honor.

THE COURT: What exhibit?

MR. MIZOGUCHI: JX34, the copy of an email from Shawn Lannen to Gail West, July 25, 2003.

BY MR. MIZOGUCHI:

Q On that Friday I understood you to testify that no one from the Corps responded to this email, is

that correct?
A That's correct.
Q And we understood you to also testify that you did not subsequently call the Corps about this email.
A I believe I said I didn't remember if I talked to her after that.
Q So you don't recall making a call to the Corps about this email after that?
A About whether they were following up or not, sir?
Q About this email, July 25, 2003.
A I don't remember calling her again about this email.
Q Okay. And we also have your testimony from last Friday as indicating that with respect to the causeway excavation items, do you see that in JX34? For example, Item 3 it says our quantity for causeway excavation is also greater.
A Yes.
Q And then if you drop down a couple of paragraphs there's another reference to causeway exc?
A Yes.
Q Last Friday you testified that this item applied to CLIN 7, correct?

A Which one.

THE COURT: What? I'm sorry.

MR. MIZOGUCHI: Contract Line Item No. 7.

THE COURT: Okay. Just keep your voice.

MR. MIZOGUCHI: I'm sorry, Your Honor.

THE WITNESS: Which one? You've referenced two points here.

BY MR. MIZOGUCHI:

Q Well, you were asked about causeway excavation on Friday?

A I was?

Q And you testified that subject of that statement relates to CLIN 7.

A Which of the two?

Q Well, let's take them one at a time, No. 3, or do you believe you were asked about only one of them?

A No.

Q Okay, so then both.

A Okay. So the first, under three, our quantity for causeway *X* is only CLIN 7 because CLIN 8, the other causeway *X* item, in my mind was a lump sum, so there could be no difference in quantity for Ms. West. On the lower part, our interpretation of the spec, that reference to causeway *X* I believe I

testified means CLIN 7 and CLIN 8.

Q Okay. Now, do you recall being deposed in this case about two months ago?

A I do.

Q And on the first subject, which is whether you called back to Gail West, do you recall being asked about that?

A I'm sure Dave asked me.

Q Do you recall the answer you gave at the time as to whether you --

A No, I don't.

MR. MIZOGUCHI: And do you have with you up there copies of deposition transcripts or do I need to hand those out?

THE COURT: We do not have those.

MR. MIZOGUCHI: Okay.

THE WITNESS: Am I done with this? Do I need this?

MR. MIZOGUCHI: You can put that one away for now, but if you wish to have occasion to reference to it.

THE WITNESS: I'll leave it.

MR. MIZOGUCHI: Now, your deposition was in two volumes, so I'm going to hand out -- approach, Your Honor?

THE WITNESS: Thank you.

THE COURT: Thank you.

BY MR. MIZOGUCHI:

Q Now, if you'll turn, please, to pages, well, it's the second volume which is the set that begins pages 68 to 150. On page 76, well, 76 to 79 is the upper right-hand corner page number, do you see there a discussion between you and Mr. Hibey? it actually goes on for all the way to the top of the next page of the manuscript, which is page 80, line 1.

Just go ahead and take as much time as you'd like to read that.

A So you would like me to read from 76 through 79, sir?

Q Eighty, line 1, but you're free to read above and below there in fairness, if that's necessary. My question to you is on March 26 of this year did you indicate that you had made several phone calls to Ms. West about this email?

A I've just read the first page, 76, so I need to finish this.

(Pause.)

Q Go ahead. And just to ask you, Mr. Lannen, what is your testimony about and extent to which, if any, you called Ms. West after the July 25 email about

that email?

A It doesn't change. Well, it doesn't change for the fact when I read this he asked me if we'd called her, and I said about all of our questions? And so simply, when you call Gail, which happens more than just with the Corps of Engineers but with any owner, hey, we've sent you a lot of questions, how are those answers coming?

Earlier you asked me specifically about this email. I do not recall calling her directly just about this email, but by the time this email happens there's other questions that have been asked and are awaiting answers. So when you call an owner you don't call and just ask about one, you'd like to know about them all, so as a group, hey, is there anything coming on that stuff?

Q Okay, but just so it's clear about this specific email, the July 25, 2003, for the record, do you have any --

THE COURT: I think he's answered your questions, Mr. Mizoguchi. I think we can move on.

BY MR. MIZOGUCHI:

Q No, you're presently employed by Kiewit/Manson, correct?

A I'm presently employed by Kiewit Pacific,

yes.

Q By Kiewit. Sorry, sorry. And at the time of your deposition that we just looked at were you also employed by Kiewit?

A Yes, sir.

Q And, I'm sorry, what is your position again?

A Area manager.

Q Is Kiewit a partnership or a corporation?

A Kiewit is a corporation.

Q Are you a shareholder?

A I am.

Q To what extent is your compensation tied to your profit/loss objectives for your area that you manage?

A Well, my initial compensation is my salary which is not tied to gain or loss. Kiewit has a bonus package that's based on, one component is profit and loss and another component is quality of work, safety, how you're perceived in doing your job for your boss. He evaluates you on a bunch of different items, if you will, to determine your bonus.

MR. MIZOGUCHI: Okay. Just one more preliminary, Your Honor.

BY MR. MIZOGUCHI:

Q Between the time you were excused by the

Court on Thursday from further discussions with counsel because of the discussions we were talking about --

A From lunchtime on Thursday or so then?

Q Until you took the stand. Did you discuss the case with anyone besides yourself? I mean, obviously you can't discuss it with yourself. Did you discuss the case with anyone?

A We discussed settlement figures so we could write up on the board what may be our offer to you, but it was not discussing the case, if you will, it was a monetary figure to send your guys' way. I did not discuss anything that happened in this room. I know they talked to my boss who I didn't talk to.

Q That's okay. I don't need to go into that. I'm just asking if you were present during any discussion of your potential testimony prior to taking the stand between Thursday and Friday morning.

A No.

Q Okay. All right. Let's go to PX1035. I think we just handed it back again. It's the one-page sheet of your insurance adjuster's claim. So now we, I take it, should understand that PX1035 sets forth Kiewit Management's current claim before the Court, correct?

A It's our revised number, if you will, yes.

Q There are two rows, if you will, of items. There's the top row, which says CLIN 4, 6 and 13, and then there's a bottom row that runs from CLIN 11 to CLIN 38. Just so we understand, those items that total to $188,476, those are not in your certified claim or claims?

A I know I'm not supposed to ask you a question, but the $188,476 was not in the original certified claim because at the time that $188,476 was under our understanding a total that the Corps was going to pay us. They were agreed to quantities, if you will.

Q Understood. You understand what a certified claim is, don't you? You certified these claims?

A I certified the original document, that's correct.

MR. MIZOGUCHI: Right.

THE COURT: Which number are you looking at? I'm sorry, I'm not with you.

MR. MIZOGUCHI: The $188,476 that appears in the amount unpaid to date column below the $3,745,000.

THE COURT: Okay. I'm sorry. $188,476, that number?

MR. MIZOGUCHI: Yes, Your Honor.

THE COURT: Okay.

MR. MIZOGUCHI: I'm just trying to find out whether that is actually covered by a certification which might trigger a Contract Disputes Act, you know --

THE COURT: Issue?

MR. MIZOGUCHI: -- interest and jurisdictional issue.

THE COURT: Jurisdictional issue, particularly.

THE WITNESS: $188,000 was expected to be paid from the Corps of Engineers to Kiewit/Manson, had not been received to this date, so when we adjusted our request to this Court, to the best of my understanding, we wanted to add that money in to get it paid. It's been money that's been laying out there due by the Corps of Engineers and not paid to Kiewit/Manson.

BY MR. MIZOGUCHI:

Q Understood. So this is money you're claiming under the contract but you arrived at that figure after you submitted the certified claim?

A Right.

Q And if I were to pick up one of your REAs for the quantity or your other REA for the dredging, I

would not find the $186,000 number in there?
A The $188,476 would be in neither of those, neither would any mention of A8 stone, B8 stone, filter and then the Line 38, which is revised bedding.
Q And are we to understand that the upper row, the total for $3,745,095, that includes all of the certified Kiewit claims including what I'll call the peel-back, the transition issues, essentially anything that has to do with the A22 and B22 rock quantities?
A You've asked me kind of two questions. I think you said that's all of Kiewit's certified claims, so that would be untrue.
Q Relating to rock quantities.
A Those three items, two of those are rock items, one is not a rock item, it's an excavation of sand off the bottom of the ocean. Those were the three main requests of our original REA. In addition, you have the winter over.
Q Right. Is there a further break out between the peel-back claim, and the transition main breakwater claim and the spur-cupping (phonetic) issue, we call it, transition claim in terms of amounts you're finally claiming?
A No.
Q So essentially it's a total cost of the rock

claims?

A This is one sheet of paper, so to detail those out, that hasn't been done, if that's what you're asking.

Q Yes, sir. Now, if I wanted to find records of the actual quantities that Kiewit/Manson put on the project, one place I might look to corroborate those might be Kiewit/Manson's quantity sheets?

A The total quantities on the job, the best place to understand that would be through the survey records. Our quantity sheets are rough numbers that are not supported by survey data. The payment for this project was all survey-measured.

MR. MIZOGUCHI: Take a look at DX2022, please.

THE COURT: I'm sorry, DX what?

MR. MIZOGUCHI: DX2022.

THE COURT: Joint Exhibit or Defendant's?

MR. MIZOGUCHI: Defendant's Exhibit 2022.

THE COURT: Okay.

THE WITNESS: Are we done with this one, sir?

MR. MIZOGUCHI: Yes.

THE WITNESS: The email one.

MR. MIZOGUCHI: For now, yes. We'll come

back to that but we're done for now.

THE WITNESS: 2022?

MR. MIZOGUCHI: Yes, 2022.

THE WITNESS: Okay.

BY MR. MIZOGUCHI:

Q I'm going to ask you to turn to Bates page 42981, please.

A 42981, okay.

Q Now, this is a document captioned quantity sheet, all A22. You should see in the very left-hand top it says Kiewit/Manson known navigation improvements. Do you see that?

A I do.

Q Okay. Do you recognize this to be a package of Kiewit's quantity sheets for the Nome project?

A They're copies of quantity sheets used by our engineers to track interim quantities, if you will. That's what I recognize them to be.

Q Right. And I think you said there can be some final adjustment to the surveys to the quantities?

A Sure.

Q All right. But do you recognize this package to be Kiewit's quantity sheets of the records of actual quantities taken off on the job of A22,

among other things? Forget that question. Just go to 42981.

A Okay.

Q Look at the last row there. It's dated 9/01/06, so that would be September 1, 2006?

A Yes.

Q Construction pretty much done by that point?

A Yeah.

Q And do you see the quantity to date figure, 37, it looks like 092?

A Uh-huh.

Q That's cubic yards of A22?

A No. That's cubic yards of A22 hauled. The top of the quantity sheet is haul A22, so this represents, again, the rough rounded number of stones, if you will, because it's converting a stone back to a cubic yard, that they thought we imported from the quarry.

Q All right. So let's look at the description column, and then do you see there, I'm just going to read left to write, a handwritten entry that says neat line? Could you just describe for us again what neat line is?

A Neat line would be, if this is used in that same context, within the prisms that are pay prisms of

the contract.

Q And that's what the surveyors are looking at to decide how much you should be paid?

A Yes.

Q Okay. And that figure is, what, 47,429 cubic yards?

A That's what it looks like. I can see the 4, 7, 4, the next number is not superclear, and then the 9.

Q If we do the math it would appear to be 429 because it seems like the next thing is to subtract salvage 10,337 cubic yards.

A Would you like me to do that?

Q Please. Then we can confirm those numbers.

A That would be a 2 then.

Q So you're taking the total neat line survey, whatever, of the A22, and this record as of 9/1/06 is 47,429 cubic yards, and they're subtracting salvage of 10,337 cubic yards. Why is that?

A Well, if that is the correct number for salvage, then to determine the correct amount that you hauled from the Cape Nome quarry 13 miles away, that would be a double-check back for the neat line yards hauled. It doesn't give you all the yards hauled because the rock that's outside of the pay lines would

not make that number.

Q And so this is neat line, how much Kiewit thinks it should be paid, minus how much it didn't have to mine but it was able to salvage of A22 equals 37,092 cubic yards?

A Right. Yes, that's correct. The only number on there that's a surveyed number is the 47,000. The salvage number was never a surveyed number.

Q So the way to understand this is neat line is the pay amount, salvage is the amount you were able to reuse of 10,337 cubic yards of A22?

A Salvage is a guesstimation of the amount that was reused.

Q This is Kiewit's estimate of the amount reused?

A One is an exact engineered number provided from the surveying company. The other number is a guesstimate of what came out of the stockpile, okay?

Q The stockpile on the beach area?

A On the beach.

Q By the spur?

A Yeah. Nobody ever measured that, if you will, for the precise payment or quantification of it, if you will, okay? So it wasn't quantified. One

number is quantified by a surveyor, one is not.
Q Again, that's A22 rock, right?
A That's correct.
MR. MIZOGUCHI: You can put that down, and why don't you grab JX230.
THE COURT: I'm sorry, what document?
MR. MIZOGUCHI: JX230.
THE WITNESS: Okay. There's two parts to that, is that correct?
MR. MIZOGUCHI: Right. I want to go to the part that has Bates 3329, which is an item summary.
THE COURT: The second book is a Defendant's exhibit number, so he's directed you just to that book one for the time being.
THE WITNESS: Yeah. Could you repeat that number, please?
MR. MIZOGUCHI: Sure. It's Bates 3329, it's the item summary input. It's a table. We've been looking at subtables. Bates 3329, Item Summary 6, construct main breakwater A22.
THE WITNESS: Okay.
BY MR. MIZOGUCHI:
Q Tell me when you're there.
A I'm there.
Q I just want to tie this down. If you'll

look at the second row where it says salvage A22 stone from Kiewit, 10 percent loss. That's the same A22 stone we were talking about on the quantity sheets we just looked at, right, in DX2022?

A Both of them, I believe, refer to the same salvage stone.

Q In here, though, the number in the plug estimate is 4,350 cubic yards?

A That's correct.

Q And this is the estimate Kiewit used to price it's CLIN 6 unit price for A22 rock, correct?

A That is correct.

Q And that price was $308 a cubic yard?

A That is correct.

Q Okay. And as long as we're on this page, let's take a look at the total mined. Would you agree that almost 90 percent of the CLIN 6 direct cost is attributable to the mining stone cost?

A Do you want me to do the math? A big portion of it is.

Q Yes. Let's just nail that down. Let's look at the first item, mined stone. Total $5,197,265, is that correct?

A That is correct.

Q And that's the cost of mining A22 stone from

the quarry?
A That's correct.
Q Then if I look at the bottom of this document there's a takeoff quantity total, $30,600 quantity. That's the cubic yards in the CLIN 6 JX231 Corps' estimate of stone for the project, right?
A I don't know the JX number, but it matches the Corps' bid schedule provided to us prior to bid.
Q Right. And so let's look all the way over to the right and see what the total -- and this is only the direct cost, right?
A That's correct.
Q The total direct cost for A22 CLIN 6 is $5,797,431?
A That's correct.
Q So relative of that $5,797,431, mining takes up $5,197,265?
A That's correct.
Q And then do you have a calculator?
A I do.
Q Would you satisfy us? I calculated it, of course I'm sometimes proven wrong in calculations, at about 90 percent, but I'd like you to confirm for us the percentage of the CLIN 6 direct costs relative to mining.

A About 89.6 percent.
Q Pretty close to 90 percent.
A Yes.
Q Thank you.
A Put this back?
Q Yes, please. Thank you. Now, Mr. Lannen, just to set the stage for the questions I'm going to be asking you today, I'd like you to take the Court through a demonstration of, well, first a comparison, if you can use JX1 as a model, first of all, what the causeway looked like prior to construction.
A So that's prior to us beginning work?
Q Yes. Can you do that with this model?
(Multiple voices.)
A I believe you can. So you want all this off, so the under water portion?
Q Yes. I'd like the Court and me to be able to see what it looked like exactly prior to any removal. So JX1, as you described to us, this is what the project site looks like before any work is done?
A Yes.
Q Okay. So what do you have there? The tan colored item is?
A That is the seafloor that was excavated for the trenched in tow.

Q And moving up in elevation, the next item? Is this sometimes called the nose or the bullnose?

A Some people do it call it that. So you have the nose is the existing causeway.

Q And what kind of rock is that dark blue rock?

A A1 or B1.

Q All right. And that's what they called the existing rock on --

A Preexisting rock on the causeway.

THE COURT: Let me understand something. This is sort of when you went in this is what it looked like?

THE WITNESS: Yeah. The day we arrived.

THE COURT: The day you arrived. All right.

BY MR. MIZOGUCHI:

Q And this upper part is also A1, the lighter blue, U-shaped ring on the top?

A Yeah.

THE COURT: All right. Hold on a second. We're having a microphone issue, so you're going to have to keep your voice up.

MR. MIZOGUCHI: I'll stand here, Your Honor.

THE COURT: All right. Well, I mean, we could try it. You can go over there. Let's try it.

We'll just move the microphone when you're ready to talk, and just feel free to wander because you'll be more comfortable. That's fine. We'll just have to work with it. The reporter will have to work with it.

MR. MIZOGUCHI: I will speak up.

BY MR. MIZOGUCHI:

Q One of the first items of work, at least as called out by your technical proposal, do you recall there's a schedule in there, JX232, Bates 3725? In fact, I'll show it to you.

A I know we submitted a schedule, yes.

THE COURT: The schedule was what number? I'm sorry.

MR. MIZOGUCHI: JX232, Your Honor.

THE COURT: 232, all right.

MR. MIZOGUCHI: That's the technical proposal. Bates page 3725.

THE COURT: Okay.

BY MR. MIZOGUCHI:

Q So, Mr. Lannen, one of the earliest items of work on the project was the peel-back, correct?

A Yes.

Q Now, could you demonstrate for us the peel-back? From the top lighter blue A1 ring comes off and that's going on to the beach stockpile?

A It goes wherever. Most likely it went to the beach.
Q Do you recall Mr. Harrison's testimony -- actually, could you leave that one on first -- that it could go to stockpile on the beach but some of it might remain nearby?
A Right. I don't believe ever being on the project where any of it remained nearby.
Q So you think it mostly went down the causeway to the beach, the stockpile?
A Yeah.
Q All right. So the upper ring comes off, and now what about the dark blue A1 and B1?
A That has to come out. As I said earlier, once you remove this out you've met the limits of RFI 1. Want to take those out.
Q So now you've got the nose open?
A Ready for installation of new rock.
Q Okay. And so one at a time if you could take us through the next step on this area of the project. Do you sometimes refer prior to its being excavated the existing causeway as the existing jetty, J-E-T-T-Y?
A We may have referred to it as that. It's called a causeway by some nomenclature because you can

drive on it. Some jetties you cannot drive on. So it's a name thing as well. So start there now?

Q So you've got it peeled back, and what's the next step?

A We have to build ourselves out far enough and above-water high enough with the correct materials so we can start excavating the trenched in tow that we can reach, and then those layers of rock get placed. The problem with the model is we built this in very small reaches because of the length to reach.

To actually reach and place an A22 stone, if you will, out at the tow, you had to float the rock out. A rock, a stone, when it's put into saltwater weighs less than it does when you're holding it up in the air therefore allowing the crane to reach to its maximum extent extends the maximum reach.

So all I mean by that is when I put a piece on the model that's longer than the field crew did I'm advancing you farther quicker. So just trying to answer your question, I want to place it where I told you.

Q Right. Did you say there's A22 in the tow?

A No. It's not in the tow, it sits up here, but when you reach it out to its furthest extent in a cross-section you might call that the tow, okay? I

didn't mean that it goes in the trench.
Q Okay. Understood.
A Okay? So sitting here was the crane. The first rock that we're going to place is the filter.
Q And that's smaller than the A22 and the B22?
A Very fine.
Q Do they call it C or is it just called a filter?
A Well, we blended the two together, gave the Corps a VE total at the start of the job. So I think it's C2 in bedding and they got combined together to form one layer. They were very similar rock.
Q Do people sometimes call the innermost area the core?
A They do. So the next layer, I think our problem is going to be -- I read? Okay. So I built enough rock to get out to here, if you will, so I can dig this because it's going to be in our way.
Q And this is the?
A Trenched in tow. I'm trying to depict this as accurately as possible, but because of how we constructed the model --
Q I can see what you're doing but for the Court record. Sometimes I'll ask you what seems to obvious just so the court reporter can get down what

you're doing for the record.

A Okay. And then this piece of trenched in tow happened later. To put this model together right it's going to have to come out now, is that okay?

Q Sure.

A Because what we're going to need to do is put those on next, the sheets of the C8. So, again, as we're working our way out of how this all goes together, we would have placed enough of each type of material to advance yourself out to dig just enough of the bottom to advance yourself out the correct type of material. The crane couldn't sit here and reach the end, if you will.

Q That sage green tile you're putting on, what layer is that?

A C8.

Q Bigger than the core filter?

A By a small amount, yes. Core on this project had progressive layers.

Q And what's that brick-color sheet you put, the third layer?

(Away from microphone.)

A The color brick is the B8 material.

Q Are you building out the approximate stages of the actual construction as you build the model?

A I'm attempting to.
Q If there are differences, please let us know.
A Okay. So the next thing that would go on is the B8 stone, and then our first round of A22 would have gone on.
Q So the green stone you called B8, is that because that's the last name of the existing --
A Of the page?
Q No, the dark green larger layer you just put on --
A B22?
Q Yes. I thought you said B8, but that's B22?
A B22.
Q Okay.
A All of the nomenclature on the model is per the new stone type, not the old stone.
THE COURT: All right. Stop. Cell phones off, please.
MR. HIBEY: I didn't even know there was a phone on this thing. I'm sorry, Your Honor.
MR. MIZOGUCHI: Okay.
THE COURT: Go ahead.
THE WITNESS: Okay. There we go again. --
BY MR. MIZOGUCHI:

Q Go ahead.
A A partial of these three filter, B8 and B22, would have been placed, but not all, because you needed a ramp that came down here that came down and in, turned the corner and came down. So the model pieces are one solid piece for the convenience of model building, but again, as you're replacing them, they don't fit to how we build out, okay?
It's only a partial of these types of material would have went in, come down, get on here, work our way out.
Q The piece that you just put on top, the green --
A B22?
Q Well, yes, and the brick-colored and the dark blue underneath that, that's core?
A Filter, B8, B22.
Q And did you place that right after you peeled back and then drive out? Is that how that works?
A No. We would have placed just a small portion of it for a ramp to get access down. Again, these pieces are way to big for me to demonstrate what you want me to show you. Well, that would have got us a ramp down so you can start placing the first

section.

Q This beige-colored thick rock, that's the new A22?

A Right. It's going on as full template, and that's not what happened.

Q All right. What happened?

A Huh?

Q Describe for us then what happened?

A Just a partial piece of that goes on so you can have access and sit just above water and work your way out.

Q All right. First you're building a strip to work your way out, is that it?

A That's right.

Q Can you with your hands just describe that for us and for the Court so that we can all see it?

A Well, the level of the amount of A22 that you put on working your way out would have varied up and down just depending on size of stone. You put a lift of what we call chink material for the crane to sit on as you work your way out. So it's not a smooth table that you can drive your car down, if you will. It's a pretty rough road, okay?

This large volume of stone back here is not on. That's not what's important. What's important is

to get your way out, to work your way back. That's why it makes it a little bit difficult to --

Q As fast as you can and when actual --

(Away from microphone.)

A The faster we got out a piece you would have put a little bit more A22 stone on but then started reaching out putting on the other layers, if you will. This, B22, then, placing it now would have had to gone on of course in advance of the A22 to make the model work. Same as this small corner -- this all would not have gone on prior to us working our way out and can help up to, allow you to work your way out.

Q So you work your way out along kind of a narrow strip in the middle?

A That's right.

Q And then as you build out, you filled out the site? Is that how that works, in reality?

A Well, the stone placement would always have to start at the furthest reach out, what I called the tow earlier, and then work the rocks back up, stacking them as you come up, but that reach doesn't have to be very far, the reach-down what I call the tow, build your way back up on each side and then advance yourself forward.

Q Is the tow in your terminology essentially

the bottom corner?

A The bottom corner intersection.

Q Okay. As you're working your way out?

A That's right.

Q And then you work your way back and build it up higher?

A Back on the top, yes.

Q So the beige stuff you just put on it's the A22?

A A22.

Q A22? Oh, we'll talk about the excavating point.

A Well, this was where the stone claim was that was not convenient.

Q Why was that not claimed?

A Because it allowed us the start of the ramp down for the contractor's access road.

Q And that's part of the peel-back area or no?

A It's outside the peel-back area.

Q And the type of stone not claimed is what kind?

A B22.

Q Can you show us in your, well, first of all, the blue stone that we peeled back from the beach, once you've built in the new part or as you're

building is the last part that you build the A22 up near the peel-back area?

A Yes.

Q By the existing causeway (phonetic)?

A (Nonverbal response.)

Q But you're putting in new core, the blue material, and new brick-colored material in that peel-back area or does it stop short of it? It goes into it, does it not?

A It goes into it.

MR. MIZOGUCHI: In fact, if I wanted to look at just to understand it from pictures the final design slides that were used with Mr. Harrison on day one -- does the Court have its copy of these?

THE COURT: I do.

MR. MIZOGUCHI: I'll let you have mine, Mr. Lannen, or I'll stand next to you and try to talk.

BY MR. MIZOGUCHI:

Q Now, on Slide No. 1, final design, there's a picture of the existing causeway, correct?

A Yes.

Q All right. And then there's a brownish drawing of the new spur breakwater. Do you see that?

A I see that.

Q Okay. Now, the new spur breakwater is

jutting into the existing causeway, correct?

A Yes. It attaches into the existing causeway.

Q And so some of the peeled-back rock, that came back to the beach stockpile?

A Yes.

Q Can you show us on that picture where that would be approximately stockpiled on the beach?

THE COURT: I can't see it.

THE WITNESS: About here.

THE COURT: So right at the back, that perpendicular piece, to the existing breach?

THE WITNESS: Back on the spit, they call it.

THE COURT: Okay.

BY MR. MIZOGUCHI:

Q How far of a haul is that would you say distancewise?

A I'd have to look at the causeway station to tell you exactly, but about less than a mile.

Q Now, so you peeled back some of the existing rock that is marked A1, the dark blue --

A That's correct.

Q -- carried onto the beach. Once you insert the new core material, the dark blue filter and the

brick -- what size is the brick?

A Let's make sure. I believe the brick is C8.

Q C8?

A Yeah.

Q And then some new green B22 goes in as well first, right, into the old existing causeway area?

A Yes, *B* or B8.

Q B8. Actually, part of the existing B22, is that peeled back and salvaged as well?

A There was no existing B22.

Q Okay. How about the rock in the green area? That was part of the existing causeway?

A Yes.

Q Was that peeled back as well and taken to the stockpile on the beach?

A It was taken to the beach.

Q Okay. And then once it's there on the beach did you bring any of those B22 and A1 back to the peel-back area?

A I'm sure that we sorted it, and any rock that we expect to fall back.

Q Once you insert the new core material, is it true that you cannot fit back all of the peeled-back A22 or the old A1 and other rocks peeled back from the existing causeway? They won't all fit back in once

you put in the new spur construction?

A That's impossible to determine without accurate surveying. You would have had to go out, survey the initial surface and then survey each consecutive layer as it's taken down to understand how much volume of that was truly there, then calculate the volume again with survey of what's required to go back in. So you're asking me to speculate, if you will.

Q Well, by definition, if this new core material -- that's new core material, correct?

A That's correct.

Q The new blue core material, the new brick core material and this new B22 goes in -- well, is the new blue and brick core material go in first, right?

A Uh-huh.

Q Onto what used to be the existing causeway?

A Yes.

Q So that was peeled back. By definition, whatever A1 or B22 rock was there before is not going to fit into that space anymore, correct?

A Whatever was there before would fit in that space. Okay. I'm not going to tell you exactly what rock type existed in that jetty, nor was it ever quantified at the project level by the Corps or by

Kiewit/Manson.

(Away from microphone.)

Q As you peeled back that blue rock and put in the new blue and brick core -- and this is new rock, too, right, part of the breaking system (phonetic)?

A Yes.

Q You can't put back both the green B22 and the A1 existing rock onto that, can you? I mean, you can't do that. I mean, you can try but it won't fit, is that correct?

A We did occupy some -- okay, of whatever this was as it came out. What came out occupied space that's taken up by new rock.

Q Right. That's my point. In fact, if you try to put back the peel-back, why don't we see what happens. Now, just leave it as the new core materials in there. Now try to put back the peeled-back blue rock in that same existing causeway space.

A You said the core material?

Q Yes

A This isn't core material.

Q You're right.

A So I'm just trying to do what you asked.

Q Now, try to put back both the new B22 and the peel-back.

A Okay.

Q Doesn't that break core material --

A This is B8, we called filter core in our earlier discussions.

Q I'm really only asking about the existing causeway area peel-back. So you had to put new core?

A I understand your question but because of the constraints of the model what you're asking me to show you, unless I move stuff down here it's not going to work very well, right, to slide, if you will. When I set this and something else is sitting out here, it's going to lump up.

THE COURT: Is there a way that you can ask some of these questions in narrative form as opposed to the this, that pieces of model?

MR. MIZOGUCHI: Yes.

THE COURT: Because you're not really creating much of a record by all of this. I do understand what you're both saying, but in terms of a record it's amounting to a large nothing.

BY MR. MIZOGUCHI:

Q So in the peeled-back causeway area when you put back on the blue first layer of core and then the brick B8 layer, that's the first part of the construction in the peel-back area?

A Partial. If you remember, I said we used this as a ramp down and so forth.

Q Right. And then you put on the green A22 layer on top of that as part of the new construction?

A You put part of it on remembering the slide down the ramp, yes.

Q As we're finishing up, though, I'm asking you about the final construction.

A When it's complete that would all be in.

Q Right. And then when you have that there, you can't put back all the remaining A22 you took out, correct?

A We didn't remove any A22 stone.

Q A1.

A Well, whatever stone we did remove, because you put other things there that are of the new specified types of the Corps of Engineers, you couldn't put the other back because it's full -- if you will.

Q Right. And A1 and A22 are, to your knowledge, the same size stone?

THE COURT: Mr. Mizoguchi, let me just stop. Somebody walked in the courtroom. Is that a witness?

MR. MIZOGUCHI: No, Your Honor. That is one of our consultants who works with Mr. McFerren, not a

testifying person.

THE COURT: Okay. All right. And the name?

MR. MIZOGUCHI:

JoAnn Coleman.

THE COURT: All right. Thank you. All right. Let's ask your question again, and Mr. Lannen can answer.

MR. MIZOGUCHI: I think the last question was once you have put back on to the peeled-back existing causeway area the lower level core, and blue and brick-colored stone, and you put back on finally all the new B22, you cannot put back into the same area with the new spur jutting into it all the A1 rock that was removed for the peel-back, right?

THE WITNESS: I'm not sure I'd tell you that right now. What was excavated out of the peel-back would have had been measured on its original surface, take that rock out, measure the next surface down to determine what existed as an actual quantity per layer. That was never a requirement of the Corps, nor did Kiewit/Manson ever do that.

BY MR. MIZOGUCHI:

Q Okay. You can go back to your seat. Let's keep that final design document.

A Well, excuse me?

Q The final design slides present.
A Okay. Am I supposed to have those somewhere?
THE COURT: You do somewhere, but we'll get you another set.
MR. MIZOGUCHI: I'll give you mine.
THE WITNESS: Okay.
BY MR. MIZOGUCHI:
Q The final design slide one where the new spur breakwater is depicted on a picture at the existing causeway.
A The document we just looked at, yes.
Q Yes, sir. Where the brown insert is for the new spur construction, almost by definition, that is displacing what used to be a 15-foot-wide A1 armor stone rock that was at the nose of the causeway, correct?
A It is displacing rock that was there before.
Q And if you turn to Slide No. 2 on the final design package, Mr. Harrison's slide, do you see a picture of the causeway before construction with all the A22 around it?
A I see it with A1 around it.
Q Or A1, right. And it's that A1 that was peeled back that is being displaced in part by the new

spur construction?
A Yes.
THE COURT: Mr. Mizoguchi, we've gone about two hours. You might want to find a spot just to take a 10-minute break.
MR. MIZOGUCHI: All right. Yes, Your Honor.
THE COURT: Whenever it's convenient.
MR. MIZOGUCHI: We can do it now, Your Honor, or it could just take me just one minute to run through the rest of these and illustrate the rest of the point.
THE COURT: Yes. Why don't you finish up. Yes.
BY MR. MIZOGUCHI:
Q And Slide 3, that's a picture of the causeway work underway with the peeled-back area exposed and there's work in this opening of a new spur?
A That's correct.
Q And then if you turn finally to Slide 4 it says spur BW-plans, and this, too, illustrates how the new spur goes into the existing causeway displacing some of what was the existing A1 rock that got peeled back?
A Well, I believe this is, somebody copied the

picture off the plans into a PowerPoint to show where the spur actually is to be built.

Q But you see the spur jutting in there. Obviously when it's built that existing A1 rock that was peeled back can't fit back in there.

A I don't think this drawing shows me anything jutting in. Not denying the fact that the spur attached to that causeway, but this drawing doesn't depict that very well.

MR. MIZOGUCHI: Your Honor, this would be a good time to take that break.

THE COURT: All right. Why don't we do a 10 minute break. You may step down. We'll be back in 10 minutes.

(Whereupon, a short recess was taken.)

THE COURT: Go ahead and be seated. Go ahead, Mr. Mizoguchi.

MR. MIZOGUCHI: Thank you, Your Honor.

BY MR. MIZOGUCHI:

Q Mr. Lannen, please turn to JX10, drawing exhibit EX-3, Bates 98.

A Okay.

Q Are you there?

A I am there.

Q All right. The top most schedule, the

cross-section of the existing causeway, and can you illustrate for the Court where and what elevation the new spur causeway ties in with this picture, if indicated?

THE COURT: When you say this picture, you're talking about?

MR. MIZOGUCHI: I'm sorry, EX-3, Bates 98, Your Honor. This is a package that Kiewit prepared in connection with its proposal, is that correct, or received with the contract documents?

THE WITNESS: Bates 98, Reference Sheet No. EX-3, is a drawing providing by the Army Corps of Engineers.

BY MR. MIZOGUCHI:

Q Okay. And this is supposed to depict the existing conditions at the causeway, the cross-section?

THE COURT: I'm not sure that we're all looking at the same sheet.

MR. MIZOGUCHI: I'm looking at EX --

THE COURT: Yes. No. Okay. All right. We're good.

MR. MIZOGUCHI: The top section. You see a bunch of big rock on top and a slope down to the bottom.

THE WITNESS: I see Section I.

BY MR. MIZOGUCHI:

Q Okay. I'd like you to just confirm for us that where the new spur ties into what was the existing A22 layer -- in fact, let's look at that A22 layer. You see some boulders on top in this cross-section and in the bottom and there's a white space in between?

A I see that.

Q Does that approximate where the new spur is coming in, the white space?

A No.

Q No. Okay.

A The drawing, EX-3, as held in your hand and that I'm looking at, was prepared in 1989, and so it's an as-built from 1989. That's all it is. There's no reference to where the spur ties in, nothing else on this drawing.

Q I understand. Do you understand the top of A22 that's coming in from the new spur construction to be at Elevation 14C?

A Would you like me to check that? I'd need to turn back to another section.

Q If you must.

A Because it's not on this plan sheet, right?

MR. MIZOGUCHI: Right.
THE COURT: Just tell us when you do which section you're looking at.
THE WITNESS: Sure. Bates 83, Reference Sheet No. H5, Cross-Section G, tells you that you'll build the top of the new spur to Elevation 14.
BY MR. MIZOGUCHI:
Q Okay. But going back to EX-3, Bates 98, could you depict for the Court on that top cross-section approximately where the top of the new spur is breaking into, or rather, at least meeting, the old causeway given that it comes in --
A I'm not to draw on this, am I?
THE COURT: You can. Well, actually, you would need a clean set.
THE WITNESS: If you will, this says Elevation 13.
MR. MIZOGUCHI: May I approach so I can see it?
THE COURT: Sure. Absolutely.
THE WITNESS: Sure.
THE COURT: Mr. Martin, you're free to come up as well.
THE WITNESS: I believe this says Elevation 13.

THE COURT: All right. I'm sorry, I'm not with you. This is the back of 3?

THE WITNESS: I believe that is.

THE COURT: Yes, I think it is. Yes. Okay

MR. MIZOGUCHI: Highlighted area right here.

THE COURT: All right. I got it.

THE WITNESS: And the other is Elevation 28, so it would tie-in one foot above that layer.

BY MR. MIZOGUCHI:

Q So the top of the new spur is coming in at Elevation 14 just above that Elevation 13?

A One foot above.

Q Right. And that's the new spur. And this existing layer of A22 is approximately how thick? Fifteen feet?

A It says on this drawing Class A1 rock, that's 15 foot thick.

Q And that's the existing layer that you have to take out, right? Peel-back?

A Yeah. This is an as-built of what the existing A1 rock was supposed to be in 1989.

Q And the new B22 and core materials would actually be how much lower down? About 15 feet lower down than the new A22 layer that comes in, 15 feet below the top of the new spur, which we said was

Elevation 14, that would be where the B22 is filling in, correct?

A Well, yes. We'd have to reference back to that same cross-section which told you that. You're trying to get an elevation again?

Q I'm trying to depict approximately where the spur is displacing the former --

A Atop of the B22 layer would be at -1 elevation.

Q And so, again, indicating on EX-3, Bates 98, for the Court, where would that be?

A Well, you can also see on that drawing an Elevation +3 if you looked here to the side, so it would be four feet below that.

Q And that's where the B22 starts?

A That's correct.

Q And then B22 fills how deep a layer?

A Per *G*, H5, 7-foot.

Q And underneath that would be the new core filter material in the spur?

A That's right.

THE COURT: Mr. Martin, once again, I am very grateful for these blowups. You can barely see it on this, so thank you.

BY MR. MIZOGUCHI:

Q All right. Thank you. You can put those down. Now, during your illustration of the construction of new spur you indicated that on the new A22 piece there was a piece at the right-hand side of the existing breakwater that was for convenience. Do you recall that?

A Yes.

Q And when you say for convenience, you mean Kiewit did it without charging the government?

A That's correct.

Q Okay. Does that show up in your estimate?

A That is correct, yes.

Q It does. Okay. Can you show us where in your estimate? JX230, would that be where we want to go?

A Well, I don't remember all the exhibit numbers.

Q That's -- one of the Kiewit estimates that we've been talking about. Is there a particular line item we would look up to see that?

A Yes.

Q Which one is that? Is it CLIN 8?

A Well, I'm going to look real quick.

Q Okay. And just to help you, I believe you'll find CLIN 8 at Bates 3331. That's the peel-

back causeway rock for construction item summary.

A Bates 3331 is the item summary for peel-back causeway rock construction, and that is where we carried the cost for nonbillable rock to the government.

Q I see. Could you indicate more specifically on this estimate where there is actually rock-placement cost in the peel-back, contract line item number?

A Contract Line Item No. 8, sir?

Q Yes. Bates 3331.

A Equipment page 100, place with 1,800 A5. That's the place and the page used.

Q And so that's 1,000 cubic yards of A5 stone?

A No, it's stuffed into this to represent any stone that was required to replace for convenience.

Q I see. When you say stuffed in, what do you mean by stuffed in?

A Well, every time you do an equipment page, every time you type one in, sometimes for convenience because we're not all fast typers, if one has the correct equipment and maybe it was named something different, we use it again and again. So page 100 was used here as the placement page for 1,000 yards of convenient stone. There is no A5 stone to go anywhere

on this peel-back area.

Q So is that really talking about A22 stone?

A It's talking about any stone that we removed for convenience that was required to go back. Most of it's A22 stone.

Q Okay. When you say any stone that we had to remove, was it more than this piece here?

A If you pick that piece up there's a small layer that fits underneath. We stripped some gravel out when we made the ramp out of the existing causeway, a very small amount, so it would be replacing A1 stone, not A22 stone.

Q And A1 is the old --

A The old stone. That's A1 and B1.

Q And that's what under the contract Kiewit was charging to put A22 in in filling back in the peel-back area, is that correct?

A No.

Q No? It's just being returned under?

A It's being returned where we excavated for what we believed was our convenience at the time of the estimate, not for filling, I don't know what you said, something different.

Q So at least to that extent Kiewit prior to award planned to return the seawall without charging

the government, correct?

A Planned to return a convenience area, yes. That section was not depicted on the drawing.

Q And that planned return without charging the government extra, because I guess CLIN 8 is a lump-sum item, right, that placement of stone was contemplated by Kiewit as a contract requirement under Contract Line Item No. 8 in formulating its proposal, correct?

A Well, what was contemplated under this is that if we removed stone outside the limits of what had to be peeled back it would be required to be put back on us under the lump-sum item. So it would be our cost for doing anything outside the limits of work.

Q And those limits of work, you understood what those were prior to award obviously because you're making these estimates prior to award, correct?

A Well, we were assuming what they were.

Q Do you know approximately when Kiewit came to have an understanding that it would need to reflect stone placement under Contract Line Item No. 8, the one job lump-sum portion of the bid that is set forth in JX231?

A When we discussed what we would need for room we talked about our trucks turning, if you will,

on the model and that some of that extra stone may need to be rehandled to get out of our way so we had a work area, if you will, so in the estimating phase.

Q Now, on the estimate you worked with Mr. Pat Harrison?

A That is correct.

Q And Mr., is it Robert Brauchle?

A John.

Q John, sorry. John Brauchle?

A That's correct.

Q Okay. And you understand Mr. Harrison to be a competent estimator?

A Yeah.

Q How about Mr. Brauchle? Also a competent estimator?

A Mr. Brauchle was not an estimator. He did perform takeoff work and did engineering tasks.

Q Which were used for the estimate of Kiewit on this project?

A Somewhere and someone.

Q Okay. If Kiewit kept them in this estimate book file, chances are Kiewit considered them worth relying upon?

A No.

Q No?

A No. We keep everything. Every single piece of paper that we generate we stuff into the book. It doesn't mean that you use them. It means at one point in time you looked at them, and reviewed them and said, okay, is this right? Maybe I need to change it and go to something else.

Q And if Mr. Harrison picked up an estimate of Mr. Brauchle's and used it would that indicate it was reliable? He used it in your Kiewit book.

A For what purpose?

Q To estimate quantities on the project in formulating your bid.

A I'm not sure I understand your question.

Q Well, let's go to the documents. Now, these item summaries, like the Item 8, peel-back causeway rock for construction, these typewritten tables, I believe you and Mr. Harrison input the figures obtained in these item summaries, correct?

A That's correct.

Q Now, let's go to JX230, Bates page 3534.

A Okay.

MR. MIZOGUCHI: That should be in the second volume.

THE COURT: Well, it's not a second volume, it's a totally different exhibit if it's Volume 2.

There's a second volume to this one. All right.

THE WITNESS: Uh-huh.

BY MR. MIZOGUCHI:

Q And are you there?

A I am.

Q You are there?

A I am there.

Q Did I give you Bates 3534?

A You did, sir.

Q Okay. Good. Now, that is a document that's captioned worksheet, and if you look in the middle of the page where it says estimator, that's John Brauchle's initials?

A I believe those are John's initials.

Q And do you recognize it to be John Brauchle's work?

A I sure would think it is since his initials are on it.

Q And this depicts and it's some drawings about the spur breakwater, A22 quantities and calculations, correct?

A He says peel-back existing causeway.

Q I'm sorry. Right. You're right. I'm on the wrong page. Yes. So 3534, the worksheet's got John Brauchle's initials, captioned peel-back existing

causeway rock and asking dimensions and calculations on here. Do you see that?

A I do see those.

Q If you look about part of the way down you see a *V*, which I take it is volume, equals, and some calculations that end up with a figure of 10,000 cubic yards. Do you see that?

A I do see that.

Q And that's A22 stone, right?

A No.

Q No. That's what's called A1?

A It's existing stone to be removed off the causeway.

Q If you look near right under where it says peel-back existing causeway rock, do you see the figure A22?

A I see that's written there.

Q And then look at the dimensions on that drawing of Mr. Brauchle's on the left, and then look at the calculations below that, and you'll see the calculations below that appear to relate to that top layer Mr. Brauchle has drawn of A22. Do you see that?

A I see that.

Q And then when you run through those calculations you get to a volume figure of 10,000

cubic yards of A22. Do you see that?

A I see that there is calculations that lead somebody to a volume of 10,000 yards.

Q Okay. And then if you'll turn to page 3526 of this same book.

A Uh-huh. 3526?

Q Yes, sir. And just like 3534, this one is captioned peel-back causeway rock, only it's called a quantity survey sheet.

A Uh-huh.

Q And then for A22 you have a cubic yard figure of 10,000.

A That's what's listed on the sheet.

Q And that's Pat Harrison's initials there, right?

A That's correct.

Q 7/24/03 is the date?

A Uh-huh.

Q All right. And that 10,000 cubic yards of A22, that corresponds to Mr. Brauchle's workup of a volume calculation on Bates 3534, correct?

A I do not know that.

Q You do not know that, but are they not the same A22 figures?

A It's the same number.

Q All right. Now, let's look at Bates 3526. There's an entry right below the 10,000 for 4,667 cubic yards. It's listed as B-8, 210.

A I see that.

Q And then if you go back to Bates 3534 there's another volume calculation of the layer underneath the A22 that gets peeled back at the bottom of the page, and if you read left to right it calculates out there to 4,667 cubic yards. Do you see that?

A I see that.

Q So does that indicate to you then that Mr. Harrison and Mr. Brauchle are on the same page here on estimating the volumes of peel-back for A22 and B-8?

A I would tell you that on 7/24/03 Pat has the same number as John.

Q Now, if you'll turn to B3535, which is the next page, also the estimator, again, that's John Brauchle, right, on this worksheet?

A Yes, sir.

Q And on this one Mr. Brauchle as well has drawn a figure. He's entered some dimensions and some calculations for volume. See that?

A Uh-huh.

Q And do you recognize this to be the

calculation of the volume for the new spur breakwater, A22 stone?

A Huh. I recognize it to say spur breakwater. I don't recognize it to be volumes for any until I go through and check the work, if you will. It's also a vertical depiction core instead of a cross-sectional calculation.

Q Looking at the drawing and the dimensions, does that appear to you to be the new spur breakwater construction area in which A22 rock will be going in?

A Based on the dimensions. I'd have to scale this drawing.

Q You're saying you can't tell whether that's the new spur breakwater construction?

A It says bullnose, it's similarly shaped, but unless you put a scale to it and try to do a bunch of engineering work I don't want to testify that it is what you're claiming it is.

Q All right. Let's just take note of the fact that on about three-quarters of the way down this page there are calculations that appear to relate by number. You'll see an A1, A2, A3, A4, A5, and there are dimensions. For example, let's look at A3 about halfway down the page, A3 equals 116 feet, do you see that?

A Yes.
Q And then if you look at the drawing, where there's a square there at the top, it says Bates No. 3, do you see that?
A Yes.
Q On the top of that square it says 116 feet, and then going back to the A6 calculation there is the figure 166 feet, do you see that?
A Yes.
Q And we go back up to the drawing, No. 3, and it says 166 feet. So -- calculating an area in space No 3?
A He is calculating a surface area as you would look in plan view, like from out of an airplane looking directly down on top of it.
Q And then I think you, you know, I'm happy to let you take the time and satisfy yourself, but if you look at each one of these numbered areas, they correspond to Mr. Brauchle's calculations of the area below. Do you see that?
A Okay.
Q Do you have any reason to doubt that is the case?
(Pause.)
A No, I don't. There's unnumbered areas on

the drawing. So I agree that for every number, 1, 2, 3, 4 and 5, on the drawing you asked me to look at he has done an area takeoff.

Q Right. And this is, again, Bates 3535. Now, let's look beneath the area calculations. There's a calculation called *V* equals. Do you see it sums up the areas which were summed to 32,285 square feet and it multiplies it by 15 feet. You see that?

A I do.

Q Now, 15 feet was the standard thickness of A22 layers, correct?

A Correct.

Q So if you multiply the area times the thickness you should get a volume calculation, right?

A You'd get a rough one, but you're ignoring the average end area principle for this job. The other thing is his *V* adds in A1, A2, A3, A4, but there's still some missing components.

Q Then look right below the *V*. There's a *V* total calculation. Do you see that?

A I do.

Q So it takes the A1, two, three, four, five figure of 17,936 cubic yards and it adds to that a figure of 6,666 cubic yards. Do you see that?

A I do.

Q Doesn't that represent the full amounts volume?
A That's what it says up above.
Q Right. So you add all that together and you get the 27,129 cubic yards?
A No. If you add 17,936 and 6,666 --
Q That's less the 2,527, right.
A Okay. Those numbers do add to 27,129.
Q Right. Keep that 27,129 in mind and turn back to Bates page 3523. Are you there, sir?
A I am.
Q That's the quantity survey sheet I was asking Mr. Harrison about on the first day of trial. Do you recall that?
A Okay.
Q Okay. Well, it does say estimated by PH there, right?
A Yes, it does.
Q In then in the row for A22, this is a sheet dated July 24, 2003, look across to the column square cubic yards, you see that, there appears the same 27,129 figure as we get looking at Mr. Brauchle's calculations, correct?
A That's correct.
Q All right. In fact, this Bates 3523, the

Pat Harrison summary of all the quantities of A22, you would need for the job under CLIN 6, Contract Line Item 6, right?

A On 7/24/03 this was his estimated quantity.

Q Right.

A His summary, if you will.

Q And then if you look to the right there's that subtotal of 44,787.

A That's correct.

Q Right. And then there's a column for the Corps' 30,600. That was a sum that is on the Corps' proposal schedule, again, to which offerors were to bid, correct?

A That's correct.

Q All right. And we could see that if we went to JX231, right?

A I'm sure we could find it.

Q And this is the calculation of quantities that prompted you to call Gail West on July 25, right?

A I believe it is.

Q And if you just look down the page you see, it's kind of askew, but the second column from the bottom is B-22, do you see that?

A Okay.

Q And then if you look under the third column

you see a quantity of 18,570 cubic yards?
A Yes.
Q And then if you flip back to Mr. Brauchle's calculations on Bates 3535 you will see the same figure of 18,570 cubic yards, correct?
A Correct.
Q So it looks like Mr. Harrison is getting his calculation of the volume of A22 and A22 from Mr. Brauchle, right?
A That is correct.
Q Relying on that, you call Gail West at the Corps on the next day, right, July 25, 2003?
A Yes.
Q Okay. So you considered Mr. Brauchle's calculations sufficiently reliable to call the Corps about them, correct?
A I considered the calculations provided from Pat to be reliable enough to have a bid inquiry, yes.
MR. MIZOGUCHI: Let's go back to Bates 3534, please.
THE COURT: Still in exhibit --
MR. MIZOGUCHI: Same book, Your Honor.
THE COURT: Exhibit number, just for the record?
MR. MIZOGUCHI: 230. I'm sorry.

THE COURT: Thank you.

MR. MIZOGUCHI: Volume 7 of eight.

BY MR. MIZOGUCHI:

Q That's Mr. Brauchle's peel-back existing causeway scheduling calculations. You see that?

A It says peel back existing causeway rock.

Q Right. And we were talking about that drawing on the left of the layers of A22 and B22. I just want to ask you quickly about that other drawing to the right. It looks like some concentric *U*-shaped figures. Do you see that?

A Yes.

Q Is that a rough depiction of the end of the existing causeway?

A I didn't draw it. I'm assuming that's what it is.

Q That what it looks like to you?

A Yeah.

Q It's a plan drawing of the end of the existing causeway looking down from above, correct?

A I wouldn't call it a plan drawing. I would call it maybe a plan sketch. It's a very rudimentary sketch at best.

Q All right. And it just looks like, you tell me if you disagree, what Mr. Brauchle is depicting

with that 76-degree, pie-shaped piece that that is roughly the area of the peel-back, correct?

A Yes.

MR. MIZOGUCHI: And the middle of the three concentric *U*s, as I call them -- may I approach just to make sure we're all talking about the same thing?

THE COURT: Yes.

MR. MIZOGUCHI: Mr. Martin, I'll show you what I've got there.

MR. MARTIN: Okay.

BY MR. MIZOGUCHI:

Q The middle of the existing concentric *U*s, which I've highlighted on my copy of Bates 3534, I want to ask you about that. That represents the seawall?

A If you go from one drawing to the other, it could. It's not labeled, so rough logic would make you think it is.

Q Can you see on the drawing on the left what the elevation is at the top of this area of removal? What does that say there, that elevation?

A I don't know if that's an elevation.

Q It seems to say EL: Does that make sense to you?

A Where does it say EL:?

Q Right there, sir. The drawing on the left it says 24 feet, and then to the right of that it says EL:

A 2, 8.

Q 2, 8, it looks like. That make sense to you?

A That looks like EL: 28 to me.

Q Does that correspond to the existing conditions of the causeway?

A We have to go back to EX-3 and that would match Section I, Bates page 98.

Q I'm sorry, sir. Can you just tell us where you are?

A Yeah, Bates page 98.

Q Bates page 98, which exhibit?

A JX10.

Q JX10.

A I thought you wanted me to confirm this.

Q I do.

A Okay. So in JX10, the plan, EX-3, the 1989 as-built showed an elevation of 28, and on here it says EL: 28.

Q You can put that down now.

A Which? Both?

Q Well, at least the drawings. Okay. Let's

go to JX230, Bates 3329. It's the same book we've been in. It may be the other one. I'm sorry.

A 3329?

Q Yes. That's one of the same item summaries we looked at earlier. This one is Item Summary 6, construct main breakwater, A22. Are you there?

A I am there, sir.

Q And this is Bates page 3329. We were looking at this, take a look at, among other things, the mining of stone and the salvage A22 rock, just earlier today. My question for you is this. On the left-hand column under Mines, you see where it says plug-PM? What is that a reference to?

A It references a placeholder that you can put in your estimate. There are three types of placeholders in our estimate where you can go in and put in a placeholder or carrier of cost. The other ones you'd see if you turned to a different one, it would say plug-sub or plug-ST&S.

Q Plug-PM is what, again?

A Permanent material.

Q And permanent material is things like rock?

A Rock.

MR. MIZOGUCHI: Okay. Well, that does sound permanent.

THE COURT: You know they've been moving rock around the whole time in this case. Not so permanent.

THE WITNESS: And the reason for the three separate types of plugs is not in Alaska but in other places that we do bids there's different taxable requirements for a sub. ST&S is small tools and supplies or miscellaneous items. When you're closing your bid, on that bid day you might be able to adjust the taxes, if you will.

BY MR. MIZOGUCHI:

Q Now, to the right of the plug entry under operation, it says sell the J22 stone from peel spur with 10 percent loss. Then it goes on to say quantity, 4,350 cubic yards. Are we to understand that this figure represents an estimate that whatever A22 stone Kiewit expected to salvage from the peel-back area that it would, after a 10-percent loss, end up with 4,350 cubic yards?

A No.

Q What does it represent?

A It represents the salvage quantity we thought we would get out of the total peel-back, 4,350 yards. There's another sheet that summarizes all the quantities that we did with Chuck to our bid review

that gets you to that number. So the plug may be descriptive typing that describes -- the plug-PM may not be clear to you but the yardage used comes directly from direction from Mr. Nylund.

Q Now, you were at Mr. Nylund's deposition, were you not?

A I was.

Q Do you recall that Mr. Nylund said he did not do those estimates?

A No, that is the Chuck Nylund page. I don't recall him saying that he did not make that summary sheet.

Q Is it your testimony that Mr. Nylund did that 4,350 cubic yard calculation?

A Not necessarily a calculation, it's a matter of risk. The volume extracted at the end of the spur was hauled to the beach. The rock had been there since prior to 1989 where it could suffer breakage and loss. So the value given to the government, it's still a quantity, but it's quantified by 4,350 yards.

That does not mean that's what came off the end of the spur. It means what we thought could go back and still be in the spec range of an A22 stone. Some of it could have been bigger, some of it could have been broken and been smaller.

Q And the 10-percent loss refers to the expected breakage?

A No.

Q What does it refer to?

A If we go back through the genesis of this whole number it starts with Pat Harrison assuming he had a 10-percent loss. I assumed a number higher than that NOR. In that bid review Chuck told us both that we would never get that high of a number, okay, so we put in 4,350 yards as the total salvage credit to the government for CLIN 6.

Q Right. And that comes from the peel-back area, correct, the salvage?

A That is correct. Yes.

Q And so that is the amount of the credit you gave to the government in pricing Contract Line Item No. 6?

A Yes.

Q Which is a unit-quantity-priced item, correct?

A Correct.

Q In contrast with Line Item No. 8, which is a lump-sum job, but a peel-back?

A Yes.

Q Now, the calculation of the 4,350 cubic

yards that you attribute to Mr. Nylund, does that appear in his estimate book?

A Yes.

Q Where is it?

A Well, that might be a while, but I'll start looking. I can roll right to it.

Q Perhaps I could save the Court some time.

A I have it.

Q Good. Okay.

A In that same exhibit that we're in, 3512 is the Bates number.

Q 3512.

A 3-5-1-2.

Q That is in the next volume, then?

A Well, it's still the same exhibit number.

Q Right, but it's the second volume I think.

A Yes, it's the next volume.

Q You were talking about this on direct testimony, right?

A Right.

Q And you say this was Mr. Nylund's work?

A That is Chuck Nylund's work.

Q Okay. There's not a number in there that breaks down the 4,350 cubic yards calculation.

A There's no number on Mr. Harrison's sheet

either, but this lists the salvage quantity to be put in Bid Item 6. Item 6, go across the sheet to the second, third, fourth column, SAL, salvage, 4,350.

Q But there's no, as far as you know, detailed breakout of how one gets to the 4,350?

A You cannot calculate how much rock will break after you haul it to a beach via a piece of paper, okay? Nor can you calculate how much is still left on the end of that breakwater from a 1989 drawing.

You can hopefully estimate how much you have to remove, but however you handle it, once you haul it to the beach, sort it into the appropriate size and comes back, it's pretty much a guess. That's the direction Mr. Nylund provided us.

Q I understand. So the, 4,350 cubic yards of salvage for Item 6 is essentially an estimate of the quantity of A22 you would be able to reuse for that contract line item?

A That's correct. Amount that would be used good enough to reuse.

(Pause.)

Q And just back on Bates 3329, which was the item summary for Item 6, the A22 estimate, if it turned out that the estimated quantity of salvage was

too low and that with the variation in quantity there was a greater amount of salvage of A22 that was obtained, that variation in quantity would result in a lower cost per unit to Kiewit versus mining, which, as we saw, mining is like 90 percent of the cost of delivering nonsalvaged A22 stone, correct?

A Could you restate that again, please?

Q Yes. I'm sorry. That got pretty long-winded.

A I think you said something backwards than you wanted to say.

Q If you were to actually obtain more in salvage of A22 rock that you could use on this project, if you only credited the government 4,300 cubic yards, but let's say you obtained 10,000, what effect does that have on the unit price?

A It doesn't affect the unit price. The unit price was provided in the bid schedule --

Q What effect does it have on profit to Kiewit?

A Well, it would increase our profit. It's part of the risk. The government chose the bid items that they put in the bid schedule. The bid schedule could have been a lot different. It could have said I'll pay you by the yard to dig the spur, and then I

want to weigh the rock as it comes back so it's tracked accurately, therefore taking the risk away from the contractor.

The bid schedule didn't do that so the risk was solely on the contractor. If we salvaged more, the government conveyed via the bid schedule that the gain was to us. If we salvaged less, the risk was to us, okay?

Q Remember at the start of the day I took you through those quantity sheets?

A Yeah.

Q And it showed 10,000 cubic yards of A22 salvage?

A No, it said 10,000 of excavation.

Q Now, remember those sheets, and we can go there, but it's --

THE COURT: Well, if you have a question let's go to the sheet rather than making him remember it. There's been a lot of information here.

MR. MIZOGUCHI: All right. Let's go to DX2022.

THE COURT: I'm sorry, exhibit number?

MR. MIZOGUCHI: DX2022, Your Honor. In fact, I think I neglected to admit that into evidence, so I'd like to move its admission.

MR. MARTIN: The sheet or the sum of the sheets, counsel?

MR. MIZOGUCHI: The DX2022, counsel.

THE COURT: It is admitted.

MR. MIZOGUCHI: It is admitted.

THE COURT: Yes.

MR. MIZOGUCHI: Thank you, Your Honor.

THE WITNESS: Okay. We're talking about quantity sheets out of a quantity book from the project.

BY MR. MIZOGUCHI:

Q Right, and remember at the beginning of the day I was asking you to look at that calculation of the total and you were explaining --

A Can you tell me the Bates number, please?

Q Yes. Just a sec.

A Is it 42981?

Q 42981. This was the end of the job, well, as of 9/1/2006 quantity sheet. Recall that?

A Yes.

Q And we looked at the neat line?

A Yes, sir.

Q Looked at the pay item. There was a subtraction of the amount of A22 that was salvaged, right, 8,337 cubic yards, and then you end up with a

37,000 cubic yard figure, right?

A On this sheet that math does show that, as I explained earlier, the neat line is a surveyed number, the salvaged number carries no quantity computation, it's just purely a guesstimate, the stockpiles on the beach were not surveyed for accurate quantities.

Q But it's Kiewit's estimate, right, of the salvage that it was able to use A22 rock?

A Yes.

Q You're ont aware of any material inaccuracy, are you, in Kiewit's quantity sheet record?

A No, sir, I'm not aware of any inaccuracy. I'm explaining that there's a difference between a surveyed item with detailed computations and a guesstimate that's based on salvage.

Q Now, all else held constant, if the amount of salvaged A22 stone from the peel spur turned out to be more than 4,350 cubic yards, doesn't that lower the cost to Kiewit of providing A22 stone to construct the spur breakwater or the main breakwater relative to having to mine that stone?

A What all else held constant are you referring to?

Q Everything else was held constant. The only difference is instead of it being a mined rock, it's a

salvaged rock.
A Salvaged rock is less expensive than mined rock. Is that your question?
Q In fact, it's free, isn't it?
A No. How would it be free?
Q Well, it's free of mining costs. Let's put it that way. Salvaged rock that you supply under CLIN 6 is free of mining costs, correct?
A That's correct. Are we done with this 20?
Q 2022? Yes, sir. Now, at the beginning of the day we took a look at the part of your request for equitable adjustment and quantities, and remember I pointed out or asked you about the fact that there is a section in there that discusses the variation in estimated quantities clause?
A I do.
Q I think you agreed that indeed that contract clause at least is in your known project contract, right?
A I agree.
Q Your understanding, you can point to the claim if you'd like but I'll just ask you first, your understanding of the way in which the variation in estimated quantities clause works is that it allowed, I think you testified about this earlier today, it's

possible change in the contract price up or down based on actual cost --

A Depending on who's requesting, yes.

Q Right. But the purpose of it, I take it, is in the event of a variation in estimated quantities in excess of, is the figure 15 percent in either direction?

A For this contract. Up, it's 15 percent.

Q All right. Let's back up. In the event that happens, what is supposed to happen is that the contract's unit price can be adjusted to reflect the actual cost incurred in light of this variation in quantities, correct?

MR. MARTIN: Objection, Your Honor. We're really in a legal category now. The key clause is of course the FAR, and the question, I can assure the Court, does not include all of the elements that go into whether or not there is a price adjustment. It has a clause based solely on the change that is not part of the question, and I think we're traveling into that area.

THE COURT: What's your response?

MR. MIZOGUCHI: Well, I'm essentially about to ask the witness what his understanding is of how that clause works in this contract.

THE COURT: Okay. Understanding that you can't testify, nor is it more than an opinion at this point, let's go ahead and do that. What I'm talking about is what you've just said. You've just articulated a theory but that's part of the debate that will occur later on, but ask him the question.

MR. MIZOGUCHI: Is it your understanding, and feel free to add to it outside the confines of the way in which I pose my question, that basically the way the variation in estimated quantities clause of the Nome project contract works is that once you have a variation in quantity in excess of 15 percent the parties to that contract can seek an adjustment in the pricing of the unit priced item to be based not on the existing contract price but rather on an actual cost figure plus reasonable profit that reflects the variation in quantities?

THE WITNESS: It is my understanding that either side once you reach the 15 percent can request a change in the price.

BY MR. MIZOGUCHI:

Q Based on actual cost experience with the variation in quantities?

A You would follow the whole clause per the contract.

MR. MIZOGUCHI: Your Honor, I can continue. This particular line of questioning could go a bit further. Would this be a reasonable place to break?

THE COURT: Well, what are you talking about a good bit further? I'd rather get through a chunk. It's, I think more convenient to keep going for a while.

MR. MIZOGUCHI: I'd say this subject, probably inside of half an hour.

THE COURT: Keep going.

BY MR. MIZOGUCHI:

Q Let's turn to PX1035. PX1035 is the Plaintiff's claim summary, correct?

A Correct.

Q And under the A22 entry, second row from the top, Kiewit claims an unpaid quantity of 10,505 cubic yards to date, correct?

A That's correct.

Q Now, in the total quantities that Kiewit has incurred, if you look in the as-built column, KM as-built cubic yards --

A Yes, sir?

Q -- for CLIN 6, A22, $308 bid price, just walking left to right, original bid quantity was 30,600 cubic yards, and the incurred quantity, I guess

I should use the as-built term, the as-built quantity is 46,118, correct?
A That's correct.
Q Now, 46,118 is more than 15 percent higher than 30,600, isn't it?
A Yes.
Q In fact, it's a little more than 50 percent higher, isn't it?
A Would you like me to do that math?
Q That's a good idea.
A It's a good idea for me to do the math?
Q Yes, so we have a precise figure.
A Okay.
Q I've done the math but we need your testimony.
A Okay. Fifty percent.
Q Thank you. So is it fair to say on this item, the A22 item, the variation in estimated quantities clause would be applicable?
A If requested by either party. During the progress of the work it was never requested from the Corps of Engineers.
Q I'm going to ask you to do the same exercise with B22, CLIN 13.
A Excuse me?

Q I'm going to ask you to do the same exercise, so let's look at CLIN 13, and that's the B22 rock, bid price $65, and we're looking at PX1035. Original bid quantity 20,600. Do you see that?

A I do see that.

Q Okay. And in the KM as-built cubic yards it's 32,970.

A I see that.

Q All right. I'll ask you to please do the same exercise and tell me how much the as-built cubic yards reported by Kiewit/Manson exceeds the original bid quantity for this contract?

A Sixty percent.

Q And that's the 32,970 divided by 20,600?

A That's correct.

Q And, again, with respect to that item the actual quantities have varied by considerably more, 60 percent more, than the 15-percent trigger for the variation in estimated quantities clause?

A No.

Q No? It's not more than 15 percent more?

A It is more than 15 percent more, but I don't believe that's what I heard you say unless I heard you incorrectly.

Q All I'm asking is does 32,970 exceed the 15

percent more, or it is more than 15 percent of 20,600, correct?

A Yes.

Q Now, under your understanding of the variation in estimated quantities clause, assuming it applies, given that both A22 and B22 actual quantities exceed the original contract quantities by 50 and 60 percent, respectively, there should be, if the clause is invoked, a reckoning, if you will, of the actual costs at these varied quantity levels, correct?

A reconciliation of the actual costs in pricing the new additional quantities once the variation in estimated quantities clause applies?

MR. MARTIN: Your Honor, I have to renew my objection. We're deep into a clause that's got a lot of law in it, and I realize he's asking about understanding, but I'm not sure we're fair to the witness at this point in understanding of how a contract operates versus an understanding of application of a FAR clause. Really are two different things.

THE COURT: I guess I'm willing to let Mr. Mizoguchi go some distance here just because we're so intimately involved in the process of claim and contact between Kiewit and the Corps. This witness

has demonstrated to me at least so far that he could handle himself pretty well, and if he doesn't understand he'll hopefully not be shy to say so in the future.

So a little bit longer but don't go on too long with this. If you're not getting what you want, you may just not get what you want.

MR. MIZOGUCHI: that's not the issue, Your Honor.

BY MR. MIZOGUCHI:

Q Well, we know you drafted the REA on quantities, right --

A I worked on the REA --

Q -- in which there is a section about the variation --

THE COURT: Don't interrupt him when he's answering, please. You said you worked on the REA?

THE WITNESS: I did, and I certified it.

THE COURT: Right.

BY MR. MIZOGUCHI:

Q And there's a section in there about the variation in quantities clause?

A There is.

Q So having certified it, I take it you understood it? That a yes?

A That's a yes. I mean, I don't want to go back and reread it now unless you want me to.

MR. MARTIN: If you went back and read it you'll see that there are citations to --

THE COURT: You can't testify either. Let him testify. We'll just strike that right now.

MR. MARTIN: Sorry, Your Honor.

THE COURT: I know you want to help your witness, but that's not where we're going. All right. Go ahead, Mr. Mizoguchi.

BY MR. MIZOGUCHI:

Q Now, I'm just asking you to do the math. I'm not asking you to agree with the implications of the math. On DX2022, and you can pull that back out if you'd like.

A Would you like me to look at it or do you want me just to run a --

Q I prefer you to look at it so there's no question about that we're looking at the same thing. That was page Bates 42981.

THE COURT: In exhibit?

MR. MIZOGUCHI: DX2022.

THE COURT: Okay.

MR. MIZOGUCHI: Are you there, sir?

THE WITNESS: I am.

BY MR. MIZOGUCHI:

Q All right. Now, again, I'm not asking you to agree with the implications of the math. See the salvage figure of 10,337 cubic yards there?

A I do.

Q Okay. Now, subtract from 10,337 cubic yards the 4,350 cubic yard plug that we saw in CLIN 6 of salvage. A22 stone from peel spur with 10 percent loss on Bates page 3329.

A Okay.

Q And how many more cubic yards -- well, what's the difference between those two figures?

A 5,987 is the difference.

Q Cubic yards. In fact, I'm going to ask you to do a little more math before we end the subject. If you'll take the 10,337 figure and tell me what percentage higher is that than the 4,350 figure in CLIN 6?

A That's 237 percent.

Q 237.6 percent?

A I haven't been giving you anything to decimal point, sir.

Q Do you see the .6 on that?

A I get 2.37 the way I do the math, but none of the other numbers I've given you are to the decimal

point.

Q 237 percent higher. Do you agree?

A Yes, sir.

MR. MIZOGUCHI: Your Honor, this would be a good place to --

THE COURT: No, it wouldn't. Keep going.

MR. MIZOGUCHI: But I did finish that subject that I told you about.

THE COURT: All right.

MR. MIZOGUCHI: Would you like to keep going?

THE COURT: I want to make some progress. We're not moving real fast. You keep wanting to break for lunch. We will break for lunch, we will not starve you, but we will keep going for a while because, frankly, it isn't a good time to break for lunch in part because it's so crowded.

We've had a break mid-morning, haven't been at it that long since that break.

THE WITNESS: Can I put the estimate one away or do I need it out?

THE COURT: Let's go off the record for a moment while you figure out what you're doing.

(Whereupon, a short recess was taken.)

BY MR. MIZOGUCHI:

Q Now, the CLIN 6, Contract Line Item No. 6, that involves mined rock, right, in part?

A In part.

Q And it's mined where?

A Cape Nome quarry.

Q And how far is that from the project site?

A Thirteen miles.

Q And is the cost of hauling the mined rock from the Nome quarry to the project site set forth in the CLIN 6 estimate that we were just looking at in JX230?

A The estimate for hauling the stone is set forth in that CLIN 6.

Q Can you point us to that? Would that be on Bates 3329?

A Yes, sir. The estimated cost, how do you want that? By the yard?

Q Why don't you give us the total and the per cubic yards.

A $218,113, or $8.31 a yard for a total quantity of 26,250 yards.

Q I gather that if you're talking about rock salvaged from a peel-back that's brought back to the beach stockpile you do not incur the haul big stone cost to bring rock from the quarry where it is mined,

is that correct?

A That would be correct.

Q Are there any other items on Item Summary 6 involving A22 that are not incurred for rock that is used from a salvage stockpile on the beach? For example, unload big stone, Entry 87, right under the haul big stone. Is that incurred to take rock off the I guess truck or something that hauls it from the quarry?

A That is incurred to remove the rock from the flatbed trailers that haul the large stone from the quarry.

Q Okay. And the cost figures for that are $37,488 total or .952 dollars per cubic yard?

A No.

Q No.

A .95 per ton. You'd have to divide the $37,488 by 26,250 to get the price per yard.

Q Could you do that for us, please?

A Yes, sir. $1.43, $1.42.8. It's $1.43.

Q $1.43 per cubic yard?

A Yes, sir.

Q Just walking down the list of operations, and the next one is LD/DMP/handle, which I understand to mean, I think we talked about this with Mr.

Harrison, load, dump and handle, is that correct?

A I would agree to that.

Q Okay. Now, that seems to be an operation that applies to everything because the quantity is 30,600.

A That's correct.

Q So whether it was hauled from the quarry or just, you know, salvaged off the beach from the peel-back, that's a cost that is incurred to handle the placement of rock, if you will?

A Correct.

Q And is the same true of the next item that says place 30,600 cubic yards?

A I would say that's correct, also.

Q And what about the tongs for 4,600, the next item, one lump sum?

A That's a special tool that would go against all rock placed.

Q And then finally Item 104, the haul 5-percent waste factor.

A That would go against all rock placed, 5 percent is applying to all rock.

Q That figure, 4,300, is that cubic yards?

A Yes, sir.

Q And what is the waste? Can you define that?

A That would be rock that leaves the beach no matter the source pile, if you will, and goes out to the zone of placement, and let's just say it's dropped by the crane and broken, and then it's no longer an A22 stone anymore. That's carting that stuff around.

Q Is that a one way waste factor? In other words, that's only the breakage that you're estimating when you bring it back from the beach to the placement or is it both ways, taking it off the peel-back --

A Has nothing to do with the peel-back.

Q Okay. So this is only the waste factor in Kiewit's estimate for bringing rock from the beach stockpile to the spot of placement?

A Spot of placement location, sir.

(Pause.)

Q Now, if I take the two operations that apply to all rock that's stockpiled on the beach, the load, dump, handle and the place, those are $4.13 and a half cents and $4.65 each, right?

A Yes.

Q Per cubic yard?

A Per cubic yard.

Q So that comes to $8.78 per cubic yard?

A You want me to check that again?

Q If you'd like, yes. Well, go ahead.

A $8.79 really.

Q Okay. And that's the incremental cost, if you will, of taking cubic yard of salvage rock from the beach and placing it on the end of the existing causeway for the construction of the spur?

A No.

Q No?

A No.

Q That is not the direct cost of moving the rock off the stockpile to the placement on the end of the spur?

A That's not what you said the first time.

Q Okay. Well, that's what I meant to ask.

THE COURT: All right. Let's get it straight. Ask your proper question so we don't have a mixed up record.

MR. MIZOGUCHI: The load, dump, handle and the place operations, which we previously agreed, I thought, were operations that applied to all rock, whether mined or salvaged, correct?

THE WITNESS: That is correct, sir.

BY MR. MIZOGUCHI:

Q All right. So once the rock is sitting on the beach that's salvage rock and hadn't been mined, hadn't been hauled, hadn't been unloaded, you take

that salvage rock off the beach stockpile, the direct cost estimated by Kiewit to put it into place on the end of the spur is $4.13 and a half cents plus $4.65 per cubic yard or a total of $8.78, correct?

A No.

Q What else --

A I would add in its proliferational cost of the tongs for the 4,600, and the expirational cost of the 5-percent waste factor, and those numbers added together would tell you how much we had in our estimate to transfer a stone sitting on the sand at the spit out to placement and have it placed.

Q So you would need to prorate the tongs and prorate the whole 5-percent waste factor across all the rock?

A Right. I think you asked me that earlier, and that's what I said.

Q Once you do that, do we now have the direct cost of moving a cubic yard of A22 salvage rock from the beach stockpile and placing it in the end of the causeway?

A You have the estimate for that.

Q Estimate of the direct cost for that?

A You don't have the direct cost. We could have done better or worse on the job. We would have

our estimate, though.

Q Mr. Lannen, if you were to prorate your estimate for the tongs and the waste factor in the same manner we just did over the load, dump and handle and place, can you give us the calculation you would arrive at for the tongs and the waste factor?

A Do you want me to tell you in words how to do it or to do the math?

Q I'd like you to tell us what you're doing, but also do the math, please.

A Under the total cost column, load, dump, handle, 19 ton, there's 126,518. So I'm going to add that number to 142,319, and I'm going to add that number to 40,000, and I'm going to add that number to 35,729 for a grand running total of 344,566. I would then divide that by 30,600 for the total stone to be placed and I'd get $11.26.

Q Per cubic yard?

A Per cubic yard, sir.

Q And that's both tongs and the waste factor?

A Yes, sir.

Q Now, if we wanted to -- strike that. The contract price for Contract Line Item No. 8 -- and let's turn to JX231.

THE COURT: Did you say 231?

MR. MIZOGUCHI: Yes, Your Honor. Are you there, sir?

THE WITNESS: I am there.

BY MR. MIZOGUCHI:

Q Okay. Contract price for Line Item 8, which is peel back causeway for spur breakwater construction complete, one job, lump sum is $595,500.

A That's correct.

Q And that was Kiewit's proposal to the government that was accepted and formed the basis of contract award for that item?

A For that item, correct.

Q And back on Bates No. 3331, I believe that is, in JX230, yes, Item 8, peel back causeway rock for construction.

A I put that away. What was the Bates number again, please?

Q I believe it's 3331. It's kind of stamped over some words, but I'm pretty sure that is it. It's former Bates No. CK109.

A All right.

Q And the direct cost for this item, CLIN Item 8, as estimated by Kiewit, was $99,355?

A $99,355.

Q Okay. The $99,355 was estimated to cover,

among other things, the cost of peeling back all the rock in this area of the existing causeway to allow the new spur construction to tie in to the existing causeway?

A It did include that.

Q And do you know when timewise Item Summary No. 8, and for that matter 7 and 6 that are on the preceding Bates pages, 3330 and 3329, were paired by Kiewit?

A I do not know the exact date, no.

Q If you look in the upper right corner where there's a date and time.

A I need to turn back to them because I saw you put your book away and I thought I could put mine away.

Q Sorry. It's probably a good idea to keep 230 around.

A So you would like me to turn to item?

Q They were at Bates 3331, and I was asking whether you knew when that estimate was prepared, the estimate on item summary for 8, peel back causeway rock for construction. There is a date on it.

A Well, I believe we bid the job on 9/3 and that's the best of my recollection. The date that this is printed is 9/22.

Q So it may have been done prior to your bid but it's printed later. When they stamped the date on there is when it's printed?

A No. The computer puts the date on there on the date that you're printing this copy.

Q Now, just to confirm for the record, if you look at JX232, will that confirm for you the bid date was September 3? JX232, Bates 3683.

A That does say September 9, 2003.

Q Now, I think you were testifying on Friday about bid day adjustments. Was that you?

A Yes, sir.

Q It's kind of a frenetic day, right, as I recall?

A It can be.

Q And there were adjustments made at the last minute to put items in or take items out on this project?

A We'd never put items in or out. The items are depicted by the bid schedule so all items would stay in.

Q Okay. I mean, I'm sorry, estimates of cost that relate to a particular contract line item. On bid day you may be making adjustments up or down?

A Up or down to our complete estimate, that's

correct.

Q Was one of those bid day adjustments the addition of money for placing rock in the peel-back area?

A I would need to look at that sheet.

MR. MIZOGUCHI: All right. Let's look at, it should be DX2005. This is a document, I believe it's in evidence, Your Honor, but if it is not, I'll move it. DX2005, Kiewit estimate, Book 2.

THE COURT: It is in evidence.

MR. MIZOGUCHI: Thank you, Your Honor.

THE COURT: Hopefully you all are keeping lists, too, so that we can compare at the end. Otherwise you get to do what I've got listed down and that's it. You ought to be keeping your own.

BY MR. MIZOGUCHI:

Q Mr. Lannen, do you recognize this to be another book of Kiewit's estimates for the Nome project?

A It appears to be part of our estimate book.

Q Okay. I'll ask you to turn to Bates page 42173.

A Okay.

Q Are you there, sir?

A I am there.

Q Now, Bates page 42173 of DX2005 is a worksheet, and that appears to be, under estimator, that's PH, that's Pat Harrison?

A Uh-huh.

Q And the date of this is 9/3/03. That's the day your bid went in, correct?

A Yes.

Q And under the handwritten caption, estimate, you see an item numbered 1.

A I do.

Q And there's a dollar sign for spur placement in peel-back, 1,000 cubic yards.

A Uh-huh.

Q Is that the same rock placement item we looked at earlier on the typewritten summary for 8, peel back causeway rock for construction, in JX230, Bates page 3331?

A I believe it is the convenience piece that we've mentioned before.

Q The cubic yards seem to match up, right, 1,000 cubic yards?

A They do.

Q And, again, another thing that matches up is this is an addition of cost for placement of rock in the spur peel-back under the Contract Line Item No. 8,

correct?

A It's addition of cost for replacing rock that was removed for convenience.

Q Underneath the Contract Line Item No. 8, correct?

A Yes. Well, that's where it went. That's where it got put. Yes. Am I done with DX2005?

Q DX2005? Yes. Now, you would agree that the costs that are set forth in Contract Line Item No. 8, that the cost for that item is not just the $99,225, but that there are other costs elsewhere in our estimate, our meaning Kiewit/Manson, that go into the peel-back charge, is that correct?

A That is correct.

Q And one of those other costs that are elsewhere in Kiewit/Manson's estimate are specialty tools, correct?

A The specialty tools are used in the peel-back and in some other items, work haul, so that's correct.

Q And I think an example that you've given before are the tongs, is that right?

A That's correct.

Q Mr.Lannen, do you still have a picture of the final design slide or did I take those back from

you?

A Kind of had me going here with a couple books each time, but I don't have those.

THE COURT: He's talking about these sheets. This is what he's talking about, these sheets. It starts with that picture on the front.

THE WITNESS: I do not have those.

MR. MIZOGUCHI: Can you find on I think it's Slide No. 2 or 3 of the final design package a picture of the tong gut work?

THE COURT: Well, he just said he didn't have it, so you need to give him a copy of the set.

MR. MIZOGUCHI: That's all right. We'll move on.

BY MR. MIZOGUCHI:

Q Tongs are used for peel-back?

THE COURT: I'm sorry, what?

MR. MIZOGUCHI: Tongs, T-O-N-G-S.

THE WITNESS: Tongs are used for handling large stone.

BY MR. MIZOGUCHI:

Q Peeling it up from an existing causeway?

A Sure, or replacing it.

Q Or replacing. Either one. So you then agree that that is the cost of the peel-back work that

does not actually appear in the item summary of Contract Line Item No. 8?

A What do you want me to agree to now?

Q That the cost of tongs is an item of the peel-back work that does not appear in the detail in the estimate for the item summary of Contract Line Item No. 8 for the peel-back job.

A A proportion of those tongs are not in Line Item 8 in our item summary. They are in our total estimate, but a portion of those tongs is not in there.

Q So that's one example of a cost that is required to perform Contract Line Item No. 8 that is not contained in the detail of the item summary for Contract Line Item No. 8?

A That is correct.

Q Not shown in Contract Line Item No. 8, the item summary, is whatever indirect costs you would allocate to that item, is that correct?

A That would be an indirect.

Q And indirect means for Kiewit's proposal things like home office overhead, I take it, and other overhead items?

A In our indirect is where we, I think somebody may have said this earlier, it's where we put

our mobilization money, temporary access money, specialty tools money, a myriad of things that are in the indirect portion of our estimate.

Q And on top of the direct costs and the indirect costs, your Contract Line Item No. 8, it includes an element of profit, correct?

A That's correct.

Q Is there anything else? Have I left anything else out?

A I don't think so. Well, if we leave out the risk for rebuild if something happened on the end of the causeway.

Q Tell us about that, and let's use the document. Bates 3331.

A Use which document, sir?

Q JX230, Bates 3331, the same item summary for Contract Line Item No. 8 that we've been talking about, peel back causeway rock.

A Okay. Bates 3331?

Q Yes. I think you were mentioning that, well, there is the risk in case you have to redo it?

A There's a possible risk if a storm hit the end of a seawall while you were completing the peel-back but prior to you placing new rock. Any damage to that end of the spur is what I would say is the risk

portion.

Q And are you saying that there is in Contract Line Item No. 8, the price of $595,000 for the lump-sum job, a risk factor that is on top of $99,000 direct cost?

A Risk and margin are really probably the same number to us.

Q I see. There was a basis upon which you calculated a risk adjustment on top of the $99,000 direct cost, is that correct? I mean, you did the pricing of Contract Line Item No. 8, yes?

A Yes.

Q All right. And in that pricing you did a risk adjustment or multiplication of the $99,000 direct cost, correct?

A You're asking me how I arrived at the number? I'm not sure what you're asking.

Q Yes. You mentioned that there is a risk factor, right?

A I did say there is a risk factor, yes.

Q And you did a calculation of what that was to come up with the $595,000 price?

A That's more of a feel thing on bid day and balancing a book full of numbers, so, I mean, the main thing on bid day is that we want to be competitive,

we'd like to be the low bidder, so the most important thing to us is the $42,167,500, the last number in the bid schedule, that it ends up that we are the selected low bidder for the work.

Q Now, is it true that in pricing Contract Line Item No. 8 you took the $99,000 figure, the Contract Line Item Summary No. 8, Bates 3331, and you doubled that sum of $99,000 to cover this risk, you doubled the cost of peel-back to allow Kiewit to redo it, meaning the existing jetty, in the event of a storm?

A I didn't do any exact calculation on bid day.

Q No, I didn't ask about bid day necessarily. Sorry.

A What are you asking about?

THE COURT: I think you did, but that's okay.

MR. MIZOGUCHI: My apology then. Whatever day you did it.

THE WITNESS: To make something perfectly clear, these numbers are inked in on bid day and they have nothing to do with your estimate. Your estimate's done. The estimate comes to a total. It's a total dollar figure that we're willing to submit to

the government for the project, as described by this bid schedule, all right?

So, as I said before on Bates page 3681, the very final total, $42,167,500, was our bid to the government for what we considered a project that would follow these descriptions, if you will, and the rest of the contract document. So on that day when these are inked in, and I say inked in because they're written in ink, you have to make this book, I will call it our bid schedule book for this purpose, it has to balance.

You cannot multiply across and add down and have that math not work or your bid will be rejected. So to make them all balance and to spread back the indirect and the profit that we put on the job, profit and risk, if you will, you have to get to these numbers.

BY MR. MIZOGUCHI:

Q Is it true that in estimating the cost of Contract Line Item No. 8 for purposes of your proposal efforts, one of which I assume is pricing CLIN 8, that you took the $99,355 figure and doubled it, you doubled the cost of the peel-back to allow Kiewit to redo it, redo it meaning the existing --

A Pardon me, sir, but I have no idea what

you're talking about because the simple fact is if you want to go to the estimate top sheet, the general estimate summary sheet, it gets us to a total number which matches the $42,167,500, okay? As far as the direct estimate costs for that item, they're on an item summary sheet which you and I have looked at quite a bit.

So I'm trying to answer your questions, but I'm really not understanding you. If I estimated something for a different cost than is on that sheet it would have been on that sheet. It's not on that sheet. Or it would be found elsewhere in the estimate and then detailed out for you.

Q Do you still have your deposition transcript with you?

A I do.

Q In the first volume of your deposition from March 25, 2008, turn to page 38, please.

A Okay.

Q Go ahead and take a look at that, but my question to you is where you not asked about how you priced this risk factor and your answer was you doubled the direct cost, which was the $99,000, so that you came to a figure of approximately $200,000?

A That's not our estimate, though. I was

explaining at this time, and maybe David and I were not talking to each other the correct way, I was explaining before you ink this number, how do you get to that $595 number, okay?

The whole thing carries margin and risk. So, okay. How much extra margin for risk or whatever you will should I put in this number when I bid, all right? And so in my head, not an estimate, nothing additional asked for, I said I have $99,000 cost, I could have some extra risk, what could that risk be, what are the tools, put the profit on, spread some indirect, and ink $595,500.

Then once you've inked $595,500, all of the rest of these still have to total up to $42,167,500 or your bid book doesn't balance.

Q So in pricing, inking, the $595,000 in your contract proposal, true, isn't it, that you factored in enough money to do the peel-back job all over again --

A No.

Q -- with direct cost at least?

A No. I guess you don't understand the way I'm trying to explain it to you, but the job, if we go to Exhibit 230, which I have in my lap, Sheet 3215 and 3216, those are the general estimate summaries, so the

very last number written on Sheet 3216 --

Q Okay. I'm sorry. Can you hang on one second, please? You're in 230?

A Yes, sir. Book 1.

Q The other volume, I take it.

A Book 1.

Q And what Bates page are you on?

A 3215 and 16 are 11 by 17 sheets that's been copied onto two 8 and a half by 11s making them unfortunately a little bit hard to read.

Q All right. I'm there.

A So the Bates 3216, the very bottom right-hand corner says bid $42,167,500.

Q Yes.

A Okay? So knowing that you're going to bid $42,167,500, that has to be the last number on this sheet, all right?

Q I'm with you.

A Okay. And then you want to spread an appropriate amount of margin and the costs that are buried off in the indirect into each one of these items. It's not a perfect science. Things happen fairly quickly that day. It's easier to leave what we call open the lump-sum items because they involve less math for you to do.

When you're doing an accumad (phonetic) multiply, if you know what I mean by that, maybe you don't, it would be, like on bit Item 9, 150 times 45 equals 6,750. Then you have to continue to do that and add the whole column string. So the items that are usually left behind would be lump-sum items because they don't require one times anything.

Therefore, the important thing for us on bid day is to bid the lowest possible competitive price to the government, and on this day that was $42,167,500.

Q Back on your deposition transcript, page 38, at the time you gave this deposition you were a Kiewit employee, correct?

A Yes.

Q All right. Just take a moment to look at page 38. In particular, on lines 12 through 13 where you're giving an answer:

"A No. You would take the $99,000 and double it. So your cost would be 99 times two if you had to go redo it."

"Q So approximately $200,000?"

"A Yes."

I just want to ask you, sitting here today do you still hold the answers you gave back then as being accurate?

A Well, I still hold the answer that it could have taken us that much money if we would have had to go rebuild it, yes. Could have been more and it could have been less. I thought you were asking me earlier if we had $99,000 in our estimate to do it once and carried an additional $99,000 to do it again. I thought that's exactly what you were asking me, sir.
Q And that is not what you're indicating here on page 38?
A No. We have $99,000 in our estimate to do the peel-back, as shown by that sheet, with some additional items in the indirect. All the rest is carried from if we go back to 230, 003126, and add up indirect and margin that are, margin being part of our risk, spread back against the items bid.
Q Since you've looked at page 38 of your deposition transcript, if you look at page 39 as well, I'll just ask you if you can identify whether there's any error in the transcription of the questions and answers on those two pages? Go ahead and take it down to the bottom of this page, which is page 40. All I'm asking you is whether it appears to be accurately transcribed.
(Pause.)
A Okay. So I'm reading these from 38 through

40?

Q Yes. You can read above it if you need to.

A No. I've read that. I still think it's exactly what I've said to you today.

Q No error in the transcription?

A Well, the transcription is not asking the questions the same way as you are, and so if you want to try to read something into this transcription, I guess you could. But there's nowhere in here where I said that I had $99,000 additional in our estimate. That's not the way I read this document, sir.

THE COURT: At this point or some point soon we might want to indeed take a luncheon recess but only at a natural breaking point. We can go for a while or not.

MR. MIZOGUCHI: That is actually the breaking point. I'm about to address a different document.

THE COURT: Thought it might be. Okay. We may stand adjourned. Mr. Lannen, it's not your responsibility to take care of the books, although we appreciate all the help that you're giving us. Your counsel, and you're their witness, or the Defendant during the time that you're the Defendant's witness, ought to be helping you do that during the recess.

So you go have lunch and enjoy yourself.

THE WITNESS: Okay. I thought I had a housekeeping duty, Your Honor.

THE COURT: You do not have a housekeeping duty. You have a testifying duty. That's pretty much the end of all of it. Thank you. You may step down, and we will return at 2:15.

(Whereupon, at 12:55 p.m., the hearing in the above-entitled matter was recessed, to reconvene at 2:15 p.m. this same day, Monday, June 2, 2008.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

A F T E R N O O N S E S S I O N

(2:26 p.m.)

THE COURT: Mr. Lannen, your seat of honor. You may not describe it that way, but it really is. All right. Mr. Mizoguchi, your witness.

MR. MIZOGUCHI: Thank you, Your Honor.

Whereupon,

SHAWN LANNEN

having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:

CROSS-EXAMINATION (RESUMED)

BY MR. MIZOGUCHI:

Q Mr. Lannen, would you please turn to JX9.

A Okay. I'm on JX9.

Q All right. And JX9, you could see it has a Bates number 76 and 77. It's a string of emails, the original one of which is near the bottom of page Bates 76. It says from Shawn Lannen, Monday, July 28, 2003, 12:35 p.m., to West, Gail. Subject: Bid question. Do you see that?

A Yes, sir.

Q The salutation, Gail, please answer the following questions, and there are three questions, set forth each with a question mark. You see that?

A I see one and then I need to turn to the next set. I've got to turn to Bates 77 to see Questions 2 and 3?

Q Right. Now, in response to these questions that are been described as bid questions, it looks like right above here we have Ms. West getting answers back from Alan Jeffreys that Friday, August 1. Do you see that?

A I do see that.

Q And then Ms. West forwards the bid question response to you on August 5, 2003. See that?

A I do see that.

Q Do you recall receiving that response?

A I don't remember.

Q Don't have any reason to doubt you did?

A Yeah. Yeah.

Q Okay. At least in this instance when an email of yours was sent to Gail West that's posed a bid question and requests please answer the following questions, you did get a response?

THE COURT: Don't spend a lot of time on this. You're back to your earlier string on responses and whatever, so keep it moving.

THE WITNESS: She responded to this email of mine from Monday, July 28.

BY MR. MIZOGUCHI:

Q And JX34. This is the July 25, 2003, email from you to Gail West that we've discussed a little bit before about the quantities in the causeway excavation?

A Yes, sir.

THE COURT: Do you have a question on Joint Exhibit 34?

MR. MIZOGUCHI: Yes, Your Honor.

THE COURT: All right.

BY MR. MIZOGUCHI:

Q None of the statements made about causeway excavation on JX34 identify a CLIN number with respect to the words causeway excavation, is that correct?

A They do not.

Q Now go to JX230.

A Volume 1 or 2?

Q This is Volume 1, Bates No. 3330, which should be Item Summary 7, remove causeway rock. Are you there?

A I am there, sir.

Q Okay. Now, if you look at the operation descriptions on Bates 3330 for CLIN 7, those are described as causeway exc, correct?

A Uh-huh.

Q And then move over to the next page, which is the item summary for CLIN 8, Bates 3331. The phrase causeway exc does not appear on this summary for Item 8, correct?

A That's correct. Can I put this one away?

Q You may put it away. Yes. And then take out what should still be in front of you, JX34. At the time that you transmitted this email to Ms. West July 25 you were aware of the actual quantities that Mr. Harrison had estimated for A22 and B22?

A Correct.

Q And those actual quantities for A22 were 46 percent higher than the 30,600 bid quantity in CLIN 6, as set forth in the Corps' proposal schedule, which is JX231?

A They were higher. You want to do the math again

Q We don't have to do the math. We can go to Mr. Harrison's sheet, if you'd like, but I thought we did that already.

A We did.

Q And the number was about 46 percent higher for A22?

A It was definitely higher.

Q Well, let's -- we don't want to leave that

ambiguous.

A I just don't want to testify to something you're telling me I should remember. Is it in Volume 2 or was it in Volume 1?

Q It is Bates page 3523, which should be Volume 2.

A I have it.

Q We've looked at that page a lot, haven't we? It's the column for A22, subtotal 44,787, on July 24, 2003. See that?

A Yes, sir.

Q Go ahead and do the math. 44,787 is 46 percent higher than the Corps' bid quantity of 30,600?

A Yes, sir.

Q Okay. And the same exercise for B22. On July 24, 2003, in JX230, Bates 3523, Mr. Harrison's estimate sheet for B22 had a figure of 30,900 and the Corps' estimated quantity was 20,600. How much higher was Kiewit's estimate at the time?

A Fifty percent, sir.

Q Now, in your email you advise Ms. West that our quantities for A22, B22 and A10 are greater than the USACE by more than 10 percent?

A Yes, sir.

Q And we could go through the same exercise in

A10 but would we have the same result? If we look at Bates 3523, Kiewit had an estimated quantity of, that looks like 2,954, is that?

A I don't know. I put that page away. I'll go back to it. Apologize. I thought we were done with that math.

Q No need to apologize.

A So which item, sir? A10?

Q A10. Kiewit's estimate at July 24 was 2,954 cubic yards for A10?

A Yes.

Q And the Corps' estimate was 550 cubic yards. So if you do the math on that, how much higher was Kiewit than the Corps?

A Five hundred and thirty-seven percent. Can I put this away now?

Q Sure. Now, outside of your email, which doesn't describe those percentages, you never told Gail West the percentages we discussed that reflect how much higher Kiewit's estimate was at the time than the Corps' proposal schedule did estimate, correct?

A I did not. I told her there was a significant difference.

Q And was there a reason you did not disclose to her the actual differences?

A She never asked.

Q Now, at the conclusion of this July 25 email that is JX34 you conclude not with a request for a response but with a statement: if you have any specific questions, please call me, correct?

A That is the last sentence on the email.

Q Is it also true that prior to this contract award to Kiewit that Kiewit/Manson never told the Corps of Engineers of its actual quantity estimates, the one we just looked at, in July 24? In other words, you bid the proposal schedule but you did not advise the Corps of the 46 percent, 50 percent and 500 something percent higher quantities that Kiewit had estimated?

A I did not advise the Corps of the exact percentage. I told the Corps we had significant quantity concerns verbally, and then again with an email.

Q As Kiewit entered into this contract with the Corps based on the proposal quantity schedules, for example, for A22 of 30,600 cubic yards, how did Kiewit expect to get the project built for the quantities set forth in the proposal schedule which were so much lower than those that you had estimated?

A I do not understand that question.

Q Sure. Now, one of the things you I take it would agree, that both parties have a duty of good faith to, it's imposed on both parties to identify, among other things, changes, isn't that correct?

A Okay.

Q You agree with that?

A I agree that we should notify somebody of a change.

Q But you believe that Kiewit met its duty of good faith in this case, correct?

A I do.

Q And is one of the reasons you have that belief that your estimated quantity of 44,700 cubic yards of A22 did not have to get built because we could have showed up on the site and the owner, the designer of record, could have altered their designs, shortened the jetty and 30,000 yards would have been placed. That was the owner's choice on what got built. That was your view entering the contract?

A Well, my view entering the contract was I didn't have backup to confirm nor disprove my numbers, I hadn't heard from the Corps, so I bid the owner's quantity. That's how we entered a contract was by bidding the owner's quantity of work. So when you reference entered a contract, I'm considering the bid

day.

Q Can you identify any document, piece of correspondence, in which Kiewit told the Corps prior to contract award that it would be charging the CLIN, Contract Line Item No. 8 unit price of $308 for the rock that was peeled off the existing causeway under Contract Line Item No. 8?

A You want to say that again?

Q Sure. Can you identify any document, piece of correspondence, communication with the Corps of Engineers prior to contract award in which Kiewit advised the Corps specifically that it would be charging under the Contract Line Item No. 6 for rock that was peeled off the existing causeway under Contract Line Item No. 8?

A Other than the email that's in front of us now, no.

Q Now, if you'd take out, please, DX22 again.

A Okay.

Q So go, please, to Bates page 42961.

A Okay.

Q I'd like you to turn to page 42982. This is a quantity sheet for A22 haul again. I want you to look under the date column. And do you see under the date 10/15, that's October 15, 2004, Mr. Lannen?

A I believe that is, sir.

Q You weren't hauling A22 on October 15, 2004, were you?

A No.

Q And the quantity to that date of October 15, 2004, was 37,341?

A That's correct.

Q Then if you go back to PX I think it's 1035, your summary of the claim that was introduced. Yes, it was introduced this morning, and it's a summary of your claim. Am I correct that as of October 15, 2004, at least according to Kiewit's quantity sheets, you've got 37,341 cubic yards of A22? I gather this is mined, right, A22?

A Mined, and this is a haul page, so 37,341 hauled down to the beach.

Q So it's mined?

A Yes, sir.

Q And then if we look at PX1035, and if we were to do that calculation where we take your total figure, the 46,118 of A22, and subtract the salvage figure, which was 10,377, you'd come to a number that was around 36,000 give or take?

A Give or take. I would agree with that.

Q And as of October 15 you've got 37,341 cubic

yards mined according to this quantity sheet of Kiewit's, right?

A Yes. Without any adjustment to the number that would be right.

Q Now, I believe you testified on Friday that the last barge left on October 25 or October 30, is that correct?

A Somewhere in there. That's right.

Q And this relates to the winter over issue. I was going to say, we're getting near the end.

A Are you done with that question, sir?

Q Yes. Remind me, Mr. Lannen, you were a Regional Manager at the time? What exactly was your title?

A It's called an Area Manager, sir. Whatever term in front of that. Regional could mean area to you.

Q And, among other things, you had responsibility for managing people who were managing this Nome project? Mr. Hansen, for example?

A Yes.

Q And you kept track of the costs that Kiewit was incurring on the project? You?

A No.

Q No?

A I had people do that for me.
Q They would review cost reports, for example, on the project?
A They would complete the cost reports. But you said me, so I didn't go out daily and keep track of the costs --
Q Understood. And would you review how the costs were rolling up on the Nome project?
A I would look at it monthly. We'd get a monthly cost report.
MR. MIZOGUCHI: Monthly cost reports, okay. Let's look at DX2035.
(The document referred to was marked for identification as Defendant's Exhibit No. 2035.)
THE COURT: So you're going to exhibit number what, and Bates what?
MR. MIZOGUCHI: DX2035, Your Honor, and it begins with Bates No. 48026. This will be very quick.
THE WITNESS: Bates 2035?
MR. MIZOGUCHI: No, no. DX, as in Defendant's exhibit.
THE COURT: DX, as the Defendant's exhibits.
THE WITNESS: Okay. I'm just trying to find

it.

MR. MIZOGUCHI: Here we go.

THE WITNESS: Okay. Should I put this one back?

MR. MIZOGUCHI: You may or if you give it to me, I'll put it away.

BY MR. MIZOGUCHI:

Q Now, DX2035 is captioned cost report.

A Yes, sir, it is.

Q And in the left-hand column it says Nome navigation improvement. Do you recognize this to be the kind of cost report that Kiewit would keep on the Nome project?

A I do.

Q In the ordinary course of business?

A Yes, sir.

MR. MIZOGUCHI: Your Honor, move the admission of DX2035.

THE COURT: Any objections?

MR. MARTIN: No objection, Your Honor.

THE COURT: Admitted.

(The document referred to, previously identified as Defendant's Exhibit No. 2035, was received in evidence.)

MR. MIZOGUCHI: Your Honor, if I could have one moment? I think I'm about there.

THE COURT: Sure.

(The document referred to was marked for identification as Defendant's Exhibit No. 2037.)

BY MR. MIZOGUCHI:

Q Stay in the same binder, Mr. Lannen, DX2037. Same exercise. I'll ask you whether you recognize this as a Kiewit cost report on the Nome project.

A Excuse me. Hold on. The first couple of sheets are cost reports.

Q This begins on Bates 48268, and like the other document, it runs through a number of spreadsheets, I would call them. Do you recognize this to be a cost report kept by Kiewit on the Nome navigation project?

A I do recognize this as a cost report kept by Kiewit/Manson and personnel at the project.

MR. MIZOGUCHI: Move the admission of DX2037, Your Honor.

THE COURT: Any objection?

MR. MARTIN: No objection, Your Honor.

THE COURT: All right. 2037 is admitted.

(The document referred to,
previously identified as
Defendant's Exhibit No. 2037,
was received in evidence.)

MR. MARTIN: Just for clarification, are these all the cost reports? I might have them, too. These are just two cost reports?

THE COURT: Well, there are three others listed as adjacent exhibits, so are you planning to admit those others or not?

MR. MIZOGUCHI: No, Your Honor.

THE COURT: Just planning to admit those two?

MR. MIZOGUCHI: Yes, Your Honor.

THE COURT: You have your answer, Mr. Martin.

MR. MARTIN: Thank you, Your Honor.

THE COURT: You can do whatever you want with that. Answer and move on or not.

MR. MIZOGUCHI: Now, perhaps one last question.

(Laughter.)

THE WITNESS: I was just saying did you want me to keep these or do you want me to put these away?

MR. MIZOGUCHI: You can put them away. I

think we're done.

BY MR. MIZOGUCHI:

Q In the area of dredging, Mr. Lannen, you're not a dredging expert, are you?

A No, sir.

MR. MIZOGUCHI: No further questions, Your Honor.

THE COURT: Mr. Martin, redirect?

MR. MARTIN: Just, I hope, one question, Your Honor.

THE COURT: How about just briefly? Does that work?

MR. MARTIN: I was going to say that and I thought, well?

THE COURT: Maybe not. Whatever you need to do.

(Laughter.)

MR. MARTIN: I will say I have just four topics I'd like to visit briefly.

THE COURT: Will this is an important witness for you so go ahead.

THE WITNESS: Hang on one second. Now let me get these put away.

THE COURT: He's got to be an engineer.

MR. MARTIN: If you've got 230, hang onto

it, would you?

THE COURT: He's got to be an engineer because the lawyers would just let it pile up and work in multiple books.

MR. MARTIN: We've just been extremely diligent today.

REDIRECT EXAMINATION

BY MR. MARTIN:

Q I'm asking the witness to refer to Exhibit 230, Bates 3217, 3218.

A 3217 and 3218?

Q Yes. Have you got that?

A Yes, sir.

Q Okay. What is that document, Mr. Lannen? It's part of your bid papers, correct?

A It's part of the SP books, that's correct.

MR. MARTIN: Okay. Does Your Honor have that in front of you?

THE COURT: I'm listening. If you want me to pull it out, I will.

MR. MARTIN: Well, no. Would you hold that up so the Court could see it so she knows what you're looking at. I don't think you need to have it in front of you.

THE WITNESS: It is an Excel spreadsheet

where you really use it --

THE COURT: I knew what it was.

THE WITNESS: -- to perform. It is to keep track of responses from the owners so you make sure you have the right amount of money in your bid, not too much and not too little.

BY MR. MARTIN:

Q So we've seen Exhibit 34 or Exhibit 134 and all these emails going forward which also were in your bid book and which also are separate exhibits. Is that document then a summary of all those inquiries?

A It's a summary of them and their response and then our action item after that.

Q And at what point is that compilation prepared?

A Well, it's dated 8/29/03, so just a couple days prior to bid.

Q So we're inquiring during this process but down here we're tallying up all of the bid inquiries that have accumulated? Is that the process?

A This would happen before GES on there.

Q Before here?

A Yes, sir.

Q Okay. And what purpose is served by making that compilation into a spreadsheet such as that?

A Well, it's a nice, easy way to keep track of it, I think I said earlier, so you have the right amount of money in your bid. Well, like No. 2, bid inquiry. Pat, I believe, made the sheet says No. 2, bid item number. So we asked a question on survey, where the payment was for certain items. It says payments included in each optional item for the survey.

Q Well, let me stop you for just a second. I know you've been there a long time. I'm remiss in not asking you to sort of lay out the structure of that document so we can see what type of use you're making of it. Just run across that, would you, and tell us what sort of a record is being maintained.

A So the inquiry number, what item number it would affect.

Q The bid item number?

A A bid item number it would affect, the date that it was submitted, the inquiry itself, the response itself, the date that you got the response, answer is if it's a no, no is in there, if it is answered there's an *X*, and then the comments by what action is taken.

Q Okay. Under the column answer, what do the no's indicate?

A That the question would have been left unanswered.

Q All right. And then I interrupted you. You were using the second bid inquiry regarding survey to illustrate the use to which you put this document near the closing of the bid in that period before submitting the proposal to the --

A Right. So in the far right-hand column in Pat's handwriting it says add per survey, in my writing it said added line on quote sheet, and that's just to remind myself or Pat to tell the surveyor we need to know his monies for the optional items so we don't miss anything, if you will.

Q So on those where you are getting an answer, if I understand correctly, you're looking at your estimate to see if you've got money in there to cover the answer that came?

A That's correct.

Q All right. Just give us one more example, if you could track one down for us there, where you did get an answer and where you had to check to see whether you had money in there to cover what the answer indicated about the contract documents.

A Well, I mean, the very first one which is removal of the sunken barge and metal debris, we go on

about the question, it says additional details on the sunken barge and debris will be provided by us. So as shown on the drawing where the barge is in the square of the metal debris, both Pat and I said that is covered. We looked back, saw our estimate, do we have enough money to rip that thing out in that bid item, Item 27, do we have the money for it? We say it's covered.

Q Okay. All right. Now, as it relates to the several where you did not get answers, how do you then conclude the bid process prior to submittal and at the point of submittal to the owner?

A We bid the owner's quantities to the best of our ability from the plans.

Q Okay. Is that tally sheet in terms of the number of questions put and the number of answers received?

A It is the number of questions.

Q Okay. Is that sheet what you would say typical or atypical of a prebid process with a federal owner such as the Corps?

A I would say this is a typical a federal and a state owner. I wouldn't single out just a federal owner.

Q So of the questions asked, how many were

answered?
A Six.
Q Out of how many questions asked?
A Fifteen.
Q Switch over to 3331, would you, Mr. Lannen, please? Bates 3331 in Exhibit 230.
A Okay.
Q What is that sheet?
A This is the CLIN 8 item summary.
Q And you were talking about that in your cross-examination, were you?
A Yeah. At length.
Q And you were talking about the indirects that are in the CLIN 8 bid item, were you?
A The indirects that may be applicable to the CLIN 8?
Q And you were being asked questions about tongs?
A Right.
Q And the tongs aren't in there but the cost is in there, is that correct?
A Cost is in another part of the estimate.
Q What I'd like to ascertain is this. If there is a direct cost item or work to be performed out on the project to be included in that bid item,

will it show up in that estimate?

A Yes, sir.

Q If there was a part of that CLIN 8 estimate that anticipated putting A22 rock back in the cavity created by the peel-back, would the direct cost appear in that sheet of the estimate?

A Yes.

Q One other question that you were asked relative to that that I'd like to clarify. You were asked about, and you might step down here, that portion of the -- in fact, when you come down here I'll take that back.

A Sit down again?

Q I just want your circulation -- I didn't do that on purpose. Feel better now?

(Laughter.)

A Yeah.

Q Grab Exhibit 10, would you? Now, we've seen and I won't even have you go to the sheet, unless you want to refresh your recollection, that you included money in CLIN 8 for that portion of the seawall removal that you called for convenience, correct?

A That's correct.

Q And we've seen that you did not include anything in CLIN 8 for replacement, is that correct?

A That's correct.

Q All right. And would you describe to the Court what contract limits are and how that affects the manner in which you prepare your estimate?

A Well, contract limits for this specific piece of work would be the defined boundary of our removal.

Q Okay. And can you illustrate on Exhibit 10 what the contract limits were in relation to the existing causeway nose or bullhead there?

A It's a pretty small drawing to look at, but if you use Sheet 80, for example, and this is a poor copy, but where the spur intersects with the existing causeway is the work area limit, if you will. You can't go 100 feet back down the causeway and do work within the work limit. You're outside of the work window.

Q So if you are going to deal with some portion of the site that's outside the contract limits how do you reflect that or how do you handle that in your bid estimate?

A Well, we put that into a lump-sum item to cover that work that is outside the work windows or pay envelopes of the contract.

Q And is that the way that you handled it on

3331 there in Exhibit 230?

A That's exactly how we handled it.

Q On the other hand, if you were to put that seawall back in, what assumption did you make, if any, relative to how you would be paid?

A If it's within the work area, as defined by the drawings or RFI 1, we would be paid contract unit prices.

Q And is the peel-back portion of the seawall within the work area?

A It is within the work area.

Q One more subject, Mr. Lannen. You were asked a lot of questions about your understanding of the variation in estimated quantities clause. Do you recall that?

A I do.

Q I do as well. I would like you to pick up Exhibit 231, if you would, sir, that spec, and turn to page 2264. I gave a bad exhibit number. Hold on a second. I'm sorry, 141. I apologize, Mr. Lannen. I know I'm torturing you. 141. I want the project specs.

THE COURT: 141 says it's an email string between Jeffreys and Anderson, Harvey, draft minutes for review.

THE WITNESS: I believe he meant 149.

THE COURT: I didn't think that was what he wanted.

MR. MARTIN: I should know that, and I apologize. Those things don't leave me very often. That shows how empathic I've been all day.

THE WITNESS: What Bates page number did you --

MR. MARTIN: 2264, sir.

THE WITNESS: Okay.

BY MR. MARTIN:

Q And do you find that to be the variations in estimated quantities clause about you were testifying earlier?

A It is listed here.

(Away from microphone.)

Q All right. I'm going to read to you that first sentence. If the quantity of the unit-priced item, and that would be the rock -- placement such as A22, correct?

A Yeah.

Q In this contract is an estimated quantity. And we're still talking about something like 30,600 of A22. Is that your understanding?

A That is.

Q Okay. And the actual quantity of the unit priced item varies more than 15 percent above or below the estimated quantity an equitable adjustment in the contract price shall be made upon the demand of either party. Now, is that what you had in mind when you were answering counsel's questions this morning?

A Yes.

Q All right. Now, what I'd like to do is go on to the second sentence of that same clause which says the equitable adjustment shall be based upon any increase or decrease in cost. That still resonate as to what you were talking with counsel about?

A Yes.

Q Okay. And then it says due solely to the variation above 115 percent or below 85 percent of the estimated quantity. Do you see that?

A I do.

Q You opened with an illustration. May I ask that you close with one, sir? Would you do us the service and the Court the service of putting on the board there the estimated quantity of A22 rock on this project, and a graph that runs from zero to 100 percent of that item?

A Okay. You start at zero and we go up to, you want 100 percent?

Q Yes.

A Okay. I put the zero over here.

Q Will you take your graph, sir, up to 115 percent of that quantity?

A Okay.

THE COURT: Now there's the difference, Mr. Martin. He did it in his head mostly. Not sure he even needed that calculator.

BY MR. MARTIN:

Q All right. And then I'm looking now at PX1035, and I'll show you my copy. This is your final submitted claim with the final quantity of pay rock that's installed in the project, and what does that show to be the final quantity?

A 46,118.

Q Okay. So that would be the graph going up to the final quantity.

THE COURT: Now, the only problem with what you've just done is that none of the other quantities or numbers are reflected in the record. They're only reflected on that piece of paper. So you may want to get a verbal description of what you've just done.

MR. MARTIN: Thank you, Your Honor.

So you've got 100 percent at what figure, sir?

THE WITNESS: 30,600.

BY MR. MARTIN:

Q And 115 percent at 35,190?

A Correct.

Q And the final quantity is in what amount, sir?

A 46,118.

Q Based on that clause, what is your understanding of the original quantity that gets paid at the contract unit price?

A My understanding would be that my contract unit price would apply to that section.

Q Can you label the section from zero to what, sir?

A One hundred and fifteen percent.

Q And looking back at the contract provision, if there is to be an adjustment to the price due solely to the variation, what is the portion of that total quantity to which the adjustment would apply?

A It would apply to this upper region from 35,190 to 46,118.

Q So potentially I could adjust the quantity between 35,190 and 46,118, is that what you're saying?

A Yeah, correct.

Q Okay. Now, you were asked a number of

questions this morning about the 4,350 quantity you had for the value to the government and the actual quantity of peel-back, correct?

A That's correct.

Q When in the course of this project did that work, peeling back the rock, and the realization of the quantity of rock you were able to reuse occur?

A On this?

Q Yes. Go ahead and use the red pen and put it on there.

A Down here.

Q So what are you saying there? You're saying that?

(Away from microphone.)

A Well, in the first 30 or 40 percent of the -- rock made this had been done. We were done by June 30 with CLIN 8.

Q And so the red line with the arrows going downward toward the bottom of your chart would indicate that all of the rock, be it 2,000, 4,000 or 10,000 yards, whatever you salvaged was available to you at that time, correct?

A That's correct.

Q Okay. Was there any event, any condition, any occurrence that took place within the 115 percent

that you're aware of which would enable either party to seek an adjustment under this clause?

A No.

Q Was there any event potentially that would allow an adjustment from 115 percent up to the 46,118, if you're aware of any?

A Well, the last one being able to leave, and we talked about it just a minute ago, but the date that you're done isn't the date you get on a boat.

Q So if I go back to the clause, the increase or decrease in cost due solely to the variation above 115 percent or below 85 percent, your testimony is you're aware of nothing that occurs to either party below 115 percent, and what did you say again above 115 percent?

A Above 115 percent is when we became late for --

Q And what is the cost that occurs there that would drive -- this is the mining activity or the mining cost, right?

A Well, it's the $1,075,854 off of sheet PX1035.

Q And what is the reason that cost occurs here, and what is the cost out on the job?

A Because we haven't taken --

Q Okay. And the -- is for what purpose, sir?

A Mining.

MR. MARTIN: That's all I have, Your Honor.

THE COURT: Thank you.

MR. MARTIN: Do you wish to have something like that marked and put in?

THE COURT: If we got a good enough description, which I think we did verbally, I think we're okay.

MR. MARTIN: That's all I have.

THE COURT: Well, are we done?

MR. MIZOGUCHI: Can I ask one question?

THE COURT: Sure.

RECROSS-EXAMINATION

BY MR. MIZOGUCHI:

Q Mr. Lannen, with respect to the salvage, the 10,377 cubic yards we saw on the Kiewit quantity sheet, PX2022, that 10,377 recovery of A22 rock, on your graph is that occurring approximately down in this area? It's one of the first items of work, correct?

A It is one of the first items of work. That's correct.

MR. MIZOGUCHI: No further questions, Your Honor.

THE COURT: All right.

THE WITNESS: Does that mean I get to leave?

(Laughter.)

THE COURT: It does, Mr. Lannen. You are done. We thank you for your time and for your testimony. I do remind you, however, that it's very important that you not discuss your testimony with anybody who has or will testify in the case until the record is closed. I'm sure your attorneys can advise you as to when that is. You understand that, sir?

THE WITNESS: I do.

THE COURT: Very good. You're dismissed. I thank you for your time, your energy and your attention.

THE WITNESS: Thank you. There are a couple of things left out here.

THE COURT: You all can have these back, actually, the depositions.

MR. MIZOGUCHI: May I approach, Your Honor?

THE COURT: Yes. And that sheet, give that to Mr. Lannen. All right. Thank you. You're excused. Is that your calculator or somebody else's?

MR. LANNEN: No, that was up here I think. Is it your guys?

MR. MIZOGUCHI: I don't know

THE COURT: Okay. All right. Thank you, sir.

MR. MIZOGUCHI: It's a collective calculator.

(Witness excused.)

MR. MARTIN: May I have just a moment, Your Honor, to tidy things up?

THE COURT: Okay.

MR. VIERGUTZ: Your Honor, if I could, we intend to comply as we have with the Court's directive on witnesses having been here. Could I respectfully request the Court to inform us how late we'll be going this evening?

THE COURT: I don't honestly know. It will depend on how late you take. So far none of your time estimates have been accurate on any side, so we're just going to keep going. You just have to have one ready.

MR. VIERGUTZ: Very good, Your Honor.

THE COURT: All right. Let's take a five-minute recess while everybody regroups for the next witness.

MR. MARTIN: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

THE COURT: Okay, gentlemen, ladies, let's

get to it. Please sit down. Some of your compatriots already have. All right. You ready, sir?

MR. VIERGUTZ: Yes, I am, Your Honor.

THE COURT: All right. Could you raise your right hand, please?

Whereupon,

PATRICK J. MCGARRY

having been duly sworn, was called as a witness and was examined and testified as follows:

THE COURT: Please be seated. State your full name, and spell your last name for the record, if you would, but go ahead and sit down.

THE WITNESS: Patrick J. McGarry, M-C-G-A-R-R-Y.

THE COURT: Go ahead, sir.

MR. VIERGUTZ: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. VIERGUTZ:

Q Mr. McGarry, by whom are you employed?
A Manson Construction Company.
Q And how long have you been so employed?
A Just over 40 years.
Q With Manson?
A That's correct.
Q What's your present position, please?

A Present position is Vice President, Northwest Area Manager.

Q Would you describe, please, your employment history through that 40 year period briefly to the Court?

A I began work with Manson in very early --

THE COURT: Are you picking him up well? He's speaking very softly.

THE REPORTER: Yes. It's a bit faint.

THE COURT: Would you just kind of keep your voice up? The microphone was down there. It's the one that's operative. Not that one, the other one. So you need to kind of speak loudly.

THE WITNESS: Began work with Manson full-time in 1968 and began working on the derrick barges and moved up into equipment manager and then on to Vice President and Area Manager.

BY MR. VIERGUTZ:

Q So you've done hands-on work with the company from running a barge through now being Vice President?

A Yes.

Q Manson is a corporation?

A Manson's a privately held corporation, yes. Family-owned.

Q And what's the history of the company? Who owns it?

A Well, at our 100 year anniversary we wrote a book about the company because we had some people that were getting on in years who had been with the company for years. It's kind of an interesting history in that it was begun by a Swedish immigrant that followed the railroads across the country and moved to a town called Docton that there was a shipyard and worked in the shipyard.

At those times all the docks in the northwest and throughout the United States were not treated and so they were quite often rotting out. So the shipyard had to bring in contractors to replace the piling periodically and Peter Manson, the original founder of Manson Construction, was quite fascinated watching these companies come in and drive piling.

He had a small cabin on the beach and he, after work working in the shipyard, every day would go home and he'd build himself a piledriver. In 1905, he quit the shipyard and started Manson Construction Company, he moved his family on to the small piledriver that he had built out in front of their cabin and that's how Manson started in 1905.

Q And since then has it been owned by the

family?

A He passed on the company to his son who had primarily daughters who did not have any sons, so there is no longer anyone in the ownership with the last name of Manson, but it's been passed on to the Haugh family and the Paup family who are both direct descendants of Peter Manson.

Q Has Manson been involved in other work in Alaska other than the Nome project?

A Manson has worked in Alaska for years. We formed a company called Manson/Osburg that did a tremendous amount of dredging after the Alaska earthquake, and since then we've split the Manson Osburg company again and we purchased all their hydraulic dredges, so now Manson does all the hydraulic dredging on their own.

Q What are some of the projects you've been involved in in Alaska?

A Well, Manson, although we're not awarded the contract this year, we've been the primary contractor that's done the dredging in the Port of Anchorage for the U.S. Army Corps of Engineers. We've probably done that work I would say at least 80 percent of the time that it's been done. I believe it was in 2006 we were awarded contractor of the year as a result of our work

there at the Port of Anchorage.

We've worked all over the state of Alaska from the Aleutian Chain out in Adak to Cold Bay, we worked in Anchorage down in the Kiski, Homer, Juneau, Vanagle, Ketchikan, we just completed a cruise ship dock in Ketchikan, we've done a lot of work for the Alaska State ferries and building their ferry terminals and maintaining their ferry terminals.

I'm sure I've missed some of the places we've worked in Alaska. We worked all over Alaska.

Q Has Manson worked for the Corps as an owner previous to Nome?

A Yes, several times.

Q And what is Manson's relationship with the Corps?

A Well, as I say, I believe it was in 2006 Manson received contractor of the year award from the Alaska District of the Corps of Engineers, so I don't think you get that without a fairly good reputation with the Corps of Engineers.

Manson as being a family-owned company has always felt very strong that our relationship with our owners is a very, very important part of our doing business and that this relationship we build with an owner, and we take great pride in the work that we've

done and the reputation we have in doing that work.

Q What is Manson's history with regard to filing claims?

A Well, I've been with Manson 40 years and this is the first claim that I'm aware of we've been involved in.

Q Now, has Manson does other JV work with Kiewit?

A Yes, we have. The job that we did in Nome was a successor job to a job that we were a joint venture partner with Kiewit on the Bonneville Dam, and, again, that was done for the Army Corps of Engineers. It was called a fish bypass. I believe the contract value was, well, I believe it was well over $50 million. It was a very good size job also for the Army Corps of Engineers.

Q How would you describe this project in relation to the work Kiewit performed versus what Manson performed?

A Very similar in that Kiewit performed -- Kiewit is primarily an over the land contractor primarily, bridges that do go over the water, but basically a land-based construction company. Manson is strictly a marine-based construction company. Our work is done almost entirely over the water.

So we work well together on a project that interfaces between some building on the land and building on the water.

The fish bypass job was a perfect example where there was quite a bit of dredging, some excavating to do, some backfilling with rock, some in water concrete structures to be built, as well as some upland work that had to be done, so it was a very, very, an excellent opportunity for the two companies to work together.

When the job in Nome was put out on the streets, we were just finishing the job at Bonneville Dam and it was a natural transition as we started talking about, both companies talking about the job at Nome. It was decided that it would be a good opportunity to bid that job as well together because of the dredging component, and the quarry, and the rock, and roadwork and that sort of thing.

Q What is the relationship? Is it good with Kiewit or are there problems?

A We've always enjoyed an excellent relationship with them.

Q Where does Manson work physically?

A Well, when I started working for Manson 40 years ago we were a Seattle-based company. I can

remember being asked to go up to Bellingham to work and I felt like I was going clear out of the country.

Since then we've expanded and opened up office in the mid-1980s in California, one in Richmond, which is in the San Francisco area, we also have an office in Los Angeles, we have an office in Houma, Louisiana, now, and just recently opened an office in Jacksonville, Florida.

So now our operations have expanded dramatically over those years. We've also done a lot of work in Mexico, Panama, Ecuador, the Philippines. Completed a job two years ago in Russia. We're working in the Bahamas now. So we're pretty much an international company with our headquarters in Seattle.

Q With regard to this project, the Nome project, what was your involvement? Give me an overview, if you would, of what your involvement was personally.

A Well, my position is Vice President, Northwest Area Manager, so my area of responsibility is the northwest area of the United States, which is a fairly broad area because Hawaii is my responsibility as well as Alaska. We've had a history of some work done in Mexico that I've been responsible for.

So primarily my area of responsibility is Washington, Oregon, Idaho, Montana, Alaska, Hawaii and some of the international work.

Q And how about on this job? What was your involvement? Did you participate in the bid? What did you do?

A On this particular job, similar to all the jobs that we get that would be in the northwest, I was involved in the bid reviews. Once the estimators had compiled their estimate, then it was reviewed by any number of us in the senior management team and we made suggestions, corrections, changes that we felt were necessary.

Then the bid was submitted. Once the job was awarded to the joint venture then it was my responsibility to put a team together and equipment together to proceed with the project and get it done.

Q And with regard to the estimate, did you put a team together to complete the estimate?

A I did not put the team together. We have a staff of estimators that put our estimates together.

Q And who put the estimate together in this project?

A The estimate for this job, and I'm talking about the dredging side of the project, Kiewit did a

lot of the estimating for the land-based but we both did overlapping estimates. But to put the estimate together it was primarily a team of John Holmes, who is our lead estimator, our dredging manager, Leonard Juhnke and Leonard brought in a consultant by the name of Bob Lofgren to help review the estimate as well.

Q And how was that broken up? What did Mr. Lofgren do versus Mr. Juhnke, for example?

A Well, Leonard is a past U.S. Army Corps of Engineers employee. He was a 20-plus-year employee for the Corps, so he's got a great deal of experience obviously in dredging. But like any of us, when we get into very technical, detailed documents we tend to want other people to review them with us as well, give us another set of eyes to look at, give us another opinion.

It's quite often, particularly on a hydraulic dredging job that requires the use of a hydraulic dredge such as the vessel that we use, the Bechtolt, it's very common to bring in a person that may even have experience with that particular vessel. So it just so happens that Mr. Lofgren worked for Reidell Corporation.

When Reidell Corporation went bankrupt, Manson purchased all of their dredging equipment,

which part of it was the dredge Bechtolt. So Mr. Lofgren had a great deal of experience with the dredge Bechtolt, so it was a very nice match to bring him in to have him help consult on this project because from the very early going on we had made plans to use that vessel for this project.

Q And with respect to Mr. Juhnke, how many years did he have an employment with Manson?

A I'm not sure when Leonard started, but I'm sure he's approaching that 20 years that he's worked for Manson, and I know he had at least 20 years with the Corps.

Q Now, with regard to the construction, you indicated you were responsible for putting that team together. Who was on the construction team, and what did they do? What were their assignments?

A Again, too, what we were looking for was a very experienced crew that could go up there realizing that Nome is a very difficult place to work. It's remote, it's difficult to get spare parts and the window of opportunity to work in Nome is very limited. There is ice in the harbor and ice in the Bering Sea until June, so you can't really access Nome until some time after June 1.

Then anytime, somewhere in the late

September area the ice is going to come back, and so you only have that window of opportunity to work. So it is very, very important as to the equipment that you choose to work up there and the people that you choose to operate it and run the job. So Manson wanted to pick our very best people to go up there and do this project because of that very limited window of opportunity to get this project done.

We didn't want to leave the equipment up there. Although we had the following year to complete the project to work out well and synchronize with the rest of the work going on, it was important that we got it done in the first year.

In addition to that, we didn't want to have to pay the mobilization charge of taking the vessels out of Nome, back to Seattle or some other safe harbor and bring them back or have to leave them up there and let them ice in over the winter where we couldn't utilize the equipment for the rest of the year.

Q And so who did you have specifically, the personalities, on the project, some of whom the Court will hear testify, so, if you would, please tell us about those people.

A Always the first most important person is whoever is going to lead the project from the dredging

side and that was going to be Bob Richardson. Bob Richardson has worked for Manson since he left high school. His first job was on a hydraulic dredge similar to the Bechtolt, so he's very, very knowledgeable.

He ran our job over in Russia for us. Just has a vast experience in dredging projects. He's done the Anchorage dredging project any number of times. Just a very, very experienced well-versed individual on doing dredging jobs. So he was the choice that we had to be the project manager for it.

Because of the change in elevations and that sort of thing on this project the hydrographic surveying was of importance so we chose Max Oviato to be our project engineer on this project. He has a great deal of hydrographic survey experience. He came to work for Manson I believe at least 10 years ago, and he's an engineer.

He came to work for us in southern California and went to work on our cutter dredge, H.R. Morris, and did all the hydrographic surveying and the project engineering for the jobs that that vessel does in southern California. So he was the project engineer that we chose for that project. He has also worked together with Bob quite often and they've been

a real successful team.

The dredge captain for the Bechtolt, which was one of the pieces of equipment we used, was Donnie Johnson. Donnie Johnson was another employee that worked for Reidell Corporation before and he had also worked aboard the Bechtolt when it was owned by Reidell. The dredge captain for the Viking was Steve Skredvig.

Steve had worked on the Viking over in Russia and had worked on it in a number of different dredging jobs that we did. So we felt very confident in that leadership team in Nome to be able to plan out the work, get the equipment, mobilize, get it up there and have the job done successfully.

Q How many years had Mr. Johnson, running the Bechtolt, had with Manson?

A Gosh. I believe Donnie's worked as a dredge captain for us for approximately the last five or six years. Prior to that, he's been on dredging jobs and been an engineer aboard our cutter-suction dredges and also been a deck engineer aboard some of our crane barges. So he's got a real wide range of experience.

A very, very nice gentleman and really knows his work. His father also was a lifelong employee of Reidell Corporation and he did work for Manson in the

last few years that he worked for them, so he's a second generation dredgehand. I think Bob Richardson as well, back to the project manager, I think he's like a third generation dredgerman.

Q And how about Mr. Skredvig? How much experience did he have?

A Well, Steve unfortunately is no longer an employee for Manson, but prior to his departure he had worked for Manson for probably 15 years and worked primarily being a foreman around construction projects. We had moved him up into doing some dredging work with the dredges and was doing a very good job.

Q And Mr. Johnson ran the Bechtolt. Would you describe to the Court, please, the difference, and we're going to see some pictures but just describe now what the basic difference is between the Bechtolt and the Viking.

A Right.

Q Just without the pictures.

A Okay. The Bechtolt is a cutter-suction dredge. A cutter-suction dredge is a piece of equipment that has a large pump in it.

Q What is the Viking?

A The Viking is a crane barge that is

basically a crane mounted on a barge that used a clamshell bucket to dig material.

THE COURT: Would we understand it better with the pictures?

MR. VIERGUTZ: We would. Now, Your Honor. I'm just going on a very brief explanation. If you could describe what we're looking at in this first picture? We've got some copies, do we not?

THE COURT: Are we having mechanical difficulties?

BY MR. VIERGUTZ:

Q Could you describe, please, what the first picture represents?

THE COURT: You're not on the same subject anymore, right? Is there some way we could get this testimony together --

MR. VIERGUTZ: We sure can, Your Honor.

THE COURT: -- rather than doing it twice, which we're going to do anyway?

MR. VIERGUTZ: Could I approach, Your Honor?

THE COURT: Yes. Go ahead. These are pictures that we have not had before, right?

(Away from microphone.)

MR. VIERGUTZ: That's correct, Your Honor, they're --

THE COURT: All right. Well, some of them look the same, or not?

MR. VIERGUTZ: Yes, they are. We thought it might be easier to Bates-number if we did them per witness.

THE COURT: Except now we're doing some of these pictures with Bates numbers and some without. Like this fourth one is, is it the same? Yes. It's the same as the first one from the last set, and we're doing this without any organization because?

MR. VIERGUTZ: We thought it might be easier, Your Honor, to track per the witness. The first group wasn't introduced as an exhibit.

THE COURT: Well, are you introducing these as an exhibit?

MR. VIERGUTZ: No, just demonstrative.

THE COURT: So what's the difference? We couldn't have done this with one set? Now we'll be referring to different sets and have different demonstratives. Go ahead. It'll take way too long to retool this. Honestly, this makes no sense whatsoever.

MR. VIERGUTZ: Very good, Your Honor. Thought it may be easier, but I was wrong.

MR. HIBEY: Your Honor, at the risk of

confusing things, I just want to understand, these are Bates-numbered to --

THE COURT: Because.

MR. HIBEY: They're not part of a joint exhibit or a Plaintiff exhibit?

THE COURT: I have no idea.

MR. VIERGUTZ: No. Just to follow through with his testimony so we --

THE COURT: But they're Bates-numbered in relation to what other Bates numbers?

MR. VIERGUTZ: It's the end. The last Bates number that we used we just continued on.

THE COURT: The last number of?

MR. VIERGUTZ: Plaintiff's Bates numbers.

THE COURT: Well, but the Defendant had exhibits that were Bates-numbered also. Is this overlapping now with the Defendant's Bates numbers on their documents?

MR. VIERGUTZ: It is not, Your Honor. It's Plaintiff's Bates number.

THE COURT: Well, it can't be. Exhibits: Joint, and Plaintiff's, and Defendant's, okay? So the Defendant's would be the last Bates numbers theoretically if you had followed the instructions, which I think in this regard maybe you did. So if we

look at Exhibit 2037, what's the last Bates number on that, on the last page of 2037?

MR. HIBEY: Your Honor?

THE COURT: All right. And herein lies the problem. Mr. Viergutz, stay with me, please.

MR. VIERGUTZ: Yes, Your Honor.

THE COURT: The last Bates number in this case as of this moment before you gave me this package -- and I apologize to the witness. This has been going on for a long time. It's just another example. The last Bates number in here is 48415. Mr. Hibey is correct to raise it as a problem.

That's why I was trying to figure out what in the world we're doing. You have numbered these pages 30754 which follows the last Plaintiff's Bates number, but indeed, would completely screw us up because we would have that as a duplicate number, so that doesn't make any sense at all.

We can renumber these in some way as demonstrative, but these Bates numbers are only going to cause us confusion because you've taken no account of the Defendant's Bates numbers.

MR. VIERGUTZ: I apologize, Your Honor.

THE COURT: So let's see if we can't take a moment and do this together, and perhaps I can lead

you through it. You've given us a number of pictures, and if everybody would stay with me and remark for a moment we'll just do an *A, B, C* on these.

The first picture, and I'll just hold them up as we go along, this is *A*. The second one, which was originally ending in 55, is *B*. Everybody with me? The third, which is ending in 56, is now *C*. It's the Nome Harbor picture.

The fourth, which is what keyed me in to the problem, is the same as the document we have in the earlier demonstratives. It was originally numbered 57, it is now *D*. It's called the final design. What was originally 58 is now *E*, no name. What was originally 59 is now *F*, no name.

What was originally 60, which is a ship, the Viking, is now *G*. What was originally 61 is now *H*. What was originally 62 is now *I*. What was originally 63 is now *J*. What was originally 64 is now *K*. I think that takes care of it. Please, both parties, when referring to any of these demonstratives use the letters we've just designated. Go ahead.

MR. VIERGUTZ: Thank you, Your Honor.

BY MR. VIERGUTZ:

Q Would you go to *G*, please?

THE COURT: I'm sorry, which one are we

going to Mr. Viergutz?

MR. VIERGUTZ: *G*, Your Honor.

THE COURT: All right.

MR. VIERGUTZ: Sir, what does *G* depict?

THE WITNESS: *G* is a picture of the dirt barge Viking, and this is as we entered the harbor en route from Seattle landing in the harbor just after the ice had left. As you can see, there's a dump barge alongside and within the dump barge you can see pontoons sticking up that are on top of the dredge pipes, the Bechtolt, we use.

MR. VIERGUTZ: Your Honor, could the witness come down and point, please, perhaps --

THE COURT: As long as you understand that you need to either pick up that little microphone right there or stand close enough so it can pick you up.

THE WITNESS: Okay.

BY MR. VIERGUTZ:

Q Then if you could start, please, sir, again. after where you said it was a dump barge so we have some definition.

A Alongside the Viking is a dump barge over here, and it has a pocket within it that is loaded with dredge pipe and you can see dredge pontoons

stacked on top of it. It's what the Bechtolt were used to pump the material from the bottom to the disposal sites. Aboard the Viking is -- sorry if I'm blocking some of you.

THE COURT: They can move if they need to.

THE WITNESS: Aboard the Viking you'll see the dredge tender boat, Lisa M, is here on deck of the Viking.

BY MR. VIERGUTZ:

Q Excuse me, sir. What does that mean, dredge tender?

A It's a small tugboat that assists the Bechtolt when it's in operation doing its dredging. Then on the other side of the boom that's laid down for sea you can see the mast sticking up of the Bechtolt. The Bechtolt is actually on deck and secured on deck of the Viking.

THE COURT: Okay. Did you say this was *G*, Mr. Viergutz? Is that what you said?

MR. VIERGUTZ: *G*, Your Honor.

THE COURT: Okay. Now, I assume the difference from the picture and that is just that it's a portion of it? Is that the only difference from what you've given us? I haven't done a close enough comparison but is that what it is?

MR. VIERGUTZ: It's a little close up here.

THE COURT: Okay. So you've cut off a part of the picture as opposed to its being a different picture.

MR. VIERGUTZ: Yes.

THE COURT: All right. Thank you.

BY MR. VIERGUTZ:

Q Sir, so am I correct the Viking is a much larger barge than the Bechtolt?

A That's correct, yes. The Bechtolt is so small it would not be able to encounter the waves and the sea state that exist in the Gulf of Alaska and the Bering Sea, so it would have to go to be on another vessel. The restrictions to get into the Nome Harbor, as it exists in the early part of June, would require a very small vessel to access the harbor.

So we had to use the Bechtolt, but it wasn't able to transit on its own.

Q If you could go to *H*, please? What is that depicting, sir?

A This is a picture of the derrick barge Viking. This crane is up here and then it's holding on to a clamshell bucket that grabs the material off the bottom. This is a 14-cubic-yard bucket, and it's depositing the material that is dug off the bottom and

placing it into a dump barge that's alongside.

The dump barge is actually two barges connected together. They're held together by a hinge here on deck and hydraulic cylinders underneath, and they're held together hydraulically. If we load them up, the tugboat will take them out to the disposal area where they remotely operate the engine aboard the dump barge, it hydraulically opens it up and it dumps itself. They close it back up by remote control from the tugboat and bring it back alongside to be reloaded.

Q While the dump barge is proceeding to dump its load does the Viking operate?

A No, it cannot. It may move into a new position, or move its anchors, or do some prep work, or some maintenance that needs to be done, or fueling, but it will not have any place to put the material.

Q Is all of this a matter of timing? Is that important in your work?

MR. HIBEY: Objection. Leading.

MR. VIERGUTZ: What is important in your work as regards moving from place to place with the bucket and the dump barge?

THE WITNESS: In our estimating for the Nome project what we had to realize is that we were only

going to have one dump barge with us, and so that meant while after this barge was loaded there would be a short period of time that the barge would leave the Viking, would go out to the dump area and dump its load and come back empty.

So we had to calculate the amount of time that it would take to do that and adjust the Viking's production rate based on that factor.

BY MR. VIERGUTZ:

Q And does this barge work in a different depth than the Bechtolt?

A The Viking draws quite a bit more water and it is quite a larger barge so we would be unable to get the Viking into the harbor when we arrived in Nome with the existing depths and the existing narrowness and corners that were in the entrance channel as it existed in Nome.

Q And then if we could go to *I*, please? And what does *I* depict?

A *I* is a picture of the Bechtolt over here. Better off on this side. What you see is the operator house.

THE COURT: You're doing better on the other side because all I'm seeing is your hand at this point.

THE WITNESS: You can see the operator's station here on the Bechtolt and the ladder that sticks out the front. Unfortunately, you can't see the cutter at the end of what we call the ladder, which is the protrusion that lowers down to the bottom.

THE COURT: I think on the picture you might be able to. You want to take a look and see if it's there?

THE WITNESS: That was which?

THE COURT: It was *I*. Yours aren't renumbered.

THE WITNESS: Yes. I did number.

THE COURT: Did you number? Okay. Is what you're looking for on the picture or not?

THE WITNESS: Yes, you can see it. It's not very clear but it is over -- out on the outer end there's actually a cutter portion of the vessel that does the work.

THE COURT: Okay.

BY MR. VIERGUTZ:

Q If you could go back to *I*.

A And on the back of the dredge are what we call spuds. These are long pipes with a point on the end that actually are lowered and stick in the ground,

and that's what holds the Bechtolt in position. The cutter is turned on, the pump that is within the Bechtolt is turned on and the dredge begins sucking water.

We engage the cutter at the end and lower it to the bottom, and then we have an anchor out to either side and the operator will actually start swinging the vessel from one side to the other with one down and the other up.

When he completes his swing to one side he will drop the other spud and raise the other one and it allows him to slowly crab ahead and work his way along the bottom and lowering this ladder to a prescribed depth that maintains the depth of the harbor that we're after.

The material is pumped. It is literally sucked, it is disturbed by the cutter, and it is picked up by this pipe that is mounted behind the cutter. It picks up the dredged material or the sand and the gravel hopefully and brings it into the pump.

The pump then builds the pressure and puts it into, in this case, a hose that's a rubber hose that has basically a lifejacket around it that keeps it from sinking when we pump the mud and the water through it. That's what you see here is a discharge

hose that go up to the beach, across the land and to wherever the proper disposal area is.

Q Now, the Court has heard some testimony on cobbles and boulders. What's the impact if a cobble enters the suction dredge?

A Well, the difficulty with a cutter-suction dredge is that you have a cutter down there like the propeller of a boat, and if it gets into cable, or a large amount of debris or something it can get all tangled up in the cutter, and then it is sucking the material into a pipe and running it through a pump.

I guess it's a little bit like walking down the beach. If you stub your toe on the sand it's not too big a deal, but if you stub your toe on a rock it is a big deal. So when you have that pump turning at 400 rpm and building 100 pounds of pressure and a large rock goes through it, it does a lot of damage and wear and tear to the pump and the components, as well as this rubber discharge hose.

It is rubber, a very hard grade of rubber designed to handle fluids. When you have a rock that's rolling down that pipe, you can hear them very clearly from a long distance away, it increases the wear factor dramatically rather than being just straight sand that stays in solution and blows right

through.

Q What if it's not a round rock but it's a flat rock?

A The flat rocks are even worse because they're a sphere and they don't just stay in solution, they cut, and dive and just cut into the rubber coating. And even the steel pipe, will dent it and make it erode.

Q If we could go to *J*, please?

A *J* is a picture of the dredge working. This is the working end. There's the operator station. This is the ladder that is off what we call the bowel of the dredge, and that ladder is controlled by cables. There's a system here where the operator up here can read the exact elevation of that cutter out there.

So he will have an instrument within the cab that tells him the elevation of the water, and he will look here at his depth meter and will make the appropriate adjustment to the ladder to maintain the proper depth.

Q And what do we see in *K*, if we could go to the next one, *K*?

A *K* is just another picture where we've actually worked our way out of the inner harbor and

are working our way out through the out tube out of the inner channel. As you can see, here's the discharge hose. Again, the previous picture showed the discharge hose quite a bit out of the water.

Here, they're actually pumping material through it so the weight of the material and the water in this pipe has lowered it in the water quite a bit so you'll see it much lower in the water. As you can see again, they have one spud up and one spud down. So they're swinging one way, they'll drop the other spud, lift the other one, and it will help them crab ahead. That's actually how they move themselves ahead.

Q Is that the Viking working behind it?

A This is the Viking working behind it. The picture, evidently they were down for whatever reason because you don't see the boom in the air and the dump scowl alongside is empty. You'll see the tugboat back behind the dump scowl.

Q Now, if we could go to *B*, which is the first picture.

THE COURT: I'm sorry. *B* is not the first picture, *B* is the first small picture. The first picture is the large *A*. So you want the first small picture? Is that what you want?

MR. VIERGUTZ: That's correct, Your Honor.

THE COURT: All right. Precision does help to build the record properly.

MR. VIERGUTZ: Now, you testified earlier that the Viking could not enter the small boat harbor, is that correct?

THE WITNESS: That's correct. Due to icing conditions, and the sea state and stuff and the very short distance that the existing breakwater had for the Nome Harbor it would typically fill in every winter, and so we had a maintenance project that cleaned out this channel every year.

So we knew when we arrived in June when the ice had gone that we would not be able to get a very large vessel in. So that's why we had to plan the work with a vessel such as the Bechtolt.

BY MR. VIERGUTZ:

Q And did you dredge the inner boat harbor behind the spit?

A The dredging actually started here in the inner harbor, proceeded I believe it's northwest, and then when we got to the mouth of the Snake River made a turn and actually ended up coming through the spit and then worked our way out until we got to a depth of I believe it was -22.

Q We have the next picture for a little better closeup of that area.

A Here it shows a picture of that.

THE COURT: This is number *C*.

MR. VIERGUTZ: Correct, Your Honor. Thank you.

THE WITNESS: This existing channel that was in place when we got to Nome and had been there for years, but you can see the sharp, not a relatively sharp corner here, but it's small enough that you couldn't get a vessel such as the Viking into the inner harbor the way it existed when we arrived.

BY MR. VIERGUTZ:

Q *D*, please. What does *D* depict to you?

THE COURT: All right. Let the record reflect this is the same final design picture that we've used previously with prior witnesses.

THE WITNESS: This depicts the dredging that occurred in Nome and that was required to be done by Manson as part of the joint venture.

BY MR. VIERGUTZ:

Q When you say this, it's the blue --

A The blue, yes.

THE COURT: The block of blue. You're talking about the dark blue or are you talking about

the area that's marked channel?

THE WITNESS: The area that's marked channel.

THE COURT: Okay.

BY MR. VIERGUTZ:

Q And was that dredged to that depth?

A It was dredged to the depths that are noted here on the picture.

Q And what is noted?

A The channel depth was -12 and the outer channel was down at -22.

Q Behind those numbers is MLLW. What does that stand for?

A That's a standard measurement baseline that you use for determining for depth. It stands for mean low low water.

Q And what does that mean in laymen's terms?

A It's just a prescribed title elevation that's common to everyone that they understand.

Q Okay. And *E*, please, the next picture? What does that depict?

A *E* is a picture of the beginnings of building the new jetty. You can see piles of rock that have been quarried and have been prepared to bring out and build the jetty. Once a lot of this rock was used,

then Manson could come through and dig the new entrance channel through here.

Q Why couldn't Manson work during the first two?

A Because all of this rock that had to be used for the jetty, the only access we had was to come through across this way.

Q So it was impossible for Manson to do the dredging until Kiewit had completed its rockwork?

A That's correct. They had some additional rock stockpiled on there just in case they needed it to finish it, but they had to get that done so that we could come through and take their access away.

Q Now, the final picture we're looking at is *F*.

A This picture was taken just prior to us coming through and opening this area up to the out and creating this new channel.

Q Now, if you could go back to where you were I'd appreciate it and describe to the Court, if you would, what the large picture represents, *A*?

A The large picture *A* is a picture of the Nome harbor as it existed in June when we arrived.

Q And where would you have dredged in relation to the spit, the outer harbor as well as the inner

harbor?

A Yes.

Q And which of the pieces of equipment did that dredging?

A The inner harbor dredging was all done with the Bechtolt, and the outer harbor dredging was not estimated but ended up being done with the Viking.

Q It was not estimated with the Viking?

A No.

Q Why?

A The Viking was brought to Nome primarily to carry the Bechtolt up there. It was brought to Nome to dredge along the piers that are on the existing breakwater. It's a little difficult with a cutter-suction dredge to dredge alongside sheet piles, so we brought the Viking up there to do that.

In addition to that, a secondary, she was a backup piece of equipment. In case we had trouble with the Bechtolt, we knew that with that extra equipment up there we'd be able to by some way get the job done.

Q You mentioned the estimate just a bit ago. What is Manson's approach to estimating projects?

A Well, you know, our approach is to obviously have the most capable people we can think of to

prepare our estimates. I feel we really have the best in the industry. In addition to that, we need to have a wide variety of people look at our estimates and give their opinion, and we do do that. That is our system.

Once the estimates are prepared, then we will look at the project, and look at the specifications and see what risks are involved, how the owner has stated, if he's put in a lot of exculpatory language, that sort of thing, whether there's a differing site condition clause. We look at all those factors and that evaluates the markup that we'll put on a project.

Typically my experience has been over the years that most owners want to minimize the risk that a contractor will look at their drawings and put a minimum amount of risk that will elevate the cost to the job. So they want to put in as much information as they can but not do anything that will suggest risk in a project that would lead to increased cost.

I think that's primarily why a lot of owners will put a differing site condition clause in their contract, to minimize the risk that a contractor feels that they're going to be exposed to on a project.

Q On this project did you follow that general

approach?

A Yeah, we did. Very much so.

Q And was there a differing site condition clause in this contract?

A Yes, there was.

Q And of what relevance is that to you in bidding?

A Well, the difference would be is that, you know, when we did our prejob job walk and went up there and actually viewed the site, you know, it was frozen over. So typical of a dredging job, most of our work is under water so it's a little tough to go kick the tires, as you'd say, and it just is hard to get a real good feel for what you're going to run into.

So you do need a lot of knowledge, and you need a lot of experience, and you need good drawings and good soil borings to be able to judge what your production rate is going to be.

Q Did you in this case send up the estimators to conduct a site investigation?

A We did. We had Leonard Juhnke and Bob Lofgren both go to Nome and look at the site.

Q And what you're saying is it's of limited relevance because your work is under water?

A When they were there it was totally frozen over.

Q And so you rely on what then?

A Then you have to rely on the information that's given you within the specifications in the contract documents.

Q So do you and your estimators review the plans in detail?

A Very, very detailed, yes.

Q And the specifications also?

A Yes.

Q And is that pretty much what you have to do your estimate in your work?

A You know, it's a little hard to describe, but our equipment is really very simple to estimate to a point. It's simple to estimate because it basically, if you want to correlate it to a car, they run down the highway at 60 miles an hour. The trench barge does one cycle a minute, so it's very easy to figure out what it's going to do.

The dredge pump that's within the Bechtolt can move a certain amount of water every minute or every hour, so it's fairly easy when you figure that it's going to be pumping material at a 30-percent density, it's fairly easy to figure out. What the

difficult part of it is is looking at what the material is.

How are you going to be able to get it into that clamshell bucket, and how is that cutter going to be able to cut into the material and get it into solution so that the pump can access it to pump it?

That's where the trick is, and that's where we have to just diligently look at the borings and any information we can get that will help us determine how that material is going to be available for that dredge, either a clamshell dredge or a cutter-section dredge. That is the crux of the matter.

If the material is very hard and it's a 14-cubic-yard bucket, such as the Viking used on the Nome project, if we can only get one cubic yard in that bucker per cycle, it's going to limit very much the production rate and increase the cost of doing the project.

If we can get 14 yards in that bucket per one-minute cycle, it is going to certainly reduce the cost of doing that project.

So those are the key in doing a dredge estimate is determining what the soil is like and determining how much we're going to be able to get at each cycle, or at each gallon of water going through

the pump, or how much that cutter is going to be able to bring that material into solution for the Bechtolt.

That is the crux of the matter. That's the whole thing that we have to figure out, and that's the difficult part of doing a dredge estimate.

Q On this project was there anything on which you could rely for those determinations other than the contract documents?

A There were some soil borings. We certainly would have liked to have seen more, but there were soil borings within the area that we were going to dredge that we were able to look at, and evaluate and base our bid on those borings. Our experience looking at the borings, the blow counts and the makeup of the material, we can correlate about how much we're going to be able to dredge based on that material.

Q On this project did you go out and do your own boring?

A No, we did not.

Q That's not allowed?

A I believe it would have been allowed, but it would have been very difficult. Would have had to mobilize equipment to Nome. It would have made it very expensive, and there were borings there that gave us the information we needed.

Q And you said you had a 14-ton bucket?

A Fourteen cubic yard.

Q Fourteen cubic yard. Did you bring along other buckets?

A As usual, we brought along a backup bucket. The buckets are a piece of machinery, they can break, so we always try to bring a backup, and we had a 10-yard bucket with us.

Q What's the difference between those two?

A One has a larger capacity than the other. In other words, one is a little bit bigger than the other. A clamshell bucket's kind of a unique monster, but its capability is determined quite a bit by the amount of weight that's on the lips. The bigger the bucket is and the lighter it is, the less weight per square inches on the lips.

It's those lips that need to dig into the material, and then the geometry of the bucket takes over and forces the bucket into the material and makes it dig quite deeply. Both the 14-yard and the 10-yard bucket had very similar what we call lip pressures. In other, the weight per square inch of lip that touches the ground when you lower it were very similar.

So we tended to use the 14-cubic-yard

throughout the project because the lip pressure's the same. I guess if you would say we were going to get half a bucket, because the lip pressures were the same and we were going to get half a bucketful every time, you'd get five cubic yards in the 10-yard and you'd get seven cubic yards in the 14-yards, so you'd tend to use the 14-cubic-yard because you would get more.

Q And did you base your estimate on that?

A We didn't really base our estimate on using one bucket over the other. We based our estimate on what the material was and how much we thought we could dredge per hour.

Q In constructing your estimate, you testified earlier you had done maintenance dredging at the Anchorage Harbor, is that correct?

A Yes.

Q Had you done that in Nome?

A No, we had not done any of the maintenance dredging.

Q Did you talk to the business or entity doing the maintenance dredging in Nome?

A We did not. The dredging community is a fairly small community. There has been some federal cases accusing the dredging industry of collusion and that sort of thing, so we do not tend to talk to other

contractors prior to a bid. We do our estimate on our own and accept that.

You know, you never know the credibility of another contractor either, whether he's going to give you the proper information or not, and so we tend to feel that our experience is in depth enough to be able to evaluate the project without having to contact another contractor.

Q Now, you said that there were test borings in the contract documents, am I correct?

A That's correct.

Q Would you look at Exhibit 10? You'll find that down there. It's the bigger set of plans. We thought it may be easier to look at. I'd refer you to Bates No. 78, please. Now, on this document is there a layout of the test borings?

A Yes, there is.

Q And where are they located?

A Over on the left-hand side of the drawings there's a jetty coming out from the beach coming from the top of the page to the bottom of the page, and you'll see along that jetty starting towards the top is an HLO-1, and HLO-2, HLO-3 through HLO-6.

Then if you go a little further to the right you'll see the other jetty coming from the top of the

page to the bottom and that, just to the left about three-quarters of the way towards the bottom of the page you'll see an SED-3, and a little further up the page in between the two breakwaters you'll see an SED-4, and then in between the breakwaters at the top of the page you'll see quite a smattering of AP10006, and I think there's actually 11 different borings done there with the AP prefix.

Q Now, let me stop you there for a second. What's the difference between HLO, and AP and SEP?

A You know, I don't honestly know. It was done by independent geotechnical firms and they all have their own way of designating. I think HL is Howard Lawson or something Lawson. I don't know. Everybody has their own system of numbering, and it doesn't really matter, or play a role, or have any importance.

Q It's just different firms?

A Identifies that particular hole.

Q Now, are any of these within the dredging prism, the area to be dredged?

A Yes. Some of the AP, and the SED-4 and the HLO-2 were probably the ones we gave the highest credibility to because they were where we were going to be doing the work, so they would directly correlate

to the material that we were going to experience when we did our dredging project.

Q What would be the relevance, if any, of a boring a third of a mile away?

A It would have very little meaning to us. We weren't going to be doing any work in that area, and it could be significantly different. We just don't know. It could be the same, it could be different. It just really wouldn't have any relevance because we wouldn't be working in that area.

Q So what you said I believe is that those test bores within the dredging prism are what you're looking for in your estimating?

A Those would be the ones we would give the highest credibility to, yes. In addition, it was nice that there was a set of borings that went from inshore to offshore that were done on this HLO line, one through six, that went from inshore to offshore. It helped us validate how the bottom sediment was stratified as it worked from offshore to inshore. So those were given some credibility as well.

Q Now, going towards the bullnose of the main breakwater, the spur breakwater also, do you have any test boring data in the area where you're dredging -22 feet?

A There is none.

Q And how about the -12.5 feet?

A There is one about midway in that area, the SED-4.

Q And then there are a few more as you work inland with the AP, correct?

A That's correct. There were none in the inner harbor, which we would have liked to have seen, and a few more on that main channel, but we felt that there was enough there to make a decision. They were consistent enough that, you know, the borings all were very similar. So the fact that they were similar told us that probably nothing unexpected in either end of the extremities of the area we had to dredge.

Q So what I hear you say is you felt that there was an acceptable number of samples in the locations to be able to construct your --

A And the consistency of the material that was depicted in those samplings, we felt comfortable that we could determine what our production rate would be, yes.

MR. VIERGUTZ: Okay. Now, if you could turn, and it's always difficult doing it the first time and I'll help you if you need it, but Exhibit 149, JX149. Could I approach, Your Honor?

THE COURT: Certainly. It would help if somebody from your side would do so and help.

MR. VIERGUTZ: Thank you.

THE WITNESS: Okay.

BY MR. VIERGUTZ:

Q And Bates No. 2411, please.

A Okay.

Q And is that Section 02222, dredging excavation and disposal?

A Yes, it is.

Q Those were the specifications on which you based your bid?

A Some of them, yes.

Q And 1.3 is the character of materials. Did you review that specification section in the construction of Manson's bid?

A We certainly did.

Q So not only you, but others? Do you have personal knowledge of that?

A Yes.

Q And who had reviewed this spec section at Manson?

A I'm sure John Holmes did, and I know for sure that Leonard Juhnke and Bob Lofgren and myself both read this language prior to the bid.

Q And approximately in the middle of the character of materials, Section 1.3 on Bates No. 2411 of Exhibit 149, the sentence starts incidental sunken logs, boulders, rocks, snags, cobbles, gravel, sand, silt, glacial till, miscellaneous metal debris, anchors, sunken boats and barges, old mining equipment and other miscellaneous debris from the harbor, mining and fishing operations, should be expected throughout the excavation and dredging areas.

Did you read the word "incidental" to modify sunken logs or did you read it to modify the entire array of verbiage?

A The word "incidental" is descriptive of all the following items. I think they missed Coke bottles and shopping carts. It reminds of an aspirin bottle that tells you you're going to have a heart attack and everything else.

I mean, it's boilerplate language that you see in contracts that is, you know, it's contradictory to a lot of the very detailed information. Like the soil borings give you that there is sand and silt in this dredge here. Here they say it's incidental.

So there are contradictions in it, and we viewed it as -- we use the word incidental as a very strong driver that none of this was very important,

and what it was telling the contractor is don't come to us and say you found one shopping cart and you want an extra $1 million. That's what that language is saying. That's what it said to us.

Don't come to us with incidental things that are going to drive up the cost of doing the job. That's what that language says. It's boilerplate, it really was not important and that's the way we viewed it.

Q Now, if you could leave that open and then, please, sir, go to Exhibit 109, JX109? Leave that section open. You may need it, I'm not certain. JX109, and Bates number, once you get there, 1386, please. Now, this is the contracting officer's decision regarding the dredging claim. Did you review that decision at the time you received it at Manson?

A Yes, I did, and was somewhat surprised by it.

Q Now, that page 1386, on the final paragraph, the second sentence says the word "incidental" modifies only the word "sunken logs" and not all the items listed in the sentence. Would you agree or disagree with that position?

A I very strongly disagree with that. "Incidental" is modifying all the words behind it. It

doesn't say "incidental sunken logs and a great deal of the following." If it only applies to sunken logs, what word modifies all the rest of the things that are listed?

I mean, it very clearly, every English class I've ever taken would have said "incidental" refers to everything now and after it." So I can't see how it could be read any other way. I was very surprised to see someone write that because anybody I've ever talked to that I've asked to read it, they've said incidental refers to all those items.

Q Now, you testified that was your interpretation, correct?

A Yes.

Q And did you discuss this with Mr. Juhnke and Mr. Lofgren, who you testified also reviewed the specification section?

A You know, that was several years ago. I know we've all read these documents. Whether we specifically talked about it in a group, I'm not aware. I personally remember reading it, but I don't remember if we discussed it as a group or not.

Q You don't remember it being a huge issue?

A No, it was not.

Q Okay. And you can close that book, sir,

Exhibit 109, and put that away. And then we're on Exhibit 149, which continues to be in front of you, and if you'd turn to within that exhibit 2420, the Bates number, please. Is that an exploration log that was contained within the specifications of contract documents for this project?

A That's correct.

Q And would you be so kind, sir, as to go through with us this exploration log and what your interpretation of it is?

A Well, this is AP1011 and it's one of the, I believe this was actually in the dredging area, and it was right at the turn of our dredging where we came out of the inner harbor and started going out into the main channel.

The boring, you know, what it does is depict on the far left column the depth that the boring went down and then as you go to the right it has different classifications of what that material was as they went down the different depths. One of the things we look at is blow count, which is about the sixth column from the left.

The blow count is a standard unit of measure that industry uses to determine the hardness of the ground. The blow counts here, as you can see from the

top of the page going down quite some ways, they're not even listed because evidently the material was so soft that it didn't even resist the 2-1/2-inch spoon, which is a fairly standard size spoon that they use.

Then once it got down to a depth of 16 feet, then it started taking two blows with their 300 pound weight to get that to go a foot. Then you can see the blow counts. As they went deeper and deeper, the blow counts started going up. The next column over, the classification, once they withdrew the spoon they graded the material.

In other words, they said what the material was. Like at the top, it's a poorly graded sand with gravel, as they went down to the 16-foot elevation it was well graded sand, and actually down at the 20-foot elevation they ran into some peat, and then down at the end of their test hole, at 24 feet, was a poorly graded sand.

And then typically as they go over to the right or as they go to the right one of the things they'll look for is what's the maximum size in inches? You'll see there up at the top the maximum size of anything they found was an inch, an inch, and then as they got down towards the bottom of their test hole, things were as small as half an inch.

Then the last description over on the right is kind of a catch all that they'll do a little further description, usually of the material, anything unique about it, might describe if there was a problem with the machine or, anyhow, just kind of a general area for description and remarks.

As you can see there, they say the material is an olive gray wet subground gravel, fine to medium sand. It's a further description of what the material is. That's very important to us, to read all of that and have it form a picture in our mind as to how dredgeable that material is.

Q And you based your bid on these exploration logs, did you?

A Yes, we did.

Q And do you see anywhere in this log where cobbles or boulders are referenced?

A I do not see any cobbles or boulders referenced.

Q Any glacial till?

A No.

Q How about if we go to 2422. That's a little bit different test. What is this?

A This is SED-3.

Q So that's just from a different entity but

it's also an exploration log, it's just graphed differently.

A That's correct.

Q Thank you. And what does it depict to you?

A The biggest thing you're looking for here, I mean, personally it's not my favorite type but it's still a good graph, it's telling you the size of the material that was recovered when they did the boring. You can see it on the graph what the size was. It's the material that drops through a screen.

Anyhow, this particular sample said that there was nothing any larger than would pass through a No. 4 screen, which is fairly small.

Q And then you talked about the sampling. If you'd please look at 2423 and 2423A, and especially 2423A, the first full paragraph. Does that describe the sampling method?

A Yes, it does. It states how they set up their equipment and how they did the borings, yes.

Q Is this a fairly standard method or is it a unique method in your opinion?

A Well, you don't see it very often where they get to work out on ice, but occasionally, obviously in areas like Nome it's an advantage to be able to have a hard surface to work off of, and that's how they did

it. But we don't see it very often other than in areas as far north as Nome.

Q But using a split-spoon sampler, that type of procedure, is it a common procedure or no?

A Very common. The 2-1/2-inch spoon is a fairly common system.

Q So what they're doing, other than being on the ice, is not exceptional, it's standard?

A It all comes out the same. You really don't know what they're doing it from, other than in a descriptive narrative like you have on 2423A.

Q Okay. Then let's look at 2466, please. And is this another boring exploration log?

A Yes, it is.

Q And would you describe to us what's being depicted here in this log to you? This is HLO-2, correct?

A HLO-2 I believe was right in the area of the *B* sand trap where we dredged quite a bit of material. It describes the material quite similar to the first boring we had, and describes the blow counts, describes the material.

Q And what material are you seeing here?

A Predominantly gray silty sand, black brown silty sand, gray gravely sand, gray gravely sand clear

to a depth of 40 feet.
Q And you don't see reference to cobbles, or boulders, or glacial till?
A No, I do not.
Q And did you rely on these exploration logs in constructing your bid?
A This was a particularly important boring in that it was one of the ones that we were going to have to do a considerable amount of dredging with the Bechtolt in that east sand trap. So this was a very significant boring to us, yes.
THE COURT: Move the mic turning towards you. Apparently the reporter is having trouble hearing you. I think you're speaking up just fine, but apparently she --
THE WITNESS: We'll try that. Is that better?
BY MR. VIERGUTZ:
Q Now if 2466, had it said boulders, cobbles, glacial till, what impact would that have had on your bid?
A It would had a very significant impact.
Q In what respect?
A It would have obviously slowed our rate of production and thusly increased our costs of doing the

project. Again, too, it depends on at what percent of impact we would have viewed that. I mean, it might have necessitated bringing another piece of equipment up, it might have necessitated laying a piece of equipment over the winter if we couldn't get it done if it had that significant an impact.

Again, you don't know because you don't see it here, so you don't know the amount of impact that it would have had. But based on this information, all appearances would tell you that it was a very easy material to pump with a hydraulic dredge.

Q And you described for the Court a picture of the Bechtolt and the piping and what happened if a rock, both round and flat, became embedded in there. Do you recall that?

A Yes.

Q Okay. And what, sir, is the impact in the Bechtolt if it encounters glacial till?

A The cutters that we took to Nome for the cutterhead, which is the propeller if you would like to call it, out on the end were just plain blades. I would say if we knew we were going to encounter glacial till we probably would have replaced those blades with blades that had cutter teeth on it that would tend to break up the glacial till.

The cutter blades that we used are a flat blade, like a curved blade of a knife, and when they hit a very hard surface they tend to just bounce and skip, and you'll actually get the ladder of the dredge doing this, bouncing on the bottom like it's sitting on cement, the glacial tills that can be that hard.

Q And what impact would it have on the Viking, the clamshell?

A It would just seriously reduce the amount of material that you would be able to get or grab ahold of at each one of your one-minute cycles. If you can only get one yard versus being able to get 14 yards per one-minute cycle, that's going to dramatically affect the amount of material you can move in any given amount of time and increase the cost of doing the project.

Q Did you encounter glacial till?

A Yes, we did.

Q How early in the project?

A When we bid the project we bid using the Viking to do 21,000 yards of dredging along the causeway docks on the outer end, and that was basically all we were going to use the Viking for. So we mobilized the Bechtolt, got it operating, put it to work.

I was in contact with Bob Richardson, and Bob said, gee, everything is really hard up here, and we're not getting very good production with the Bechtolt. I said, well, get the Viking on line, let's see how things go in the next few days. By day eight we had another crew sent up to operate a second shift on the Viking, and we ended up working the Viking 24 hours a day, seven days a week for just about the entire project.

She ended up digging almost half of the material. The material was hard enough and full of enough debris and cobbles that our production was terrible. Totally unexpected, but it was obvious enough within the first week that we knew we had to make some major changes to the way we had approached the project.

Q You could close that book, sir. If you could please go back, if you would, sir, to Exhibit 109, and if you could go to, it's the contracting officer's decision and Bates No. 1391, please, of Exhibit 109.

A Okay.

Q And the fourth paragraph down, it says, and this is a quote from your proposal, "the resources we tend to employ give us tremendous flexibility in

performing the work given the potential for variations in the material type, sea conditions and possible miscellaneous debris removal." What do you mean by inclusion of that statement in your proposal?

A It means you're hiring one hell of a company, somebody that's not going to come up there with some marginal equipment and marginal people. They're going to come up there and do the job for you. That's exactly what Manson did. I mean, this statement is right on.

I mean, Manson went up there with equipment that even though the conditions were dramatically different from what was illustrated in the contract documents, we were able to get that job done in one year and minimize the additional cost to the government because we had the equipment there that was capable of doing it.

We did exactly what we said here. Obviously this was an RFP process, and you're going to blow your own horn, you're going to try to make yourself look good, and that's what we were trying to do here in our proposal. But in fact we did do exactly what we told the government we were going to do.

We were going to bring the right equipment up there, and if we ran into any difficulties we're

still going to get their job done. That's exactly what we did.

Q Was the fact that this was a remote site play into your analyzing at all the equipment that you would take?

A To get any large equipment, such as a new pump shell or a major component of one of our pieces of equipment, it takes a month to get components of that type up there. You can't put something that weighs several tons into a plane and get it up to Nome without great expense. You have to ship it by sea.

There's just not that kind of time available for you to do the work in Nome, so you have to send the best equipment you can, the most well-prepared equipment, the people that know how to take care of it and get the job done.

Q Did you expect to be paid if the conditions were different than is represented in the contract documents?

A We've always had a wonderful relationship with the Corps, and we had no reason to believe with the differing site condition in the contract documents that if the conditions were different we'd have any difficulty working out an equitable resolve.

Q And were the conditions different than you

anticipated?

A Dramatically.

Q Now, if we could ask you to go to Exhibit 231, please. You can put that book away for the time being. Then you don't get them clogged up there.

THE COURT: 231?

MR. VIERGUTZ: Yes, Your Honor.

Once you get the book I'll give you the Bates number, sir. If we could, Bates No. 3679.

THE WITNESS: Grabbed 131. That's 241. 231.

BY MR. VIERGUTZ:

Q It's the first page of 231, Bates No. 3679. My question, sir, is if you would describe on the bid schedule what Manson's work was in relation to the bid items?

A Well, this was a joint venture bid proposal, so Item 1 was a total mobilization and demobilization that both Manson and Kiewit were going to share, so that is spread between the two companies. Items 2 and 3 were work that Manson was going to perform. And I believe Item 27 was a shared-bid item.

Manson was going to remove the sunken barge from the water and Kiewit was going to take it to its disposal site. Option Items 30 and 34 were awarded.

Q Okay. So No. 1 is mobilization and demobilization, correct?

A Yes.

Q So would that include Kiewit's as well as your own?

A Yes.

Q Okay. For $7,664,000. Bid Item 2 is dredge, excavate and dispose of material from entrance channel and sediment traps, complete. You bid that $7 a cubic yard, is that correct?

A That's correct.

Q And your bid was $4,013,800?

A That's correct.

Q And that's entirely your work, is that correct?

A Yes, it was.

Q And Bid Item 3, dredge, excavate and dispose of material from causeway dock area, complete. You also bid that at $7 a cubic yard, correct?

A That's correct.

Q And your bid was $181,300?

A That's correct.

Q And that's entirely your work, that's not Kiewit's, correct?

A That's correct.

Q And Bid Item 27, remove and dispose of metal debris and partially sunken barge, complete. That was a lump-sum item, correct, at $250,000?
A That's correct.
Q Was there an entire barge that you removed?
A Yes. There was a sunken barge there where we left the inner harbor and turned to go out to the outer channel and it was in the way, and so it had to be removed. So as soon as we opened up the inner channel we brought the Viking in and had it throw the material up on the beach, and I believe Kiewit took it over and put it in the old channel to be filled in with the excavation material.
Q And, again, that's entirely your work item, that's not Kiewit's in any respect?
A It was somewhat shared. They did do some of the disposal, yes.
Q Okay. And Item 30, Option 1, dredge, excavate, survey and dispose of material from barge loading area, complete. You bid that at $11 a cubic yard for $100,100, correct?
A That's correct.
Q Was any of that work Kiewit's?
A No.
Q And then Bid Item 34, the last one, was an

option item, Option 5, correct?
A That's correct.
Q And that was awarded?
A Yes, it was.
Q And that's dredge, excavate, survey and dispose of material from Area A6, A7, A8, complete, and you bid that at $13 a cubic yard for a total of $280,800, correct?
A That's correct.
Q Was any of that work Kiewit's?
A No.
Q Now, if I could ask you, in your bid items, other than the direct cost, do you blend in any other bid item prices?
MR. HIBEY: Objection. Vague.
THE COURT: I don't understand the question either. Did you understand it, Mr. McGarry?
THE WITNESS: No, I didn't.
THE COURT: No, you didn't?
THE WITNESS: I'm sorry.
THE COURT: Let me just suggest to you this, that if there is a question that you do not understand from either counsel, whether they're Mr. Viergutz or from, I think it's going to be Mr. Hibey on you this time asking the cross-examination questions, if you

don't understand a question or feel it's been misstated, you're perfectly entitled and ought to say so. Don't answer a question you don't understand. It will truly mess up the record and your testimony.

THE WITNESS: Thank you, Your Honor.

THE COURT: Go ahead.

THE WITNESS: Thank you, Your Honor.

BY MR. VIERGUTZ:

Q Let's take Bid Item 2. What is involved in that figure? What is that figure comprised of that you bid?

A It would involve the Bechtolt moving to the site for this particular work had to happen and putting in an operation and excavating that amount of material from these sites.

Q Do you have indirect costs in there, such as wear and tear and fuel, that type of thing?

A That is built in to our price, yes. Built in to our rates.

Q Is overhead and profit built in?

A No, that's separate.

Q If we could go to Exhibit 207, please. What is 207?

A 207 is basically the notes that were taken in a prejob construction meeting that we had up in

Nome prior to the start of the work.

Q April 20, 2005?

A Yes.

Q And did you attend that meeting?

A I did.

Q And you're listed on there?

A Yes.

Q And it says in the fourth paragraph the Bechtolt production rate is 6,000 cubic yards a day, is that accurate?

A That's what we assumed the production rate of the Bechtolt to our knowledge should be.

Q And if you could go to the third page of that exhibit, Bates No. 2962 of Exhibit 207, what is this page?

A That was a schedule that we did for the Corps to give our anticipated start times and completion times for the various phases of the work.

Q Do you know how many days you planned on working based on this schedule?

A I don't recall the exact number. Ninety days, somewhere in that area.

Q Okay. Now, the schedule we're going to spend a little time on. First, getting the equipment to the site, was the Bechtolt ready to work and

prepared to go to Nome at bid day?

A I guess I'll have to back up a little bit and say that historically Manson has built all their own equipment. Whenever we have an opportunity we tend to upgrade our equipment and make it bigger. Manson just finished building the largest hopper dredge in the United States, and we're building one of the largest crane barges right now and have a 1,000-ton capacity.

The company has always been very, very keen on building new equipment, and building the best equipment that we can and keeping all the people within the company involved in building that equipment. It establishes a great deal of pride and character within the company that we build our own equipment, and we take care of it, and our people know how to build it and repair it, and there's a great deal of pride in that.

When we looked at the Nome job, the Bechtolt was a perfect fit for that job. It was of the right size, it was portable, it would fit through the existing entrance channel even at June when it was filled in, and it was just the perfect tool for the job.

Just prior to that time there was quite a

bit of work going on in southern California that was some, remediation isn't the right word, I'm searching for the right word, but there was quite a bit of work going on in southern California that was using cutter-suction dredges to create marshes and do that sort of thing.

To work construction equipment in southern California -- excuse for the long story -- you have to use environmentally proper diesel engines to get them permitted. So we were talking about doing this other work after the Nome job in California, and we started talking about, well, we need spare pump parts, and we should replace the engine because we can't work it in California.

Anyway, to make a long story short, we decided to put a major investment into the Bechtolt prior to going to Nome. Now, it wasn't done just to do the job at Nome, it was for a long-range development. As long as we were going to have to put some money into it, why just maintain it at the same capacity it was?

We decided to upgrade the Bechtolt significantly. Basically, when we were done we were going to have the largest portable dredge probably in the United States, have the largest capacity. So that

was our goal. So prior to going to Nome I think we ended up putting well over $1 million into the Bechtolt to make it a real piece of equipment that we could really do some work with.

Q And who ran the Bechtolt?

A Do you mean physically was the leverman or the operator?

Q The captain.

A The captain was Donnie Johnson.

Q And as a result of this reconstruction, rehabilitation effort, was there a learning curve for Mr. Johnson on the operation of the Bechtolt?

A Well, as I say, Donnie's dad was a dredge captain and now Donnie's a dredge captain. Donnie's worked on dredges and he's worked on the Bechtolt for years. The two levermen that actually pulled the controls in the wheelhouse were two brothers, Bennie and, I can't think of the other, both their last names are Stevens.

They have both since retired. They have both operated cutter-suction dredges since they were kids. So there was no shortness of experience there. Matter of fact, I don't know how you get more experienced people. I don't think it's available in the marketplace. So obviously you go into a new area

there is a learning curve, but it certainly didn't take very long.

Q Was this rehabilitation, the increase in the Bechtolt capacity, was that factored into your bid?

A No, it was not.

Q Okay. So your bids based on actual production anticipated 6,000 cubic yards?

A Yes.

Q Now, the schedule that we're looking at that you have open yet, 2962 Bates number of Exhibit 207, is that the schedule which was presented to the owner?

A Yes, it was.

Q And that's the schedule on which you operated during the course of this project?

A Yes.

Q And is it important to Manson to have that equipment out of the Nome area by the end of the construction season in 2005?

A Very, very important. Yes.

Q Why?

A Manson is basically an equipment company. A lot of our costs and a lot of our work is very equipment-oriented. Some people are surprised at the size of our company that we only have 600 employees, but it's because of the nature of marine construction

work. It requires very large, heavy, expensive equipment and a minimum of people to operate it. And so does that answer your question?

Q Yes. Now, did you have to do anything to the Viking to make it appropriate for use in Nome? We talked about the Bechtolt and you did a rehabilitation. Was there any work performed on the Viking?

A The only modification or change we made in the Viking was that fuel in Nome is only delivered during the three ice free months, and so fuel in Nome is very expensive.

So what we did, the Viking has one fuel tank and there is another tank that when it was built could be used as a fuel tank, and so what we chose to do was to utilize that additional fuel tank that had been built into the barge so that we had enough fuel to go up to Nome, do the project and return back to Seattle without having to purchase the expensive fuel that was in Nome.

Q And did you base your bid based upon that expectation?

A That's correct.

Q Now, you said you did not encounter the materials you expected to encounter at Nome. What

materials did you encounter that you did not expect to?

A We encountered with the Bechtolt very hard digging, an abundance or huge volumes of rock anywhere from 16 inch all the way down to two, three inches, but great, great volumes in eight to 10-inch range.

I know there's a lot of documentation and pictures in some of the exhibits that will demonstrate that, but just tremendous volumes of large rocks, and, you know, the results of the impacts of those rocks within the machinery is pretty dramatic and really plays a toll on the machinery.

Q Now, if you could go to Exhibit 108, please. Exhibit 108, and I'd like you to go to Bates No. 1369, please.

A Okay.

Q What is Exhibit 1369, please?

A This was a letter written by the joint venture project manager to the Corps to Mr. Flodin notifying him that there's notification that the location of the metal debris as found in the field is significantly different than those shown on the attached sheet, and basically telling him that the debris field that they've identified on the drawings was mistakenly placed.

Q Now, if we could go to Exhibit 10, which is the plans, is the metal debris depicted in those plans the location of them?

A It is.

Q Give the Court the Bates number, would you, please, of that page?

THE COURT: Well, which exhibit are we looking at? Exhibit 10?

MR. VIERGUTZ: Exhibit 10, Your Honor.

THE COURT: No, I understand, but what --

THE WITNESS: 7-8.

MR. VIERGUTZ: 7-8. That's the first page, Your Honor.

BY MR. VIERGUTZ:

Q Where on Exhibit 78 would the Court find the location of the metal debris as depicted on the plans?

A In the large square on the bottom two-thirds of the page, up towards the top in the middle is a small box and there's an arrow going into that box and it says metal debris to be removed. It depicts a square of an area that has metal debris in it.

Q And is that where the metal debris was found?

A No, it was not, and that was the purpose of this letter, to notify the Corps that that's not where

the metal debris was.

Q Where was it found?

A The metal debris was found just northwest of that location. If you're looking at Drawing LV1 or Joint Exhibit 10, 78, right where it says -10.5 feet below water, or MLLW, that's the approximate location of the debris field of metal.

THE COURT: I'm sorry. I've got an MLLW. What, 10 feet is sort of towards the top of this plate?

THE WITNESS: Yes.

THE COURT: All right.

THE WITNESS: Where it says -10.5 is about where that square was. It was probably a little larger than the square they've depicted, but it was in that area rather than being where it's depicted on the drawing.

BY MR. VIERGUTZ:

Q What does it matter where it is?

A Surprisingly enough, it had a huge impact to us because the reason, when it was off to the side it's impossible for the Bechtolt to deal with a large metal debris field like that. That cutter wheel will just not go through and excavate that type of material. It just won't do it.

So with the location of it being where I've identified allowed us to go around on the upper side of the drawing or the up top towards the top of the page and go around it and go all the way around and open up the harbor was our plan. Then we were going to bring the Viking in, and the Viking with her clamshell bucket could remove that debris field.

Then the Bechtolt could fall back behind where the debris field was and go through after the debris field had been removed by the Viking. The difficulty we had with the debris field being right in the middle of the channel, we couldn't get around it to open up the harbor to get the Viking in to remove the debris field.

So we basically had to just use the Bechtolt as a battering ram and force our way through there and get very, very poor production, and do a lot of damage to the equipment to get around it so that we could get the harbor opened up so we could bring the Viking in to remove those obstacles.

Q So that had a financial impact, did it?

A A very, very big impact, yes.

Q And if you could turn to the same exhibit we're talking about is 108 at this point, the one you were just on in the book. It's the 108 in the book.

Turn to the next page, which is page 1371. 1371 is what, sir?

A The Corps is responding to our letter of April 28 and responding on May 6 saying that upon close examination of the photographs included it appears that the true location of the debris field found in the field is more likely as shown on your sketch.

The government has no reason to believe that there is another one located as shown on H-2, which is one of the drawings. However, there is a high likelihood that debris other than in the photo will be encountered throughout the excavation and dredging operation as described in Section 02222, paragraph 1.3, character of the material.

Q So is the government saying, Manson, you're correct, the debris field is not located according to the plans?

A That's what they're saying.

Q Now, if you could turn to 1372, please. And this is dated July 9, 2005. It's a letter from the joint venture, Kiewit/Manson, to the Corps, and the subject says excessive metal debris encountered during dredging. Are you putting the Corps on notice here of additional problems relating to the excessive debris

encountered.

A Yes, we were.

MR. HIBEY: Objection. Leading question.

THE COURT: Sustained.

MR. VIERGUTZ: Very well.

BY MR. VIERGUTZ:

Q Would you please describe to me the content of Exhibit 1372?

A What we were doing was putting the Corps on notice that what we were experiencing was nothing that was described within the contract documents and that we were experiencing significant metal debris and difficulties associated with it.

Q And in the third sentence of that correspondence it says on past similar projects where incidental metal debris was inherent to dredging operations, the suction pump and/or cutterhead would be cleared of obstructions at an average of 15 times per day.

The cleanout rate for this project is significantly higher than normally encountered and is severely impacting suction dredge operations. Up to 75 cleanouts in a day have been experienced with an average rate of 37 cleanouts per day. Is that an accurate statement?

A Yes, it is.

Q Did the Corps respond to this letter prior to your concluding your dredging operations?

A They did not.

MR. VIERGUTZ: And if you'd go to 1373, please. The same exhibit, Your Honor, Exhibit 108.

BY MR. VIERGUTZ:

Q This is a letter dated July 23, 2005, to the Corps from the joint venture, and the subject is excessive obstructions encountered. What's the purpose of this letter, sir?

A This was to notify the Corps that the samples, the borings that they used to depict the conditions in the Nome harbor were not correct, that there was significant rock, cobbles and debris, and that not only was there small rock but there were large rock up to about 16 inches that we were encountering.

Q Okay. So this letter you're putting the Corps on notice of encountering cobbles, correct?

A That's correct.

Q And did the Corps respond to this letter prior to the conclusion of dredging?

A They did not.

Q And attached to this letter is a picture of

those cobbles that you're encountering, Bates No. 1374 of Exhibit 208, is that correct?

A That's correct.

Q Excuse me, 108. And is that representative of the cobbles you encountered?

A It's very representative of what we encountered and not very representative of the borings that were done.

Q And then the next page is Bates No. 1375, and that's dated August 3, 2005, and the subject is excessive obstructions encountered, followup. The first sentence, the second line says KM continues daily to encounter metal debris, rocks and cobbles not representative of the subsurface data provided in the contract documents.

KM's cutter-suction dredge is still experiencing excessive cutterhead and pump cleans and washbacks. Production rates for dredging continue to be impacted as a result of this differing site condition encountered. Is that an accurate statement?

A Yes, it is.

Q And what is a washback?

A Quite often when a rock is sucked up into the intake pipe of the cutter-suction dredge it becomes lodged and it won't move, and it blocks the

availability of any material to go and go any further.
So what the operator will do is disengage the engine, allow the pump to start turning, and due to the fact that the discharge line is higher than the cutterhead, the water will siphon backwards and hopefully dislodge that. By reversing the flow in the pipe it will dislodge that obstruction.
A fairly standard procedure to try to clear the pipe or the pump.
Q You said hopefully dislodge it. What happens if it doesn't dislodge it?
A The next choice is to start disassembling components and try to find out where that rock or obstacle, whether it be a piece of metal debris, or a large cobble, or a piece of wood, or whatever it is, start disassembling components to find out where it's lodged in so that we can remove it.
THE COURT: I may have missed this but define cobble for me.
THE WITNESS: Cobbles are typically round rocks would typically be a cobble.
THE COURT: Any size?
THE WITNESS: Yes.
BY MR. VIERGUTZ:
Q And, sir, was there any response by the

Corps to this letter prior to your concluding dredging?

A There was not.

Q I'm sorry. I should ask for a definition also of pump clean. What does that mean?

A The pump is a very large unit. It weighs probably 25 tons, it's about six feet tall, it's cylindrical, and the shaft goes into one end of it and there's a door on the other end with the suction on it.

There's a ring of bolts all the way around, they're about two inch bolts, and to get into the pump to remove large stone that's wedged its way into the suction, what we call the mouth of the pump, you have to remove the piece of pipe in front of the pump, undo all the bolts, hook onto the door with a little internal crane in the dredge, swing the door out of the way and get inside the pump physically with a person getting inside it, and in there with crowbars and whatever you can to get that stone, or piece of metal debris, or whatever it is unwedged from inside the pump.

Q And does that impact time?

A There's no dredging that goes on while all this occurs. Your production is stopped.

Q Now, does this result in damage to the equipment?

A Well, yes. Those pumps are designed to pump primarily what was depicted in the borings: sand, silty sand, gravel. That's what it's designed to pump. It's not designed to pump rocks.

Q And so what you encountered had an impact on your equipment?

A Yes.

Q And a financial impact?

A Yes.

Q And did you have in that remote location spare parts?

A We brought up spare parts. We certainly weren't anticipating the type of conditions that we encountered, needless to say, but we did bring up sufficient spare parts that we were able to get the project done, in addition to flying spare parts up on a regular basis to keep our spare parts inventory available to us on the project.

Q The Court asked an interesting question about cobbles. Do you know the difference between a boulder and a cobble in this case or do you need to defer to Mr. --

A Yeah. I'm not a geologist so I'm sure

there's a technical description of a cobble, and I may have been a little bit in error to try to describe it because I'm not sure what the technical determination of what's a cobble, and what's a rock, and what's gravel.

Q Not within your realm?

A That's not my forte.

Q Now, did you have sufficient spare parts?

A Yes, we did.

Q And it allowed you to stay working?

A Yes.

Q But there was a financial impact associated with that?

A That's correct.

MR. VIERGUTZ: Okay. Within the claim, Your Honor, are pictures that we'd like to put up on the screen of the materials that were encountered and they're beginning on, it's Exhibit 108, page 1350.

(The document referred to was marked for identification as Defendant's Exhibit No. 2003.)

BY MR. VIERGUTZ:

Q If you could, sir, describe what you're seeing on the screen? It's a little easier perhaps

than the black and white in the claim itself. Keep moving while he's doing that. If you'd look at DX. That's a different series of books. Leave that book open, if you would, because we're going to refer to it as time permits here, but DX series, those are Defendant's exhibits, 2003, 2-0-0-3. I'd refer you, please, to Bates No. 40044.

THE COURT: I'm sorry it was 2000?

MR. VIERGUTZ: Three, Your Honor, 2003, Bates No. 4004. What is this?

THE WITNESS: Help me, counsel.

MR. VIERGUTZ: You bet.

THE WITNESS: You said the Bates number was what?

MR. VIERGUTZ: 4-0-0-4-4.

THE WITNESS: Okay, I'm there.

BY MR. VIERGUTZ:

Q What is this compilation of documents that's Exhibit DX2003?

A It's one of our daily dredge logs that we do on a daily basis that gives a description primarily to the office and for recordkeeping of what we did on a particular day. In particular, over in the top right-hand corner, not the very top but just under the double line, particularly important to us is the area

that we're working in.

When this is sent to the office it's something I'll look at, and I can look at one of the project drawings, and I can tell exactly where the dredge is working, and I can look at what operation they were doing on the description of delays, et cetera, on the bottom, and I can get a pretty good picture of what's going on in that project on a daily basis.

Q And did you during the course of this project receive dredge logs to keep you informed?

A Almost daily, yes.

Q Now, if you'd walk us through this dredge log to take us through a typical day, what are we experiencing? This is the Bechtolt, correct?

A Yes, this is one for the Bechtolt. It was done on July 16, it was the 46th day of the project and we had at this point 31 operating days.

Gives the length of the line that is out, the discharge line for the dredge, gives us an idea of how much pressure has to build up in the pump to get the material out the end, it shows the RPM that they're running the pump and how high the material is being discharged, at what elevation, and different pressures that the pump is seeing which help determine

the amount of wear that's taking place within the pump and the pipeline.

Over on the right of that top section it shows the number of operating hours for that day that they were actually pumping material and the estimated quantity that they excavated on that day. Then it gives the total yards that they've done for the month and the total yards they've done on the project.

Q Okay. And on the bottom left, that column, it says distribution of time, it says washbacks. You had 40 on that day?

A That's correct.

Q And pump cleans, 135?

A That's correct.

Q Is that normal?

A No.

Q Is that excessive?

A Very excessive.

Q Okay. And you had, I can't read that, cleaned suction, does that say 90?

A The suction, it's where the opening, the mouth of the pipe is right behind within the cutter, and typically we have a cutter in that area and it's just basically a piece of flat bar that won't allow large obstacles to go in. Sometimes we call it a

blade. So right down the middle of the opening of that pipe is this piece of flat bar and it keeps large pieces from going into the suction pipe.

Sometimes the material will lodge in there and when they do suction clean, that's what they do. They have to, they'll first try a backwash and if it doesn't dislodge it they have to lift the ladder up out above the surface of the water, either bring a skiff or a float over there, and a man has to get in there with a large bar or something and pry the rock, or piece of wood, debris, or whatever is lodged in there, dislodge it somehow. I mean, sometimes we even have to use a chainsaw or something to cut it out of there.

Q And how about the next page, 40045? What does that depict?

A This just is a followup to the previous page and further describes all the shutdowns, how long they took and exactly what they were removing. It also lists when they shut down and if they were doing any kind of a minor repair, or an oil change, or something. It would be listed here as a further breakdown on the preceding page.

Q And you do this on a daily basis?

A We don't normally do this second page as am

matter of normal, but on this job with all the different shutdowns we had we wanted to keep a record of what they were.

Q Could go to 40119, please.

A Okay.

Q And this is August 19, 2005, is that correct?

A That's correct.

Q And here we show 125 washbacks, 175 pump clean. Is that excessive?

A Needless to say, yeah, it's quite shocking to see those numbers. Normally those would be single digit numbers.

Q And let's go to the Viking. These have all been the Bechtolt, correct?

A Yes.

Q Let's go to 40190, same exhibit, Exhibit 2003. What does this document tell us, 40190?

A This is a similar report but rather than from a suction dredge it's from the clamshell dredge, the Viking. It lists the stations or where we started the day, and where we ended in that day, and what cut we were in, how far we've gone, the width of the cut, the average depth of the cut and the depth that we were digging to.

And then it lists the total minutes that we were actually dredging, doing different things during that day, it lists the time that we spent doing those things.

Q And the comments say extreme hard digging, correct?

A Yes.

Q Okay. Now, if we could go back to the claim, which is -- those dredge logs, they're maintained in the ordinary course of Manson's business?

A Yes.

Q And you reviewed those dredge logs?

A Yes.

Q And they're authored by employees of Manson, correct?

A Yes.

Q And they're authored at your direction?

A Yes.

MR. VIERGUTZ: I'd move for the admission of Exhibit 2003, Your Honor.

THE COURT: Any objection?

MR. HIBEY: No, Your Honor.

THE COURT: Admitted.

(The document referred to, previously identified as Defendant's Exhibit No. 2003, was received in evidence.)

BY MR. VIERGUTZ:

Q Then if we could go back to the claim, JX108, and we're at Bates No. 1350, and this is the middle photograph. What are we seeing here, sir?

MR. HIBEY: Excuse me a minute. Your Honor?

THE COURT: Yes?

MR. HIBEY: Just a point of clarification. Does that say 1360? I just want to make sure I'm on the right --

MR. VIERGUTZ: 1360. Thank you.

THE COURT: Is that what it is in your book, Mr. Viergutz, or was that just misreading, or do we have a misnumbering problem?

MR. VIERGUTZ: Let's hope not, Your Honor.

THE COURT: You want to pull it for us?

MR. VIERGUTZ: It is 1360, Your Honor. Thank you, Mr. Hibey. It's the middle photograph on 1360.

THE COURT: Double-check it, please.

MR. VIERGUTZ: Thank you. And what does that depict, sir?

THE COURT: Hold on a second. We're double-checking.

MR. VIERGUTZ: Sorry.

THE COURT: Okay. Go ahead.

THE WITNESS: The picture depicts, I believe this is in the disposal or the upshore disposal area just on the other side of the new breakwater that Kiewit had built. This is some of the material that had gone through the Bechtolt and was discharged up. This is probably a low tide so you were able to actually see a compilation of what we had been dredging.

As you can see, they're are a very large quantity of very flat stones. Boy, those are really, really hard to pump through a pipeline. They don't like to move down a pipeline. They like to just stack up like saucers and block the pipeline. You can't just continually keep digging.

You have to stop periodically, run the pump very hard, flush water through it to try to get those flat rocks to work their way through the pipe so they can get out the other end so you can put some more material into the pipe. It's a very, very difficult operation and takes a great deal of time.

It takes a lot of patience for the operators

because they're anxious to produce material. That's what they're being paid to do. They have a great deal of pride in moving a lot of material in a day, and they're very competitive. It's very frustrating for them to have to stop and just run water through the pump to try to clear all those rocks out of the pipeline.

It's very, very abrasive because as these discs go through the pipeline they're diving and crashing into the pipe as they go through the pipe. They don't just roll along or stay in solution and go through the pipe. They bang and crash all the way through and cause extreme wear.

You can see by the size of the hardhat the size of some of those, realizing that those are going through a pump that's turning it with blades in it that turn at 400 RPM. Those rocks are crashing into steel blades and within a pump that are turning at 400 RPM.

I guess I would ask anyone to look at the core samples or the borings that were done on this project and look at those rocks and none of those were ever depicted in anything that we looked at when we bid the job.

BY MR. VIERGUTZ:

Q You said these flat rocks, such as the one directly above the hardhat there, are more difficult on your machinery than say that big, black rock on the height of that berm?

A That's correct.

MR. VIERGUTZ: Okay. If we could have the next picture.

BY MR. VIERGUTZ:

Q This is Bates 1360, the bottom of the page, and what does this depict, sir?

A Well, this, again, was at one of the low tides where you could see the material that had been discharged out of the Bechtolt. As you can see here, you know, the borings said silty gray sand, that sort of thing. That's rocks, and that's what we were encountering.

That's what we had to dredge, right there. What's coming out the end of the pipe is what you see there on the beach. Just very, very difficult dredging. It's just not certainly anything that we anticipated.

Q Was this incidental?

A I think it's self-explanatory.

MR. VIERGUTZ: If we could go to the next picture, please.

BY MR. VIERGUTZ:

Q This is Bates No. 1350, the center of the page. What does that depict, sir?

A This is just another picture. Again, they tend to throw the hardhats down. That's always been something that dredgermen do so that you have something to relate to as to what the size of the rocks are. I don't know what the diameter of a brimmed hardhat like that is. Probably about 12 inches.

So you can see some over 12 inch rocks that have gone through a 16 inch pump.

Q And this material to the left, that sand left of the hardhat, is that what you expected to encounter?

A Yes, yes. WE would have expected the bulk of the material to be sand, as shown there on the left.

MR. VIERGUTZ: Next picture, please.

BY MR. VIERGUTZ:

Q Now, this is Bates No. 1351, the bottom of the page. Another example in a different location of the same type of material, is that correct?

A That's correct.

MR. VIERGUTZ: Next picture, please.

BY MR. VIERGUTZ:

Q What is this depicting, sir?

A These two gentlemen are two of the engineers on the dredge. This picture was taken from inside the Bechtolt. They are standing in front of the dredge pump. The arm that you see, the right arm that you see most prominent in the picture is right next to the dredge pump.

The dredge pump is just in the bottom right-hand corner. You can see some of the slotted bolts that hold the front door on the pump. That's the suction side of the pump. On the suction side of the pump is what they call a rock box. A rock box has an obstruction in that lid. As you can see behind their hands, it's somewhat of a cone-shaped piece.

What that device is designed to do, it's called a rock box, it's designed to collect rocks before they go into the pump. What the guys do is take an impact wrench, loosen the bolts, they have a little crane that hooks onto that lid, lifts the lid up and they remove the obstruction or the rock that's trapped in that box before it gets into the pump. Hopefully before it goes through the pump.

Q And you said this picture, it's Bates No. 1360, the top of the page, right?

A Yes.
Q And is this, it's referred to as a pump cleanout?
A This would be a pump cleanout, yes. Yes.
Q So they have to take this and they have to disassemble the machine?
A This is a rock box cleanout or a box cleanout. The pump cleanout is when you actually have to take that lid off and take the fixture that's below it away from the pump and out of the dredge, and then take that door off that's the front cover of the pump and actually go inside. That's a pump cleanout. This is just a cleanout of the rock box.
MR. VIERGUTZ: Thank you. Next picture.
BY MR. VIERGUTZ:
Q And what does the center picture of Bates No. 1351 depict?
A That's another picture of the female end of the rock box. The lid you can see at the very top of the picture hanging with the cone-shaped pieces that hopefully will trap the rocks before they go into the pump.
Q And do these people then, do the male or female clean up rocks out of that?
A Then they pick the rocks out of that area

that traps them and lift them out.

Q And what do they do with them?

A They usually just set them outside the dredge. It's a good picture because you can see all the work that was done on the Bechtolt. That is a very saltwater intruded area when the pump is running because there's a stuffing box and some things.

There's some saltwater pumps right there by the guy's feet but you can see the piping behind him, the orange piping, is all hydraulic piping. That's all clean. That was all brandnew and put in when we did the reconstruction and the upgrading of the Bechtolt.

MR. VIERGUTZ: Next picture, please.

BY MR. VIERGUTZ:

Q Now, this is Bates No. 1359, the center page.

A And this is just a picture taken from the same position. It's a little dark and hard to see, but the gentleman is actually holding a rock that the rock box stopped. You can see it's how far apart he's got his hands. It was a big rock that worked its way up the suction pipe and was trapped by the rock box before it got into the pump.

Q And none of those are depicted in the specs,

is that correct?

A No, they're not.

MR. VIERGUTZ: Next picture, please.

BY MR. VIERGUTZ:

Q And what is this?

A This is a collection of the rocks that they've taken out of the rock box and set through the side door out on the deck of the Bechtolt. I don't know how long a period of time those had accumulated, but that's some of the rocks that the rock box trapped that the pump had sucked up.

Q And this is the bottom page of Bates No. 1358. I see some tires there. Does that have an impact on the cutter-suction dredge?

A Typically the tires will go through. I'm surprised that the rock box trapped them. But, yes, the rock box obviously trapped a section of tire and we were able to get it out before it jammed into the pipe.

Q Next picture.

A Just another picture. That's the on the edge of the Bechtolt just where we've accumulated some of the rocks. Typically we won't throw them back in the water behind us because in doing our hydrographing surveying later on we may find that we left a little

hump or a little bump that we have to go back and clean out, and so we wouldn't want to pick those rocks up again.

So typically we'll put them on ar dredge tender, the Lisa M., put it on her deck, she'll go over to the beach and offload them by hand.

Q And you bid this project expecting to find none of that?

A Exactly. You're correct.

Q Next picture.

A Just another picture. That's where they set the rocks out from the inside of the dredge and set them out on the deck.

Q Next picture, please.

A This is a picture up on the derrick barge, and this is actually aboard the dump barge so we could get a sample of the material that we were digging with the Viking. You know, you can't really see the material because the clamshell bucket lowers under water, it grabs a scoop of material, brings it over and dumps it in the dump scowl.

Typically there's water in the dump scowl so you can't really see the material that you're excavating. We knew it was very, very hard because the production was so low. So what we did was take

one of the bucket loads and dump it on the deck of the dump scowl just to see the material that we were excavating.

As you can see there, it's a very large boulder in just one of the bucket fulls that we dumped on the deck. And you can see some metal debris off to the gentleman's right leg there, see a piece of metal debris standing up. Just a whole compilation of large rocks, and cobbles, and it looks like a very compacted material.

MR. VIERGUTZ: This is Bates No. 1355, the top of the page. Next picture, please.

BY MR. VIERGUTZ:

Q What is this, sir? This is Bates No. 1356, the top of the page.

A This is a picture of the cutter on the Bechtolt that actually interfaces with the bottom and does the excavating. Here the crew have brought in a float. We've raised the cutter off the bottom and looked at it above the water, and the crew has brought a float underneath it so that they can unwrap all the debris and garbage off of the cutter so it can work efficiently.

Q And you didn't expect to encounter that?

A No. Only incidental debris is what we

anticipated. But this was occurring many times a day.

MR. VIERGUTZ: Next picture.

BY MR. VIERGUTZ:

Q And what is this, sir, the Bates 1357, the bottom?

A Just more of the same materials removed from the two vessels that were encountered during the dredging, miscellaneous garbage, there's tires, looks like wood and just all types of debris.

MR. VIERGUTZ: The next picture, please.

BY MR. VIERGUTZ:

Q 1353, the center of the page.

A Again, too, just more of the same. More tires, more garbage, more large boulders.

Q Same? Just debris?

A Just more of the stuff that have stacked up on deck that will have to be discharged to the beach.

Q 1356, the bottom of the page. 1358, the top of the page?

A That's just some metal debris that had picked up and gone into the pump.

Q Thank you. Just briefly I want to talk about the trip back to Nome being a little out of sequence. What was the issue with regard to the trip back to Nome?

THE COURT: Back from where to what?

MR. VIERGUTZ: From Nome back to Seattle.

THE WITNESS: Seattle.

THE COURT: Mr. Hibey?

MR. HIBEY: I object to the lack of foundation. It's vague.

THE COURT: I'll let it slide. It's vague. I don't know what you're talking about at this point when you're: Back to Nome from where, with what equipment, under what conditions? What are you talking about.

MR. VIERGUTZ: Thank you. Did you demobilize your equipment from Nome?

THE WITNESS: Yes, we did.

BY MR. VIERGUTZ:

Q And how did you do that?

A What we had anticipated when we left Seattle was to put enough fuel aboard the Viking to make the trip up, to complete the project and to make our trip home. The fact is that we had to operate the Bechtolt in very difficult dredging, lots of line cleans, and we used more fuel with the Bechtolt than we anticipated.

In addition to that, the Viking that we anticipated working a single 12-hour shift and

dredging somewhere in the neighborhood of 20,000 cubic yards, we ended up digging 160,000 cubic yards and working it 24 hours a day, seven days a week through the duration of the project, which used a tremendous amount more fuel.

What all this meant was that we weren't able to, we did not have enough fuel when we completed the project to get home, so we had to buy fuel in Nome at premium price to enable our tugboat to tow our equipment home and have enough fuel reserve that in case of any encountered problems we could have enough fuel to get home.

THE COURT: Can you turn that screen off, please? Thank you.

MR. VIERGUTZ: Your Honor, I'm estimating about an hour. I have two topics left, the claim and then some issues on the nondisclosure and misrepresentation issue. If you want me to continue, I certainly will. It's Your Honor's discretion.

THE COURT: Well, I suppose we could stop. I'm just mindful of the following, and I did a quick calculation. We've done five days, of course breaking at your suggestion for one afternoon, and we've done about 20 of what was projected to be only 27 hours of testimony.

Even if we were to project a 40-hour week, and we're trying to do a little bit more than that, we're behind. So I'm happy to adjourn now, but understand that we are definitely behind schedule, partly because of the afternoon break last Thursday for a good reason, but nonetheless, a gamble based on your representations of strong possibilities of settlement.

As you know, at the time I was hesitant but you all seemed so eager to get to work on possibly achieving a settlement. As long as we understand that the consequences at the end of the day are adjournment and reconfiguration at some point if we don't finish.

Now, some of the witnesses that are projected for particular periods of time may take less time. We'll see. Our track record is not good, but I want to make you all mindful of that. With that in mind, I think probably it is late enough in the day for us to adjourn so you all can do whatever you have to do for tomorrow and keep the attorneys and the witnesses fresh at this point.

If we do adjourn, obviously, Mr. Hibey, you need to be ready to go on cross-examination immediately without any substantial adjournment. Five or 10 minutes to clean up your books, that's fine. So

we will do that. Now, let's go off the record at this point, if we could.

(Witness excused.)

(Whereupon, at 5:55 p.m., the hearing in the above-entitled matter was adjourned, to reconvene on Tuesday, June 3, 2008.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 06-796C

CASE TITLE: Kiewit/Manson JV v. United States

HEARING DATE: June 2, 2008

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: June 2, 2008

_______________________________

Barbara Berney
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018